**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF CALIFORNIA; COMMONWEALTH OF MASSACHUSETTS; STATE OF NEVADA; STATE OF WASHINGTON; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WISCONSIN; JOSH SHAPIRO, in his official capacity as Governor of the Commonwealth of Pennsylvania, | Case No. 1:26-cv-11581-IT |

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States; UNITED STATES DEPARTMENT OF JUSTICE; TODD BLANCHE, in his official capacity as Acting U.S. Attorney General; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, in his official capacity as Secretary for the Department of Homeland Security; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; JOSEPH B. EDLOW, in his official capacity as Director of U.S. Citizenship and Immigration Services; UNITED STATES SOCIAL SECURITY ADMINISTRATION; FRANK BISIGNANO, in his official capacity as Commissioner of the U.S. Social Security Administration; UNITED STATES POSTAL SERVICE; DAVID STEINER, in his official capacity as Postmaster General and Chief Executive Officer of the Postal Service; DOUG TOLINO, in his official capacity as Deputy Postmaster General, Chief Operating Officer and Chief Human Resources Officer of the Postal Service and Member of the Postal Service Board of Governors; AMBER MCREYNOLDS, in her official capacity as Chair of the Postal Service Board of Governors; DEREK T. KAN, in his official capacity as Vice Chairman of the Postal Service Board of Governors; RONALD STROMAN, in his official capacity as a Member of the Postal Service Board of Governors; DANIEL TANGHERLINI, in his official capacity as a Member of the Postal Service Board of Governors; UNITED STATES DEPARTMENT OF COMMERCE; HOWARD LUTNICK, in his official capacity as Secretary of Commerce,

*Defendants*.

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1. The President's latest attempt to interfere with the States' administration of their elections is as unprecedented as it is unconstitutional. Under our Constitution, the President has no authority to restrict voter eligibility or mail voting to lists of voters pre-authorized by the federal government. Plaintiff States bring this action to safeguard their constitutional authority to administer state and federal elections.

2. The Constitution assigns primary responsibility for federal elections to the States, subject only to preemption by Congress. U.S. Const. art. I, § 4, cl. 1; U.S. Const. art. II, § 1, cl. 2, 4; *see* The Federalist No. 59 (Alexander Hamilton). This separation of powers serves as a "'structural protection[] against abuse of power,'" which in turn "'preserv[es] liberty.'" *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 223 (2020) (quoting *Bowsher v. Synar*, 478 U.S. 714, 730 (1986)). That division has two dimensions—one to "prevent the accumulation of excessive power in any one [federal] branch," and another to ensure "a healthy balance of power between the States and the Federal Government." *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991). This separation of powers gives rise to another principle that sits at the heart of our Nation's structure of governance: "The President's authority to act . . . 'must stem either from an act of Congress or from the Constitution itself.'" *Medellín v. Texas*, 552 U.S. 491, 524 (2008) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952) ("*Youngstown*")).

3. Neither the Constitution nor any act of Congress confers upon the President the authority to mandate sweeping changes to States' electoral systems or procedures.

4. Defendant President Donald J. Trump has once again flouted these basic constitutional principles. On March 31, 2026, the President issued Executive Order No. 14399, entitled *Ensuring Citizenship Verification and Integrity in Federal Elections* ("EO"). The EO erects shadow voter eligibility lists within the federal government and uses threats of investigation and prosecution to coerce States into disenfranchising voters missing from those lists. It also directly interferes with mail voting by mandating that the United States Postal Service ("USPS") refuse to deliver voted ballots unless the voters are on USPS's precleared list,

2

which is maintained outside the control of the States who administer federal elections.  Finally, the EO purports to lengthen the existing period for elections officials to preserve elections records to facilitate threatened prosecutions, contradicting existing requirements in state and federal law.  Plaintiff States challenge and seek relief from each of these provisions.

5.      First, Plaintiff States seek relief from the EO's unlawful attempt to create federal voter eligibility lists inconsistent with States' own voter rolls, voter registration obligations, and constitutional authority to prescribe voter qualifications.  The EO mandates "State Citizenship Lists," compiled by the Department of Homeland Security ("DHS") from federal records and meant to indicate citizenship and residency, even though the latter is a question of state law.  EO § 2(a).  It also requires "Mail-In and Absentee Participation Lists" controlled by USPS, meant to indicate entitlement to vote by mail.  *Id.* § 3(b)(iv).  Both lists are to be sent to States before federal elections, and it falls to States to "routinely supplement and provide suggested modifications or amendments" to those lists.  *Id.* §§ 2(a), 3(b)(v).  Nothing requires the federal government to accept those modifications.  Yet the EO threatens elections officials and "any others involved in the administration of Federal elections" with criminal prosecution if they issue ballots to purportedly ineligible voters, laying bare a scheme to intimidate and coerce state officials into removing voters who do not appear on the federal government's lists, regardless of the accuracy or reliability of those lists.  *Id.* §§ 2(b), 3(a), & 5.  Further, the EO attempts to alter state voter qualifications through threats of criminal prosecution, excluding all persons under 18 years of age from the definition of "eligible to vote in a Federal election" without regard to state laws to the contrary.  *Id.* § 2(b).

6.      Second, Plaintiff States seek relief from the EO's attempt to rewrite States' mail voting laws, a voting method that every State allows in some form.  Most concerningly, in a shocking and unprecedented power grab, the EO mandates that USPS maintain a Mail-In and Absentee Participation List and refuse to transmit mail ballots from any individual whose name does not appear on that list.  *Id.* §§ 3(b)(iii), (iv).

3

7.      Third and finally, Plaintiff States seek relief from the EO's expansion of record-keeping expectations, which provides that States "should" preserve key elections records for five years as "evidenc[e]" of voter participation, paired with explicit threats of criminal prosecution. *Id.* § 5.

8.      If not enjoined, the provisions of the EO challenged in this lawsuit will inflict significant, imminent, and irreparable injuries on the Plaintiff States.  The EO violates bedrock principles of federalism and separation of powers.  Each Plaintiff State has duly enacted laws governing voter rolls, voter qualifications, and mail voting that are, where applicable, consistent with statutory requirements set forth by Congress.  The EO disregards States' inherent sovereignty and attempts to arrogate to the President the States' and Congress's constitutional power to regulate federal elections.

9.      Moreover, election administration is highly complex, requiring substantial planning and preparation far in advance.  *See Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020) (per curiam) (explaining the harms of changing the rules on the eve of an election).  If not enjoined, the EO will require Plaintiff States to upend ongoing election administration activities for upcoming elections, demanding that Plaintiff States revise election laws and policies, implement trainings, and conduct statewide voter education.  These changes will force Plaintiff States to invest enormous amounts of time and resources, diverting those resources from other critical election priorities.  And the EO comes after some States have already held their primaries, within weeks of other States' primaries, and mere months before mail voting procedures for the 2026 General Election begin.  Even with Plaintiff States' best efforts, the EO has sown and will sow confusion and chaos in their election systems, together with the threat of disenfranchisement of States' voters.

10.     For all these reasons, the EO is unconstitutional and ultra vires.  The Court should declare the specified provisions of the EO unlawful and void and order corresponding preliminary and permanent relief enjoining the implementation or enforcement of those specific provisions by any Defendant except the President.

**JURISDICTION & VENUE**

11.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a).

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities.

13.     The Commonwealth of Massachusetts is a resident of this District, and a substantial part of the events or omissions giving rise to this Complaint occurred and continue to occur within the District of Massachusetts.

**PARTIES**

**I.      Plaintiffs**

14.     The State of California is a sovereign state of the United States.  California is represented by Attorney General Rob Bonta, who is the State's Chief Law Officer.

15.     The Commonwealth of Massachusetts is a sovereign State of the United States. Massachusetts is represented by Attorney General Andrea Joy Campbell, the Commonwealth's chief law enforcement officer.

16.     The State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign State within the United States of America.  The Attorney General is the chief law enforcement officer of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. § 228.110 and Nev. Rev. Stat. § 228.170.

17.     The State of Washington is a sovereign State of the United States of America. Washington is represented by Attorney General Nicholas W. Brown, the State's Chief Legal Officer.

18.     The State of Arizona is a sovereign State of the United States.  Arizona is represented by Attorney General Kris Mayes, who is the State's Chief Law Officer.

19.     Plaintiff the State of Colorado is a sovereign state in the United States of America.  Colorado is represented by Philip J. Weiser, the Attorney General of Colorado.  The

5

Attorney General acts as the chief legal representative of the State and is authorized by Colo. Rev. Stat. § 24-31-101 to pursue this action.

20.    The State of Connecticut is a sovereign State of the United States.  Connecticut is represented by Attorney General William Tong, who is the State's Chief Law Officer.

21.    The State of Delaware is a sovereign State of the United States of America.  This action is brought on behalf of the State of Delaware by Attorney General Kathleen Jennings, the "chief law officer of the State." *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del. 1941).  Attorney General Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority.  29 Del. C. § 2504.

22.    The District of Columbia is a municipal corporation organized under the Constitution of the United States and is empowered to sue and be sued.  For purposes of election administration, it is treated as a State.  *See, e.g.*, 52 U.S.C. § 20310(6); 52 U.S.C. § 20502(4); 52 U.S.C. § 21141.  The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb.  D.C. Code. § 1-301.81.

23.    The State of Illinois is a sovereign State of the United States.  Illinois is represented by Attorney General Kwame Raoul, who is the State's Chief Law Officer.

24.    The State of Maine is a sovereign State of the United States.  Maine is represented by Attorney General Aaron M. Frey, who is the State's Chief Law Officer.

25.    The State of Maryland is a sovereign State of the United States.  Maryland is represented by Attorney General Anthony G. Brown, who is the State's Chief Legal Officer.

26.    The State of Michigan is a sovereign State of the United States of America.  Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan.

27.    The State of Minnesota is a sovereign State of the United States.  Minnesota is represented by Attorney General Keith Ellison, who is the State's Chief Law Officer.

28.     The State of New Jersey is a sovereign State of the United States.  New Jersey is represented by and through Attorney General Jennifer Davenport, who is the chief legal officer of New Jersey.

29.     The State of New Mexico is a sovereign State of the United States.  New Mexico is represented by Attorney General Raúl Torrez, who is the State's Chief Legal Officer.

30.     The State of New York, represented by and through its Attorney General, Letitia James, is a sovereign State of the United States.  The Attorney General is New York State's chief law enforcement officer and is authorized under N.Y. Executive Law § 63 to pursue this action.

31.     The State of North Carolina is a sovereign State of the United States.  North Carolina is represented by Attorney General Jeff Jackson, who is the State's Chief Law Officer.  Attorney General Jackson brings this action on behalf of the State of North Carolina pursuant to his statutory authority to appear for the State in any court in any civil matter in which the State may be interested.  N.C. Gen. Stat. § 114-2(1).

32.     The State of Oregon, represented by and through its Attorney General Dan Rayfield, is a sovereign State of the United States of America.  As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

33.     The State of Rhode Island is a sovereign State of the United States.  Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

34.     The State of Vermont is a sovereign State of the United States.  Vermont is represented by Attorney General Charity R. Clark, who is the State's Chief Law Officer.

35.     The Commonwealth of Virginia is a sovereign State of the United States of America.  Virginia is represented by Attorney General Jay Jones, the chief executive officer of the Department of Law.  Va. Code § 2.2-500.  Attorney General Jones is authorized to represent the Commonwealth and its interests in controversies with the federal government.  Va. Code § 2.2-513.

36.     The State of Wisconsin is a sovereign State of the United States.  Wisconsin is represented by Josh Kaul, the Attorney General of Wisconsin.  Attorney General Kaul is authorized to pursue this action.

37.     Josh Shapiro brings this suit in his official capacity as Governor of the Commonwealth of Pennsylvania.  The Pennsylvania Constitution vests "[t]he supreme executive power" in the Governor, who "shall take care that the laws be faithfully executed."  Pa. Const. art. IV, § 2.  The Governor oversees all executive agencies in Pennsylvania, including the Pennsylvania Department of State, and is authorized to bring suit on their behalf.  71 P.S. §§ 732-204(c), 732-301(6), 732-303.

## II.     Defendants

38.     Defendant Donald J. Trump is the President of the United States.  He is responsible for the actions and decisions that are being challenged by Plaintiff States in this action and is sued in his official capacity, and only for declaratory relief.

39.     Defendant United States Department of Justice ("U.S. DOJ") is an agency and executive department of the United States government and has responsibility for enforcing federal laws.

40.     Defendant Todd Blanche is the Acting Attorney General of the United States.  He is sued in his official capacity.

41.     Defendant Department of Homeland Security ("DHS") is an agency and executive department of the United States government and has responsibility for certain United States security initiatives and implementing related funding programs.

42.     Defendant Markwayne Mullin is the Secretary of DHS.  He is sued in his official capacity.

43.     Defendant United States Citizenship and Immigration Services ("USCIS") is a component of DHS and is responsible for processing naturalization applications and establishing related policies.

44.    Defendant Joseph Edlow is the Director of USCIS.  He is sued in his official capacity.

45.    Defendant Social Security Administration ("SSA") is an agency and executive department of the United States government and has responsibility for administering certain social insurance programs.

46.    Defendant Frank Bisignano is the Commissioner of the SSA.  He is sued in his official capacity.

47.    Defendant United States Postal Service is an independent establishment of the executive branch of the Government of the United States and has as its basic function to provide postal services throughout the county.

48.    Defendant David Steiner is the Postmaster General of the United States, Chief Executive Officer of USPS, and Member of the USPS Board of Governors.  He is sued in his official capacity.

49.    Defendant Doug Tulino is the Deputy Postmaster General of the United States, Chief Operating Officer and Chief Human Resources Officer of USPS, and Member of the USPS Board of Governors.  He is sued in his official capacity.

50.    Defendant Amber McReynolds is the Chair of the USPS Board of Governors. She is sued in her official capacity.

51.    Defendant Derek Kan is the Vice Chairman of the USPS Board of Governors.  He is sued in his official capacity.

52.    Defendant Ronald Stroman is a Member of the USPS Board of Governors.  He is sued in his official capacity.

53.    Defendant Daniel Tangherlini is a Member of the USPS Board of Governors.  He is sued in his official capacity.

54.    Defendants USPS, David Steiner, Doug Tulino, Amber McReynolds, Derek Kan, Ronald Stroman, Daniel Tangherlini are referred to herein as the "USPS Defendants."

9

55.     Defendant United States Department of Commerce ("US DOC") is a is an agency and executive department of the United States government.

56.     Defendant Howard Lutnick is the Secretary of Commerce.  He is sued in his official capacity.

## LEGAL BACKGROUND

### I.     Constitutional Provisions Regarding Election Regulation

57.     States bear primary responsibility for elections under the U.S. Constitution.  The Constitution's Elections Clause provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."  U.S. Const. art. I, § 4, cl. 1.  Similarly, the Electors Clause specifies that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress."  *Id.* art. II, § 1, cl. 2.  The Constitution likewise gives States the power to determine who may vote in federal elections.  *Id.* art. I, § 2, cl. 1; *id.* amend. XVII.

58.     The Constitution therefore "invests the States with responsibility for the mechanics of [federal] elections," but allows Congress to preempt those choices.  *Foster v. Love*, 522 U.S. 67, 69 (1997).  Unless Congress provides otherwise, States have the authority "to provide a complete code for [federal] elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, [and] prevention of fraud and corrupt practices."  *Smiley v. Holm*, 285 U.S. 355, 366 (1932); *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8–9 (2013).  In short, States are authorized "to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved."  *Smiley*, 285 U.S. at 366.

59.     U.S. elections are administered consistent with this constitutional command. State constitutions establish both the right to vote and the eligibility requirements to do so.  State

legislatures enact statutes that comprehensively structure state and federal elections. Plaintiff States' elections officials implement and clarify those laws with regulations and guidance. These laws and regulations govern a wide range of election issues, from early voting to redistricting. Election codes differ significantly by State, with each State tailoring its rules to the needs and preferences of its residents.

60.     Plaintiff States and their subdivisions, including local municipalities, administer virtually every aspect of elections in accordance with these laws and regulations. That includes testing, certifying, and maintaining voting technology, registering voters and maintaining voter rolls, maintaining lists of voters who opt in or out of mail-in voting, informing and training voters and state and local elections officials, issuing and processing ballots, providing ballot tracking, operating polling locations, tabulating election returns, and certifying election results.

61.     In contrast to the States and Congress, the President has no constitutional authority to make or alter laws governing federal elections. In fact, the Constitution grants the President no legislative power at all, "refut[ing] the idea that he is to be a lawmaker.'" *Medellín*, 552 U.S. at 527 (quoting *Youngstown*, 343 U.S. at 587); *cf.* U.S. Const. art. I, § 4. Nor does he have any authority to judge the returns or qualifications of any elected official. *Cf.* U.S. Const. art. I, § 5. Instead of granting the President a free hand to rewrite federal law or declare entitlement to public office, the Constitution imposes on him the mandatory duty only to "take Care that the Laws be faithfully executed." *Id.* art. II, § 3.

## II.    State Election Laws

62.     Voter eligibility, means of registration, and methods of voting are set by state constitutions, statutes, and regulations. With limited exceptions, Congress has left the States' constitutional prerogatives in this area untouched.

63.     The Plaintiff States have each adopted standards for voter eligibility. For example, the California Constitution provides that voters in statewide and federal elections must be (1) "A United States citizen 18 years of age" and (2) "a resident in this State." Cal. Const. art. II, § 2. The residence requirement is for the Legislature to define. *Id.* § 3. With limited

11

exceptions, those who meet both requirements "may vote." *Id.* § 2; *see also* Cal. Elec. Code § 2000(a).

64.    The Massachusetts Constitution provides for and protects the right to vote for qualified residents.  Mass. Const. Decl. Rights art. 9, amends. art. 3; *see Chelsea Collaborative, Inc. v. Sec'y of Commonwealth*, 100 N.E.3d 326, 330 (Mass. 2018).  To be qualified to vote, Massachusetts residents must be citizens, eighteen years of age or older, and not be under guardianship, incarcerated for a felony conviction, or disqualified, and must be a resident of the city or town in which they seek to vote.  Mass. Gen. Laws ch. 51, § 1.

65.    The Nevada Constitution provides that "[a]ll citizens of the United States" who are at least 18 years old "shall be entitled to vote for all officers that now or hereafter may be elected by the people," with certain limitations based on residency.  Nev. Const. art. 2, § 1. However, "no person who has been or may be convicted of treason or felony in any state or territory of the United States, unless restored to civil rights, and no person who has been adjudicated mentally incompetent, unless restored to legal capacity" may vote.  *Id.*

66.    The Washington Constitution provides that, in general, all persons who are at least eighteen years of age, citizens of the United States, and residents of Washington "shall be entitled to vote at all elections."  Wash. Const. art. VI, § 6; *see also* Wash. Rev. Code § 29A.08.010(1).  There are limited exceptions related to convictions and mental competency. Wash. Const., art. VI, § 3; *see also* Wash. Rev. Code. § 29A.08.520.  Washington law also permits certain 17-year-olds to vote in primary elections if they will be 18 at the time of the general election.  Wash. Rev. Code § 29A.08.170(2).

67.    Article 2, section 1 of the Rhode Island Constitution grants "[e]very citizen of the United States of the age of eighteen years or over who has had a residence and home in this state for thirty days next preceding the time of voting, who has resided thirty days in the town or city from which such citizen desires to vote, and whose name shall be registered at least thirty days preceding the time of voting as provided by law, shall have the right to vote."  *See also* R.I. Gen. Laws § 17-9.1-1.  It further provides that "[n]o person who is incarcerated in a correctional

facility upon a felony conviction shall be permitted to vote until such person is discharged from the facility." R.I. Const. art. 2, § 1. Rhode Island law permits "any person who has not yet reached age eighteen (18), but will be age eighteen (18) at the time of the general election" to "vote in a primary election, in which candidates are nominated for a general or special election." R.I. Gen. Laws § 17-1-3(b).

68.    The Plaintiff States generally confirm voter eligibility at the point of registration. States have maintained registration systems since the early 1800s (with most adopting them by the late 1800s) and have modernized those systems over time. Alexander Keyssar, *The Right to Vote: the Contested History of Democracy in the United States* (2000) at 122–28.

69.    In California, voter identity and qualifications are generally confirmed with documentation and attestation under penalty of perjury during the registration process. Cal. Elec. Code §§ 2112, 2150, 2196; Cal. Code Regs. tit. 2, §§ 19073, 20107. Registered voters may then avail themselves of a more streamlined process at the polls or while casting a mail ballot. Cal. Elec. Code §§ 3011, 3019, 14216; *see also* Cal. Code Regs. tit. 2, § 19075.

70.    Massachusetts likewise requires that every voter's qualifications and identity be verified in connection with registration. Voters may register in person, by mail, online, and at the Registry of Motor Vehicles or at other designated state agencies. Mass. Gen. Laws ch. 51, §§ 26, 28, 33, 33A, 36, 42F, 42G, 42G ½, 44. Prospective voters must attest to their citizenship, residence, and age, and provide information (under penalty of perjury) establishing their identity when they register to vote; registering illegally or providing false information is unlawful, and subject to criminal penalties. Mass. Gen. Laws ch. 51, §§ 36, 42, 44, 47A; *see also id.* ch. 56, §§ 6, 8.

71.    New York law similarly requires voters to provide documentation confirming their identities and to attest under penalty of perjury that they are qualified to vote. N.Y. Elec. Law § 5-210. Voters may provide a range of approved documents, such as "a driver's license or department of motor vehicles non-driver photo ID number," "the last four digits of [their] social security number," or "a copy of a current utility bill, bank statement, government check,

paycheck or other government document that shows" their name and address in order to verify their identities. N.Y. Elec. Law § 5-210(k)(viii); *see also* N.Y. Elec. Law § 8-302 (requiring voters to verify their identities before voting for the first time).

72.     In the Plaintiff States, registered voters are permitted to vote by mail if they meet the state law requirements for doing so, which vary from state to state. And each state has detailed measures to ensure that mail ballots are validly cast.

73.     California has adopted a universal mail voting system, wherein each active registered voter is sent a mail ballot. Cal. Elec. Code §§ 3000.5, 3003, 3010. After voting their ballot, a voter places it in an envelope that is signed under penalty of perjury to establish the validity of the vote. *Id.* § 3011(a)(1)–(2). State law and guidance cover the standards for mail envelope design and tracking. *See id.* § 3011(a).[1] The envelope is then submitted to the appropriate elections official via one of several methods: sent through prepaid United States Postal Service mail, dropped in a designated ballot drop box, or delivered to a polling location. *Id.* §§ 3016.7, 3017. Elections officials then compare the signature on the mail ballot envelope to the signature on file for the voter. *Id.* § 3019. When the signatures compare and the ballot is otherwise validly cast (e.g., the voter has not already cast a ballot), the ballot is tabulated. *Id.* §§ 3019, 15101, 15109; Cal. Code Regs. tit. 2, §§ 20282. When the signatures do not compare, elections officials contact the voter to provide the opportunity to correct the mistake. Cal. Elec. Code § 3019(1).

74.     Washington is also a universal mail voting state. Wash. Rev. Code § 29A.40.010. Each Washington voter receives a ballot, a security envelope in which to conceal the ballot, a larger envelope in which to return the security envelope, a declaration that the voter must sign, and associated instructions. *Id.* § 29A.40.091(1). Voters may return ballots through USPS or to a secure ballot drop box. *See id.* §§ 29A.40.091, .170. Voters must swear under penalty of perjury that they meet the qualifications to vote and have not voted in any other jurisdiction at

---

[1] *See also, e.g.*, Cal. Sec'y of State, Vote-by-Mail Envelope Design for California (Dec. 15, 2017), https://elections.cdn.sos.ca.gov/vote-by-mail/pdf/guidance.pdf.

that election. *Id.* § 29A.40.091(2). The declaration must clearly inform the voter, among other things, that it is illegal to vote if he or she is not a United States citizen. *Id.* Washington ensures that each returned ballot cast was by a registered voter by using a signature verification process. *Id.* § 29A.40.110(3). Before accepting a ballot, elections officials must "verify that the voter's signature on the ballot declaration is the same as the signature of that voter in the registration files of the county." *Id.*

75.     Massachusetts allows no-excuse early voting by mail, meaning any qualified voter can request and cast a mail ballot. Mass. St. 2022, c. 92, § 10; Mass. Gen. Laws ch. 54, § 25B(a)(i). When voting by mail, a voter places the completed ballot in an envelope on which an affidavit is printed which advises the voter of criminal penalties for illegal voting and must be signed under penalty of perjury. Mass. Gen. Laws ch. 54, §§ 25B(a)(1). 92; c. 56, § 26. The voter then places the sealed affidavit envelope within an outer mailing envelope, which bears the USPS "official election mail" logo and is marked "ballot enclosed," and can either mail it to their local election office, submit it at an early voting location or the office of the local election official, or deposit it in a secure drop box. Mass. Gen. Laws ch. 54, §§ 25B(a)(13), 92; 950 Code Mass. Regs. 47.06 (1)(b); 47.10 (2), (5). Once received, the elections official examines whether the affidavit is properly executed and whether the voter's signature matches the one on file. Mass. Gen. Laws ch. 54, §§ 25B(a)(10), (14), 94; 950 Code Mass. Regs. 47.10 (5)(a). The ballot is rejected if the affidavit or signature is defective, and the voter is notified and sent a new ballot, time permitting. Mass. Gen. Laws c. 54, §§ 25B(a)(10), (14), 94; 950 Code Mass. Regs. 47.10 (5). Once a mail ballot is accepted, the ballot is considered cast, and a voter may not vote in-person either early or on Election Day. 950 Code Mass. Regs. 47.10 (7). Accepted mail ballots remain sealed and secured until counted. *Id.* 47.14 (3)–(4); 47.15 (3)–(4).

76.     Nor is Massachusetts's mail voting system optional for statewide elections. Massachusetts law provides that qualified, registered voters have a right to vote by mail and a right to request and thereafter receive a mail ballot application. Mass. Gen. Laws ch. 54, § 25B(a)(1)-(2); *id.* (a)(7) (requiring the Secretary of the Commonwealth to mail registered

voters a mail ballot application upon request).  Upon receipt of a mail ballot application and verification of the voter's registration, a mail ballot "shall be mailed" as soon as they are available.  *Id.* (a)(1).

77.    These laws are merely pieces of a broader constellation of the States' comprehensive regulation and administration of federal elections.

### III.    Federal Election Laws

78.     Congress has established limited baseline requirements for federal elections, most often leaving the States considerable discretion in how to meet those requirements. Especially relevant here, Congress has set forth requirements for voter registration and mandated certain mail voting procedures.

79.    Congress enacted the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") in 1986 to increase access to the franchise for absent military and overseas voters. UOCAVA requires each State to permit those voters to use absentee registration procedures and vote by absentee ballot in all federal elections.  52 U.S.C. § 20302(a)(1).  It specifies that States must use an "official post card form" prescribed by the President's designee "for simultaneous voter registration application and absentee ballot application."  *Id.* § 20302(a)(4).

80.    Congress enacted the National Voter Registration Act ("NVRA") in 1993 to reduce barriers to voter registration, protect the integrity of federal elections, and improve the accuracy of voter registration rolls.[2]  The NVRA expressly recognizes "method[s] of voter registration provided for under State law," and builds atop that foundation by requiring certain additional methods be made available to those seeking "to register to vote in elections for Federal office."  52 U.S.C. § 20503(a).  Each State subject to the NVRA must inform applicants of the applicable voter eligibility requirements and penalties associated with submitting false information on an application.  *Id.* § 20507(a)(5).  Like UOCAVA, the NVRA requires States to

---

[2] Six states are exempt from the NVRA because they either did not have a voter registration system or allowed voter registration on Election Day when the law was passed.  *See* 52 U.S.C. § 20503(b).  All Plaintiff States except Wisconsin and Minnesota are subject to the NVRA.

accept and use a federal "mail voter registration application form" for mail registration and in-person registration at certain government or nongovernment offices designated by statute. *See id.* §§ 20505(a)(1), 20506(a)(6)(A). That form must include an attestation of the applicant, under penalty of perjury, that they meet every eligibility requirement to vote. *Id.* § 20508(b)(2).

81. The NVRA provides a framework for the removal of voters from the rolls, ensuring that the process is fair and protects eligible voters. States subject to the NVRA may remove registered voters from the voter rolls only (1) at the voter's request, (2) if a voter becomes ineligible under state law "by reason of criminal conviction or mental incapacity," (3) if the voter dies, or (4) if the voter changes residence, but then only with written notice and significant lag time. 52 U.S.C. §§ 20507(a)(3)–(4), (d)(1). Covered States must also complete any program that systematically removes the names of ineligible voters from the official list of eligible voters no later than 90 days before a federal primary or general election. *Id.* § 20507(c)(2)(A). This window of time, known as the "quiet period," is meant to ensure that qualified voters erroneously removed from the list have sufficient time to correct the mistake and exercise their right to vote. *See Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1346 (11th Cir. 2014). Overall, the NVRA requires only that States "conduct a general program that makes a reasonable effort to remove the names of voters who have become ineligible on account of death or change of address." *Bellitto v. Snipes*, 935 F.3d 1192, 1199 (11th Cir. 2019); *see also* 52 U.S.C. § 20507(a)(4).

82. The NVRA also requires States to retain certain federal elections records for a fixed period. Specifically, it directs that "[e]ach State shall maintain for at least 2 years . . . all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). This builds upon a baseline federal election record retention requirement of 22 months. *Id.* § 20701 (requiring retention of "records and papers . . . relating to any application, registration, payment of poll tax, or other act requisite to voting in" federal elections).

83.     Congress enacted the Help America Vote Act ("HAVA") in 2002, in the wake of the 2000 Presidential Election, with the intention to upgrade the States' voting infrastructure. Among other things, HAVA mandated that States create a centralized database of registered voters and set forth standards for applicants to verify their identity upon registration. *See* 52 U.S.C. § 21083.  Applicants registering to vote in federal elections must provide a driver's license number, if any, or the last four digits of their Social Security number with their registration application, or else be assigned a unique State-issued identification number. *Id.* § 21083(a)(5)(A).  Under HAVA, if a voter who does not appear on the voter roll appears at a polling place but declares that they are duly registered and eligible, that voter must be allowed to cast a provisional ballot. *Id.* § 21082(a).  That provisional ballot is to be counted only if "the appropriate State or local election official . . . determines that the individual is eligible under State law to [have] vote[d]" the ballot. *Id.* § 21082(a)(4).

84.     In sum, UOCAVA, the NVRA, and HAVA provide strictly limited and specified roles for the federal government in States' election administration.  None of these statutes confer any unilateral authority to the President relevant to the EO.

85.     Finally, Congress has established numerous criminal penalties for individuals who seek to interfere with free and fair elections, including by unlawfully attempting to register to vote or vote and providing false voting-related information. *See, e.g.*, 52 U.S.C. §§ 10307, 20511; 18 U.S.C. §§ 371, 611, 911, 1001, 1015.

86.     For several years, Congress has considered measures intended to establish new voting requirements for federal elections. *See, e.g.*, SAVE Act, H.R. 8281, 118th Cong. (2024); SAVE Act, H.R. 22, 119th Cong. (2025); SAVE America Act, H.R. 7296, 119th Cong. (2026). No such proposal has passed the Senate or been presented to the President for signature.

## IV.     State Implementation of Federal Election Laws

87.     Plaintiff States have legislated consistent with these congressional enactments.

88.     As to voter roll maintenance, States have adopted regulatory schemes consistent with the NVRA, designed to keep voter rolls updated while avoiding unnecessary voter removal

and potential disenfranchisement.  California, for example, provides that NVRA-mandated address confirmation notices be sent in response to information that an individual has moved.  *See* Cal. Elec. Code §§ 2155, 2225.  California elections officials also place the registration records of voters whose residence-based eligibility cannot be determined on "inactive" status, meaning the voter is ineligible to vote (and will not be mailed a ballot) unless and until they re-establish their eligibility, where appropriate.  *Id.* §§ 2221, 2225, 3000.5(c).  Elections officials cancel those inactive voter registrations when all relevant NVRA requirements are satisfied.  *Id.* §§ 2225, 2226.  Finally, consistent with the NVRA's timelines, elections officials must preserve certain election records for 22 months after an election, followed by mandatory destruction where there is no contest or criminal prosecution pending.  *See id.* §§ 17301, 17303, 17305.

89.    Likewise, Washington also has a robust process to maintain an accurate and up-to-date voter registration list.  Elections officials regularly receive address updates from the Washington Department of Licensing and must request USPS change-of-address information for all mail ballots.  Wash. Rev. Code § 29A.08.620(1)–(2).  If the voter has moved within the State, their voter registration is automatically updated.  *Id.* § 29A.08.620(2).  If the voter has moved outside of Washington or a mailing from election officials to the voter is returned as undeliverable, the voter's registration is placed on inactive status.  *Id.*  Washington law requires that, "[a]t least once a month," election officials must compare the voter registration list with a list of persons who are ineligible due to incarceration for a felony.  *Id.* § 29A.08.520(2).  Washington also requires regular review of voter rolls to remove deceased voters, a process that broadly relies on lists created by government agencies, newspaper obituaries, and sworn statements by other registered voters.  *Id.* § 29A.08.510.

90.    Similarly, before a Nevada elections official may inactivate, remove, or correct a registrant's information in the statewide voter registration list, counties must send a notice and return postcard to the registrant.  Nev. Rev. Stat. §§ 293.530(1)(c), (1)(f).  If the voter does not respond within 30 days, they are put into inactive status.  *Id.* § 293.530(1)(g).  If the inactive registrant later meets all relevant NVRA requirements for cancellation, their registration is

canceled. *Id.* § 293.530(c). In addition, pursuant to the NVRA's requirement that States "conduct a general program that makes a reasonable effort to remove" registrants who have become ineligible because of death, 52 U.S.C. § 20507(a)(4), each business day the Nevada Secretary of State's Office compares the statewide voter registration list to the States' vital statistics records. Nev. Admin. Code § 293.464(1). If the Secretary's Office finds a match, it flags that registrant for the relevant county clerk, who then determines if the person is deceased and, if so, cancels the registration. *Id.* § 293.464(2)(b).

91.    In Massachusetts, the primary method for list maintenance is an annual census mailed to every residential address. If a voter fails to respond to the census, they are sent a confirmation notice and remain on the inactive voter list for two federal elections at which time they are removed, unless they update their status by voting, signing a nomination paper or petition or re-registering. State law and regulations require that voter and resident information be maintained and updated in the statewide voter list system to ensure compliance with the NVRA and HAVA. Mass. Gen. Laws ch. 51, §§ 42H, 46, 47C, 55; 950 Mass. Code Regs. §§ 58.00 *et seq.* Massachusetts uses several methods to prevent duplication, confirm residence, and remove deceased or otherwise ineligible voters from the voter registration list to comply with federal law, including cross-referencing death records from the Department of Public Health and regularly reviewing for potential duplicate voters. *See, e.g.*, Mass. Gen. Laws ch. 51, §§ 4 (annual street list survey used to confirm address information), 14 (process for removing deceased voters), 1; *id.* ch. 54, § 25C (incarcerated voters).

92.    States have also implemented HAVA's mandates. For example, California law provides that, "[p]ursuant to the Help America Vote Act of 2002, each voter's identity shall be verified." Cal. Code Regs. tit. 2, § 19073(a). The State maintains laws and regulations establishing that requirement. *See, e.g.*, Cal. Elec. Code §§ 2112, 2150, 2196; Cal. Code Regs. tit. 2, §§ 19073, 19075, 20107. The Nevada Secretary of State is tasked with adopting the regulations necessary to comply with HAVA. Nev. Rev. Stat. § 293.4685(1)(d); *see also* § 293D.530. Washington law also contains a HAVA-compliant verification of voter identity.

20

Wash. Rev. Code § 29A.08.107.  In New York, ballots must be designed to "satisfy all requirements and standards set forth pursuant to the federal Help America Vote Act," N.Y. Elec. Law § 7-104, and the state voter registration form "shall conform to the requirements for the national voter registration form in the rules and regulations promulgated by the federal election commission and the federal Help America Vote Act," N.Y. Elec. Law § 5-210.  New Jersey has also codified HAVA's voter registration list mandates in state law, providing for "a Statewide voter registration system, as required pursuant to section 303 of the federal 'Help America Vote Act of 2002.'"  N.J. Stat. Ann. 19:31-31(a).

93.    States have also codified the procedure for absentee voting under UOCAVA. California law explains that "[i]f an elections official receives a completed federal postcard application from a person qualified as a military or overseas voter, the application shall be deemed to be an affidavit of registration."  Cal. Elec. Code § 3102(c).  And a "military or overseas voter may . . . use a federal write-in absentee ballot to vote in any election in which the military or overseas voter is qualified to vote."  *Id.* § 3105(b)(2).

94.    Likewise, Massachusetts law has codified the UOCAVA absentee voting procedure.  Mass. Gen. Laws ch. 54, § 91C.  The State's law permits any UOCAVA voter to apply for an absentee ballot and requires that the relevant federal form "shall be accepted" by the State's Secretary; that upon receipt of a properly executed application, a clerk "shall" expeditiously transmit the ballot; and that the Secretary "shall provide" clear instructions for return of the ballot.  *Id.*

95.    Washington law similarly permits UOCAVA voters to register by signing the declaration on the return envelope of an absentee ballot.  Wash. Rev. Code § 29A.08.107(5); *id.* § 29A.40.091(3).  Washington law also requires that ballots be mailed to UOCAVA voters "at least forty-five days before each primary or general election, or any special election that involves federal office" and provides for immediate processing of later-received ballot requests from UOCAVA voters.  *Id.* § 29A.40.070(2).

## V.    The United States Postal Service

96.      The United States' federal mail system started in 1775—predating the enactment of the Constitution—and was foundational to the birth of this nation.[3]  A robust, reliable, and secure means of exchanging information was deemed critical to connecting distant parts of the nation to maintain unity after achieving independence.[4]

97.      Upon ratification, the Constitution vested Congress with the power "to establish Post Offices and post Roads."  U.S. Const., art. I, § 8, cl. 7.  In 1789, Congress exercised this power for the first time by passing legislation establishing the Post Office and making the Postmaster General subject to the President's direction.[5]  Soon thereafter, in 1792, Congress enacted the first major postal law, which professionalized the Post Office and gave it a "postal monopoly."[6]  Two years after that, in 1794, Congress indefinitely continued the Post Office's existence.[7]  Since then, Congress's constitutional authority "to establish Post Offices and post Roads" has been regarded as plenary, "embrac[ing] the regulation of the entire postal system of the country."  *Ex parte Jackson*, 96 U.S. 727, 732 (1877).

98.      For two hundred and fifty years, the federal postal service has provided reliable, vital services to millions of Americans and served to "bind the Nation together through the personal, educational, literary, and business correspondence of the people."  39 U.S.C. § 101(a).

99.      Over the course of its history, one of the most critical components of the federal postal service has been its commitment to its integral role in federal, state, and local elections across the country through the delivery of critical election materials, such as ballots, voter registration cards, absentee applications, and polling place notifications.[8]  That said, the postal

[3] U.S. Postal Serv., The United States Postal Service: An American History 1 (2020), https://about.usps.com/publications/pub100.pdf.

[4] *Id.*

[5] *Id.* at 4.

[6] *Id.* at 1, 4.

[7] *Id.* at 5.

[8] *See* U.S. Postal Serv., Election Mail, https://about.usps.com/what/government-services/election-mail (last visited Apr. 1, 2026).

service has no independent authority to regulate elections.  *See Colorado v. DeJoy*, No. 20-cv-2768, 2020 WL 5513567, at *2 (D. Colo. Sept. 14, 2020).

100.    The federal postal service is known today as USPS, which came into existence in 1970.  Congress passed the Postal Reorganization Act ("PRA"), Pub. L. 91–375, 84 Stat. 719 (Aug. 12, 1970), to preserve and protect the federal postal service's critical role in American life.  *See* 39 U.S.C. § 101, *et seq.*  Specifically, Congress replaced the old Post Office Department with USPS, which is "an independent establishment of the executive branch of the Government of the United States."  39 U.S.C. § 201; 39 C.F.R. § 1.1.  Congress enacted the PRA pursuant to its express constitutional authority.  U.S. Const. art. I, § 8, cl. 7; 39 U.S.C. § 101(a).

101.    This major restructuring into an "independent establishment," 39 U.S.C. § 201, "was adopted to increase the efficiency of the Postal Service and reduce political influences on its operations."  *U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd.*, 540 U.S. 736, 740 (2004); *accord* H.R. Rep. No. 91-1104, at 1 (1970) (Conf. Rep.), as reprinted in 1970 U.S.C.C.A.N. 3649, 3650.  In enacting the PRA, Congress established USPS's independence from political pressures by fundamentally changing its structure.  It removed the Post Office from the President's Cabinet and—for the first time—provided that the Postmaster General would be appointed by a newly established Board of Governors rather than the President.  *See* 39 U.S.C. § 202.[9]  This newly established Board of Governors directs USPS's authority.  *Id.* § 202(a)(1).

102.    The Board of Governors is composed of eleven members: nine Governors appointed by the President with advice and consent of the Senate, the Postmaster General (chosen by the nine Governors), and the Deputy Postmaster General (chosen by the nine Governors and the Postmaster General).  *See* 39 U.S.C. § 202.  In making his nominations for appointments, the President "should consult with the Speaker of the House of Representatives, the minority leader of the House of Representatives, the majority leader of the Senate, and the minority leader of the Senate."  *Id.* § 202(a)(2).  No more than five Governors can be of the

---

[9] The PRA also created the Postal Rate Commission, an independent body charged with overseeing postage rate decisions and certain other agency actions.

23

same political party, and they must be chosen "solely on the basis of their experience in the field of public service, law or accounting or on their demonstrated ability in managing organizations or corporations (in either the public or private sector) of substantial size." *Id.* § 202(a)(1).

103.    The Postmaster General is the "chief executive officer of the Postal Service," 39 U.S.C. § 203, and is delegated broad authority to exercise the powers of USPS—including the authority to promulgate regulations—except where authority has been explicitly reserved to the Governors or the full Board, *see id.* §§ 401(2), 402; 39 C.F.R. § 3.5. But that authority to promulgate regulations is limited to those that "are not inconsistent with [Title 39]" and which "may be necessary in the execution of its function under [Title 39]." 39 U.S.C. § 401(2).

104.    Importantly, under the applicable law, the President has no role in removing or selecting the Postmaster General nor any power to order the Postmaster General to do anything. *Cf. Governors of U.S. Postal Serv. v. U.S. Postal Rate Comm'n*, 654 F.2d 108, 114 (D.C. Cir. 1981) (concluding that the history of the PRA "demonstrates the intention of Congress to vest in the Board of Governors exclusive authority to manage the Postal Service"). Only the nine Governors—not the President—have the power to appoint and remove the Postmaster General, a decision that is within the Governors' complete discretion and not subject to judicial review. *See* 39 U.S.C. § 202(c); *Silver v. U.S. Postal Serv.*, 951 F.2d 1033, 1039 (9th Cir. 1991); *Carlin v. McKean*, 823 F.2d 620, 623 (D.C. Cir. 1987).

105.    In addition to establishing a newly independent, politically neutral governing structure, the PRA affirms that USPS is "a basic and fundamental service provided to the people by the Government of the United States, authorized by the Constitution, created by Act of Congress, and supported by the people." 39 U.S.C. § 101(a). Its "basic function" is still to meet "the obligation to provide postal services to bind the Nation together through the personal, educational, literary, and business correspondence of the people." *Id.*

106.    Consistent with its core function, USPS "shall provide prompt, reliable, and efficient services to patrons in all areas and shall render postal services to all communities." *Id.* In short, USPS has a universal service obligation. *See id.* § 403(a).

107.    In fact, USPS is duty-bound to "serve as nearly as practicable the entire population of the United States." *Id.* § 403(a).  In particular, the agency must "maintain an efficient system of collection, sorting, and delivery of the mail nationwide"; "provide types of mail service to meet the needs of different categories of mail and mail users"; and "establish and maintain postal facilities of such character and in such locations, that postal patrons throughout the Nation will . . . have ready access to essential postal services." *Id.* § 403(b).  In providing these postal services, USPS "shall not . . . make any undue or unreasonable discrimination among users of the mails." *Id.* § 403(c).

108.    Congress has directed USPS to follow specific statutory commands in providing its postal services.  Among other things, when establishing postal service policies, USPS "shall give the highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail." 39 U.S.C. § 101(e).  In enacting the statutes governing USPS's authority and operations, "Congress effectively mandated certain policies to be followed by the Postal Service, leaving no discretion for the agency to do otherwise." *New York v. Biden*, 636 F. Supp. 3d 1, 25 (D.D.C. Oct. 6, 2022).

109.    Furthermore, USPS imposes strict nondisclosure requirements on lists and names of its users: "no officer or employee of the Postal Service shall make available to the public by any means or for any purpose any mailing or other list of names or addresses (past or present) of postal patrons or other persons." 39 U.S.C. § 412(a).  The only exception is for the Census Bureau. *See id.* § 412(b).  There is no exception to provide states with so-called "Mail-In and Absentee Participation Lists."

110.    USPS's authority to reject certain mail is also governed by statute.  Congress has carefully defined categories of "nonmailable matter," which "shall be disposed of as [USPS] shall direct." 39 U.S.C. § 3001(b).  Neither mail ballots nor mail ballot envelopes fall into any nonmailable category.

111.    For greater oversight of the detailed statutory scheme governing USPS, Congress passed the Postal Accountability and Enhancement Act ("PAEA") in 2006. Pub. L. No. 109-435,

120 Stat. 3198 (Dec. 20, 2006) (codified at 39 U.S.C. § 3600 *et seq.*).  The PAEA expanded and transformed the former Postal Rate Commission into the Postal Regulatory Commission, increasing the Commission's authority regarding USPS's execution of its duties and obligations. By law, the Commission maintains political independence with bipartisan members who are appointed by the President and confirmed by the Senate.  *See* 39 U.S.C. § 502(a).

112.    USPS must go through the Commission before making major changes to its policies or operations.  Specifically, "[w]hen the Postal Service determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis, it shall submit a proposal, within a reasonable time prior to the effective date of such proposal, to the Postal Regulatory Commission requesting an advisory opinion on the change."  *Id.* § 3661(b).

113.    Following the submission of a proposal, "[t]he Commission shall not issue its opinion on any proposal until an opportunity for hearing on the record under [the Administrative Procedure Act] has been accorded to the Postal Service, users of the mail, and an officer of the Commission who shall be required to represent the interests of the general public.  The opinion shall be in writing and shall include a certification by each Commissioner agreeing with the opinion that in his judgment the opinion conforms to the policies established under this title."  *Id.* § 3661(c).

114.    By enacting the PAEA, Congress also sought to limit USPS's ability to take on new non-postal services.  39 U.S.C. § 404(e).  Requiring USPS to operate a complex, State-by-State voter eligibility verification and enrollment system is far outside the definition of postal services, which only includes "the delivery of letters, printed matter, or mailable packages, including acceptance, collection, sorting, transportation, or other functions ancillary thereto."  *Id.* § 102(5).

**FACTUAL ALLEGATIONS**

**I.    The Administration's Prior Attempts to Change Federal Election Law**

115.    This EO is not the President's first attempt to rewrite federal election law unilaterally, nor to impose restrictions allegedly designed to root out non-citizen participation in the electoral process.  On March 25, 2025, the President issued Executive Order No. 14248, *Preserving and Protecting the Integrity of American Elections*, purporting to mandate sweeping changes to the rules for administering federal elections.  Among other things, that Order sought to impose documentary proof of citizenship requirements—contrary to existing federal law—on federal voter registration forms.  Three courts, including this Court, have so far preliminarily or permanently enjoined key provisions of that Order.  *See California v. Trump*, 786 F. Supp. 3d 359 (D. Mass. 2025), *appeal docketed*, No. 25-1726 (1st Cir. July 31, 2025); *League of United Latin Am. Citizens v. Exec. Off. of the President*, 808 F. Supp. 3d 29 (D.D.C. 2025), *appeal docketed*, No. 25-5476 (D.C. Cir. Dec. 31, 2025); *League of United Latin Am. Citizens v. Exec. Off. of the President*, __ F. Supp. 3d __, 2026 WL 252420 (D.D.C. Jan. 30, 2026); *Washington v. Trump*, __ F. Supp. 3d ___, 2026 WL 73866 (W.D. Wash. Jan. 9, 2026).

116.    Similarly, U.S. DOJ has pursued an unprecedented initiative to obtain access to confidential state voter registration information.  It has demanded complete, unredacted voter registration lists—which include voters' driver's license numbers and the last four digits of their Social Security Numbers—from every State.  It has declined offers to review States' publicly available voter lists (i.e., without those confidential identifiers) and has instead sued 30 States and the District of Columbia for declining to produce this sensitive information.  U.S. DOJ has admitted that it is seeking this data to transfer it to DHS to determine whether non-citizens have registered or voted.[10]  But U.S. DOJ's attempt to obtain all States' voter data through litigation has so far failed, as every court to consider the federal government's claims in those cases has dismissed them.  *See United States v. Galvin*, __ F. Supp. 3d __, 2026 WL 972129 (D. Mass.

---

[10] Jude Joffe-Block, *The Justice Department plans to share sensitive voter data with Homeland Security*, NPR (Mar. 27, 2026), https://www.npr.org/2026/03/27/nx-s1-5764266/voter-data-trump-doj-dhs.

Apr. 9, 2026); *United States v. Weber*, __ F. Supp. 3d ___, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026), *appeal docketed*, No. 26-1232 (9th Cir. Mar. 3, 2026); *United States v. Oregon*, __ F. Supp. 3d ___, 2026 WL 318402 (D. Or., Feb. 5, 2026), *appeal docketed*, No. 26-1231 (9th Cir. Mar. 3, 2026); *United States v. Benson*, __ F. Supp. 3d ___, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026), *appeal docketed*, No. 26-1225 (6th Cir. Feb. 27, 2026); *United States v. Raffensperger*, No. 5:25-cv-00548, 2026 WL 184233 (M.D. Ga. Jan. 23, 2026).

117.    Consistent with these actions, the President has repeatedly accused his political opponents—without evidence—of encouraging non-citizens to unlawfully vote.[11]  He has also announced that he will "lead a movement to get rid of MAIL-IN BALLOTS." [12]  These statements have come alongside sweeping claims of presidential authority.  In one social media post, the President made the audacious claim that "the States are merely an 'agent' for the Federal Government in counting and tabulating the votes" and "must do what the Federal Government, as represented by the President of the United States, tells them . . . to do."[13]  In another, the President insisted that he has authority to change the rules for elections "whether approved by Congress or not."[14]  And for weeks, the President has alluded to his desire to "nationalize" the 2026 midterm elections.[15]

---

[11] Donald J. Trump (@realDonaldTrump), Truth Social, https://truthsocial.com/@realDonaldTrump/posts/116065471857020644 (last visited Apr. 1, 2026); Donald J. Trump (@realDonaldTrump), Truth Social, https://truthsocial.com/@realDonaldTrump/posts/116282577310101116 (last visited Apr. 1, 2026).

[12] Donald J. Trump (@realDonaldTrump), Truth Social, https://truthsocial.com/@realDonaldTrump/posts/115049485680941254 (last visited Apr. 1, 2026).

[13] *Id.*

[14] Donald J. Trump (@realDonaldTrump), Truth Social, https://truthsocial.com/@realDonaldTrump/posts/116065471857020644 (last visited Apr. 1, 2026).

[15] *See, e.g.*, Jacob Wendler, *Trump says Republicans should 'nationalize' elections*, POLITICO (Feb. 2, 2026), https://www.politico.com/news/2026/02/02/trump-nationalize-elections-2026-midterms-00760015.

118.    Finally, in the weeks leading up to signing this EO, the President has relentlessly urged Congress to enact the "Safeguard American Voter Eligibility Act" (the "SAVE America Act") S. 1383 (119th Cong.).[16]  The Act would change voter registration requirements nationwide by requiring registrants to provide documentary proof of citizenship to register and impose new voter identification rules to vote in federal elections.  It also would require States to use DHS's Systematic Alien Verification for Entitlements ("SAVE") system for purposes of identifying non-citizens on their voter rolls and require States to remove any voters flagged by SAVE as potential non-citizens.  The President stated that he would withhold his signature on all legislation until Congress passes the Act, going so far as to advocate for termination of Senate filibuster rules to lower the vote threshold to enact the law without bipartisan support.[17]  This pressure has not yet yielded the President's desired results, and at the signing of this EO, the President acknowledged that the bill did not have the support to pass.[18]

## II.    The EO

119.    Having failed to enact changes to election administration through Congress, the President has resorted to unlawfully attempting to legislate by fiat.  The EO mandates that federal agencies create their own voter eligibility lists and imposes those lists on the States through threats of prosecuting States and their elections officials.  This lawsuit addresses the following Challenged Provisions:

120.    **Section 2** creates a new federal program designed to exert federal control over States' voter rolls.  Section 2(a) directs the Secretary of Homeland Security, through the Director of USCIS and in coordination with the SSA Commissioner, to develop "a list of individuals

---

[16] The House passed the SAVE America Act on February 11, 2026, and the Senate began debate on an updated version of the bill on March 17, 2026. S.1383, Congress.gov, https://www.congress.gov/bill/119th-congress/senate-bill/1383 (last visited Apr. 3, 2026).

[17] Luke Garrett, *Trump Says He Won't Sign Bills Until Congress Overhauls Voting*, NPR (Mar. 8, 2026), https://www.npr.org/2026/03/08/g-s1-112917/trump-says-he-wont-sign-bills-until-congress-overhauls-voting.

[18] *See* White House, *President Signs an Executive Order, Mar. 31, 2026* (Mar. 31, 2026), 34:22-37:14, https://www.whitehouse.gov/videos/president-trump-signs-an-executive-order-mar-31-2026/.

29

confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State," deemed the "State Citizenship List." EO § 2(a). Though residence for purposes of voter eligibility is a question of state law, the EO anticipates that the Secretary will make residency determinations when compiling the list. *Id.*

121. The State Citizenship List is to be compiled from "citizenship and naturalization records, SSA records, SAVE data, and other relevant Federal databases." *Id.* It is to be sent to States' chief elections officials "no fewer than 60 days before each regularly scheduled Federal election, or promptly upon request by a State in connection with any special Federal election." *Id.* A related provision of the EO sets a 90-day deadline for the Secretary of Homeland Security to "establish the infrastructure necessary to compile, maintain, and transmit the State Citizenship List" and requires the SSA Commissioner to "provide all necessary citizenship and identity data to the Secretary of Homeland Security" to support the creation of the list. *Id.* § 4(c).

122. The Secretary of Homeland Security must also "establish procedures to (i) allow individuals to access their individual records as well as to update or correct them in advance of elections; and (ii) enable States to routinely supplement and provide suggested modifications or amendments to the [list]." *Id.* § 2(a). The EO does not require the Secretary of Homeland Security to accept suggested modifications and amendments; rather, the final list is within exclusive federal control. *See id.*

123. Section 2 also pairs the provision of the State Citizenship List to state elections officials with an explicit threat of criminal prosecution. Namely, the EO directs the Attorney General to prioritize the investigation and prosecution of "State and local officials" or others who "issue Federal ballots to individuals not eligible to vote in a Federal election[.]" *Id.* § 2(b); *see also id.* § 5 (soliciting referrals to U.S. DOJ of any "[e]vidence of violations of existing Federal laws by State or local elections officials" and related entities in connection with voting). Section 2 also defines "eligible to vote in a Federal election" to require, among other things, that the person is "18 years of age or older by the date of the upcoming election[.]" *Id.* § 2(b).

124.    Under Section 2, "State and local officials or any others involved in the administration of Federal elections who issue Federal ballots" to voters not on the federal State Citizenship List face an acute risk of criminal prosecution simply for doing their jobs in compliance with state and federal law.

125.    **Section 3** directly interferes with state mail voting programs by interposing USPS into States' administration of mail voting, especially by prohibiting USPS from transmitting mail ballots from voters who are not on a USPS-controlled list.  Section 3 sets out a detailed, multipart regulatory program that USPS is commanded to adopt within 120 days.  EO § 3(d).

126.    First, Section 3 requires USPS to adopt regulations governing numerous details regarding mail ballots, from particular envelopes to specific markings and tracking technology. *Id.* § 3(b)(i)(A)–(C).

127.    Section 3 further provides that "no fewer than 90 days prior to a Federal election, any State may choose to notify the USPS if it intends to allow for mail-in or absentee ballots to be transmitted by the USPS" and whether it intends to submit "a list of voters eligible to vote in a Federal election" via mail.  *Id.* § 3(b)(ii).  USPS must then in turn "provide each State with a list of individuals . . . who are enrolled with the USPS . . . for mail-in or absentee ballots provided by such State," deemed the "Mail-In and Absentee Participation List."  *Id.* § 3(b)(iv).

128.    The EO does not specify how such "enroll[ment]" will be effectuated, nor the entity charged with effectuating it.  It does, however, provide that USPS must establish "procedures enabling each State to routinely supplement and provide suggested modifications or amendments to the [list] in advance of any Federal election."  *Id.* § 3(b)(v).  The EO does not require USPS to accept suggested modifications and amendments, nor to provide voters' updates to elections officials; rather, the ultimate list is within exclusive federal control.  *Id.*

129.    Section 3 prohibits USPS from transmitting a completed mail ballot from any voter not included on that list.  *Id.* § 3(b)(iii).

130.    Like Section 2, Section 3 pairs the new USPS voter lists with explicit threats of criminal prosecution for States, their elections officials, and voters who make "unlawful use of

31

the mail in connection with elections."  *Id.* § 3(a); *see also id.* §§ 3(c), 5.

131.    **Section 5**, which relates to enforcement, threatens States and localities with federal funding cuts for any "noncompliance with Federal law" and reiterates threats of investigations and criminal prosecutions for State and local entities and elections officials.  EO § 5.  Additionally, Section 5 provides that States "should preserve, for a 5-year period, all records and materials—excluding ballots cast—evidencing voter participation in any Federal election (e.g., ballot envelopes, regardless of carrier)."  It does not cite any statutory basis for this demand.

### III.   The Federal Government's Unreliable Citizenship Verification

132.    Recent federal information management efforts demonstrate how destabilizing and unproductive the EO's voter eligibility lists will be, potentially disenfranchising eligible voters in Plaintiff States.

133.    Take the SAVE database, which the President has repeatedly highlighted as a potential tool for purging States' voter rolls.  First, the SAVE database is notoriously inaccurate, such that its use risks denying eligible citizens the right to vote.[19]  Voting experts and the federal government have historically warned against overreliance on SAVE given the risk of errors, false negatives, and wrongful voter purges.[20]  SAVE is not a comprehensive list of U.S. citizens; among other things, it is not updated to include all naturalized citizens and does not include all derivative citizens born to U.S.-citizen parents outside of the country.[21]  This leads to clear oversights—for example, a naturalized citizen who obtained a driver's license before becoming a

---

[19] In one Plaintiff State, Arizona, elections officials use the SAVE database in combination with other information in some voter registration contexts.  While Arizona agrees that the database is imperfect, Arizona does not join this paragraph or the following paragraph.

[20] *Mi Familia Vota v. Fontes*, 129 F.4th 691, 705 (9th Cir. 2025); Jasleen Singh, *Homeland Security's "SAVE" Program Exacerbates Risks to Voters,* Brennan Center for Justice (July 21, 2025), https://www.brennancenter.org/our-work/research-reports/homeland-securitys-save-program-exacerbates-risks-voters.

[21] *An Assessment of Minority Voting Rights Access in the United States: 2018 Statutory Enforcement Report*, U.S. Commission on Civil Rights (2018), pp. 148–49, https://www.usccr.gov/files/pubs/2018/Minority_Voting_Access_2018.pdf.

citizen may be identified as a noncitizen in the database, a designation that was accurate at the time of entry but no longer true after naturalization, and singled out for verification and possible loss of the right to vote.[22]  One review found that the database was incorrect as to a staggering 35% of individuals whose information was run through the database in one Missouri county.[23]

134.    Recent significant changes to SAVE have only heightened these concerns. Reports indicate that States' recent attempts to trim voter rolls using SAVE have wrongfully cancelled citizens' voter registration.[24]  This has led local elections officials in some States using SAVE to conclude that the database is of little to no value in verifying citizenship status.[25]

135.    Beyond SAVE, there have been several recent reports of the federal government's mishandling of personal information.[26]  For example, attorneys for the SSA admitted in a court filing that an SSA employee and member of the U.S. Department of Government Efficiency executed an agreement with a political advocacy group requesting to analyze state voter rolls.[27]

136.    The State Citizenship List will inevitably suffer from the same defects as SAVE. Many of SAVE's defects arise from combining or layering independent data sources that do not share the same unique identifiers, a necessary tool for linking datasets.  When no universal

---

[22] *Using the Systematic Alien Verification for Entitlements (SAVE) Program for Voter Eligibility Verification*, American Immigration Counsel (Aug. 2, 2012), https://www.americanimmigrationcouncil.org/fact-sheet/using-systematic-alien-verification-entitlements-save-program-voter-eligibility/.

[23] Alexandra Berzon & Nick Corasaniti, *Initial Review Finds No Widespread Illegal Voting by Migrants, Puncturing a Trump Claim*, N.Y. Times (Jan. 14, 2026), https://www.nytimes.com/2026/01/14/us/politics/noncitizen-voters-save-tool.html.

[24] *See, e.g.*, Jude Joffe-Block, *Trump's SAVE Tool is Looking for Noncitizen Voters. But it's Flagging U.S. Citizens Too*, NPR (Dec. 10, 2025), https://www.npr.org/2025/12/10/nx-s1-5588384/save-voting-data-us-citizens; Fredreka Schouten, *Trump's Push to Audit Voter Rolls is Already Snaring US Citizens*, CNN (Feb. 9, 2026), https://www.cnn.com/2026/02/09/politics/trump-voter-roll-audit-push.

[25] *See* Jen Fifield, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes*, ProPublica (Feb. 13, 2026), https://www.propublica.org/article/save-voter-citizenship-tool-mistakes-confusion.

[26] Clint Swift and Jiamin Huang, *The 'SAVE' Tool Could Disenfranchise U.S. Citizens*, Protect Democracy at 12–13 (Aug. 2025), https://protectdemocracy.org/wp-content/uploads/2025/08/SAVETool_Aug2025.pdf.

[27] *AFSCME, AFL-CIO, et al. v. Soc. Sec. Admin., et al.*, No. 1:25-cv-00596-ELH, Dkt. 197 at 5 (D. Md., Jan. 16, 2026).

identifier exists across all data sources, records must be matched using combinations of fields (such as first name, last name, and date of birth), which increases the risk of both false positives (records incorrectly linked) and false negatives (records that should match but do not). The State Citizenship List will not only be relying on one database that links different sources—SAVE—but combining that with other sources that lack a universal identifier, compounding the potential for error. It is further unclear whether DHS and SSA have access to reliable sources of information pertaining to residence, among other things.

## IV.    Harm to Plaintiff States

137.    The Challenged Provisions irreparably harm Plaintiff States in several ways.

138.    *First*, the Challenged Provisions transgress Plaintiff States' constitutional power to prescribe the time, place, and manner of federal elections and voter qualifications. The Challenged Provisions seek to amend and dictate election law by fiat based on the President's whims. Section 2 of the EO attempts to coerce Plaintiff States to act contrary to existing state laws and practices related to voter rolls and the determination of voter eligibility through threats of criminal prosecution, and to do so on highly compressed timelines and at significant cost. Section 3 interposes federal limits that prevent States from guaranteeing the fair and lawful administration of their mail ballot programs. The Challenged Provisions thus harm Plaintiff States' authority to administer elections, set voter qualifications, and secure the voting rights of their citizens, and particularly the States' authority to determine which voters are entitled to vote by mail. This invasion of States' constitutional power amounts to concrete constitutional injury, abrogating Plaintiff States' sovereign interests in conducting elections in accordance with duly enacted state and federal law.

139.    *Second*, the Challenged Provisions introduce chaos as the 2026 midterm elections approach, imposing a significant burden on Plaintiff States' electoral systems. "When an election is close at hand, the rules of the road should be clear and settled. That is because running a statewide election is a complicated endeavor." *Democratic Nat'l Comm. v. Wis. State*

34

*Legislature*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring in denial of application to vacate stay).

140.    Americans vote by mail in significant numbers; approximately 30% of voters voted by mail in the November 2024 election, and that number is substantially higher in certain Plaintiff States that choose to offer their voters no-excuse mail voting.  USPS serves a critical role in delivering election mail, processing nearly 100 million ballots in the 2024 General Election alone.[28]

141.    The scale of mail voting underscores the challenges of forcing state and local elections officials to navigate conflict between state laws, which allow duly registered voters to request, receive, and cast a mail ballot, and the EO's limitations on mail ballots cast by voters not on a USPS-controlled list, on threat of criminal penalty.  That challenge is especially heightened in Plaintiff States in which most voters vote by mail, and which automatically send mail ballots to all registered voters.  *See, e.g.*, Cal. Elec. Code § 3000.5.

142.    If the Challenged Provisions go into effect, state and local elections officials will have to devote significant time, personnel, and money to managing and mitigating the harms associated with these dramatic changes, including by erecting new mail voting infrastructure and conducting widespread voter education campaigns to inform voters accustomed to voting by mail under existing state law.  *See Doe v. Trump*, 157 F.4th 36, 79 (1st Cir. 2025), *petition for cert. filed*, No. 25-899 (U.S. Jan. 30, 2026).

143.    The Challenged Provisions will also leave States' voters perplexed over the state of the law—whether USPS will accept their ballots, whether their names are being compiled on a federal list, and whether their State may administer an election pursuant to state law.  As a first point of contact for voters and the designated administrators of elections, it will be up to Plaintiff States (directly and through their political subdivisions) to bear the burden of this confusion.  For

---

[28] United States Postal Service, *Delivering the Nation's Election Mail Securely and Effectively: 2024 Post-Election Analysis Report*, https://about.usps.com/what/government-services/election-mail/pdf/usps-post-election-report-2024-12-02.pdf.

example, citizens who access their records on the State Citizenship List and find that they are not listed will likely turn to Plaintiff States with questions about why they are not listed and what rights they do or do not have. Plaintiff States will need to develop training programs for staff to answer these kinds of question and divert staff to interface with the public.

144.    The EO's record preservation requirement would add to these costs, too. Consistent with federal law, States already store election records for at least 22 months. The EO more than doubles that retention period, requiring States to spend on physical or electronic storage to account for this new data retention paradigm.

145.    Taken together, reinventing Plaintiff States' electoral systems in the EO's image will come at significant financial cost.

146.    *Third*, the public's confusion over voting rules will generate a separate injury: damage to the public trust in States to administer elections fairly in accordance with state law. If the Attorney General "enforce[s] compliance," EO § 4(b), as the EO threatens, it will levy irreparable reputational harm on Plaintiff States. *See Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996).

147.    *Fourth*, the Challenged Provisions' overlapping sets of voter eligibility lists will disenfranchise Plaintiff States' voters, stymying Plaintiff States from administering their elections as their laws and their constitutions provide.

148.    *Fifth*, the Challenged Provisions expose Plaintiff States' elections officials and personnel to the threat of criminal prosecution. The EO repeatedly and clearly directs federal law enforcement authorities to bring criminal prosecutions against state and local employees involved in election administration. EO §§ 2(b), 5. This harms Plaintiff States by threatening prosecution against their employees and damaging their ability to hire and retain workers.

149.    No adequate remedy at law is available to redress these irreparable harms.

**FIRST CAUSE OF ACTION**

**EO § 2 – Separation of Powers / Elections and Electors Clauses / Voter Qualifications / Commandeering – Presidential Action in Excess of Authority – Unlawful Interference with States' Voter Roll Maintenance and Authority to Set Voter Qualifications**

**(Against the President, U.S. DOJ, Acting Attorney General Blanche, DHS, Secretary Mullin, USCIS, Director Edlow, SSA, SSA Commissioner Bisignano, U.S. DOC, and Secretary Lutnick)**

150.    Plaintiff States restate and reallege paragraphs 1 to 145 as if fully set forth herein.

151.    Plaintiff States have an equitable, non-statutory right of action for claims seeking to enjoin and declare unlawful official action that is ultra vires and for which there is no other remedy at law.

152.    The U.S. Constitution grants States legislative power to prescribe "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives," subject to preemption by Congress, U.S. Const. art. I, § 4, cl. 1, and to "direct" the "Manner" of appointment of presidential electors, *id.* art. II, § 1, cl. 2.  This constitutional power encompasses the authority to "provide a complete code for [federal] elections."  *Smiley*, 285 U.S. at 366.

153.    Plaintiff States and their instrumentalities maintain voter rolls in accordance with state and federal law.  Voter rolls are continuously updated to account for new voters, changes in residence, deaths, and other grounds for ineligibility.  In compliance with state and federal law, Plaintiff States' elections officials issue ballots to duly registered voters.

154.    Section 2 of the EO creates a new federal program to superintend and control States' maintenance of their voter rolls.  EO Section 2 requires DHS and SSA to create lists of voting age citizen residents of each State and to send the relevant list to each State a mere "60 days prior" to an election.  EO § 2(a).  DHS and SSA have no authority to create such lists, nor to compile the data that would be included in such lists, nor to send such lists to States for use in connection with elections.  The President also has no power to order DHS and SSA to take actions outside their statutory authority.

155.    Upon receipt of the State Citizenship List, state elections officials must either rapidly remove voters from the rolls who are omitted from that list and refuse them a ballot—in violation of the NVRA, state and federal notice protections, and in reckless disregard of voters' fundamental rights—or face the risk of criminal prosecution for "issu[ing] Federal ballots to individuals not eligible to vote in a Federal election" according to the federal government's own

assessment of voters' residency and citizenship. *Id.* § 2(b). These conflicting legal obligations create an untenable legal dilemma for Plaintiff States and their elections officials.

156. No constitutional provision or statute authorizes the President to direct the creation of lists defining the voting age citizen residents in each State; federal election statutes reference State voter rolls (and impose on States the requirement to maintain them), and neither those statutes nor any other require, contemplate, or allow Defendants to cull data from various federal government sources into a shadow voter eligibility list. Nor does any constitutional provision or statute authorize the President to use the threat of criminal prosecution to coerce States to refrain from issuing ballots to voters due to their absence from such a list. *Cf. Youngstown*, 343 U.S. at 585.

157. The U.S. Constitution also vests States with primary authority to determine the qualifications of voters for the U.S. House of Representatives and U.S. Senate. U.S. Const. art. I., § 2, cl. 1; U.S. Const. amend. XVII. "[T]he Qualifications Clauses of Article I, § 2, and the Seventeenth Amendment are applicable to primary elections in precisely the same fashion that they apply to general congressional elections." *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 227 (1986).

158. Plaintiff States have exercised their powers under the Voter Qualifications Clauses, among other authorities, to determine who is eligible to vote in federal primary and general elections. Exercising those powers, over 20 states—including many Plaintiff States[29]— permit certain 17-year-olds to vote in federal primary elections should they turn 18 years old on or prior to the next federal general election.

159. Section 2 of the EO interferes with the States' authority to determine the qualifications of voters in federal primary elections. Section 2(a) directs the creation of a federal

---

[29] *See* Colo. Rev. Stat. 1-2-101(2)(c); Conn. Const. art. VI, § 11; Del. Code Ann. tit. 15, §§ 1701, 3110; D.C. Code Ann. § 1-1001.02(2)(A); 10 Ill. Comp. Stat. 5/3-6(a); Me. Rev. Stat. Ann. tit. 21-A, § 111-A; Md. Code Ann., Elec. Law § 3-102(a)(2); N.J. Rev. Stat. § 19:4-1.2; N.M. Stat. Ann. § 1-4-2(B)(3); N.C. Gen. Stat. § 163-59; R.I. Gen. Laws § 17-1-3(b); Vt. Const. ch. II, § 42; Va. Code Ann. § 24.2-403; Wash. Rev. Code § 29A.08.170(2).

voter eligibility list limited to citizens who are over 18 years of age, omitting eligible 17-year-olds. Section 2(b) likewise purports to supersede state laws authorizing 17-year-olds to participate in federal primary elections by excluding them from the definition of individuals "eligible to vote in a Federal election" and directing the investigation and prosecution of state and local officials who "issue Federal ballots" to qualified 17-year-olds.

160.    Not only does the President lack authority to enact this new process, but EO Section 2 also intrudes on the powers of the States and Congress and is contrary to applicable law for numerous independent reasons, including the following:

a.  EO Section 2 unconstitutionally usurps Plaintiff States' and Congress's power to determine appropriate methods and procedures for maintaining voter rolls and assessing voter eligibility, including residency and citizenship.

b.  EO Section 2 unconstitutionally commandeers Plaintiff States' elections officials to implement its new program, including by tasking them with "routinely supplement[ing] and provid[ing] suggested modifications or amendments to the State Citizenship List." EO § 2(a). When the State Citizenship List does not match a State's voter roll, the State faces the intolerable choice of disenfranchising a voter or facing federal investigation and prosecution of its officials.

c.  EO Section 2 is contrary to the expressed will of Congress because it applies coercive pressure to States and their elections officials to systematically remove voters during the NVRA-mandated quiet period, 52 U.S.C. § 20507(c)(2), (a)(4), contravenes Congress's legislative design in the NVRA, which leaves the States responsibility for conducting voter roll maintenance, *id.* § 20507, places in doubt the qualification of voters expressly permitted by UOCAVA in federal elections, and threatens criminal penalties against elections officials for issuing ballots to voters even though federal law requires elections officials to issue provisional ballots in certain circumstances, *id.* § 21082(a).

39

    d.   EO Section 2(a)'s mandate that DHS create, maintain, and share State Citizenship Lists is ultra vires and contrary to law because neither DHS nor SSA have authority to create lists defining the voting age citizen residents in each State, to compile the data that would be included in such lists, or to send such lists to States for use in connection with elections.

    e.   EO Section 2 unconstitutionally usurps the State's authority to determine voter qualifications in federal elections.

161.    Plaintiff States will be harmed by the new federal effort to interfere with States' voter rolls, including harm to their authority over elections, reputational harm from wrongful prosecution, and significant costs and administrative burdens.

162.    Plaintiff States will also be harmed by being forced to manage federal eligibility lists that experience has shown to be highly unreliable, creating a serious and unjustified risk of disenfranchisement. Section 2 of the EO grants federal agencies decisive control of this list, preventing States from ensuring accuracy.

163.    Plaintiff States are also harmed by the imminent threat of criminal prosecution of their elections officials. There is an actual controversy about whether Plaintiff States' elections officials will be deemed to have violated federal criminal statutes by providing a ballot to a voter whose citizenship the federal government has not confirmed. Plaintiff States intend to administer federal elections in compliance with existing state and federal law and do not intend to remove voters from rolls based on the federal government's failure to confirm voters' residency and citizenship. The EO directs the Attorney General to prioritize investigations and criminal prosecutions against elections officials who "issue Federal ballots to individuals not eligible to vote in a Federal election," EO § 2(b), establishing an actual controversy and a credible threat of prosecution.

164.    Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that Section 2 of the EO violates the separation of powers and impermissibly arrogates to the Executive power that is reserved to the States and Congress.

165.    Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that issuing a ballot to an individual who has been omitted from the State Citizenship List does not per se violate federal criminal law.

166.    Plaintiff States are further entitled to a preliminary and permanent injunction preventing Defendants U.S. DOJ, Acting Attorney General Blanche, DHS, Secretary Mullin, SSA, and SSA Commissioner Bisignano from enforcing or implementing Section 2 of the EO.

**SECOND CAUSE OF ACTION**

**EO § 3 – Separation of Powers / Elections and Electors Clauses / Commandeering – Presidential Action in Excess of Authority – Unlawful Interference with States' Mail Voting**

**(Against the President, Acting Attorney General Blanche, and USPS Defendants)**

167.    Plaintiff States restate and reallege paragraphs 1 to 159 as if fully set forth herein.

168.    Plaintiff States have an equitable, non-statutory right of action for claims seeking to enjoin and declare unlawful official action that is ultra vires and for which there is no other remedy at law.

169.    The U.S. Constitution affords States legislative power to prescribe "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives," subject to preemption by Congress, U.S. Const. art. I, § 4, cl. 1, and to "direct" the "Manner" of appointment of presidential electors, *id.* art. II, § 1, cl. 2.  This constitutional power encompasses the authority to create and administer a mail voting program.  *See Smiley*, 285 U.S. at 366.

170.    Plaintiff States allow for mail voting under legislative schemes adopted in each State.  Some Plaintiff States, including California, Colorado, the District of Columbia, Nevada, Oregon, and Washington, send mail ballots to all active, registered voters.  Other Plaintiff States, including Arizona, Illinois, Massachusetts, Michigan, Minnesota, New Jersey, New Mexico, New York, North Carolina, Rhode Island, Virginia, and Wisconsin, allow voters to request mail ballots through specified procedures.  Still others, like Vermont, maintain some combination of both systems.

171.    Section 3 of the EO mandates that USPS adopt a specific, comprehensive program to regulate mail ballots.  Regardless of any remaining implementation details, EO Section 3 unequivocally mandates new USPS requirements for mail voting which are ripe for review and should be enjoined as unconstitutional now.

172.    The President has no constitutional or statutory authority to require USPS to enact a program to monitor and control States' mail ballot programs.  *Cf. Youngstown*, 343 U.S. at 585.

173.    Congress carefully crafted a statutory scheme insulating USPS from political pressure and presidential meddling.  In doing so, Congress relegated the President to the modest role of nominating Governors, with bipartisan consultation, and a limit on no more than five Governors belonging to the same political party.

174.    Moreover, EO Section 3's requirements intrude on the powers of the States and Congress and are contrary to applicable law for numerous independent reasons, including:

    a.   EO Section 3 unconstitutionally invades Plaintiff States' power under the Elections and Electors Clauses to provide for and administer mail voting.

    b.   EO Section 3 unconstitutionally commandeers Plaintiff States and their elections officials to "routinely supplement and provide suggested modifications or amendments" to the Mail-In and Absentee Participation list, EO § 3(b)(iv)–(v), and to implement new federal design requirements for mail ballot envelopes, *id.* § 3(b)(i), among other burdens.

    c.   EO Section 3 unconstitutionally invades Congress's power to enact law governing "the entire postal system of the county," *Ex parte Jackson*, 96 U.S. at 732, by dictating new USPS rules by presidential decree.  *See* U.S. Const. art. I, § 8, cl. 7.

    d.   EO Section 3 is contrary to the expressed will of Congress, as represented in UOCAVA, because it creates new limitations on voters' use of mail voting, including military and overseas voters.  52 U.S.C. § 20302(a)(1).

    e.   EO Section 3 violates existing statutory requirements applicable to USPS, including that USPS is governed by an independent, bipartisan, multimember

Board of Governors who appoints the Postmaster General, 39 U.S.C. §§ 201, 202, 203; that new rules must be adopted through proper process, including submission of proposed changes to the Postal Regulatory Commission, *id.* § 3661(b); that USPS has an affirmative mandate to "provide postal services," *id.* § 101(a), including types of mail service necessary "to meet the needs of different categories of mail and mail users, *id.* § 403(b); that USPS may not "make any undue or unreasonable discrimination among users of the mails," *id.* § 403(c); that nonmailable matter is limited to discrete categories defined by statute, *id.* § 3001(b)(1); that USPS is prohibited from taking on new non-postal services and Section 3 is not "necessary in the execution of its function," *id.* §§ 404(e), 401(2); and that USPS cannot make available to the public or States any "list of names or addresses (past or present) of postal patrons or other persons," *id.* § 412(a).

175.   Plaintiff States will be harmed by the new federal initiative to interfere with States' administration of mail voting, including harm to their sovereignty and significant costs and administrative burdens.

176.   Plaintiff States will also be harmed by being forced to manage USPS's mail ballot eligibility lists, creating a serious and unjustified risk of disenfranchisement.  Section 3 of the EO grants federal agencies decisive control of this list, preventing States from ensuring accuracy.

177.   Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that Section 3 of the EO violates the separation of powers and impermissibly arrogates to the Executive power that is reserved to the States and Congress.

178.   Plaintiff States are further entitled to a preliminary and permanent injunction preventing Defendants U.S. DOJ, Acting Attorney General Blanche, and USPS Defendants from enforcing or implementing Section 3 of the EO.

**THIRD CAUSE OF ACTION**

**EO § 5 – Separation of Powers / Elections and Electors Clauses / Commandeering –
Presidential Action in Excess of Authority – Unlawful Document Preservation Mandate**

43

**(Against the President, U.S. DOJ, and Acting Attorney General Blanche)**

179.    Plaintiff States restate and reallege paragraphs 1 to 171 as if fully set forth herein.

180.    Plaintiff States have an equitable, non-statutory right of action for claims seeking to enjoin and declare unlawful official action that is ultra vires and for which there is no other remedy at law.

181.    The U.S. Constitution grants States legislative power to prescribe "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives," subject to preemption by Congress, U.S. Const. art. I, § 4, cl. 1, and to "direct" the "Manner" of appointment of presidential electors, *id.* art. II, § 1, cl. 2.  This constitutional power encompasses the authority to "provide a complete code for [federal] elections," including procedural matters like the preservation of election-related documents and materials.  *Smiley*, 285 U.S. at 366.

182.    Section 5 of the EO directs that "States and localities should preserve, for a 5-year period, all records and materials—excluding ballots cast—evidencing voter participation in any Federal election (e.g., ballot envelopes, regardless of carrier)."

183.    Existing federal law requires preservation of voting materials for 22 months following an election, and preservation of records concerning voter roll maintenance for two years.  52 U.S.C. §§ 20507(i)(1), 20701.  Plaintiff States have also enacted laws and regulations setting timelines for the preservation and destruction of voting materials in federal elections. *See, e.g.*, Cal. Elec. Code §§ 17301(b), 17303(b), 17305(b) (preservation for 22 months followed by mandatory destruction if no contest or criminal prosecution is pending); Mass. Gen. Laws ch. 54, § 109 (requiring destruction of records upon expiration of retention period); Wash. Admin. Code § 434-262-200 (setting 22-month deadlines for federal election materials).

184.    The President has no constitutional or statutory authority to create document preservation obligations for Plaintiff States' elections officials by executive fiat.  *Cf. Youngstown*, 343 U.S. at 585.

185.    The document preservation standard in EO Section 5 unconstitutionally invades States' and Congress's power to regulate federal election administration by imposing different

44

and contrary rules for document preservation than those currently binding state elections officials.

186.    The document preservation standard in EO Section 5 unconstitutionally commandeers the Plaintiff States' resources and personnel to accomplish a presidential objective, without congressional authorization.

187.    Compliance with a five-year document preservation standard for election materials would impose significant compliance, storage, and other costs on Plaintiff States and their elections officials.

188.    Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the five-year document preservation standard in Section 5 of the EO violates the separation of powers and impermissibly arrogates to the Executive power that is reserved to the States and Congress.

189.    Plaintiff States are further entitled to a preliminary and permanent injunction preventing Defendants Acting Attorney General Blanche and U.S. DOJ from enforcing the five-year document preservation standard in Section 5 of the EO against States and their elections officials.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff States pray that this Court:

1.    Issue a judicial declaration that the Challenged Provisions of the EO are unconstitutional and void because they are ultra vires and violate both the separation of powers and the States' sovereignty and authority over elections under the United States Constitution;

2.    Preliminarily and permanently enjoin all Defendants, except President Trump, from implementing or enforcing the Challenged Provisions of the EO;

3.    Award Plaintiff States their reasonable fees, costs, and expenses, including attorneys' fees; and

4.    Grant any other relief as this Court may deem just and proper.

Dated: April 17, 2026                                  Respectfully submitted.

**ROB BONTA**                                          **ANDREA JOY CAMPBELL**
Attorney General of California                         Attorney General of Massachusetts

By: */s/ Michael S. Cohen*                             By: */s/ Vanessa A. Arslanian*
Michael S. Cohen*                                      M. Patrick Moore (BBO No. 670323)
    *Deputy Attorney General*                              *First Assistant Attorney General*
Thomas S. Patterson*                                   Vanessa A. Arslanian (BBO No. 688099)
    *Senior Assistant Attorney General*                    *State Trial Counsel*
Seth E. Goldstein*                                     Jared B. Cohen (BBO No. 689217)
    *Supervising Deputy Attorney General*              Jak Kundl (BBO No. 713951)
Anne P. Bellows*                                           *Assistant Attorneys General*
Malcolm A. Brudigam*                                   One Ashburton Place
Robert William Setrakian*                              Boston, MA 02108
    *Deputy Attorneys General*                         (617) 963-2107
1300 I Street, P.O. Box 944255                         Vanessa.Arslanian@mass.gov
Sacramento, CA 95814                                   Pat.Moore@mass.gov
(916) 210-6090                                         Jared.B.Cohen@mass.gov
Michael.Cohen@doj.ca.gov                               Jak.Kundl@mass.gov
Seth.Goldstein@doj.ca.gov
Anne.Bellows@doj.ca.gov                                *Counsel for the Commonwealth of Massachusetts*
Malcolm.Brudigam@doj.ca.gov
William.Setrakian@doj.ca.gov

*Counsel for the State of California*

**AARON FORD**                                         **NICHOLAS W. BROWN**
Attorney General of Nevada                             Attorney General of Washington

By: */s/ K. Brunetti Ireland*                          By: */s/ Tera M. Heintz*
K. Brunetti Ireland*                                   Tera M. Heintz*
    *Chief of Special Litigation*                      Cristina Sepe*
1 State of Nevada Way, Suite 100                       Karl D. Smith*
Las Vegas, NV 89119                                        *Deputy Solicitors General*
(702) 486-9246                                         1125 Washington Street SE
KIreland@ag.nv.gov                                     PO Box 40100
                                                       Olympia, WA 98504-0100
*Counsel for the State of Nevada*                      (360) 753-6200
                                                       Tera.Heintz@atg.wa.gov
                                                       Cristina.Sepe@atg.wa.gov
                                                       Karl.Smith@atg.wa.gov

                                                       *Counsel for the State of Washington*

*(additional counsel on following page)*

**KRISTIN K. MAYES**
Attorney General of the State of Arizona

By: */s/ Kara Karlson*
Kara Karlson*
Karen J. Hartman-Tellez*
Joshua M. Whitaker*
Syreeta Tyrell*
    *Assistant Attorneys General*
2005 North Central Ave.
Phoenix, AZ 85004
(602) 542-8118

*Counsel for the State of Arizona*

**WILLIAM TONG**
Attorney General of Connecticut

By: */s/ Maura Murphy*
Maura Murphy*
    *Deputy Associate Attorney General*
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5020

*Counsel for the State of Connecticut*

**BRIAL L. SCHWALB**
Attorney General of the District of
Columbia

By: */s/ Eliza H. Simon*
Eliza H. Simon*
    *Senior Counsel*
400 6th St. NW
Washington, D.C. 20001
(202) 741-5221

*Counsel for the District of Columbia*

**PHILIP J. WEISER**
Attorney General for the State of Colorado

By: */s/ Shannon Stevenson*
Shannon Stevenson*
    *Solicitor General*
Peter Baumann*
    *Senior Assistant Attorney General*
1300 Broadway
Denver, Colorado 80203
(720) 508-6400

*Counsel for the State of Colorado*

**KATHLEEN JENNINGS**
Attorney General of the State of Delaware

By: */s/ Ian R. Liston*
Ian R. Liston*
    *Director of Impact Litigation*
Vanessa L. Kassab*
    *Deputy Attorney General*
820 N. French Street
Wilmington, DE 19801
(302) 683-8899

*Counsel for the State of Delaware*

**KWAME RAOUL**
Attorney General for the State of Illinois

By: */s/ Vikas Didwania*
Vikas Didwania*
    *Complex Litigation Counsel*
Alex Hemmer*
    *Deputy Solicitor General*
Holly F.B. Berlin*
    *Assistant Attorney General*
115 S. LaSalle St.
Chicago, IL 60603
(312) 814-5526

*Counsel for the State of Illinois*

*(additional counsel on following page)*

47

**AARON M. FREY**
Attorney General for the State of Maine

By: */s/ Katherine W. Thompson*
Katherine W. Thompson*
 *Special Counsel*
6 State House Station
Augusta, ME 04333-0006
(207) 626-8800

*Counsel for the State of Maine*

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Neil Giovanatti*
Neil Giovanatti*
Erik Grill*
 *Assistant Attorneys General*
P.O. Box 30736
Lansing, MI 48909
(517) 335-7659

*Counsel for the State of Michigan*

**JENNIFER DAVENPORT**
Attorney General of New Jersey

By: */s/ Meghan K. Musso*
Meghan K. Musso*
Jonathan Mangel*
Joshua P. Bohn*
 *Deputy Attorneys General*
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5276

*Counsel for the State of New Jersey*

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: */s/ Virginia A. Williamson*
Virginia A. Williamson*
 *Assistant Attorney General*
200 Saint Paul Place
Baltimore, MD 21202
(410) 576-6584

*Counsel for the State of Maryland*

**KEITH ELLISON**
Attorney General for the State of Minnesota

By: */s/ Allen Cook Barr*
Angela Behrens*
Allen Cook Barr*
 *Assistant Attorneys General*
Lindsey E. Middlecamp*
 *Special Counsel*
445 Minnesota Street, Suite 600
St. Paul, MN, 55101
(651) 300-0711

*Counsel for the State of Minnesota*

**RAÚL TORREZ**
Attorney General of New Mexico

By: */s/ Bailey Colfax*
Bailey Colfax*
 *Assistant Attorney General*
408 Galisteo Street
Santa Fe, NM 87501
(505) 490-4060

*Counsel for the State of New Mexico*

*(additional counsel on following page)*

**LETITIA JAMES**
Attorney General of New York

By: */s/ Colleen K. Faherty*
Colleen K. Faherty*
 *Special Trial Counsel*
Rabia Muqaddam*
 *Chief Counsel, Federal Initiatives*
28 Liberty Street
New York, NY 10005
(212) 416-6046

*Counsel for the State of New York*

**DAN RAYFIELD**
Attorney General, State of Oregon

By: */s/ Thomas H. Castelli*
Thomas H. Castelli*
 *Special Assistant Attorney General*
100 SW Market Street
Portland, OR 97201
(971) 673-1880

*Counsel for the State of Oregon*

**CHARITY R. CLARK**
Attorney General for the State of
Vermont

By: */s/ Ryan P. Kane*
Ryan P. Kane*
 *Deputy Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-2153

*Counsel for the State of Vermont*

**JEFF JACKSON**
Attorney General of North Carolina

Laura Howard
Chief Deputy Attorney General

By: */s/ Daniel P. Mosteller*
Daniel P. Mosteller*
 *Associate Deputy Attorney General*
114 W. Edenton Street
Raleigh, NC 27603

*Counsel for the State of North Carolina*

**PETER F. NERONHA**
Attorney General of Rhode Island

By: */s/ Kyla Duffy*
Kyla Duffy*
 *Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400

*Counsel for the State of Rhode Island*

**JAY JONES**
Attorney General for the Commonwealth of
Virginia

By: */s/ Tillman J. Breckenridge*
Tillman J. Breckenridge*
 *Solicitor General*
202 North Ninth Street
Richmond, VA 23219

*Counsel for the Commonwealth of Virginia*

*(additional counsel on following page)*

**JOSHUA L. KAUL**
Attorney General for the State of Wisconsin

By: */s/ Lynn Lodahl*
Lynn Lodahl*
    *Assistant Attorney General*
17 West Main Street
Madison, WI 53707-7857
(608) 264-6219

*Counsel for the State of Wisconsin*

**JOSH SHAPIRO**
Governor of the Commonwealth of Pennsylvania

By: */s/ Michael J. Fischer*
Michael J. Fischer*
    *Executive Deputy General Counsel*
Jacob B. Boyer*
    *Deputy General Counsel*
30 North Third Street, Suite 200
Harrisburg, PA 17101
(717) 831-2847

*Counsel for the Governor of the Commonwealth of Pennsylvania*

**\****Admitted pro hac vice or pro hac vice applications forthcoming*

50