## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

STATE OF CALIFORNIA; et al.,

                    *Plaintiffs,*

v.

DONALD J. TRUMP, in his official
capacity as President of the United States; et
al.,

                    *Defendants.*

Case No. 1:26-cv-11581

## DECLARATION OF JANA M. LEAN

I, Jana M. Lean, declare as follows:

1.      I am a resident of the State of California.  I am over the age of 18.  I am familiar with the information in the statements set forth below either through personal knowledge, consultation with staff in the Office of the California Secretary of State, or from my review of relevant documents and information.  If called as a witness, I could and would testify competently to the matters set forth below.

2.      I am the Chief of the Elections Division, employed in the Office of the California Secretary of State.  I work for Secretary of State Shirley N. Weber, Ph.D. and support her in her official capacity as the Chief Elections Official for the State of California.  In my role, I assist her in the execution and enforcement of all state and federal laws relating to elections.

3.      I have served as the Chief of the Elections Division at the California Secretary of State's Office since 2010.  Before assuming my current position, I served in various roles in the Elections Division for more than 12 years.  I am familiar with all aspects of the Elections

1

Division's work.  To date, I have overseen 17 statewide elections and 78 special vacancy elections.

4.    The California Secretary of State and California's 58 counties are primarily responsible for administering federal elections in the state.  This responsibility encompasses voter registration, maintaining and updating voter rolls, issuing ballots to registered voters, tabulating votes, and certifying results in all elections for federal office, among numerous other tasks.

5.    As California's Chief Elections Officer, the Secretary of State is responsible for executing and enforcing all state and federal law relating to elections within the state.  *See* Cal. Gov't Code § 12172.5(a); Cal. Elec. Code § 10.  The Elections Division is responsible for implementing the Secretary of State's responsibilities with regard to elections, including enforcing laws, ensuring that elections are conducted efficiently, and providing technical information, advice, and assistance to County Clerks and Registrars of Voters ("county elections officials") and the public.  California law charges my office with preventing disenfranchisement and ensuring that all eligible voters who want to vote are able to do so.  *See, e.g.*, Cal. Gov't Code § 12172.5; Cal. Elec. Code § 2300.  However, the Secretary's role does not include actually conducting elections, which is primarily administered at the county level in California.

6.    In my role as Chief of the Elections Division at the California Secretary of State's Office, I am responsible for overseeing the work of the Elections Division.  The Elections Division oversees the administration of federal and state elections within the State of California, including by providing guidance on election laws and procedures to county elections officials, assisting National Voter Registration Act ("NVRA") agencies in California and county elections officials in ensuring compliance with the NVRA, training county elections officials and NVRA

2

agencies, preparing state voter information guides, printing and distributing voter registration cards, maintaining a statewide system of all registered voters ("VoteCal"), coordinating and compiling all statewide voter registration statistics, qualifying candidates for statewide and special elections, certifying the list of candidates for state and federal office, tracking and certifying ballot initiatives, surveying all of California's 58 counties regarding ballot transmittal statistics on military and overseas voters and reporting those statistics to the United States Department of Justice, administering a Voter Assistance Hotline for the entire state, receiving Election Day complaints from the public and coordinating the resolution of those complaints with all of California's 58 counties, compiling the vote results from each county, certifying the election results, issuing nomination and election certificates to all victorious state and federal candidates, educating California citizens about their voting rights, and promoting voter registration and participation.

7.    I am familiar with the Executive Order published on March 31, 2026, entitled "Ensuring Citizenship Verification and Integrity in Federal Elections" (the "EO").  Sections 2, 3, and 5 of the EO (collectively, the "Challenged Provisions") have already caused confusion and concern and will impose unrecoverable costs on California.

8.    In response to the issuance of the EO, my office has already begun conducting outreach to county election officials.  County elections officials across the state have voiced concern to me about the impact of the EO on election administration, as preparations for the June 2, 2026, Primary Election and November 3, 2026, General Election are already under way.

9.    It is my understanding that Section 2(a) of the EO directs the Department of Homeland Security ("DHS") to create a "State Citizenship List" for each State, which will include "individuals confirmed to be United States citizens who will be above the age of 18 at

3

the time of an upcoming Federal election and who maintain a residence in the subject State." It is also my understanding that DHS will send these lists "no fewer than 60 days before each regularly scheduled Federal election, or promptly upon request by a State in connection with any special Federal election." This would mean that DHS will send this list by Friday, September 4, 2026, for the federal general election taking place on November 3, 2026.

10.    Section 2 requires immediate action from me and my team in the California Secretary of State's Office to understand how it interacts with VoteCal, and to coordinate with other state and local agencies across California. Our efforts to address the changes and impacts of the EO will divert time and attention from other critical election preparations necessary for the June 2, 2026, Statewide Direct Primary Election and the November 3, 2026, General Election.

11.    My office has a continuing obligation to work with county election officials in each of the 58 counties to perform regular list maintenance, as required under the National Voter Registration Act ("NVRA"), Help America Voter Act ("HAVA"), and California state law. This includes sending notices to voters who may have moved, identifying duplicates on the statewide voter registration list, cancelling the registrations of those who have been convicted of a felony and are currently incarcerated, and cancelling the registrations of those who have died.

12.    Additionally, county election officials will need to continue to register those who are eligible to vote in California. California allows qualified individuals to register up to 15 days before Election Day. Cal. Elec. Code § 2102(a); 52 U.S.C. § 20507(a)(1) (requiring States to permit registration up to 30 days before a federal election). California also allows voters to register up to and on Election Day through a process called conditional voter registration, if they satisfy the applicable requirements. Cal. Elec. Code § 2170. California citizens can register to vote online, at their county elections official's offices, at various state social service agencies,

4

and through California's Department of Motor Vehicles when they submit sufficient information regarding their voter qualifications (including citizenship) through their transaction. All methods of voter registration in California require individuals to certify that they meet all eligibility qualifications (including citizenship) under penalty of perjury. *See* Cal. Elec. Code §§ 2101, 2102(c), 2111, 2112, 2150.

13.    In compliance with the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), California allows uniformed and overseas voters to register for a federal election if their registration application is received at least 15 days before that election. Cal. Elec. Code § 3102(e); 52 U.S.C. § 20302(a)(2) (requiring States to permit registration from absent uniformed services or overseas voters up to 30 days before a federal election). In addition, UOCAVA voters may register to vote in the 14 days prior to and on Election Day through conditional voter registration, if they satisfy the applicable requirements. *See* Cal. Elec. Code § 2170(b); Cal. Code Regs., tit. 2, § 20021.

14.    In compliance with the NVRA "quiet period" or "black out period" for voter registration, California does not systematically remove voters from the rolls during the 90 days prior to a federal election unless a statutory exception applies. *See* 52 U.S.C. §§ 20507(c)(2)(A), 3(A)-(B), 4(A). California does, however, lawfully remove voters on an individual basis where appropriate, such as when a voter requests that his or her registration be canceled, when a voter has been found mentally incompetent to vote by a court, and upon proof that the voter is presently imprisoned for the conviction of a felony. Cal. Elec. Code § 2201.

15.    In sum, California's statewide voter registration list changes up to and on Election Day. Registrants are constantly being added, updated, and removed as required (and limited) by federal and state law, and this will continue through the 2026 elections and beyond.

5

16.     I have considered how this dynamic statewide voter registration list will intersect with the list created by DHS.  As noted above, pursuant to Section 2(a) of the EO, DHS will share a State Citizenship List by September 4, 2026.  The EO permits the state "to routinely supplement and provide suggested modifications or amendments to the State Citizenship List transmitted thereto."  The EO does not require DHS to accept any of these state supplements, modifications, or amendments to the State Citizenship List.

17.     Once we receive the State Citizenship List, we will have to devote substantial resources to identifying any differences between it and our current statewide voter registration list maintained in VoteCal; investigating the reason for any discrepancies; tracking those records; and communicating such discrepancies back to federal agencies as required by the EO.  As a baseline matter, comparing the State Citizenship List to our current statewide voter registration list in VoteCal will necessitate linking registrants across the lists.  This will be difficult, as it is extremely doubtful that the State Citizenship List will contain the same unique identifiers as VoteCal, such that we could perform straightforward matching.  For example, California uses California Driver's License numbers and identification card numbers, which federal agencies generally do not have.  Rather, it is inevitable that there will be differences in the files that will make matching difficult, time-consuming, and potentially inaccurate, as people's names, addresses, and other information may vary slightly (*e.g.*, Robert vs. Bob, Apartment #3 vs. Apt. 3, Sara Jones-Smith vs. Sara Jones Smith).  I know from my experience that data matching is a complex process and extreme care must be taken when the consequences of errors may lead to voter disenfranchisement.  And because California will receive the State Citizenship List so close in time to the election, my office must plan for all of this as soon as possible.

18.     For eligible voters who appear on the statewide voter registration list but not the State Citizenship List, my office will need to investigate further pursuant to our obligation to ensure that eligible voters are able to vote.  Even though California will not cancel voters' registrations simply due to their absence from the State Citizenship List, the List could disenfranchise voters in multiple ways.  First, voters who check their status on the State Citizenship List as contemplated by Section 2(a) and see that they are not listed may be deterred from voting because they believe they will be blocked from voting or prosecuted, especially if DHS does not timely accept their corrections.  Second, eligible voters may believe they are registered because their name is on the State Citizenship List even though they have not gone through the registration process in California, and as a result they may ultimately not be able to vote.  Third, USPS may rely on the State Citizenship List to determine which voters can receive and transmit mail ballots in response to the EO's emphasis on criminal penalties associated with the distribution of mail ballots to ineligible individuals.  EO §§ 2(b), 3(a), 5.  Additionally, if the State Citizenship List is publicly accessible, local elections workers may misunderstand their legal obligations and refuse to provide a ballot to eligible voters missing from the State Citizenship List based on their belief that the voters are ineligible.  These are all risks that California cannot accept.  We must make every effort to avoid disenfranchising eligible California citizens.

19.     Accordingly, in compliance with California's obligation to protect the right to vote, California would expend significant resources to attempt to supplement and amend the federal list as necessary, as errors were found through our comparison and investigation.  This includes determining proper and secure methods for sending large volumes of confidential data to the federal government.  However, even if we are able to quickly offer all necessary

7

corrections, the EO does not require DHS to accept the State's "suggested modifications or amendments."  EO § 2(a).

20.     California would incur significant costs to undertake this comparison and verification of the State Citizenship List.  VoteCal would need to be updated to allow California to receive the Statewide Citizenship List and compare it with the statewide voter registration list in VoteCal.  Because it is unclear what precise fields would be included in the State Citizenship List or in what format the List will be provided, it is difficult to determine at this time exactly what updates we would need to make to VoteCal to account for this new functionality.  A recent similar, but smaller scale, change to VoteCal to add a list maintenance process for conservatorships took about a year and a half to develop, test, and deploy, and required the addition of four new staff.  These types of modifications to our VoteCal system historically are extremely costly.  The EO provides no funding, so paying for these costs will have to come from devoting fewer resources to our office's other pressing responsibilities.  The necessary modifications to VoteCal to implement the EO would be unprecedented.  Because every registered California voter receives a vote-by-mail ballot, this comparison process would entail evaluating over 23 million registered California voters.

21.     The Elections Division in the California Secretary of State's Office produces training materials, guidance documents, and communications to, and conducts in-person and remote trainings for, elections officials in California's 58 counties.  For example, my office regularly provides written guidance and information to the State's county election officials through written advisories, known as County Clerk/Registrar of Voter Memoranda or "CC/ROVs."  In addition to producing a variety of written guidance documents, my office produces training PowerPoints and video resources available to county elections officials.

22.    If Section 2 is implemented, California will have to devote significant time, personnel, and money to update training materials for county election officials and their staff, specifically detailing what steps they must take with respect to voters who appear on California's voter registration list but not on the State Citizenship List.  Specifically, educating county elections officials would involve my office preparing and disseminating guidance and informational materials, including CC/ROVs, on how to interpret and best implement Section 2 of the EO.  In addition, our office frequently conducts trainings on various topics, especially when there are changes to the state's elections processes that affect all 58 counties.  When we need to train county elections officials in all 58 counties, the state is split into five regions and the trainings require coordination with all the county elections officials in each region.  In short, a rollout of a statewide change to our elections processes like the EO would generate a significant need for trainings around the state, written advisories, and constant follow-up and iterations in these materials based on feedback.  An analogous situation arose in 2020.  The COVID-19 pandemic led to rapid changes to our state election laws to successfully run an election during an ongoing pandemic on short notice.  This endeavor took massive coordination from the Secretary of State's Office involving statewide calls daily to respond to problems and issues arising in real time.  I expect a similar demand on our time would arise if Section 2 were implemented, as we would need to review, supplement, amend, and implement any requirements regarding the State Citizenship List to mitigate the harms that could flow from that List.  I estimate that more than 25 Elections Division staff—approximately half of all Elections Division staff—would be required to assist in implementing these requirements.  This is yet another aspect of the EO's implementation that will necessarily divert significant resources and staff from other important election administration tasks.

23.    I anticipate that in addition to formal training materials, my office will need to allocate significant resources to responding directly to local election officials, given the threat of criminal prosecution in Section 2 of the EO.

24.    At the same time my staff will be performing investigations into the accuracy of the State Citizenship List, they will have to conduct a wide-ranging public education campaign to ensure that eligible voters understand the EO's requirements, and how they may impact a citizen's registration and ability to vote.  For example, my staff will have to update our website and prepare and distribute public education materials guiding citizens through accessing and correcting their individual records on the State Citizenship List under section 2(a).  We will also need to field questions from registrants concerned about their voter registration status and generally confused about the process and qualifications to vote in California elections.

25.    If Section 2(a) is implemented, a sustained public education campaign will likely be necessary to effectively educate the public regarding the new State Citizenship List and how voters can check, update, and correct their record on that List.  Running such a public education campaign through the conclusion of the 2026 elections, and perhaps thereafter, would require a significant amount of money and resources that are not currently contained in our state election budget.  An analogous high-profile statewide education campaign in 2020 educating Californians about statewide vote by mail cost more than $15 million.  Our current budget does not have funds for such a large-scale public education campaign.

26.    In my experience administering elections, changes to registration and election procedures in the time immediately preceding an election can cause voter confusion.  The complicated requirements of the EO will likely lead some citizens to misunderstand the requirements for registration, or whether they are able to vote in California's elections.  Some

10

citizens will determine that the added requirements make registering and/or voting too confusing to be worthwhile.  For example, a voter may check their individual status on the State Citizenship list, according to the EO.  If they are mistakenly not included, they may believe they have no recourse, and choose not to vote, or they may misunderstand the process for correction (despite my office's attempts to provide education), or DHS may not issue a correction in time. The result of this confusion will be that fewer eligible voters successfully register to vote or decide to cast a ballot.

27.    This inevitable voter confusion harms California because it will disenfranchise voters, interfering with our sovereign interest and state-law obligation to ensure that all eligible voters who want to can cast a vote.  It will also impose a burden on my staff's time, as my staff (and the elections staff at the county offices) will be responsible for dispelling voter confusion to the extent possible.  This voter confusion will come at a crucial time, shortly before the election, when county elections officials' resources are particularly stretched.

28.    California elections officials are required by state law to issue ballots to duly registered voters.  *See* Cal. Const., art. II, sec. 2 (providing qualifications for voters), sec. 2.5 (providing the right for qualified voters to have their votes counted); Cal. Elec. Code §§ 3000.5 (requiring every active registered voter to be sent a vote-by-mail ballot); 14217 (requiring the furnishing of a provisional ballot to voters whose names are not on a precinct's roster); 14270-14300 (setting forth the procedures for issuing ballots at the polls).  My office intends to comply with these state legal requirements in administering upcoming federal elections.

29.    In compliance with UOCAVA, California issues ballots to registered voters who request an absentee ballot under that Act at least 45 days before an election.  52 U.S.C. §§ 20302(a)(1)-(3), (8)(A).

11

30.     It is my understanding that Section 2(b) of the EO instructs the Attorney General to prioritize investigation and prosecution, under a variety of federal statutes, of "State and local officials or any others involved in the administration of Federal elections who issue Federal ballots to individuals not eligible to vote in a Federal election." I understand that the EO provides that "an individual is 'eligible to vote in a Federal election' if the individual is a citizen of the United States, 18 years of age or older by the date of the upcoming election, and otherwise qualified under the laws of his or her State." I further understand that Section 5 of the EO encourages referrals to U.S. DOJ of "[e]vidence of violations of existing Federal laws by State or local election officials" and "States or localities," among other parties, "for consideration of investigation or charges."

31.     If EO Section 2 goes into effect, I would be concerned that I, my staff, and county elections officials would face federal prosecution if we issued ballots to California voters who are not on the State Citizenship List. I am concerned about the impact of these threats of criminal prosecution on my staff, not because I believe they would violate federal criminal laws, but because the EO increases the amount of pressure and scrutiny on them, including by the public.

32.     I know that the threat of prosecution under the EO is on the minds of state and local elections officials like me. I am aware of numerous county election officials who have left the field of elections since 2020 due to increased threats, harassment, and public pressure. In addition, my office has experienced significant staff turnover in the last three years due to the increased pressure and scrutiny on our work over this time period. I worry that the threat of prosecution under the EO could result in more state and local elections officials leaving their jobs, as people may not wish to take on the risk.

12

33.     Should the Attorney General initiate any such enforcement actions, the California Secretary of State's Office would be required to divert significant resources not only to respond to such legal action but also to educate the public, with the aim of minimizing voter confusion.

34.     Any such legal proceedings would also have severe and adverse consequences for the public's trust in California's administration of elections.  California is committed to running free and fair elections, and the Secretary of State's Office places the highest value on maintaining public trust as a steward of our democracy.  Legal proceedings challenging California's lawful administration of elections could unfairly undermine that public trust.

35.     Additionally, the creation of a State Citizenship List may directly disenfranchise voters.  It is my understanding that if a citizen is not included on the list—due, for example, to errors in DHS's static immigration information contained in its Systematic Alien Verification for Entitlements (SAVE) system, the federal government's misinterpretation of whether the citizen qualifies as a state resident, or any other error—they may believe they are unable to vote, and could be prosecuted for doing so.  That is why California works so hard to maintain consistent voter registration information so that voters are not erroneously informed that they are ineligible to vote.

36.     Based on my experience assisting county election officials, I understand these officials may feel they cannot register or send a ballot to such voters without risking criminal prosecution, despite those voters' fundamental right to vote under state and federal law.  Similarly, based on my experience I understand that United States Postal Service ("USPS") or other entities involved in the "printing, production, shipment, or distribution of ballots" may believe they cannot provide a ballot to those voters without risking criminal prosecution.

13

37.      In California, every active registered voter is mailed a ballot.  Cal. Elec. Code § 3000.5.  Under state law, such ballots can be counted if post marked on or before Election Day and received by the county elections official no later than seven days after Election Day.  Cal. Elec. Code § 3020(b).  California law also allows voters who cast vote-by-mail ballots on or before Election Day to cure signature issues on their vote-by-mail ballot return envelope up to eight days before certification of election results (which occurs up to 30 days after Election Day), potentially allowing their ballots to ultimately be counted.  Cal. Elec. Code § 3019(d), (e), (j).  My office intends to comply with these state legal requirements in administering upcoming federal elections.

38.      It is my understanding that Section 3(b) of the EO directs the USPS to initiate a rulemaking that, among other things, would allow States to provide lists of mail voters to USPS 60 days before an election, require the creation of a "Mail-In and Absentee Participation List" ("USPS Mail Ballot List") and prohibit USPS from delivering mail ballots sent by individuals not on the USPS Mail Ballot List.  It is also my understanding that California can "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, but USPS is not required to accept any changes provided by California.

39.      Under Section 3(b) of the EO, in order to comply with state law requiring all eligible voters to receive a mail ballot, at least 60 days before Election Day we would need to send a list to USPS of voters to whom we intend to send a mailed ballot ("State Mail Ballot List").  Cal. Elec. Code § 3000.5.  For the 2026 federal general election, that deadline will be September 4, 2026.  Failing to provide this list to USPS would pose an unacceptable risk under the EO that USPS will not include California mail voters on the USPS Mail Ballot List, thereby making it more difficult or impossible for eligible voters to cast their ballots.

14

40.    As discussed throughout this declaration, California's use of the mail for elections, paired with our election calendar, means I must prepare now for how to align California's administration of mail voting with the EO.

41.    Creating the State Mail Ballot List will require my office and county elections officials to expend time and resources to ensure that all active registered voters are included. This task will be significantly complicated by the influx of registration updates and changes that elections officials typically receive in the months before the election (and which I expect will be exacerbated by the State Citizenship List provisions discussed above).

42.    The deadline to provide this list to USPS no later than 60 days before the election means that some voters who are entitled to a mail ballot under state and federal law will unavoidably be left off the list.  UOCAVA permits uniformed and overseas voters to request absentee ballots up to 45 days before an election.  52 U.S.C. § 20302(a)(8).  Under California law, voters may register and receive a vote-by-mail ballot up to 15 days before an election.  Cal. Elec. Code §§ 2102(a), 3000.5, 3001.  The EO does not specify when USPS will transmit its USPS Mail Ballot List to our office, which could cause substantial complications, nor does it require USPS to accept any modifications suggested by California, even if errors were identified in the State Citizenship List.

43.    Once we receive the USPS Mail Ballot List, we will have to devote substantial resources to understanding any differences between it and our own list of voters eligible to receive mail ballots.  This will be a difficult task for many of the same reasons set out above with regard to the State Citizenship List, including: the lack of unique identifiers shared by both lists, the potential for slight variations in spelling to wrongly preclude matches, the fluid nature of voter registration rolls in the lead-up to elections, and administrative challenges inherent to any

15

data-matching process.  Accordingly, reviewing the USPS Mail Ballot List will require a significant expenditure of time and resources, which will be diverted away from preparing for upcoming midterm elections and other necessary election administration tasks.

44.     For citizens who appear on the statewide voter registration list and are eligible to receive a mail ballot under California law but not the USPS Mail Ballot List, my office will need to investigate further pursuant to our obligation to ensure that every active registered voter is able to receive a mail ballot pursuant to State law.  *See* Cal. Elec. Code § 3000.5.  We must make every effort to do so to avoid disenfranchising eligible California residents.

45.     California would expend significant resources to attempt to supplement and amend the USPS Mail Ballot list as necessary, as errors were found through our comparison and investigation.  This includes determining proper and secure methods for sending large volumes of confidential data to the USPS.  This is true even though the EO instructs that we can only "supplement" and "provide suggested modifications or amendments" to the USPS Mail Ballot List, and USPS is not required to accept them.

46.     Even with the best efforts of my office and county elections officials, the challenges of completing a complex data-matching program in a short timeframe and while preparing to administer an election poses the high risk of errors and omissions.

47.     California would incur significant costs to undertake this comparison and verification of the USPS Mail Ballot List.  Comparison and verification of the USPS Mail Ballot List would also require adding a new functionality to VoteCal.  Because it is unclear what precise fields would be included in the USPS Mail Ballot List or in what format the List will be provided, it is difficult to determine at this time exactly what updates we would need to make to VoteCal to account for this new functionality.  As I discussed in paragraph 20, changes to

16

VoteCal can be very costly, and it can take more than a year to develop, test, and ensure the security of any new functionality.

48. If Section 3 is implemented, California will have to devote significant time, personnel, and money to update training materials for local elections officials and their staff. Those materials would have to specifically detail what steps they must take with respect to voters who appear on California's voter registration list and are eligible to receive a mail ballot under California law, but who do not appear on the USPS Mail Ballot List. This is yet another aspect of the EO's implementation that will necessarily divert more than half of our team's resources from other important election administration tasks.

49. I anticipate that, in addition to formal training materials, my office will need to allocate significant resources to responding directly to local elections officials, given the threat of criminal prosecution in the EO.

50. At the same time my staff is creating the State Mail Ballot List and performing investigations into the accuracy of the USPS Mail Ballot List, they will have to field questions from citizens concerned about their ability to receive or return a mail ballot in the upcoming elections. Thus, a separate impact of the EO's directive concerns the need for a wide-ranging public education campaign to ensure that eligible voters understand the EO's requirements, and how they may impact a citizen's ability to vote by mail. This is particularly the case for California residents, who are used to automatically receiving mail ballots and being able to vote by mail under existing state law.

51. I estimate that such a public education effort would be expensive and require funds not allocated for in the current budget. An analogous statewide education campaign in 2020 educating Californians about statewide vote by mail cost more than $15 million.

17

52.     Apart from the time and monetary costs that Section 3's implementation would impose on California, Section 3 also risks voter confusion and disenfranchisement.  This inevitable voter confusion is a harm in and of itself and is also a burden on my staff's time.  This voter confusion will come at a crucial time shortly before the election, when county elections officials are required under California law to send mail ballots to all eligible voters.

53.     Sending mail ballots in a timely fashion is not only required by state and federal law, but is critical to ensuring that as many eligible California citizens as possible can exercise their right to vote.  In the 2024 General Election, 80.76% of all California voters voted by mail—13,034,378 out of 16,140,044 total votes cast.[1]

54.     Errors in the USPS Mail Ballot List would be extremely harmful because of the potential for voter disenfranchisement.  For example, consider an eligible voter who is on the State Mail Ballot List but not on the USPS Mail Ballot List.  Under the EO, they are likely to receive a mail ballot from their local elections official that USPS will later refuse to return to the local elections official.  In that situation, the voter may think that they have voted, but they have not.  Nor would the voter necessarily know to cancel that ballot and vote in person, given that the EO does not charge USPS with notifying the voter.  A voter may also be concerned about casting two ballots, which is itself a criminal violation, and choose not to vote.  My office must take every measure possible to avoid this kind of voter disenfranchisement.

55.     In my experience administering elections, changes to election procedures in the time immediately preceding an election can cause voter confusion.  The EO's complicated requirements will likely lead some eligible voters to misunderstand whether they are able to use

---

[1] *Historical Vote-By-Mail (Absentee) Ballot Use in California*, Cal. Sec'y of State, https://www.sos.ca.gov/elections/historical-absentee (last visited Apr. 20, 2026).

18

a mail ballot.  Some eligible voters will determine that the added requirements make voting too confusing to be worthwhile.  The result of this confusion will be that fewer eligible voters decide to cast a ballot.

56.     There are several additional inherent problems posed by the deadlines outlined above and the requirement to compare static lists (the State Citizenship List, USPS Mail Ballot List, and State Mail Ballot List) with a constantly evolving list (the statewide voter registration list).  For example, between the day the State Citizenship List is sent and 15 days before Election Day (the last day a voter may register to receive a mail ballot under California law) there will inevitably be a significant number of individuals who become eligible but are not captured on the State Citizenship List.  They may, for example, have moved to California or become naturalized citizens after the list was sent.  Regarding voters who have moved, I am not aware of any legal requirement that voters report change of residential address to the Federal Government.

57.     Additionally, as already noted, the timeline simply is not workable.  The EO requires DHS to send the State Citizenship List to States "no fewer than 60 days before each regularly scheduled Federal election."  For the November 3, 2026, General Election, that means DHS must send this list by Friday, September 4, 2026.  And California must also send its State Mail Ballot List to USPS 60 days before the election—also Friday, September 4, 2026.  Thus, we must send the State Mail Ballot List (i.e., all those who should receive a mail ballot under state law) to USPS on the *same day* we might receive the State Citizenship List from DHS. Comparing the statewide voter registration list and the State Citizenship List to see who is eligible according to both lists in *one day*, or even *a few hours*, is simply not possible to do with any meaningful degree of accuracy, no matter how many resources my office dedicates to the project.

19

58.    Although the EO provides that we may "routinely supplement and provide suggested modifications or amendments" to the USPS Mail Ballot List, there is no guarantee that USPS will accept those suggestions.  If we—in an attempt to protect California's elections officials from criminal liability—sent a State Mail Ballot List to USPS 60 days before Election Day that reflected only confirmed matches between the statewide voter registration list and the State Citizenship List, knowing that many eligible voters could have been wrongfully excluded from the State Citizenship List, we would be committing ourselves to potentially violating California law.  We could then endeavor to submit additional matches as we confirmed them. But it would be very difficult to do so quickly enough to matter.  For the November 3, 2026, General Election, county election officials may begin transmitting ballots to UOCAVA voters as early as September 4, 2026 (E-60)—the same date the State Citizenship List is to be sent to States under the EO.  *See* Cal. Elec. Code § 3105.  On September 19, 2026 (E-45)—only 2 weeks after we receive the State Citizenship List—UOCAVA voters' ballots must be mailed out. No later than October 5, 2026 (E-29), county election officials begin mailing each active registered voter a vote-by-mail ballot.  Even if DHS and USPS accepted our suggestions, there is unlikely to be enough time to get a ballot to those who are eligible but did not appear on the State Citizenship List.  Voters would be disenfranchised and California law would not be honored.

59.    Again, because of our obligation to ensure that every eligible California resident can vote, we would need to take additional steps after receiving the State Citizenship List and USPS Mail Ballot List to investigate the status of all those on the statewide registration list who do not appear on the federal lists, and then suggest changes to both.  This will require data matching, verification, follow-up investigations, and interfacing with DHS, USPS, counties, the public, and others, and will demand an enormous investment of resources.  Additionally, state

20

cybersecurity and information technology staff would need to be involved to facilitate the secure transfer of information between the federal government and the California Secretary of State. This would require the redirection of a significant number of staff and staff's time required to work with DHS and USPS to securely transfer information.

60.     Based on my experience, I believe the EO will increase financial strain on my office and necessitate a higher budget.  My office will need to request additional funds from the legislature, which we are far from assured to receive.  We will be unable to pull funds or cut expenses from elsewhere in our budget.

61.     Any time spent by current staff on implementing the EO would divert time and attention from other critical election preparation in the days leading up to the election, my office's busiest time.  Our staff is already at capacity and dedicated to routine tasks and special projects that ensure California's elections run smoothly and every eligible California resident can exercise their right to vote.  This work becomes more voluminous, significant, and urgent in the months leading up to the election, when we must answer an increasing volume of questions and handle tasks related to, for example, logic and accuracy testing and voter challenges.

62.     Each of these tasks and costs will divert scarce resources from other important election administration needs.

63.     Out of 58 counties in California, 55 counties currently use Intelligent Mail barcodes on ballot mail.  Three counties do not currently use Intelligent Mail barcodes for outbound and inbound tracking.

64.     It is my understanding that Section 5 of the EO directs that "States and localities should preserve, for a 5-year period, all records and materials—excluding ballots cast— evidencing voter participation in any federal election (e.g., ballot envelopes, regardless of

21

carrier)." But existing federal law only requires preservation of voting materials for 22 months following an election, and preservation of records concerning voter roll maintenance for two years. 52 U.S.C. §§ 20507(i)(1), 20701. California law and regulation also set timelines for the preservation and destruction of voting materials in federal elections. *See* Cal. Elec. Code §§ 17301, 17303, 17305, 17601.

65.    Compliance with a five-year document preservation standard for election materials would impose significant compliance, storage, and other costs on California and local elections officials.

66.    Additionally, under current State and federal law, California may begin properly disposing of certain retained materials from the 2024 primary elections on April 2, 2028 (22 months after the June 2, 2026, primary election) and the 2024 general election on September 3, 2028 (22 months after the November 3, 2026, general election). The EO prevents California from undertaking these actions as to some, but not all, of the retained materials, and requires California to incur further management, storage, and security costs instead.

67.    More than doubling the required retention time for some (but not *all*) voting materials would increase these burdens and costs significantly.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 21, 2026, in Sacramento, California.

_____
Jana M. Lean
Chief of Elections Division
California Secretary of State's Office

22