**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

STATE OF CALIFORNIA, et al.,

                    *Plaintiffs,*

v.

DONALD J. TRUMP, in his official capacity
as President of the United States, et al.,

                    *Defendants.*

Case No. 1:26-cv-11581-IT

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF STATES' MOTION
FOR SUMMARY JUDGMENT, DECLARATORY RELIEF, AND PERMANENT
INJUNCTION**

## TABLE OF CONTENTS

**Page**

Introduction...............................................................................................1

Background...............................................................................................2

    I.     Legal Framework Governing Federal Elections.............................2

          A.    States Have Broad Constitutional Authority to Regulate Federal Elections...............................................................................2

          B.    Congress Has Set Limited Requirements for Federal Elections.........3

    II.    Factual Background .........................................................................4

          A.    The States' Preparation for Midterm Elections ...............................4

          B.    The Executive Order .........................................................................5

Legal Standard .........................................................................................7

Argument .................................................................................................7

    I.     Plaintiff States Have an Equitable Cause of Action to Enjoin Presidential Orders that Violate the Separation of Powers.................................7

    II.    The Challenged Provisions Violate the Separation of Powers .......................8

          A.    Section 2 Unconstitutionally Invades State Power Over Voter Rolls .........................................................................................8

               1.    Section 2(a) exceeds the President's authority ......................8

               2.    Section 2(b)'s threat of prosecution abuses the President's authority ...............................................................................10

               3.    Section 2 violates the separation of powers and conscripts state and local officials to implement a presidential policy..................................................................................12

          B.    Section 3 Unconstitutionally Requires USPS to Regulate Mail Voting ...............................................................................14

               1.    The President cannot order USPS to impose a new mail voter eligibility program .........................................................14

               2.    The President lacks authority to order USPS to require ballot envelope design changes..............................................18

          C.    Section 5 Unconstitutionally Regulates States' Election Record Retention ...................................................................................19

    III.   Plaintiff States' Claims Are Justiciable .......................................................20

          A.    Plaintiff States Have Standing to Challenge Sections 2, 3, and 5.....20

          B.    Plaintiff States' Challenges to Section 2, 3, and 5 Are Ripe ............25

    IV.   Declaratory Relief is Proper..........................................................................27

    V.    The Court Should Permanently Enjoin the Challenged Provisions As To Plaintiff States.............................................................................................28

          A.    The Challenged Provisions Inflict Imminent and Irreparable Harm ...................................................................................28

**TABLE OF CONTENTS**
**(continued)**

**Page**

B.    The Equities and the Public Interests Favor Injunctive Relief .........29

Conclusion .................................................................................................................30

# TABLE OF AUTHORITIES

**Page**

### CASES

*Abbott Lab'ys v. Gardner*
387 U.S. 136 (1967)................................................................................................27

*Abbott v. Perez*
585 U.S. 579 (2018)...............................................................................................29

*Adria Int'l Grp., Inc. v. Ferre Dev., Inc.*
241 F.3d 103 (1st Cir. 2001)....................................................................................7

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*
458 U.S. 592 (1982)...............................................................................................21

*Algonquin Gas Transmission, LLC v. Weymouth*
919 F.3d 54 (1st Cir. 2019)........................................................................25, 26, 27

*Am. Sch. of Magnetic Healing v. McAnnulty*
187 U.S. 94 (1902)..................................................................................................16

*Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*
220 F. Supp. 3d 27 (D.D.C. 2016) ..........................................................................15

*Arizona v. Inter Tribal Council of Ariz., Inc.*
570 U.S. 1 (2013).................................................................................2, 12, 13, 17

*Bantam Books, Inc. v. Sullivan*
372 U.S. 58 (1963)..................................................................................................11

*Bellitto v. Snipes*
935 F.3d 1192 (11th Cir. 2019) .................................................................................4

*California v. Trump*
786 F. Supp. 3d 359 (D. Mass. 2025) ............................................................ *passim*

*City of Providence v. Barr*
954 F.3d 23 (1st Cir. 2020)...........................................................................9, 17, 18

*Clinton v. Jones*
520 U.S. 681 (1997).................................................................................................13

*Collins v. Yellen*
594 U.S. 220 (2021)..................................................................................................7

*Colorado v. DeJoy*
No. 20-cv-2768, 2020 WL 5513567 (D. Colo. Sept. 14, 2020)...................................17

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*CoxCom, Inc. v. Chaffee*
536 F.3d 101 (1st Cir. 2008)..................................................................................28

*Democratic Nat'l Comm. v. Wis. State Legislature*
141 S. Ct. 28 (2020).............................................................................................26

*Diamond Alt. Energy, LLC v. Env't Prot. Agency*
606 U.S. 100 (2025)..............................................................................................12

*Doe v. Bush*
323 F.3d 133 (1st Cir. 2003)..................................................................................27

*Doe v. Trump*
157 F.4th 36 (1st Cir. 2025)..............................................................................20, 29

*Doe v. Trump*
766 F. Supp. 3d 266 (D. Mass. 2025) ....................................................................28

*Does 1-6 v. Mills*
16 F.4th 20 (1st Cir. 2021)....................................................................................29

*Duke Power Co. v. Carolina Env't Study Grp.*
438 U.S. 59 (1978)................................................................................................25

*Fish v. Kobach*
840 F.3d 710 (10th Cir. 2016) ..............................................................................30

*Foisie v. Worcester Polytechnic Inst.*
967 F.3d 27 (1st Cir. 2020)...................................................................................20

*FPL Energy Me. Hydro LLC v. FERC*
551 F.3d 58 (1st Cir. 2008)...................................................................................27

*Georgia v. Meadows*
88 F.4th 1331 (11th Cir. 2023) .......................................................................9, 12, 18

*Gonzalez v. Arizona*
677 F.3d 383 (9th Cir. 2012) ..................................................................................3

*Hyde Park Partners, L.P. v. Connolly*
839 F.2d 837 (1st Cir. 1988)..................................................................................30

*In re Admin. Subpoena No. 25-1431-019*
800 F. Supp. 3d 229 (D. Mass. 2025) ....................................................................11

*In re Grand Jury Subpoenas*
___ F. Supp. 3d ___, 2026 WL 710202 (D.D.C. 2026)................................................11

iv

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Ex parte Jackson*
96 U.S. 727 (1877)...............................................................................................17

*Jensen v. R.I. Cannabis Control Comm'n*
160 F.4th 18 (1st Cir. 2025)...................................................................25, 26, 27

*Kansas v. United States*
249 F.3d 1213 (10th Cir. 2001) ...........................................................................28

*Katz v. Pershing, LLC*
672 F.3d 64 (1st Cir. 2012)............................................................................20, 21

*Kimani v. Holder*
695 F.3d 666 (7th Cir. 2012) ...............................................................................10

*La. Pub. Serv. Comm'n v. FCC*
476 U.S. 355 (1986).................................................................................................9

*Lackey v. Stinnie*
604 U.S. 192 (2025)...............................................................................................17

*Largess v. Supreme Jud. Ct.*
373 F.3d 219 (1st Cir. 2004) (per curiam) ...........................................................9

*League of United Latin Am. Citizens v. Exec. Off. of the President*
__ F. Supp. 3d __, 2026 WL 252420 (D.D.C. Jan. 30, 2026) ...............................7, 9, 12

*League of Women Voters of U.S. v. Newby*
838 F.3d 1 (D.C. Cir. 2016)...........................................................................29, 30

*Little v. Reclaim Idaho*
140 S. Ct. 2616 (2020)...........................................................................................28

*Louisiana v. Biden*
55 F.4th 1017 (5th Cir. 2022) ...............................................................................22

*Maryland v. King*
567 U.S. 1301 (2012)..............................................................................................28

*Massachusetts v. U.S. Dep't of Health & Hum. Servs.*
923 F.3d 209 (1st Cir. 2019)..........................................................................21, 28

*Merrill v. Milligan*
142 S. Ct. 879 (2022)..............................................................................................26

*Morales v. Trans World Airlines, Inc.*
504 U.S. 374 (1992)................................................................................................29

## TABLE OF AUTHORITIES
### (continued)

**Page**

*New Hampshire Lottery Comm'n v. Rosen*
　986 F.3d 38 (1st Cir. 2021)......................................................................................11

*N.H. Right to Life Pol. Action Comm. v. Gardner*
　99 F.3d 8 (1st Cir. 1996)......................................................................................24, 29

*Nat. Res. Def. Council, Inc. v. U.S. Dep't of the Interior*
　397 F. Supp. 3d 430 (S.D.N.Y. 2019)..................................................................19

*Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*
　407 F. Supp. 2d 323 (D. Mass. 2005) .................................................................30

*New York v. Biden*
　636 F. Supp. 3d 1 (D.D.C. 2022).........................................................................17

*Obama for Am. v. Husted*
　697 F.3d 423 (6th Cir. 2012) ...............................................................................30

*Printz v. United States*
　521 U.S. 898 (1997).............................................................................13, 18, 19, 20

*Pub. Int. Legal Found., Inc. v. Bellows*
　92 F.4th 36 (1st Cir. 2024)...................................................................................15

*Purcell v. Gonzalez*
　549 U.S. 1 (2006)..............................................................................................24, 30

*R.I. Ass'n of Realtors v. Whitehouse*
　199 F.3d 26 (1st Cir. 1999)................................................................................24, 26

*Reddy v. Foster*
　845 F.3d 493 (1st Cir. 2017)................................................................................24

*Rhode Island v. Trump*
　781 F. Supp. 3d 25 (D.R.I. 2025) .......................................................................9, 17

*Rodriguez v. Robbins*
　715 F.3d 1127 (9th Cir. 2013) .............................................................................30

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*
　102 F.3d 12 (1st Cir. 1996)...........................................................................24, 25, 29

*Smiley v. Holm*
　285 U.S. 355 (1932).........................................................................................2, 21

*Steffel v. Thompson*
　415 U.S. 452 (1974).........................................................................................24, 27

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Stern v. U.S. Dist. Ct. for Dist. of Mass*.
   214 F.3d 4 (1st Cir. 2000)..............................................................................25

*Susan B. Anthony List v. Driehaus*
   573 U.S. 149 (2014)......................................................................................24

*Tashjian v. Republican Party of Conn.*
   479 U.S. 208 (1986)......................................................................................13

*Town of Milton v. Fed. Aviation Admin.*
   87 F.4th 91 (1st Cir. 2023)............................................................................24

*Tutor Perini Corp. v. Banc of Am. Sec. LLC*
   842 F.3d 71 (1st Cir. 2016)..............................................................................7

*U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*
   453 U.S. 114 (1981)......................................................................................17

*United States v. Ford*
   821 F.3d 63 (1st Cir. 2016)............................................................................10

*United States v. Gonzales*
   570 F.3d 16 (1st Cir. 2009)............................................................................10

*United States v. Martinez-Mercado*
   919 F.3d 91 (1st Cir. 2019)............................................................................10

*Washington v. Trump*
   145 F.4th 1013 (9th Cir. 2025) ....................................................................28

*Washington v. Trump*
   814 F. Supp. 3d 1173 (W.D. Wash. 2026)......................................................8

*Youngstown Sheet & Tube Co. v. Sawyer*
   343 U.S. 579 (1952)............................................................................ *passim*

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I
   § 2.................................................................................................................13
   § 2, cl. 1....................................................................................................2, 13
   § 4, cl. 1....................................................................................................2, 20
   § 8, cl. 7.......................................................................................................17

U.S. Const. art. II
   § 1, cl. 2..................................................................................................13, 20
   § 3.............................................................................................................2, 9

## TABLE OF AUTHORITIES
### (continued)

Page

U.S. Const. art. III ................................................................................................25, 26

U.S. Const. art. IV
   § 4 ...........................................................................................................................9

U.S. Const. amend. XVII ..........................................................................................2, 13

**FEDERAL STATUTES**

18 U.S.C.
   § 2(a) ...............................................................................................................5, 10
   § 241 ...........................................................................................................5, 6, 10
   § 371 ...............................................................................................................5, 10
   § 611 ...............................................................................................................5, 10
   § 1001 .............................................................................................................5, 10
   § 1015 .............................................................................................................5, 10

28 U.S.C.
   § 2201(a) .............................................................................................................27

39 U.S.C. .............................................................................................14, 15, 17
   § 102(5) ...............................................................................................................15
   § 401(2) .........................................................................................................14, 15
   § 402 ...................................................................................................................14
   § 403(c) ...............................................................................................................15
   § 404(e)(1) ...........................................................................................................15
   § 404(e)(2) ...........................................................................................................15
   § 404(e)(3) ...........................................................................................................15
   § 404(e)(4) ...........................................................................................................15
   § 3001(b) .............................................................................................................16
   § 3001(c)–(h) .......................................................................................................16
   § 3406(a)(1) .........................................................................................................16
   §§ 3701–3705 ......................................................................................................15

42 U.S.C.
   § 405(r)(8) .............................................................................................................9

52 U.S.C.
   § 10307 ...........................................................................................................5, 10
   § 20301 ...............................................................................................................19
   § 20302(a)(1) ....................................................................................................3, 16
   § 20302(a)(2) .........................................................................................................3
   § 20302(a)(8) .........................................................................................................3
   §§ 20501–20511 ....................................................................................................9
   § 20503(a) ..........................................................................................................4, 9
   § 20503(b) .............................................................................................................3

## TABLE OF AUTHORITIES
### (continued)

**Page**

§ 20507......................................................................................................12

§ 20507(a).....................................................................................................9

§ 20507(a)(1)................................................................................................4

§ 20507(a)(4)................................................................................................4

§ 20507(a)(5)................................................................................................4

§ 20507(c)................................................................................................4, 12

§ 20507(c)(2)(A).....................................................................................4, 12

§ 20507(i)(1)...........................................................................................4, 20

§ 20511...................................................................................................5, 10

§ 20701...................................................................................................4, 20

§§ 20901–21145...........................................................................................9

§ 21082(a).....................................................................................................4

§ 21083......................................................................................................12

§ 21083(a).....................................................................................................9

§ 21083(a)(1)................................................................................................4

§ 21083(a)(5)................................................................................................4

§ 21083(a)(5)(B)(ii)......................................................................................9

§ 21085.........................................................................................................9

### STATE CONSTITUTIONAL PROVISIONS

Cal. Const. art. II

  § 2............................................................................................................2, 3

  § 2(a)............................................................................................................2

  § 2.5.........................................................................................................2, 3

Nev. Const. art. II

  § 1..............................................................................................................13

### STATE STATUTES

Cal. Elec. Code

  §§ 3101 *et seq.* ..........................................................................................17

Mass. Gen. Laws ch. 51

  § 36...............................................................................................................2

  § 44...............................................................................................................2

  § 47A............................................................................................................2

Mass. Gen. Laws ch. 54

  § 25B(a)(1)–(2) ...........................................................................................3

  § 25B(a)(6)–(7) ...........................................................................................3

  § 25B(a)(9)–(10) .........................................................................................3

Wash. Rev. Code

  § 29A.40.010................................................................................................3

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

§ 29A.40.070..................................................................................................3
§ 29A.40.110(2)–(3) .......................................................................................3

**REGULATORY MATERIALS**

39 C.F.R.
§ 3.5..........................................................................................................14
§ 111.1 (2020)..........................................................................................18

Executive Order No. 14399, *Ensuring Citizenship Verification and Integrity
in Federal Elections* ................................................................ *passim*

**COURT RULES**

Fed. R. Civ. P.
Rule 56(a)...................................................................................................7
Rule 56(c)...................................................................................................7

**OTHER AUTHORITIES**

Domestic Mail Manual, §§ 202.8.0, 703.8.4, 703.8.4.1, 700.8.4.2, 703.8.4.3,
https://tinyurl.com/yc244a4c ...................................................................19

Postal Bulletin 22595, DMM Revision: Ballot Mail Clarification (Apr. 7,
2022), https://tinyurl.com/38bt4rjd.........................................................19

**INTRODUCTION**

After months of promising unprecedented interference with the administration of the midterm elections and mail voting, the President issued Executive Order No. 14399, entitled *Ensuring Citizenship Verification and Integrity in Federal Elections* ("EO").  The EO invades Plaintiff States' authority to administer elections and threatens to massively disrupt midterm elections that are already underway.

Plaintiff States challenge three dangerous and unlawful provisions of the EO.  Section 2 creates a new federal program to define baseline voter eligibility for each State by requiring federal agencies to make and share inevitably flawed lists of citizen residents who are at least 18 years old in each State.  It also compels States to conform their voter rolls to that list on pain of criminal prosecution.  Section 3 orders the United States Postal Service to take charge of States' mail voting programs by unilaterally determining which voters may cast mail ballots and how ballot envelopes must be designed.  Finally, Section 5 imposes new election material preservation requirements, more than doubling the timeline for retention under federal law.

These provisions inflict imminent, irreparable harm.  The EO imposes significant financial and administrative burdens which force Plaintiff States to divert precious resources from critical, ongoing election administration work.  States have no choice in the matter, as the EO threatens their officials with criminal prosecution for failure to comply with its new and unlawful programs.  The EO also damages public trust in States' administration of elections by confusing and disenfranchising voters.  And it disregards the States' sovereign power to regulate and administer elections.  Those injuries are urgent and constitutionally intolerable.

This Court should grant summary judgment to Plaintiff States and order the requested declaratory and permanent injunctive relief.  The President derives power only from the Constitution or federal statute.  Neither source grants the President the authority to impose the EO's requirements.  That alone would be fatal, but the EO is even worse: it runs counter to numerous constitutional and statutory mandates.  This Court should not let it stand.

1

## BACKGROUND

I.    **LEGAL FRAMEWORK GOVERNING FEDERAL ELECTIONS**

A.    **States Have Broad Constitutional Authority to Regulate Federal Elections**

The U.S. Constitution grants States primary authority to regulate federal elections, subject only to preemption by Congress. *California v. Trump*, 786 F. Supp. 3d 359, 372–373 (D. Mass. 2025) ("*California I*"), *appeal docketed*, No. 25-1726 (1st Cir. 2025); *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013) ("*ITCA*"). Specifically, the Elections Clause empowers States to prescribe the "Times, Places, and Manner of holding" congressional elections, though Congress may "make or alter" those laws. U.S. Const. art. I, § 4, cl. 1. This authorizes States to "provide a complete code" for elections, "not only as to times and places, but in relation to notices, registration, [and] protection of voters," among other issues. *Smiley v. Holm*, 285 U.S. 355, 366 (1932). In contrast, "[t]he Constitution does not grant the President any specific powers over elections." *California I*, 786 F. Supp. 3d at 373. Rather, the President is bound only to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

State law therefore sets the framework for federal elections. The U.S. Constitution leaves it up to the States to determine who may vote, U.S. Const. art I, § 2, cl. 1; *id.* amend. XVII, subject to certain limitations, and Plaintiff States have each adopted standards for voter eligibility. In California, for example, voters in statewide and federal elections must be United States citizens, at least 18 years of age, and state residents. Cal. Const. art. II, § 2(a). Eligible voters "may vote" and "shall have that vote counted." *Id.* §§ 2, 2.5. Plaintiff States typically confirm voter eligibility during registration. In Massachusetts, for instance, prospective voters must attest to their citizenship, residence, and age, and provide information under penalty of perjury establishing their identity when they register. Mass. Gen. Laws ch. 51, §§ 36, 44, 47A. And States have long maintained voter rolls listing eligible, registered voters.

State law also defines *how* eligible voters may vote by establishing various methods of voting—most commonly by mail, early in-person, and in-person on election day. Plaintiff States allow eligible voters to request and receive a mail ballot, and in most Plaintiff States, no excuse

2

is required to vote by mail.  Some States send every active registered voter a mail ballot.  *See, e.g.*, Wash. Rev. Code §§ 29A.40.010, 29A.40.070.  Others allow voters to request and receive one.  *See, e.g.*, Mass. Gen. Laws ch. 54, § 25B(a)(1)–(2), (6)–(7), (9)–(10).  When mail ballots are returned to elections officials, each Plaintiff State undertakes certain verification procedures.  *See, e.g.*, Wash. Rev. Code § 29A.40.110(2)–(3).  Once verified, the mail ballot must be counted.

These state law requirements are binding on state and local elections officials.  Where registered voters validly request and cast ballots, officials must comply with their legal obligations to allow those voters to vote and have their ballot counted.  *See, e.g.*, Cal. Const. art. II, §§ 2, 2.5 (eligible voters "may vote" and "shall have that vote counted.").

### B.    Congress Has Set Limited Requirements for Federal Elections

Congress has enacted three statutes related to voter registration, voter roll maintenance, and mail voting that are relevant here: the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), the National Voter Registration Act ("NVRA") and the Help America Vote Act ("HAVA").  In each enactment, Congress acknowledged state law procedures and preserved considerable discretion for States in meeting the prescribed requirements.  States have since incorporated many of these requirements into their own laws.

Congress enacted UOCAVA to improve voting access for members of the uniformed services and U.S. citizens living abroad.  It requires States to allow these voters to register and vote absentee in all elections.  52 U.S.C. § 20302(a)(1).  States must transmit validly requested ballots to UOCAVA voters no later than 45 days before a federal election (with exceptions not relevant here) and must process valid registration applications received at least 30 days before the election.  *Id.* § 20302(a)(2), (a)(8).

Congress meant the NVRA to reduce barriers to voter registration, protect the integrity of federal elections, and improve the accuracy of voter rolls.[1]  As relevant here, the NVRA expanded the "method[s] of voter registration" that States had to offer for federal elections, set a

---

[1] All Plaintiff States except Wisconsin and Minnesota are subject to the NVRA.  *See Gonzalez v. Arizona*, 677 F.3d 383, 394 n.12 (9th Cir. 2012) (citing 52 U.S.C. § 20503(b)).

floor for state voter registration deadlines (no more than 30 days before an election), and required States to inform applicants of the applicable voter eligibility requirements and penalties associated with submitting false registration information. *Id.* §§ 20503(a), 20507(a)(1), (5).

The NVRA also set forth a framework for States' maintenance of voter rolls. *Id.* §§ 20507(a)(4), (c), (i)(1). It requires States to "conduct a general program that makes a reasonable effort to remove the names of voters who have become ineligible on account of death or change of address." *Bellitto v. Snipes*, 935 F.3d 1192, 1199 (11th Cir. 2019); *see* 52 U.S.C. § 20507(a)(4). Any program that systematically removes ineligible voters from voter rolls must conclude no later than 90 days before a federal primary or general election, unless an exception applies. 52 U.S.C. § 20507(c)(2)(A). In addition, the NVRA requires preservation of records concerning voter roll maintenance for two years, while other federal law requires preserving other voting records for 22 months following federal elections. *Id.* §§ 20507(i)(1), 20701.

Congress enacted HAVA to upgrade the States' voting infrastructure. As relevant here, HAVA requires States to create a centralized database of registered voters and set forth standards for applicants to verify their identity upon registration. *Id.* §§ 21083(a)(1), (5). Under HAVA, if a voter not listed on the voter roll appears at a polling place but declares themselves duly registered and eligible, they must be allowed to cast a provisional ballot. *Id.* § 21082(a).

## II.    FACTUAL BACKGROUND

### A.    The States' Preparation for Midterm Elections

Plaintiff States and their subdivisions administer elections for federal office. Plaintiffs' Statement of Undisputed Material Facts, Doc. No. 105 at 2 ¶ 6. This includes registering voters, issuing ballots, and certifying results in all federal elections. *Id.* at 3 ¶ 7. Each State is currently preparing to administer the November general election, and many are actively administering or preparing to administer federal primaries. *Id.* at 4 ¶ 8. Deadlines will accumulate as preparations proceed, including deadlines to complete systematic maintenance of voter rolls, enroll overseas and military voters who submit timely applications, issue mail ballots, complete voter registration, and eventually open and staff polling places. *Id.* at 4–8 ¶¶ 9–13.

4

### B.    The Executive Order

President Trump has publicly railed against mail ballots and advocated for a federal takeover of States' election administration. *Id.* at 1 ¶¶ 1–2. On March 31, 2026, the President issued the EO. *Id.* at 2 ¶ 3. The White House described the EO as, among other things, "ordering citizenship verification for Federal elections." *Id.* at 2 ¶ 5.

Section 2(a) of the EO instructs the Department of Homeland Security ("DHS") to collaborate with the Social Security Administration ("SSA") to compile, disseminate, and maintain "State Citizenship Lists" identifying individuals who are "confirmed to be United States citizens," will be over 18 by the next federal election, and are residents of the relevant State. EO § 2(a); *see also id.* § 4(c) (requiring data sharing and setting deadlines). DHS must transmit these State Citizenship Lists to States "no fewer than 60 days" before a federal election. *Id.* § 2(a). DHS must also allow individuals and States to offer corrections, but nothing in the EO requires DHS to accept those corrections. *Id.* This State Citizenship List program forms the apparent backbone of the EO's effort to verify "Federal election voter eligibility." *Id.* § 1.

Section 2(b) begins by defining individuals "eligible to vote in a Federal election" as persons who are "citizen[s] of the United States, 18 years of age or older by the date of the upcoming election," and otherwise qualified under state law. Next, the provision directs the U.S. Attorney General to "prioritize" investigating and prosecuting state and local officials and others involved in federal election administration "who issue Federal ballots to individuals not eligible to vote in a Federal election." *Id.* Section 2(b) cites a laundry list of federal statutes, including statutes that criminalize non-citizen voter registration and voting, 18 U.S.C. §§ 611, 1015, false statements to the government or related to voting, *id.* §§ 1001, 1015 & 52 U.S.C. §§ 10307, 20511, conspiracies against individuals' exercise of federal rights, 18 U.S.C. § 241, and statutes articulating the standards of principal liability and conspiracy liability, *id.* §§ 2(a), 371.

Section 3 orders the United States Postal Service ("USPS") to adopt new mail voting rules, with rulemaking to begin by May 29, 2026 and conclude by July 29, 2026. *Id.* § 3(b). Section 3 directs that the proposed rules "shall include" certain provisions. *Id.*

5

The first set of provisions relates to mail ballot eligibility.  Section 3 provides that States may submit to USPS "a list of voters eligible to vote in a Federal election" ("State Mail Ballot List") via mail "no fewer than 60 days before the election."  *Id.* § 3(b)(ii).  Next, USPS must "provide each State with a list of individuals . . . who are enrolled with the USPS . . . for mail-in or absentee ballots provided by such State" ("USPS Mail Ballot List").  *Id.* § 3(b)(iv).  USPS must establish "procedures enabling each State to routinely supplement and provide suggested modifications or amendments to" that List.  *Id.* § 3(b)(v).  Section 3 does not require USPS to accept corrections, nor to provide voters' updates to elections officials.  *See id.*  The EO then bars USPS from transmitting a completed mail ballot from any voter not on that list.  *Id.* § 3(b)(iii).  And it directs USPS to coordinate with federal law enforcement to investigate the unlawful use of mail in connection with election materials.  *Id.* §§ 3(a), (c).

The second set of provisions orders USPS to impose several mail ballot envelope design requirements, including that ballot envelopes be "marked as Official Election Mail" using markings from USPS, be "automation-compatible," and "bear a unique Intelligent Mail barcode."  *Id.* § 3(b)(i)(A)–(B).  That section also requires jurisdictions to undergo "mail envelope design review[s] by the USPS to ensure compliance with USPS mailing standards, including barcode placement."  *Id.* § 3(b)(i)(C).

Finally, Section 5 directs the U.S. Attorney General, as well as all federal agency heads, to withhold funds from "noncompliant" States and localities and provides that "[e]vidence of violations" of federal law "may be referred" to the U.S. Department of Justice for investigation or charges under a list of criminal statutes.  To further such investigations, Section 5 imposes document preservation requirements on States, directing that they "should" preserve "all records and materials . . . evidencing voter participation" for five years, including, for example, "ballot envelopes, regardless of carrier," but excluding cast ballots.  *Id.* § 5.

As detailed below, these mandates impose profound and harmful consequences on Plaintiff States.  *See infra* §§ III, V(A).  These harms take several forms: sovereignty harms from the EO unconstitutionally overriding duly enacted state laws; fiscal harms from the EO forcing Plaintiff

6

States to spend heavily to adapt to this new legal regime; enforcement harms from the EO threatening States, localities, and their officials with legal consequences; and reputational harms from the damage the EO will do to Plaintiff States' reputations as stewards of elections.

## LEGAL STANDARD

Summary judgment is proper if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party may show that a fact "cannot be . . . genuinely disputed" by citing to documents, affidavits, or other materials. *Id.* 56(c). On cross-motions for summary judgment, the Court determines "whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Adria Int'l Grp., Inc. v. Ferre Dev., Inc.*, 241 F.3d 103, 107 (1st Cir. 2001). The Court "must consider each motion separately, drawing inferences against each movant in turn." *Tutor Perini Corp. v. Banc of Am. Sec. LLC*, 842 F.3d 71, 84 (1st Cir. 2016) (quotation omitted).

## ARGUMENT

**I.    PLAINTIFF STATES HAVE AN EQUITABLE CAUSE OF ACTION TO ENJOIN PRESIDENTIAL ORDERS THAT VIOLATE THE SEPARATION OF POWERS**

The Supreme Court has long recognized a non-statutory, equitable cause of action to enjoin unlawful presidential action, and courts have repeatedly recognized its continuing vitality.

The President's powers are limited and "must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). Presidential action taken without constitutional or statutory authority is ultra vires, and federal courts have authority to invalidate that action. *See id.* at 588–589; *Collins v. Yellen*, 594 U.S. 220, 245 (2021) ("[W]henever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge.").

Courts have reaffirmed the availability of an equitable cause of action to challenge unconstitutional governmental acts, including in challenges to a prior executive order purporting to regulate elections in excess of the President's authority. *California I*, 805 F. Supp. 3d at 403–404; *League of United Latin Am. Citizens v. Exec. Off. of the President* ("*LULAC II*"), __ F.

Supp. 3d __, 2026 WL 252420 at *24–26 (D.D.C. Jan. 30, 2026), *appeal docketed*, No. 26-5102 (D.C. Cir. 2026); *Washington v. Trump*, 814 F. Supp. 3d 1173, 1210–11 (W.D. Wash. 2026).

Plaintiff States' claims fit squarely within this equitable cause of action. Each claim alleges that the EO violates the constitutional separation of powers by usurping authority that the Constitution assigns to the States and to Congress. These claims fall within the heartland of the non-statutory, equitable cause of action recognized by federal courts.

## II.    THE CHALLENGED PROVISIONS VIOLATE THE SEPARATION OF POWERS

### A.    Section 2 Unconstitutionally Invades State Power Over Voter Rolls

Section 2 creates a new federal program to (1) dictate federal voter eligibility lists for each State and (2) coerce States, with threats of criminal prosecution, to deny ballots to voters excluded from those lists, and even to maintain the lists themselves. EO §§ 2(a)–(b). These two directives work together to assert federal control over States' administration of their voter rolls based on nothing more than presidential fiat. Section 2 far exceeds the President's authority, invades States' and Congress's power to regulate federal elections, and unconstitutionally commandeers Plaintiff States to implement presidential policy.

#### 1.    Section 2(a) exceeds the President's authority

Section 2(a) mandates the creation of novel State Citizenship Lists, requires that they be sent to States' chief elections officials before each federal election, and directs new DHS processes to allow individuals and States to suggest non-binding corrections, leaving ultimate control of the Lists in DHS's hands. EO § 2(a); *see also id.* § 4(c) (data sharing and deadlines). No element of this program is authorized by federal law. By any measure, Section 2(a) fails the constitutional requirement that "[t]he President's power" to issue an order "must stem from an act of Congress or from the Constitution itself." *Youngstown*, 343 U.S. at 585.

Section 2(a) does not cite any statutory authority for the novel State Citizenship List program, and no current federal statute authorizes this dramatic intrusion into the States' traditional area of responsibility. The EO's preamble invokes the NVRA and HAVA, but neither law authorizes the President to order the creation of federal voter eligibility lists. Rather, both

8

laws make *States* responsible for maintaining voter rolls, while imposing some federal requirements and standards for discharging that duty. *See* 52 U.S.C. §§ 20503(a), 20507(a), 21083(a), 21085. Neither enactment grants any authority to DHS, election-related or otherwise. *See id.* §§ 20501–20511, 20901–21145. And the sole authority granted by either statute to SSA is the authorization to share death records with States. *See id.* § 21083(a)(5)(B)(ii) (citing 42 U.S.C. § 405(r)(8)). No statute authorizes DHS or SSA to stand up a new program to create, transmit to States, and maintain lists of voters deemed to meet baseline eligibility requirements.

The lack of statutory authority to carry out Section 2(a)'s mandates is decisive. A federal agency "'has no power to act . . . unless and until Congress confers power upon it.'" *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)). Nor can the President order federal agencies to take actions that exceed their statutory powers. *See Rhode Island v. Trump*, 781 F. Supp. 3d 25, 51–52 (D.R.I. 2025).

The Constitution does not give the President any power to overcome this hurdle. *Cf. Youngstown*, 343 U.S. at 585 (President's power to act may stem from "the Constitution itself"). "[O]ur Constitution entrusts matters of election regulation exclusively to Congress and the States," not the President. *LULAC II*, 2026 WL 252420, at *40. The President's charge to "take Care that the Laws be faithfully executed" binds him to carry out *existing* federal law. U.S. Const. art. II, § 3. It does not empower him to create new voter eligibility verification programs on his "own initiative." *Georgia v. Meadows*, 88 F.4th 1331, 1347 (11th Cir. 2023).

In the preamble, the EO claims authority grounded in the Guarantee Clause of the Constitution. U.S. Const. art. IV, § 4 ("The United States shall guarantee to every State in this Union a Republic Form of Government[.]"). Courts have never found a threat to republican governance that would trigger the Guarantee Clause, *see Largess v. Supreme Jud. Ct.*, 373 F.3d 219, 227–229 (1st Cir. 2004) (per curiam) (collecting cases), and the President's disagreement with current election procedures unquestionably falls short, *cf. id.* at 229 (noting that federal courts may be able to enforce Guarantee Clause "in unusual and extreme cases, such as the establishment of a monarchy by a state"). For all these reasons, Section 2(a) is unconstitutional.

### 2.    Section 2(b)'s threat of prosecution abuses the President's authority

The EO pairs the State Citizenship List requirement (in Section 2(a)) with a pointed threat (in Section 2(b)) to criminally prosecute elections officials who issue ballots to "ineligible" voters.  Taken together, these provisions threaten criminal prosecution for anyone who issues a ballot to a voter omitted from a State Citizenship List.  EO § 2(a)–(b).  Section 2(b)'s threat of prosecution acts as an enforcement mechanism to force States to assist with and adhere to DHS's determination of voter eligibility in the State Citizenship Lists.

Section 2(b)'s lawlessness begins at its foundation.  None of the cited statutes, nor any combination of them, impose per se criminal liability for providing a ballot to a voter omitted from a State Citizenship List.  Rather, criminal liability under any of the substantive statutes cited by the EO requires knowing or willful violations of law.  *See* 18 U.S.C. §§ 1001, 1015; 52 U.S.C. §§ 10307, 20511; *United States v. Martinez-Mercado*, 919 F.3d 91, 98–99 (1st Cir. 2019) (holding that 18 U.S.C. § 241 requires proof of an "intent to interfere" with a person's federal rights); *see also* 18 U.S.C. §§ 2(a), 371, 611.[2]  For several reasons, the absence of a voter from a State Citizenship List cannot, standing alone, transform the issuance of a ballot to that voter into a knowing, willful, or intentional violation of any of these laws.

*First*, a voter's omission from a State Citizenship List could easily stem from errors and inadequate information rather than actual ineligibility.  The SAVE system, identified in Section 2(a) as a source for the Lists, has a record of erroneously flagging U.S. citizens as non-citizens.  Doc. No. 105 at 9–10 ¶¶ 16–17.  Errors could also arise where DHS lacks accurate address information or an omitted voter is an eligible non-resident under UOCAVA, *id.* at 10 ¶¶ 19–20, or where an omitted voter becomes a naturalized citizen or moved to the State and registered within 60 days of an election, *id.* at 11 ¶ 21.  *Second*, all States require voters to verify eligibility

---

[2] Although some courts have interpreted 18 U.S.C. § 611 as requiring a lesser mens rea for non-citizens to be criminally liable for registering or voting, *see, e.g.*, *Kimani v. Holder*, 695 F.3d 666, 669–670 (7th Cir. 2012), charges against elections officials or workers under this statute on a theory of aiding, abetting, or conspiracy would still require showing that they acted knowingly or intentionally, *see United States v. Ford*, 821 F.3d 63, 69–70 (1st Cir. 2016) (aiding and abetting); *United States v. Gonzales*, 570 F.3d 16, 24 (1st Cir. 2009) (conspiracy).

at registration.  *Id.* at 6 ¶ 11.  *Third*, omission from a List does not give the voter adequate notice and opportunity to establish eligibility, calling for caution in relying upon the Lists.  *Cf. id.* at 10 ¶ 18.  *Fourth*, as to the 13 Plaintiff States that allow 17-year-olds to vote in federal primary elections if they will be 18 by the general election ("Qualifications States"), the Lists will erroneously exclude 17-year-old primary voters who are eligible under state law.  *Id.* at 9 ¶ 14.

That the threats of criminal prosecution in Section 2(b) are meritless does not dispel the atmosphere of menace they create, nor lessen their coercive power.  As the First Circuit held in *New Hampshire Lottery Comm'n v. Rosen*, 986 F.3d 38 (1st Cir. 2021), States "should not have to operate under a dangling sword" of criminal enforcement, even if prosecution would ultimately fail on the merits.  *Id.* at 53; *see id.* at 61–62 (concluding that government's threat was based on impermissible interpretation of criminal statute).  Indeed, the EO's threats have the acute potential to disrupt Plaintiff States' administration of elections.  For example, even if a State provides the guidance that registered voters should receive ballots even if they are omitted from a State Citizenship List, an election worker may refuse to follow that guidance to avoid federal criminal investigation and prosecution.  Doc. No. 105 at 18 ¶ 32.  After all, "[p]eople do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around."  *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 68 (1963).

Using threats of criminal prosecution to pressure elections officials into implementing the President's preferred policies is improper.  *In re Grand Jury Subpoenas (Federal Reserve)*, ___ F. Supp. 3d ___, 2026 WL 710202 at *8 (D.D.C. 2026) (explaining that "prosecutors — or the President who appointed and can fire them — are legally barred from interfering in an official's policy choices" and official duties via criminal investigations); *see also In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 239 (D. Mass. 2025) (finding "true purpose" of issuing subpoena "was to interfere with the Commonwealth of Massachusetts' right to protect [gender-affirming care] within its borders" and was thus improper and "motivated only by bad faith"), *appeal docketed*, No. 26-1093 (1st Cir. 2026).  At a minimum, where the threats of prosecution in Section 2(b) are legally baseless, this Court should say so.

11

More fundamentally, the Court should recognize the combined effect of Sections 2(a) and 2(b) for what it is: a new federal program to superintend States' determinations of voter eligibility by creating federal voter eligibility lists and using threats of prosecution to force States to adhere to those lists. *See Diamond Alt. Energy, LLC v. Env't Prot. Agency*, 606 U.S. 100, 122 (2025) (the court is "not required to exhibit a naiveté from which ordinary citizens are free"). No statute authorizes such a program, and as set out above, the President lacks any independent constitutional power to regulate elections procedures or interfere with state elections officials' duties and authority. *See Meadows*, 88 F.4th at 1346; *LULAC II*, 2026 WL 252420, at *40. Accordingly, Section 2 is ultra vires and unconstitutional. *See Youngstown*, 343 U.S. at 587.

### 3. Section 2 violates the separation of powers and conscripts state and local officials to implement a presidential policy

Section 2 encroaches on States' and Congress's power to determine election procedures, usurps States' power under the Qualifications Clause, and conscripts state officials to update DHS's shadow voter eligibility list and implement federal voter eligibility determinations. These violations of the separation of powers are a further reason to find Section 2 unconstitutional.

*First*, Section 2 encroaches on States' and Congress's broad power to "'provide a complete code for congressional elections,'" including procedural requirements related to voter registration. *ITCA*, 570 U.S. at 8–9 (citation omitted). The States and Congress have enacted comprehensive procedures for registering voters and maintaining voter rolls, which States carry out. *See, e.g.*, 52 U.S.C. §§ 20507, 21083; Doc. No. 105 at 2–8 ¶¶ 6–13. Section 2 disregards those laws to impose its own novel program, which runs at cross-purposes to existing law.

For example, the transmission of State Citizenship Lists to elections officials 60 days prior to an election, coupled with the threat of prosecution for issuing ballots to any individuals not on those Lists, is plainly designed to push States to remove from the voter rolls those individuals missing from the Lists as a means of achieving "citizenship verification for Federal elections." *See* Doc. No. 105 at 2 ¶ 5. But such removals would directly violate federal law prohibiting systematic removal of voters from the rolls in the 90 days prior to an election. *See* 52 U.S.C.

§ 20507(c)(2)(A).  Similarly, issuing ballots only to those on a State Citizenship List also threatens ballot access for UOCAVA voters and voters who lawfully register shortly before an election, *see id.* §§ 20302(a)(1)–(2), (4), 20507(a)(1), Doc. No. 105 at 6–8 ¶ 12–13; contravenes HAVA's provisional ballot requirement, *see id.* § 21082(a); runs contrary to elections officials' state law duties, Doc. No. 105 at 19–20 ¶¶ 33–35; and likely violates voters' fundamental rights. Each conflict shows that Section 2 unconstitutionally seizes power for the federal executive branch at the expense of the lawful procedures enacted by Congress and the States pursuant to their authority over elections.  *See Clinton v. Jones*, 520 U.S. 681, 699–700 (1997) (finding that separation of powers principle is a "self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other" (citation omitted)).

*Second*, Section 2 is also unconstitutional because its provisions conscript "the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997).  The combined effects of Sections 2(a) and 2(b) press Plaintiff States into the President's service to correct State Citizenship Lists and to deny ballots to voters omitted from those Lists on pain of criminal prosecution.  In many cases, acceding to the EO's threat would require violating state constitutions and laws that protect the right of all eligible voters to cast a ballot.  *See, e.g.*, Nev. Const. art. 2, § 1.

*Finally*, Section 2 invades the States' power to set the qualifications for voters.  *See ITCA*, 570 U.S. at 16–17; U.S. Const. art. I, § 2, cl. 1; *id.* art. II, § 1, cl. 2; *id.* amend. XVII. Qualifications States allow 17-year-olds to vote in federal primary elections if they will be 18 by the general election.  Doc. No. 105 at 9 ¶ 14.  "[T]he Qualifications Clauses of Article I, § 2 and the Seventeenth Amendment are applicable to primary elections in precisely the same fashion that they apply to general congressional elections." *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 227 (1986).  Yet Section 2(b) threatens elections officials with investigation and prosecution if they provide a ballot to eligible 17-year-olds, disregarding the States' constitutional prerogative.

13

B.      **Section 3 Unconstitutionally Requires USPS to Regulate Mail Voting**

Section 3 supplants Plaintiff States' mail voting systems with a new, USPS-administered system.  Plaintiff States challenge two sets of requirements in Section 3.  The first charges the States and USPS with compiling mail voter eligibility lists and prohibits USPS from transmitting mail ballots from voters not on a USPS Mail Ballot List.  EO § 3(b)(ii)–(v).  The second mandates that USPS require that ballot mail take a specific form.  *Id.* § 3(b)(i)(A)–(C).

The President's unprecedented attempts to interpose USPS into States' administration of mail voting "must stem from an act of Congress or from the Constitution itself" to pass constitutional muster.  *Youngstown*, 343 U.S. at 585.  Instead, they run headlong into States' and Congress's authority to regulate elections and Congress's power to regulate USPS.  The States and Congress have adopted numerous statutes pursuant to that authority.  Section 3 violates these constitutional and statutory mandates and is unconstitutional and ultra vires.  *See id.* at 587.

1.      **The President cannot order USPS to impose a new mail voter eligibility program**

Nothing authorizes the President to order States to compile lists of mail voters, to mandate that USPS create and implement lists of voters eligible to cast a mail ballot, to require States to review and correct those lists, or to prohibit USPS from delivering mail ballots from voters omitted from USPS-controlled lists but entitled to cast a mail ballot under state law.  EO §§ 3(b)(ii)–(v).  To the contrary, these mandates—which are backed by threat of prosecution, *id.* §§ 3(a), (c)—cannot be reconciled with federal law governing USPS or state laws permitting mail voting, and they unconstitutionally invade powers reserved to the States and Congress.

Title 39 of the U.S. Code limits USPS's regulatory authority.  Although the Postmaster General has broad authority to exercise USPS's powers, 39 U.S.C. §§ 401(2), 402; 39 C.F.R. § 3.5, any regulations pursuant to that authority are limited to those "necessary in the execution of [USPS's] function under [Title 39]" and "not inconsistent with [Title 39]."  39 U.S.C. § 401(2).  But the President's order is "inconsistent" with several provisions of Title 39 and is not "necessary" to USPS's function.  Section 3's inconsistency with these statutes emphasizes the President's lack of authority to issue the EO's mandates.  *See, e.g., California I*, 786 F. Supp.

14

3d at 382–384 (analyzing conflict with UOCAVA's requirements to inform determination that executive order exceeded President's authority).

*First*, the President's order conflicts with Congress's requirement that USPS only provide "postal services"—i.e., "the delivery of letters . . . including acceptance, collection, sorting, transportation, or other functions ancillary thereto." 39 U.S.C. § 102(5); *see id.* §§ 404(e)(1)–(2). In 2006, Congress prohibited USPS from taking on any new non-postal services, and subjected any existing non-postal service offered as of January 1, 2006 to review by the Postal Regulatory Commission to determine whether those services should continue. *Id.* §§ 404(e)(3), (e)(4). In 2022, Congress delineated certain permissible non-postal services that allowed USPS to, for example, enter into certain service-related agreements. *See id.* §§ 404(e)(3) (permitting only "nonpostal products or services authorized by chapter 37"), 3701–3705 (chapter 37).

Here, the President has sought to override Congress's explicit limitation on non-postal services. The preparation, maintenance, and implementation of USPS Mail Ballot Lists is not "necessary" for USPS to carry out postal services. *Id.* § 401(2). These functions are outside the statutorily defined function of "postal services" and are found nowhere in Title 39. *Compare id.* § 102(5) *with* EO § 3(b)(iv). Yet Congress has shown that when it intends for USPS to engage in non-postal services, it has specifically so provided. *See Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 48 (1st Cir. 2024) ("[T]he enumeration of specific exclusions from the operation of a statute is an indication that the statute should apply to all cases not specifically excluded." (quotations omitted)). And, of course, USPS has long carried out its critical elections-related role without superintending mail voting in this way.

*Second*, USPS's governing statutes constrain its operations in other ways that run counter to the President's order. For example, USPS "shall not . . . make any undue or unreasonable discrimination among users of the mails," 39 U.S.C. § 403(c), yet the EO unjustifiably treats mail voters differently depending on their inclusion in a USPS Mail Ballot List. *See Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*, 220 F. Supp. 3d 27, 31 (D.D.C. 2016) ("Courts have . . . read § 403(c) in context, as a provision prohibiting run-of-the-

15

mine . . . service discrimination."). Congress also limited USPS's authority to reject certain mail by exhaustively cataloguing categories of "nonmailable matter" that "shall be disposed of," none of which permit the disposal of voted mail ballots. 39 U.S.C. §§ 3001(b), (c)–(h).

*Third*, Section 3 conflicts with the requirements that USPS "*shall* have as its basic function the obligation to provide postal services" and "*shall* provide prompt, reliable, and efficient services to patrons in all areas and *shall* render postal services to all communities." *Id.* § 101(a) (emphasis added). In doing so, USPS must maintain a nationwide mail system that meets the needs of different categories of mail and mail users so "postal patrons throughout the Nation will . . . have ready access to essential postal services." *Id.* § 403(b). It must, in other words, "serve as nearly as practicable the entire population of the United States." *Id.* § 403(a).

Section 3 directly contravenes USPS's affirmative mandate to "provide postal services," *id.* § 101(a), including service necessary "to meet the needs of different categories of mail and mail users," *id.* § 403(b)(2), by ordering USPS not to transmit mail ballots from voters who do not appear on USPS Mail Ballot Lists. Because those Lists will omit some registered voters, Section 3 will deprive voters of the basic services at the heart of USPS's mission with no statutory basis. *See Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 109 (1902) (explaining that a postal official's "right to exclude letters . . . must depend upon some law of Congress, and if no such law exists, then he cannot exclude or refuse to deliver them").

*Fourth*, the President's order conflicts with Congress's decisions regarding USPS's handling of UOCAVA materials. Namely, UOCAVA "balloting materials," including mail ballots, "shall be carried expeditiously and free of postage." 39 U.S.C § 3406(a)(1); *see also* 52 U.S.C. §§ 20302(a)(1) (mandating certain procedures for military and overseas voters), 20304(b) (providing that the UOCAVA administrator "shall provide expedited mail delivery service" for UOCAVA ballots). This mandatory duty necessarily bars USPS from withholding voted mail ballots cast under UOCAVA.

The EO contravenes these congressional mandates, prohibiting USPS from transmitting mail ballots from voters omitted from USPS Mail Ballot Lists, with no exception for UOCAVA

16

voters. By linking USPS's obligations under Title 39 to UOCAVA, "Congress has shown that it knows how to" require that USPS treat mail ballots differently—but nothing in Title 39 includes anything like Section 3. *Lackey v. Stinnie*, 604 U.S. 192, 205 (2025) (quotation omitted).

By violating each of the above aspects of Congress's design and reaching far beyond the Postmaster General's regulatory authority, Section 3 co-opts Congress's exclusive constitutional power to enact law governing "the entire postal system of the country." *Ex parte Jackson*, 96 U.S. 727, 732 (1877); *accord U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 121 (1981) (recognizing Congress's broad power over postal system); *see also* U.S. Const., art. I, § 8, cl. 7. Pursuant to that power, "Congress effectively mandated certain policies to be followed by the Postal Service, leaving no discretion . . . to do otherwise." *New York v. Biden*, 636 F. Supp. 3d 1, 25 (D.D.C. 2022) (quotation omitted). USPS "has no power to act" beyond that statutory authorization, *Barr*, 954 F.3d at 31 (quotation omitted), and no independent authority over elections, *Colorado v. DeJoy*, No. 20-cv-2768, 2020 WL 5513567, at *2 (D. Colo. Sept. 14, 2020). The President cannot unilaterally expand USPS's elections functions. *See Rhode Island*, 781 F. Supp. 3d at 51–52.

Section 3 also unconstitutionally invades Plaintiff States' powers to provide for and administer mail voting. *See ITCA*, 570 U.S. at 8–9 (recognizing States' broad power to regulate federal elections). Plaintiff States have exercised those powers to enact laws comprehensively structuring mail voting, including to meet obligations under UOCAVA. *See, e.g.*, Cal. Elec. Code §§ 3101 *et seq*. Given USPS's constitutional role in providing postal services, it is no surprise that USPS is a central pillar of States' mail voting programs. The President has ordered USPS not just to facilitate mail voting, but to decide which voters can cast a mail ballot—power that the Constitution has vested in the States. *See California I*, 786 F. Supp. 3d at 373.

The President's order that States' officials compile and cross-check voter eligibility lists is similarly invasive. While the EO frames the State Mail Ballot List as voluntary, *see* EO § 3(b)(ii), it is mandatory for the Plaintiff States, which must ensure that eligible voters receive a mail ballot under their laws, Doc. No. 105 at 29 ¶ 49. Yet the State Mail Ballot Lists will

17

inevitably prove incomplete.  For example, States will not be able to include voters registered up to 30 days before an election or UOCAVA voters who request a mail ballot fewer than 60 days beforehand, both of which are permitted by federal law.  *Id.* at 6–8, 20, 27 ¶¶ 12–13, 35, 45–46; *see also supra* § 1(B).  Nor will States be able to include voters who become eligible to receive a mail ballot under state law in that timeframe.  *Id.* at 27 ¶ 46.  And comparing the USPS Mail Ballot List and Plaintiff States' data is itself a massive undertaking, particularly because federal and state data will likely appear in different formats.  *Id.* at 28, 30–31 ¶¶ 47, 50–51.  It also carries a high risk of error.  *Id.* at 32 ¶ 52.  The President has no authority to frustrate States' election administration in this way, nor to seize for himself the States' personnel resources and power over elections.  *See California I*, 786 F. Supp. 3d at 373; *Printz*, 521 U.S. at 935.

### 2.    The President lacks authority to order USPS to require ballot envelope design changes

Section 3 also orders USPS to impose several design requirements for States' mail ballot envelopes.  EO § 3(b)(i)(A)–(B).  It further commands USPS to micromanage ballot mail by requiring all jurisdictions to undergo a USPS mail envelope design review to ensure compliance with mailing standards, claiming for USPS the power to disapprove of designs.  *Id.* § 3(b)(i)(C).

The President has no authority to require States to adhere to a particular mail ballot envelope design and review process.  *Meadows*, 88 F.4th at 1346; *California I*, 786 F. Supp. 3d at 373.  Nor can he direct USPS to exceed its authority—and nowhere has Congress given USPS the power to countermand a States' choices in designing its ballot envelopes or in adopting appropriate security procedures for mail ballots.  *See supra* § 2(B)(1); *Barr*, 954 F.3d at 31 (noting that an agency's power is limited to its statutory authorization).

USPS's own Domestic Mail Manual underscores its lack of authority to dictate ballot mail design.  The Manual sets out standards for mail sent within the United States, including standards for ballot mail, which are incorporated by reference into the Code of Federal Regulations.  *See* 39 C.F.R. § 111.1 (2020).  But as USPS itself makes clear, the unique mailing

18

standards for ballot mail are only "recommended," not required.[3]  These recommendations include: "[t]he Official Election Mail logo *should* be used on all outbound and return Ballot Mail;" "Ballot Mail *should* be mailed as automation compatible letters that bear a unique Intelligent Mail barcode;" and "[e]lection officials are *encouraged* to submit new and previously approved Ballot Mail envelope designs to USPS each election cycle."[4]  Those recommendations contrast with uniform requirements for mail that leave States no discretion in their implementation for ballot mail, *see, e.g.*, *id.* §§ 700.8.4.2, 202.8.0 (required standards for mail markings that "must" be used), or are otherwise required by statute, *see, e.g.*, 52 U.S.C. § 20301.

Nothing authorizes the President to transform non-binding recommendations about ballot mail design into requirements, nor to force upon States Section 3's review process, rendering this portion of Section 3 unconstitutional.  *See Youngstown*, 343 U.S. at 585; *Printz*, 52 U.S. at 935.

C.    **Section 5 Unconstitutionally Regulates States' Election Record Retention**

Section 5 provides that States "should preserve, for a 5-year period, all records and materials—excluding ballots cast—evidencing voter participation in any Federal election (e.g., ballot envelopes, regardless of carrier)."  While "should" is traditionally precatory, Plaintiff States and their elections officials face serious pressure to comply.  The immediately preceding provisions—which direct federal officials to "deter and address noncompliance with Federal law" and solicit "evidence" that may give rise to elections-related investigations and prosecutions—cast the preservation period in a decidedly mandatory light.  *See EO § 5.*  The EO conveys that the material to be preserved may constitute evidence of criminal violations warranting federal prosecution, effectively coercing Plaintiff States to comply.  *Cf. Nat. Res. Def. Council, Inc. v. U.S. Dep't of the Interior*, 397 F. Supp. 3d 430, 439–440 (S.D.N.Y. 2019)

---

[3] *See* Postal Bulletin 22595, DMM Revision: Ballot Mail Clarification (Apr. 7, 2022), https://tinyurl.com/38bt4rjd; *see also* Exhibit G to the Declaration of Michael S. Cohen, Official Mail Guide, Doc. No. 103-7 at 2, 3, 4, 5, 6, 9, 10, 15, 25, 26, 27, 29 (characterizing USPS's advice to States as "recommendations" or "recommended"); *id.* Exhibit H, 2024 Report, Doc. No. 103-8 at 2, 5, 15 (same).
[4] Domestic Mail Manual, §§ 703.8.4, 703.8.4.1, 703.8.4.3, https://tinyurl.com/yc244a4c (emphasis added).

(recognizing that federal government's representations regarding enforcement have material effect on third-party conduct).

The President's new preservation period is inconsistent with federal and state law. Federal law already requires preservation of voting materials for 22 months following an election, and preservation of records concerning voter roll maintenance for two years. 52 U.S.C. §§ 20507(i)(1), 20701. Plaintiff States have also exercised their constitutional prerogative to enact laws and regulations setting timelines for the preservation and destruction of voting materials reflecting these statutory requirements. Doc. No. 105 at 40–42 ¶¶ 67–68.

The President's order in Section 5 unconstitutionally displaces States' and Congress's power to regulate federal election administration by unilaterally imposing new rules for document preservation. *See* U.S. Const. art. I, § 4, cl. 1; *id.* art. II, § 1, cl. 2. It also unconstitutionally commandeers Plaintiff States' resources and personnel to accomplish a presidential objective. *Printz*, 521 U.S. at 935. The President has no constitutional or statutory authority to create document preservation obligations for Plaintiff States' elections officials by executive fiat. *See California I*, 786 F. Supp. 3d at 373.

## III.  PLAINTIFF STATES' CLAIMS ARE JUSTICIABLE

Sections 2, 3, and 5 threaten serious injury to Plaintiff States. Plaintiff States have demonstrated, through undisputed facts, that they have standing to challenge those provisions and that their claims are ripe for review.

### A.    Plaintiff States Have Standing to Challenge Sections 2, 3, and 5

To establish standing, "a plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Foisie v. Worcester Polytechnic Inst.*, 967 F.3d 27, 35 (1st Cir. 2020) (quotation omitted). The latter two requirements are uncontestable here, as the below harms are "a direct result of the EO's enforcement and implementation," *Doe v. Trump*, 157 F.4th 36, 52 (1st Cir. 2025), *petition for cert. filed*, No. 25-899 (U.S. 2026), and "a favorable resolution . . . would likely redress the" States' injuries, *Katz v. Pershing, LLC*, 672 F.3d 64, 72

20

(1st Cir. 2012). The injury requirement is similarly satisfied here, as the EO inflicts the following distinct injuries on Plaintiff States.

**Sovereignty Harms.** The EO transgresses Plaintiff States' "sovereign power . . . to create and enforce a legal code." *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982). Plaintiff States have each exercised their powers to "provide a complete code for [federal] elections," including rules for voter eligibility, registration, mail voting, and election records preservation and destruction. *Smiley*, 285 U.S. at 366; Doc. No. 105 at 3–9, 19–20, 23, 40–42 ¶¶ 7–14, 34–35, 40, 67–68; *see also supra* § 1(B). The EO undermines this sovereign exercise in several ways.

Section 2 creates a new federal program to superintend and control States' voter roll maintenance by requiring DHS and SSA to create State Citizenship Lists of voting-age citizen residents of each State and to send the relevant List to States "60 days prior" to an election. EO § 2(a). Upon receipt, State's elections officials must either rapidly remove voters from the rolls who are omitted from that List and refuse them a ballot—in violation of the NVRA, state and federal notice protections, and in reckless disregard of voters' rights—or face the risk of investigation and criminal prosecution for issuing ballots to allegedly ineligible voters. *Id.* § 2(b). Section 3 requires States to create a State Mail Ballot List, review and correct USPS Mail Ballot Lists, and potentially redesign mail ballot envelopes and undergo USPS review, all to prevent USPS from refusing to transmit mail ballots, despite contrary state law. *Id.* § 3; Doc. No. 105 at 23, 37–38 ¶¶ 40, 60–61. Finally, Section 5 significantly expands existing election record retention requirements, conflicting with Plaintiff States' plans for disposing of that material, made in compliance with state and federal law. Doc. No. 105 at 40–42 ¶¶ 67–68.

**Fiscal Harms.** Imminently threatened fiscal injury—even "a relatively small economic loss"—is sufficient to confer federal court jurisdiction. *Katz*, 672 F.3d at 76 (quotation omitted). The economic injury need not be direct, so long as there is a causal relationship. *Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 923 F.3d 209, 221–227 (1st Cir. 2019) (standing satisfied

21

by "likely chain of events" resulting in fiscal injury to the Commonwealth that is "concrete and particularized"). A State need not wait for an injury before filing suit. *Id.* at 222.

In order to abide by both Sections 2 and 3 and Plaintiff States' legal duties to ensure all eligible voters have the ability to register and cast a ballot, Plaintiff States must spend time and resources to review, create, and attempt to correct the required State Citizenship Lists, State Mail Ballot Lists, and USPS Mail Ballot Lists, and mitigate the devastating effects that flow from their implementation. To do this, Plaintiff States must divert significant resources from current election administration activities, causing unrecoverable implementation and compliance costs. *See Louisiana v. Biden*, 55 F.4th 1017, 1033–34 (5th Cir. 2022) (affirming injunction based on "diversion of resources" resulting in "nonrecoverable compliance costs").

As to Section 2, after each Plaintiff State receives its State Citizenship List, it must devote substantial resources to understanding and reconciling any differences between the List and its voter rolls. Erroneous omissions from State Citizenship Lists are inevitable due to flawed federal citizenship data, Doc. No. 105 at 9–10 ¶¶ 16–18, changes in voter residency and the absence of reliable federal address data, *id.* at 10 ¶¶ 19–20, the difficulty of accounting for non-resident UOCAVA voters, *id.* at 20 ¶ 35, and the addition of newly naturalized citizens to State voter rolls in the 60 days prior to an election, *id.* at 11 ¶ 21. Plaintiff States must therefore try to remedy omissions from the Lists to protect their voters from disenfranchisement and their elections officials and workers from criminal prosecution. *Id.* at 11, 18–19, 21 ¶¶ 22, 32–33, 36–37. This will consume time and resources. *Id.* at 12–16 ¶¶ 24–26, 28–29. Because Plaintiff States will receive Lists close to upcoming elections, they must prepare now. *Id.* at 17 ¶ 30. After identifying any eligible, registered voters omitted from the Lists, Plaintiff States must work to ensure all eligible voters may vote, including by submitting suggested corrections to DHS. *Id.* at 11, 19–20 ¶ 22, 33–35. This, too, will be time-consuming and expensive. *Id.* at 12 ¶ 24.

As to Section 3, Plaintiff States will have to create and provide USPS with State Mail Ballot Lists at least 60 days before a federal election and then review and attempt to correct USPS's Mail Ballot Lists. EO § 3(b)(ii); Doc. No. 105 at 26–27 ¶¶ 44, 46. These will be

22

technically challenging tasks demanding significant resources, and they will carry a high risk of error due to the difficulty of matching up disparate datasets on a short timeframe, and the inherently dynamic nature of voter rolls close to elections. Doc. No. 105 at 28–33 ¶¶ 47–53. Moreover, Section 3(b)(i)'s requirement that Plaintiff States redesign their mail ballots, add Intelligent Mail Barcodes, and secure USPS approval of mail ballot envelopes imposes additional fiscal costs on these States. EO § 3(b)(i); Doc. No. 105 at 37–39 ¶¶ 60–63. Complying with these new requirements will consume significant resources and disrupt and delay Plaintiff States' mail ballot programs. Doc. No. 105 at 28–30, 39–40 ¶¶ 47–48, 50, 64–66. Indeed, the delays could even jeopardize these States' ability to transmit and receive mail ballots, as required by their state laws. *Id.* at 25–27, 39 ¶¶ 43–46, 64–65.

Sections 2 and 3 combine to inflict additional harm on Plaintiff States because the EO sets out an unworkable schedule. The deadline for DHS to transmit the State Citizenship Lists to the States and the deadline for States to send their State Mail Ballot Lists to USPS fall on the same day—60 days prior to the election, or September 4, 2026 for the upcoming general election. EO §§ 2(a), 3(b)(ii). Comparing state voter rolls and the State Citizenship List to see who is eligible according to both lists in one day, or even mere hours, is simply not possible to do accurately, regardless of the resources Plaintiff States pour into the project. Doc. No. 105 at 29 ¶ 48.

These requirements would have cascading effects. Plaintiff States will have to spend time, personnel, and money updating training materials for local elections officials and their staff, specifically detailing what steps they must take with respect to voters who appear on a State's voter rolls but not on the State Citizenship List or the USPS Mail Ballot List. *Id.* at 33 ¶ 54. In addition, Plaintiff States will need to allocate resources to interface with local elections officials, especially given the EO's threat of criminal prosecution. *Id.* at 21, 33, 35 ¶¶ 36–37, 53, 56. Plaintiff States will also have to conduct public education campaigns to ensure voters understand the EO's requirements and how they may impact registration and voting. *Id.* at 34 ¶ 55.

Lastly, Section 5's record preservation requirements would impose compliance, storage, and other costs on Plaintiff States and local elections officials. *Id.* at 40–42 ¶ 67–69. The EO

23

provides no funding, meaning the foregoing costs will be drawn from Plaintiff States' resources already devoted to ongoing election administration tasks. *Id.* at 16, 35, 41–42 ¶¶ 29, 56, 67, 69.

**Enforcement Harms.** Where enforcement is threatened, plaintiffs need not expose themselves to enforcement before filing suit. *Reddy v. Foster*, 845 F.3d 493, 500 (1st Cir. 2017) (citing *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)). "[A] credible threat" of enforcement "is sufficient to confer standing." *N.H. Right to Life Pol. Action Comm. v. Gardner*, 99 F.3d 8, 13 (1st Cir. 1996). Pre-enforcement standing exists when a plaintiff intends to engage in conduct proscribed by a challenged action and faces a credible threat of enforcement for that conduct. *R.I. Ass'n of Realtors v. Whitehouse*, 199 F.3d 26, 30–31 (1st Cir. 1999). A credible threat is shown where enforcement is "certainly impending" or is a "substantial risk." *Reddy*, 845 F.3d at 500 (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).

Plaintiff States and their officials face legal jeopardy given the EO's directive to prosecute those who issue ballots to purportedly ineligible voters in federal elections. EO §§ 2(b), 5; Doc. No. 105 at 19, 21 ¶¶ 33–34, 36–37. This threat is exacerbated by the EO defining voter eligibility to exclude 17-year-olds to whom elections officials in Qualifications States issue ballots under state law. EO § 2; Doc. No. 105 at 16, 35, 40, 42 ¶¶ 29, 56, 67, 69.

**Reputational Harms and Loss of Public Trust.** Sections 2 and 3 further injure Plaintiff States' "compelling interest in preserving the integrity of [their] election process[es]" by upending longstanding state law and confusing and disenfranchising the States' voters. *See Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam) (quotation omitted). This undermines voters' goodwill and the States' reputations for administering elections. *Town of Milton v. Fed. Aviation Admin.*, 87 F.4th 91, 95 (1st Cir. 2023); *see Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996) ("injury to goodwill and reputation" can satisfy the more demanding irreparable harm standard).

Specifically, Sections 2 and 3 threaten to confuse and disenfranchise voters, which in turn will disrupt States' election administration and damage the public's goodwill. The EO threatens to disenfranchise numerous eligible voters, including voters erroneously left off State Citizenship

24

Lists who may believe they can no longer register or vote; certain 17-year-old voters in Qualifications States; voters who may be prevented from voting by officials fearing prosecution; and voters erroneously left off USPS Mail Ballot Lists, who may believe they can no longer vote or whose cast ballots USPS refuses to deliver. Doc. No. 105 at 9–11, 18, 36–37 ¶¶ 15–21, 31–32, 58–59. Moreover, the existence of State Citizenship Lists and USPS Mail Ballot Lists may confuse voters, who may believe they have no recourse if mistakenly omitted, misunderstand the process, or decide not to cast a ballot. *Id.* at 18, 37 ¶¶ 31, 59. This confusion will come at a crucial time, shortly before the election, when elections officials' resources are particularly strained. *Id.* at 35 ¶ 56. Prosecution of elections officials will further exacerbate damage to public trust. *Id.* at 22–23 ¶ 39. All of this will cause reputational harm to the Plaintiff States.

### B. Plaintiff States' Challenges to Section 2, 3, and 5 Are Ripe

Ripeness has two prongs: fitness and hardship. *Jensen v. R.I. Cannabis Control Comm'n*, 160 F.4th 18, 24 (1st Cir. 2025). The fitness prong "implicates both constitutional and prudential justiciability concerns." *Algonquin Gas Transmission, LLC v. Weymouth*, 919 F.3d 54, 62 (1st Cir. 2019). The Article III component asks "'whether the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all,'" while the prudential component asks if the claim "turns on 'legal issues not likely to be significantly affected by further factual development.'" *Id.* (quotation omitted). The hardship prong, a prudential evaluation, considers "whether the challenged action creates a direct and immediate dilemma for the parties." *Id.* (quotation omitted). Each of Plaintiff States' challenges are ripe.

**Section 2.** Section 2(a) satisfies the fitness prong's Article III component because it is a direct order to DHS and SSA to take specific actions on a prescribed timeframe—there is nothing "uncertain" or "contingent" about it. *Stern v. U.S. Dist. Ct. for Dist. of Mass.*, 214 F.3d 4, 12 (1st Cir. 2000) (citation omitted); *see* EO §§ 2(a), 4(c). The prudential component is also satisfied because further development—e.g., distribution of State Citizenship Lists—will not "significantly advance [the Court's] ability to deal with the legal issues presented." *Duke Power Co. v. Carolina Env't Study Grp.*, 438 U.S. 59, 81–82 (1978). Plaintiff States' challenge to the

25

combined effects of Sections 2(a) and 2(b) also pose a "purely legal question" fit for review, *Whitehouse*, 199 F.3d at 34, as further factual development is unnecessary to determine the lawfulness of the new federal program they create.

Similarly, Section 2(b)'s threat of prosecution is fit for adjudication now. A challenge to anticipated criminal enforcement is ripe if the plaintiff faces a "credible threat of prosecution" based on their plans to take actions "arguably proscribed" by the challenged requirement. *Id.* at 33. Here, Plaintiff States' elections officials intend to comply with existing legal duties to provide ballots to registered voters. Doc. No. 105 at 19 ¶ 33. The conflict between Plaintiff States' existing legal obligations and Section 2(b) "gives a precise shape" to the dispute, "posing a specific legal question fit for judicial review." *Whitehouse*, 199 F.3d at 33.

Section 2 also "creates a direct and immediate dilemma for the parties," *Weymouth*, 919 F.3d at 62 (quotation omitted), satisfying the hardship prong. Plaintiff States must begin planning now to manage the fallout from the State Citizenship Lists. Doc. No. 105 at 17 ¶ 30. And they must determine now how to best protect their elections officials from threatened prosecution. *See Whitehouse*, 199 F.3d at 33 (the threat of being criminally prosecuted "adds the element of hardship."). "When an election is close at hand," as they are today, "the rules of the road should be clear and settled . . . because running a statewide election is a complicated endeavor." *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring). "The [EO] would require heroic efforts by those state and local authorities in the next few weeks [and months]—and even heroic efforts likely would not be enough to avoid chaos and confusion." *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring). The constitutionality of Section 2 can and should be resolved now.

**Section 3.** Plaintiff States' challenge to Section 3 is also directed at a detailed presidential command, leaving nothing for future development and satisfying the fitness prong's Article III component. *Jensen*, 160 F.4th at 24–25. That USPS has "not yet promulgated . . . regulations implementing these challenged provisions d[oes] not mean that the eventual promulgation [is] an uncertain or contingent event, and [does] not render the case not ripe." *Id.* The same is true of

26

prudential fitness.  The codification of these preordained regulations will not affect the legality of the underlying mandates, which is a pure question of law.  *Id.*; *see also California I*, 786 F. Supp. 3d at 378–379 (finding challenge to executive order ripe where it ordered agency to promulgate regulation and "dictate[d] the precise contents of the new rule" (quotation omitted)).

The hardship flowing from Section 3 is also significant.  By ordering USPS to withhold the delivery of voted mail ballots, the President raises pressing questions about whether voters in Plaintiff States can vote by mail per state law.  It also forces Plaintiff States to prepare to administer an election in which they will have to manage USPS Mail Ballot Lists and updated mail ballot design and review standards, at significant administrative cost.  The ramifications are thus already "felt in a concrete way."  *FPL Energy Me. Hydro LLC v. FERC*, 551 F.3d 58, 62 (1st Cir. 2008) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148–149 (1967)).  As discussed above, elections require months of preparation, meaning this dictate forces Plaintiff States to prepare now and puts out of reach any "realistic opportunity to secure comparable relief by bringing the action at a later time."  *Doe v. Bush*, 323 F.3d 133, 138 (1st Cir. 2003).

**Section 5.**  Section 5 is ripe for review now because it creates an "immediate dilemma" for Plaintiff States, which must decide whether to abide by Section 5 or existing federal and state law.  *Weymouth*, 919 F.3d at 62 (quotation omitted).

## IV.    DECLARATORY RELIEF IS PROPER

Under the Declaratory Judgment Act, the Court "may declare the rights and other legal relations of any interested party seeking such declaration" in any "case of actual controversy with [the Court's] jurisdiction."  28 U.S.C. § 2201(a).  A decision to award such relief is distinct from the determination of whether an injunction is warranted.  *Steffel*, 415 U.S. at 468–469.

Here, each of the EO's challenged provisions are ultra vires and unconstitutional, violating both the separation of powers and Plaintiff States' authority over elections.  Declaratory relief as to each claim is warranted and necessary to remove any uncertainty that the President and other Defendants are constitutionally prohibited from unilaterally interfering with Plaintiff States' authority to regulate and administer federal elections.

27

V.    **THE COURT SHOULD PERMANENTLY ENJOIN THE CHALLENGED PROVISIONS AS TO PLAINTIFF STATES**

Plaintiff States are entitled to a permanent injunction as long as they show "(1) that [they] have] suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *CoxCom, Inc. v. Chaffee*, 536 F.3d 101, 112 (1st Cir. 2008) (quotations omitted).

To satisfy the first two factors, Plaintiff States must only show "substantial injury that is not accurately measurable or adequately compensable by money damages." *Id.* (quotation omitted). As set out above and below, Plaintiff States face irreparable injuries to their sovereign power to regulate elections; unrecoverable fiscal harms stemming from diversion of resources; a threat of criminal enforcement against state and local officials; and harm to their reputation as stewards of elections. The balance of hardships and public interest factors also tip sharply in favor of an injunction because the public has an interest in federal agencies and officials following the law and in preventing election disruption and voter disenfranchisement.

**A.    The Challenged Provisions Inflict Imminent and Irreparable Harm**

Each of the harms listed above are imminent and irreparable. *See supra* III(A).

Injuries where "sovereign interests and public policies [are] at stake" are irreparable. *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001); *see also Little v. Reclaim Idaho*, 140 S. Ct. 2616, 2617 (2020) (Roberts, C.J., concurring in grant of stay). Preventing States from "effectuating statutes" therefore constitutes irreparable injury. *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (quotation omitted).

So, too, of the impending fiscal injury flowing from the EO. The burden of the EO's changes and the speed at which the EO contemplates its implementation threaten "serious administrative upheaval," constituting irreparable harm. *See Doe v. Trump*, 766 F. Supp. 3d 266, 285 (D. Mass. 2025), *vacated on other grounds*, 157 F.4th 36; *see also Massachusetts*, 923 F.3d at 221–227; *Washington v. Trump*, 145 F.4th 1013, 1037 (9th Cir. 2025) (ruling no abuse of

28

discretion in irreparable harm finding based on unrecoverable "substantial administrative costs associated with complying with the Executive Order").  The necessary diversion of resources will cause "inability to enforce [Plaintiff States'] duly enacted plans," which "clearly inflicts irreparable harm on the State[s]."  *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018).  Put another way, these directives present an "obstacle[] [that] unquestionably make[s] it more difficult" for Plaintiff States "to accomplish their primary mission," causing irreparable harm.  *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (citation omitted).  There is no adequate remedy at law for these harms.  No cause of action provides money damages to compensate Plaintiff States for the costs of complying with and implementing the EO.  *Doe v. Trump*, 157 F.4th at 79 (affirming irreparable harm based on "unrecoverable costs" associated with States modifying systems, processes, and guidance in response to executive order).

The same is true of the harms stemming from the EO's threat to prosecute the States, localities, and their officials.  *See N.H. Right to Life*, 99 F.3d at 13.  The choice imposed on Plaintiff States—submit to an unconstitutional presidential decree or face prosecution—constitutes an irreparable injury.  *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) (relief proper where party must either "continually violate the [] law and expose themselves to potentially huge liability; or violate the law once as a test case and suffer the injury of obeying the law during the pendency of the proceedings").

Finally, damage to Plaintiff States' reputations as stewards of elections—stemming from the inherent challenges of implementing the EO and voter confusion and disenfranchisement—constitutes irreparable harm.  *See Baccarat, Inc.*, 102 F.3d at 20 ("By its very nature injury to goodwill and reputation is not easily measured" and "is often held to be irreparable.").

### B.    The Equities and the Public Interests Favor Injunctive Relief

The equities and public interest weigh heavily in favor of the narrow and targeted relief requested here.  *See, e.g.*, *Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021) (these factors "merge when the [g]overnment is the opposing party") (citation omitted).  The public interest here follows the merits because "[t]he public has an important interest in making sure government

agencies follow the law." *Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*, 407 F. Supp. 2d 323, 343 (D. Mass. 2005), *aff'd*, 463 F.3d 50 (1st Cir. 2006). The EO violates the law, and if a law is "unconstitutional, the public interest would be adversely affected by the denial of [] an injunction." *Hyde Park Partners, L.P. v. Connolly*, 839 F.2d 837, 854 (1st Cir. 1988). Similarly, the federal government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013).

The public also has a strong interest in preventing the irreparable harm of disenfranchisement and late-stage disruptions to election administration. *See, e.g.*, *Purcell*, 549 U.S. at 4–5 (observing that the public has a "strong interest in exercising the fundamental political right to vote" and discouraging courts from altering election rules close to elections (quotation omitted)); *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012) ("The public interest . . . favors permitting as many qualified voters to vote as possible."). That is "[b]ecause there can be no 'do-over' or redress of a denial of the right to vote after an election." *Fish v. Kobach*, 840 F.3d 710, 752 (10th Cir. 2016); *see also Newby*, 838 F.3d at 14 (recognizing "the strong public interest in ensuring that unlawful agency decisionmaking does not strip citizens of the right to vote"). As described above, the EO will disenfranchise Americans by leaving them unclear on their eligibility and registration status; compelling elections officials to remove voters from the rolls immediately before elections; and prohibiting USPS from delivering ballots cast by voters eligible to use a mail ballot under state and federal law. The public interest thus requires enjoining the EO.

## CONCLUSION

For the foregoing reasons, Plaintiff States respectfully request that the Court grant Plaintiff States' motion for summary judgment, enter declaratory relief, and permanently enjoin implementation or enforcement of the EO's challenged provisions as to Plaintiff States.

30

Dated: April 23, 2026

Respectfully submitted.

**ROB BONTA**
Attorney General of California

By: */s/ Michael S. Cohen*
Michael S. Cohen*
    *Deputy Attorney General*
Thomas S. Patterson*
    *Senior Assistant Attorney General*
Seth E. Goldstein*
    *Supervising Deputy Attorney General*
Anne P. Bellows*
Kevin L. Quade*
Lisa C. Ehrlich*
Malcolm A. Brudigam*
Robert William Setrakian*
    *Deputy Attorneys General*
1300 I Street, P.O. Box 944255
Sacramento, CA 95814
(916) 210-6090
Michael.Cohen@doj.ca.gov
Seth.Goldstein@doj.ca.gov
Anne.Bellows@doj.ca.gov
Kevin.Quade@doj.ca.gov
Lisa.Ehrlich@doj.ca.gov
Malcolm.Brudigam@doj.ca.gov
William.Setrakian@doj.ca.gov

*Counsel for the State of California*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

By: */s/ Vanessa A. Arslanian*
M. Patrick Moore (BBO No. 670323)
    *First Assistant Attorney General*
Vanessa A. Arslanian (BBO No. 688099)
    *State Trial Counsel*
Jared B. Cohen (BBO No. 689217)
Jak Kundl (BBO No. 713951)
    *Assistant Attorneys General*
One Ashburton Place
Boston, MA 02108
(617) 963-2107
Vanessa.Arslanian@mass.gov
Pat.Moore@mass.gov
Jared.B.Cohen@mass.gov
Jak.Kundl@mass.gov

*Counsel for the Commonwealth of Massachusetts*

**AARON FORD**
Attorney General of Nevada

By: */s/ K. Brunetti Ireland*

K. Brunetti Ireland*
    *Chief of Special Litigation*
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
(702) 486-9246
KIreland@ag.nv.gov

*Counsel for the State of Nevada*

**NICHOLAS W. BROWN**
Attorney General of Washington

By: */s/ Tera M. Heintz*
Tera M. Heintz*
Cristina Sepe*
Karl D. Smith*
    *Deputy Solicitors General*
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200
tera.heintz@atg.wa.gov
cristina.sepe@atg.wa.gov
karl.smith@atg.wa.gov

*Counsel for the State of Washington*

*(additional counsel on following page)*

31

**KRISTIN K. MAYES**
Attorney General of the State of Arizona

By: */s/ Kara Karlson*
Kara Karlson*
Karen J. Hartman-Tellez*
Joshua M. Whitaker*
Syreeta Tyrell*
    *Assistant Attorneys General*
2005 North Central Ave.
Phoenix, AZ 85004
(602) 542-8118

*Counsel for the State of Arizona*


**WILLIAM TONG**
Attorney General of Connecticut

By: */s/ Maura Murphy*
Maura Murphy*
    *Deputy Associate Attorney General*
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5020

*Counsel for the State of Connecticut*


**KATHLEEN JENNINGS**
Attorney General of the State of
Delaware

By: */s/ Ian R. Liston*
Ian R. Liston*
    *Director of Impact Litigation*
Vanessa L. Kassab*
    *Deputy Attorney General*
820 N. French Street
Wilmington, DE 19801
(302) 683-8899

*Counsel for the State of Delaware*


**PHILIP J. WEISER**
Attorney General for the State of Colorado

By: */s/ Shannon Stevenson*
Shannon Stevenson*
    *Solicitor General*
Peter Baumann*
    *Senior Assistant Attorney General*
1300 Broadway
Denver, Colorado 80203
(720) 508-6400

*Counsel for the State of Colorado*


**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: */s/ Virginia A. Williamson*
Virginia A. Williamson*
    *Assistant Attorney General*
200 Saint Paul Place
Baltimore, MD 21202
(410) 576-6584

*Counsel for the State of Maryland*


**DANA NESSEL**
Attorney General of Michigan

By: */s/ Neil Giovanatti*
Neil Giovanatti*
Erik Grill*
    *Assistant Attorneys General*
P.O. Box 30736
Lansing, MI 48909
(517) 335-7659

*Counsel for the State of Michigan*

*(additional counsel on following page)*

32

**BRIAL L. SCHWALB**
Attorney General of the District of
Columbia

By: */s/ Eliza H. Simon*
Eliza H. Simon*
   *Senior Counsel*
400 6th St. NW
Washington, D.C. 20001
(202) 741-5221

*Counsel for the District of Columbia*


**KWAME RAOUL**
Attorney General for the State of Illinois

By: */s/ Vikas Didwania*
Vikas Didwania*
   *Complex Litigation Counsel*
Alex Hemmer*
   *Deputy Solicitor General*
Holly F.B. Berlin*
   *Assistant Attorney General*
115 S. LaSalle St.
Chicago, IL 60603
(312) 814-5526

*Counsel for the State of Illinois*


**AARON M. FREY**
Attorney General for the State of Maine

By: */s/ Katherine W. Thompson*
Katherine W. Thompson*
   *Special Counsel*
6 State House Station
Augusta, ME 04333-0006
(207) 626-8800

*Counsel for the State of Maine*


**KEITH ELLISON**
Attorney General for the State of Minnesota

By: */s/ Angela Behrens*
Angela Behrens*
Allen Cook Barr*
   *Assistant Attorney General*
Lindsey E. Middlecamp*
   *Special Counsel*
445 Minnesota Street, Suite 600
St. Paul, MN, 55101
(651) 300-0711

*Counsel for the State of Minnesota*


**JENNIFER DAVENPORT**
Attorney General of New Jersey

By: */s/ Meghan K. Musso*
Meghan K. Musso*
Jonathan Mangel*
Joshua P. Bohn*
   *Deputy Attorneys General*
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5276

*Counsel for the State of New Jersey*


**RAÚL TORREZ**
Attorney General of New Mexico

By: */s/ Bailey Colfax*
Bailey Colfax*
   *Assistant Attorney General*
408 Galisteo Street
Santa Fe, NM 87501
(505) 490-4060

*Counsel for the State of New Mexico*


*(additional counsel on following page)*

**LETITIA JAMES**
Attorney General of New York

By: */s/ Colleen K. Faherty*
Colleen K. Faherty*
 *Special Trial Counsel*
Rabia Muqaddam*
 *Chief Counsel, Federal Initiatives*
28 Liberty Street
New York, NY 10005
(212) 416-6046

*Counsel for the State of New York*

**CHARITY R. CLARK**
Attorney General for the State of Vermont

By: */s/ Ryan P. Kane*
Ryan P. Kane*
 *Deputy Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-2153

*Counsel for the State of Vermont*

**JEFF JACKSON**
Attorney General of North Carolina

Laura Howard
Chief Deputy Attorney General

By: */s/ Daniel P. Mosteller*
Daniel P. Mosteller*
 *Associate Deputy Attorney General*
114 W. Edenton Street
Raleigh, NC 27603

*Counsel for the State of North Carolina*

**JAY JONES**
Attorney General for the Commonwealth of Virginia

By: */s/ Tillman J. Breckenridge*
Tillman J. Breckenridge*
 *Solicitor General*
202 North Ninth Street
Richmond, VA 23219

*Counsel for the Commonwealth of Virginia*

**DAN RAYFIELD**
Attorney General, State of Oregon

By: */s/ Thomas H. Castelli*
Thomas H. Castelli*
 *Special Assistant Attorney General*
100 SW Market Street
Portland, OR 97201
(971) 673-1880

*Counsel for the State of Oregon*

**PETER F. NERONHA**
Attorney General of Rhode Island

By: */s/ Kyla Duffy*
Kyla Duffy*
 *Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400

*Counsel for the State of Rhode Island*

*(additional counsel on following page)*

34

**JOSHUA L. KAUL**
Attorney General for the State of
Wisconsin

By: */s/ Lynn Lodahl*
Lynn Lodahl*
 *Assistant Attorney General*
17 West Main Street
Madison, WI 53707-7857
(608) 264-6219

*Counsel for the State of Wisconsin*

**JOSH SHAPIRO**
Governor of the Commonwealth of Pennsylvania

By: */s/ Michael J. Fischer*
Michael J. Fischer*
Jacob B. Boyer*
 *Deputy General Counsel*
30 North Third Street, Suite 200
Harrisburg, PA 17101
(717) 831-2847

*Counsel for the Governor of the Commonwealth of Pennsylvania*

*\*Admitted pro hac vice or pro hac vice applications forthcoming*

## 7.1 CERTIFICATION

I, Michael S. Cohen, hereby certify that counsel for Plaintiff States conferred with counsel for Defendants via virtual conference on April 10 and April 21, 2026.  Counsel were unable to resolve or narrow the issues for review.

Dated:  April 23, 2026

   */s/ Michael S. Cohen*
   Michael S. Cohen
   Deputy Attorney General
   *Counsel for the State of California*

## CERTIFICATE OF SERVICE

I, Michael S. Cohen, hereby certify that I served a true copy of the above document upon all counsel of record via this Court's electronic filing system.

Dated:  April 23, 2026

   */s/ Michael S. Cohen*
   Michael S. Cohen
   Deputy Attorney General
   *Counsel for the State of California*

35