**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF MASSACHUSETTS, *et al.*,<br><br>       Plaintiffs,<br><br>       v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>       Defendants. | No. 1:26-cv-11549-IT |
| STATE OF CALIFORNIA, *et al.*,<br><br>       Plaintiffs,<br><br>       v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>       Defendants. | No. 1:26-cv-11581-IT |

**BRIEF OF *AMICI CURIAE* LOCAL ELECTION OFFICIALS AND LOCAL
GOVERNMENTS IN SUPPORT OF PLAINTIFFS' MOTIONS FOR
PRELIMINARY INJUNCTION AND SUMMARY JUDGMENT**

**LEAVE TO FILE GRANTED ON MAY 1, 2026**

Jonathan B. Miller (BBO #663012)
Alex M. Goldstein*
PUBLIC RIGHTS PROJECT
490 43rd Street, #115
Oakland, CA 94609
Phone: (510) 214-6960
jonathan.miller@publicrightsproject.org

*Pro hac vice application forthcoming*
*Counsel for Amici Curiae*

## TABLE OF CONTENTS

STATEMENT OF INTEREST ................................................................................1

SUMMARY OF ARGUMENT ..............................................................................2

ARGUMENT .........................................................................................................3

I. The EO Places Significant Burdens On Local Election Officials While Subjecting Them To Significant Risk ................................................................4

    A.   Implementation of the EO will fall on local election officials ...................4

        1.  Burdens of State Citizenship List ............................................................6

        2.  Burdens associated with changes to mail ballots ...................................7

        3.  Burdens associated with record preservation .........................................8

    B.  The EO purports to place local election officials in serious legal jeopardy ..........................................................................................................9

        1.  Prioritizing prosecution .........................................................................9

        2.  Legal uncertainty ................................................................................11

        3.  Practical implications ..........................................................................12

    C.  Local election officials and local governments similarly risk losing critical funding if they fail to properly implement the EO .........................13

    D.  These burdens and risks create an impossible choice for local election officials, risking voter disenfranchisement .................................13

II.  The EO's Provisions Are Unlawful And Would Cause Significant Confusion In Election Administration ...........................................................14

    A.  The State of Citizenship List presents unique challenges for local election officials…………………………………………………………. 15

    B.  USPS involvement in voter eligibility verification presents unique challenges for local election officials .........................................................16

CONCLUSION ....................................................................................................18

APPENDIX A ......................................................................................................19

i

# TABLE OF AUTHORITIES

CASES

*Berge v. Sch. Comm. of Gloucester*,
107 F.4th 33 (1st Cir. 2024)................................................................3

*California v. Trump*,
No. 26-cv-11581 (D. Mass. Apr. 23, 2026), Dkt. No. 106 ....................4

*City & Cnty. of San Francisco v. Trump*,
783 F. Supp. 3d 1148 (N.D. Cal. 2025) ................................................13

*CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*,
48 F.3d 618 (1st. Cir. 1995)................................................................11

*Cramp v. Bd. of Pub. Instruction of Orange Cnty.*,
368 U.S. 278 (1961)..............................................................................11

*Democratic Nat'l Comm. v. Wis. State Legislature*,
141 S. Ct. 28 (2020)..............................................................................3

*Grayned v. City of Rockford*,
408 U.S. 104 (1972)..............................................................................11

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
No. 25-cv-0946, 2026 WL 252420 (D.D.C. Jan. 30, 2026)...................5

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010)..............................................................................2

*Nken v. Holder*,
556 U.S. 418 (2009)..............................................................................3

*Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*,
996 F.3d 257 (4th Cir. 2021) ...............................................................6

*United States v. Benson*,
No. 25-cv-01148 (W.D. Mich. filed Sept. 25, 2025). .........................10

*United States v. Oregon*,
No. 25-cv-01666 (D. Or. filed Sept. 16, 2025)....................................10

*United States v. Weber*,
No. 25-cv-09149 (C.D. Cal. filed Sept. 25, 2025)...............................10

**CONSTITUTION**

U.S. Const. art. I, § 4, cl. 1 ................................................................4

U.S. Const. art. I, § 2, cl. 1 ................................................................5

U.S. Const. art. II, § 1, cl. 2 ..............................................................5

**STATUTES**

18 U.S.C. § 611 ................................................................................14

52 U.S.C. § 10307(a) ........................................................................17

52 U.S.C. § 20501(a) .....................................................................1, 14

52 U.S.C. § 20507(a) ..........................................................................5

52 U.S.C. § 20701 ..............................................................................8

Or. Rev. Stat. § 247.292 ...................................................................14

Or. Rev. Stat. § 247.555 ...................................................................14

Or. Rev. Stat. § 247.563 ...................................................................14

Or. Rev. Stat. § 247.570 ...................................................................14

**EXECUTIVE ORDERS**

Ensuring Citizenship Verification and Integrity in Federal
    Elections," Exec. Order No. 14399, 91 Fed. Reg. 17125 (Mar.
    31, 2026) ................................................................................ *passim*

**OTHER AUTHORITIES**

Andrew Howard, *Election officials grapple with a brain drain as
    threats rise*, Politico (Feb. 3, 2026),
    https://www.politico.com/news/2026/02/03/election-officials-
    threat-midterms-00761210................................................................12

Charles Stewart, *President Trump's latest election executive order
    is a case study in how-hard-could-it-be-ism.*, Substack: Playing
    with Election Data (Apr. 22, 2026),
    https://playingwithelectiondata.substack.com/p/president-
    trumps-latest-election........................................................................16

David Wickert, *Fulton County election raid: A timeline of how we got here*, AJC Politics (Feb. 10, 2026), https://www.ajc.com/politics/2026/01/fulton-county-election-raid-a-timeline-of-how-we-got-here/ ...................................................10

Jacob Wendler, *Trump DOJ redoubling election scrutiny efforts*, Politico (Apr. 19, 2026), https://www.politico.com/news/2026/04/19/trump-doj-redoubling-election-scrutiny-efforts-00880159 ...................................10

Jen Fifield, *Election Records Handed Over to the FBI in Maricopa County, Arizona, Could Be Fatally Flawed, Experts Say*, ProPublica (Mar. 12, 2026), https://www.propublica.org/article/maricopa-county-arizona-election-records-fbi ....................................10

Patrick Marley, *DOJ demands Detroit-area 2024 ballots, escalating election scrutiny*, Wash. Post (Apr. 19, 2026), https://www.washingtonpost.com/politics/2026/04/19/michigan-2024-ballots-harmeet-dhillon/ ...........................................10

Ruby Edlin & Lawrence Norden, *Poll of Election Officials Finds Concerns About Safety, Political Interference*, Brennan Ctr. for Just. (May 1, 2024), https://www.brennancenter.org/our-work/analysis-opinion/poll-election-officials-finds-concerns-about-safety-political. ...........................................12

*Update: Review of Claims of Noncitizen Registrants and Voters*, Ctr. for Election Innovations and Rsch. (Feb. 2026), https://electioninnovation.org/research/noncitizen-analysis-update/...............................................11

William T. Adler & Wren Orey, *What's in the New Executive Order on Elections?*, Bipartisan Policy Center (Apr. 14, 2026), https://bipartisanpolicy.org/issue-brief/whats-in-the-new-executive-order-on-elections/ ............................................6

**STATEMENT OF INTEREST**

*Amici* are local election officials and local governments representing 26 jurisdictions across the country. *Amici* sign this brief in their individual capacities or as local governments in support of Plaintiff League of Women Voters of Massachusetts' Motion for Preliminary Injunction and Plaintiff 23 States' Motion for Summary Judgment against the implementation of the executive order entitled "Ensuring Citizenship Verification and Integrity in Federal Elections," Exec. Order No. 14399, 91 Fed. Reg. 17125 (Mar. 31, 2026) ("EO" or "Executive Order").[1] *Amici* are responsible for administering local, state, and federal elections in their respective jurisdictions. *Amici* are duty bound under the National Voter Registration Act ("NVRA") to "promote the exercise of" "the fundamental right" to vote. 52 U.S.C. § 20501(a). *Amici* are unified in their commitment to ensuring that elections operate in accordance with state and federal law and that every eligible voter has an opportunity to cast a ballot. To carry out these duties, *amici* develop policies and procedures for their election administration offices, train staff and poll workers, educate voters, and respond to real-time constituent needs within their respective states and localities.

As the front-line workers of election administration, *amici* are well-positioned to understand the practicalities of running elections and write to offer their perspective on the potential impact of the EO to the Court. *Amici* are directly responsible for implementing election procedures and would be forced to reconcile the EO's requirements with existing state and federal statutory obligations. Local election officials across the country have different day-to-day experiences based on the state election codes in their respective states and the size and makeup of

---

[1] No party or party's counsel authored this brief in whole or in part. No party or party's counsel contributed money intended to fund preparation or submission of this brief. A list of all *amici* is attached as Appendix A.

their jurisdictions. Some serve hundreds of thousands (or millions) of voters, operating bustling offices with multiple full-time staff members, while others serve individual townships, operating part-time as the jurisdiction's sole election administrator. But while their day-to-day operations may differ, *amici* agree on the effects of the EO: it will needlessly place election officials at great legal and financial risk, while causing disruption to local election administration and potentially disenfranchising voters.

## SUMMARY OF ARGUMENT

Beyond violating the Constitution and several federal statutes, as Plaintiffs in both cases have ably demonstrated, the EO would severely disrupt local election administration by compelling officials to implement sweeping changes within months—or even weeks—of a federal election. At the same time, the EO would subject local election officials to legal and financial jeopardy, undermining their ability to retain staff, recruit volunteers, work with third-party contractors, and ultimately injuring the voting public. More specifically, the EO's provisions related to the establishment of a list of voting-age citizens who reside in each state and those related to United States Postal Service ("USPS") involvement in verifying voter eligibility contradict existing state procedures and would, if implemented, result in severe disruption and confusion.

Plaintiffs have demonstrated the prerequisites for equitable relief, whether by preliminary or permanent injunction. In either case, the standards are largely the same and *amici*'s arguments apply equally to both. To obtain a permanent injunction, "[a] plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S.

139, 156–57 (2010). The final two factors merge when the government is the opposing party. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). Furthermore, "a preliminary injunction preserve[s] the status quo during the pendency of trial-court proceedings." *Berge v. Sch. Comm. of Gloucester*, 107 F.4th 33, 37 n.6 (1st Cir. 2024). Here, an injunction is appropriate because it would prevent *amici* and other local election officials and local governments from needing to expend significant resources attempting to implement a legal regime that will likely be held unlawful. It will allow them to continue preparing for the election without fear that they or their staff will be subject to unwarranted criminal prosecution or withholding of needed funds. Local election officials are already preparing for the 2026 midterm elections. Implementing the EO's unlawful mandates would cause significant disruption to election preparation.

## ARGUMENT

Plaintiffs are correct on the merits and entitled to injunctive relief. *Amici* write to bring the Court's attention to the significant and irreparable harms that the EO will place on election officials who serve on the front lines of election administration. "[R]unning a statewide election is a complicated endeavor," requiring "thousands of state and local officials and volunteers [to] participate in a massive coordinated effort to implement the lawmakers' policy choices on the ground before and during the election," and requiring "at every step, state and local officials [to] communicate to voters how, when, and where they may cast their ballots through in-person voting on election day, absentee voting, or early voting." *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring in denial of application to vacate stay). Because the EO will disrupt each step of this complicated endeavor, relief enjoining the EO is decisively in the public interest.

## I.    The EO Places Significant Burdens on Local Election Officials While Subjecting Them to Significant Risk

The EO imposes fundamental changes to voter registration and list maintenance, vote-by-mail, and document preservation requirements and procedures throughout the country. Plaintiffs have amply demonstrated that multiple provisions of the Executive Order are unlawfully in excess of the President's constitutional and statutory authority. *See* Pls.' Mem. Supp. Mot. Summ. J. ("MSJ Br.") at 8-20, *California v. Trump*, No. 26-cv-11581 (D. Mass. Apr. 23, 2026), Dkt. No. 106; Pls.' Mem. Supp. Mot. Prelim. Inj. ("PI Br.") at 9-20, *League of Women Voters of Mass. v. Trump*, No. 26-cv-11549 (D. Mass. Apr. 23, 2026), Dkt. No. 74. Beyond its unlawful terms, the EO is contrary to the public interest because it would cause significant disruption to the orderly operation of elections at the local level and would place significant new burdens on *amici*, with the threat of legal and financial retaliation. The ultimate victims of these burdens and risks will be the American voting public and the constitutional guarantee of free and fair elections.

### A.    Implementation of the EO will fall on local election officials

The EO would introduce significant changes to election processes throughout the country, and apparently with very little time to implement before the November 2026 election. Although the EO directs federal officials to take certain actions, *see, e.g.*, EO § 2(a) (directing the Secretary of Homeland Security through the Director of USCIS and in coordination with the Commissioner of SSA to create the State Citizenship Lists); *id.* § 3(b) (directing the Postmaster General to initiate a rulemaking to implement the EO); *id.* § 5 (directing the Attorney General and the heads of executive departments and agencies to enforce compliance with the EO), the implementation, and resulting impacts, will be felt most acutely at the state and local levels, where elections are administered.

4

The Constitution empowers states, not the federal government, with the primary responsibility to administer state and federal elections. *See* U.S. Const. art. I, § 4, cl. 1 ("Elections Clause"); *id.* art. II, § 1, cl. 2 ("Electors Clause"); *id.* art. I, § 2, cl. 1 (allowing states to determine who may vote in federal elections). The EO purports to regulate who is eligible to "receive and cast ballots," EO § 1 ("Purpose and Policy"), but "[o]ur Constitution provides that only the States—not Congress, and certainly not the President—may decide who is qualified to vote in federal elections." *League of United Latin Am. Citizens v. Exec. Off. of the President*, No. 25-cv-0946, 2026 WL 252420, at *42 (D.D.C. Jan. 30, 2026), *appeal filed*, No. 26-5102 (D.C. Cir. Apr. 2, 2026); *see also* 52 U.S.C. § 20507(a) (entrusting states with "administration of voter registration for elections for Federal office").

While state legislatures pass laws regulating elections and statewide officials often oversee elections, practically speaking, it is local election officials and local governments, like *amici*, who bear responsibility of carrying out the election processes outlined in the EO. Local election officials coordinate with election workers, establish guidance and rules for election administration, engage in voter education, send ballots to registered voters, work with third-party contractors, and rely on their experience and expertise in a given jurisdiction to ensure the orderly operation of elections. The EO fails to account for the realities of election administration, including how its mandates interact and interfere with existing federal and state statutes, local rules and guidance, and practicalities of election administration. Although the EO orders the Attorney General to "provide guidance to election officials," EO § 4(b), such guidance could not possibly be comprehensive enough to account for the realities of challenges for countless jurisdictions throughout the country.

### 1. Burdens of State Citizenship List

Section 2 of the EO commands the federal government to "compile and transmit to the chief election official of each State a list of individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State (State Citizenship List)." EO § 2(a). This list is compiled from various federal databases and explicitly is not a state voter registration list. *Id.* (explaining that voters will still need to follow state processes to register to vote). The EO does not explain how this list will be used but imposes significant penalties on election officials that provide ballots to individuals who are purportedly rendered ineligible to vote in federal elections. *See infra* Part I.B.

The State Citizenship List will be "derived from Federal citizenship and naturalization records, SSA records, SAVE data, and other relevant Federal databases," EO § 2(a), but these databases are unlikely to contain accurate citizenship information and therefore the federal government's list will improperly exclude eligible voters. Many citizens, for example, may not appear on federal citizenship databases, including those born outside of the country, those not born in hospitals, and those who have become naturalized. *See, e.g.*, *Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 261 (4th Cir. 2021) (noting a "high rate of inaccuracy" in the SAVE database's information on voter eligibility). Furthermore, federal databases do not, and were not intended to, track voters' residence.[2] And state voter registration lists regularly use driver's license numbers rather than Social Security numbers, meaning local election officials will not have sufficient information to cross-check their voter rolls with the State Citizenship List, even

---

[2] *See* William T. Adler & Wren Orey, *What's in the New Executive Order on Elections?*, Bipartisan Policy Center (Apr. 14, 2026), https://bipartisanpolicy.org/issue-brief/whats-in-the-new-executive-order-on-elections/.

assuming its accuracy.[3] Local election officials, who are already responsible for effectuating voter registration under the NVRA and Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") will bear the burden of determining how to use the State Citizenship List when providing ballots to registered voters.

Relatedly, the EO requires the Secretary of Homeland Security to "establish procedures to (i) allow individuals to access their individual records as well as to update or correct them in advance of elections; and (ii) enable States to routinely supplement and provide suggested modifications or amendments to the State Citizenship List transmitted thereto." EO § 2(a). Local election officials regularly work with voters to correct issues with their registration status and it is likely that the burden will fall on them to correct significant errors resulting from the State Citizenship List. Given that the federal government can transmit the State Citizenship List to states as close as 60 days before the election, *see id.*, local officials will be under significant strain to work with voters in their jurisdictions to correct errors during an already challenging period.

### 2.  Burdens associated with changes to mail ballots

The EO also directs significant changes to the ways the USPS handles mail ballots, including requiring the USPS to "provide each State with a list of individuals (Mail-In and Absentee Participation List) who are enrolled with the USPS [ . . . ] for mail-in or absentee ballots provided by such State," EO § 3(b)(iv), and allowing states to provide "a list of voters eligible to vote in a Federal election in such State to whom the State intends to provide a mail-in or absentee ballot to be transmitted via the USPS," *id.* § 3(b)(ii). Local election officials would be primarily responsible for implementing both lists. They would need to determine how existing election management systems that track ballots issued would interact with both lists, would—as the actors

---

[3] *Id.*

that administer elections, including sending and receiving mail-in and absentee ballots—need to provide to their states and to the federal government the information on file related to voter registration, addresses, and requests for absentee and mail ballots, and would be primarily responsible for assisting voters if and when errors in the lists result in eligible voters not receiving mail ballots.

Furthermore, the EO directs significant changes to mail ballot envelope design. *See* EO § 3(b)(i)(A)-(C). But the EO's proposed rulemaking leaves very little time before the midterm elections, and many local jurisdictions will have already printed their mail ballot envelopes well ahead of election day. With little time, the financial and practical burdens of reprinting ballot envelopes in bulk will fall on local officials and their jurisdictions.

### 3. Burdens associated with record preservation

The EO orders state and local officials to "preserve, for a 5-year period, all records and materials" evidencing voter participation in federal elections. EO § 5. Again, local election officials are responsible for maintaining election materials and have established systems to comply with the federally mandated 22-month preservation requirement. 52 U.S.C. § 20701. States similarly have provided funding for record preservation with this federal standard in mind. The EO fails to account for the additional resources needed for localities to almost triple the required preservation period. Additionally, the longer maintenance period means that more records are available to be scrutinized under public records laws—and for longer periods of time. Given the rapid growth in these requests and the burden they already impose, extended preservation requirements further deplete local election officials and local governments.

**B.     The EO purports to place local election officials in serious legal jeopardy**

While local election officials will need to navigate the unclear legal complexities related to voter registration lists, vote-by-mail, and document preservation, the EO aims to subject those same individuals to unique legal vulnerability through the risk of aggressive criminal prosecution. It raises the specter of investigation and prosecution while using uncertain terms, failing to explain what conduct is expected of local officials, and not including clear standards of enforcement, leaving *amici* to guess what is expected of them. This uncertainty would exacerbate existing threats facing election officials including deterring staff, volunteers, and contractors from engaging in election administration.

**1.  Prioritizing prosecution**

The EO is clear in its intention to put *amici* in legal peril. The EO's "Purpose and Policy" section explains that "[f]ederal statutes explicitly prohibit non-citizens from registering to vote or voting in Federal elections and impose criminal penalties for violations," citing various criminal statutes, and that it is the federal government's duty to "prevent[] violations of Federal criminal law." EO § 1. It directs the Attorney General to "prioritize the investigation and, as appropriate, the prosecution of" both "*State and local officials* or any others involved in the administration of Federal elections who issue Federal ballots to individuals not eligible to vote in a Federal election" and of "*individuals and public or private entities engaged in, or aiding and abetting*, the printing, production, shipment, or distribution of ballots to individuals who are not eligible to vote in a Federal election." *Id.* § 2(b) (emphases added). The EO specifies that "the unlawful use of the mail in connection with elections is prohibited by various Federal statutes" and directs agencies to coordinate "for investigation of suspected unlawful use of the mail involving Federal election materials." *Id.* § 3(a), (c). Furthermore, it prioritizes referral of "[e]vidence of violations of existing

Federal laws *by State or local election officials; States or localities, including any instrumentalities thereof*; contractors; individuals involved in the administration of Federal elections; or public or private entities engaged in the printing, production, shipment, or distribution of ballots" for investigation and charges under various federal criminal statutes. *Id.* § 5 (emphasis added).

The EO leaves little doubt that criminal prosecution will be an option of first resort, creating an atmosphere of fear and making clear that even small mistakes resulting from confusion about implementing the EO's new mandates could result in investigations, indictments, and prison time. From the perspective of local election officials and local governments, the EO's prosecute-first mandate does not exist in a vacuum. While the federal government has long been a partner to state and local governments in the effort to administer free and fair elections, over the past year the federal government has repeatedly undermined that relationship. In recent months, the federal government has seized or attempted to gain access to election materials in Fulton County, Georgia,[4] Maricopa County, Arizona,[5] and Wayne County, Michigan.[6] The DOJ has filed dozens of lawsuits against states that refused to comply with the federal government's demand for voter registration lists.[7] FBI Director Kash Patel recently announced plans to issue arrests related to the

---

[4] David Wickert, *Fulton County election raid: A timeline of how we got here*, AJC Politics (Feb. 10, 2026), https://www.ajc.com/politics/2026/01/fulton-county-election-raid-a-timeline-of-how-we-got-here/.

[5] Jen Fifield, *Election Records Handed Over to the FBI in Maricopa County, Arizona, Could Be Fatally Flawed, Experts Say*, ProPublica (Mar. 12, 2026), https://www.propublica.org/article/maricopa-county-arizona-election-records-fbi.

[6] Patrick Marley, *DOJ demands Detroit-area 2024 ballots, escalating election scrutiny*, Wash. Post (Apr. 19, 2026), https://www.washingtonpost.com/politics/2026/04/19/michigan-2024-ballots-harmeet-dhillon/.

[7] *See, e.g.*, *United States v. Weber*, No. 25-cv-09149 (C.D. Cal. filed Sept. 25, 2025); *United States v. Oregon*, No. 25-cv-01666 (D. Or. filed Sept. 16, 2025); *United States v. Benson*, No. 25-cv-01148 (W.D. Mich. filed Sept. 25, 2025).

2020 election.[8] These efforts are not aimed at improving election administration; they are focused on attempting to revive disproven suspicions. Under these conditions, local election officials reasonably fear that the threat of prosecution is genuine.

### 2. Legal uncertainty

Election officials are already careful to follow state and federal law. They have established and strictly follow processes to ensure only eligible voters can vote. As a result, noncitizen voting is vanishingly rare.[9] Focused on this rare issue, the EO imposes significant changes, ambiguity about its implementation, and a tight turnaround for election officials. As a result, the EO suffers additional constitutional infirmities in its implementation.

Because its terms "are not clearly defined," the EO fails to provide *amici* with a "reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). For example, Section 2 directs the federal government to provide states with a "State Citizenship List" to determine voter eligibility but fails to explain how this list interacts with state voter registration systems. It similarly does not explain how this list would interact with the list that states may send to the USPS under Section 3(b)(ii), nor the Mail-In and Absentee Participation List described under Section 3(b)(iv). And it fails to "provide explicit standards" of enforcement, *Grayned*, 408 U.S. at 108, threatening prosecution of a potentially wide range of actors and broad scope of conduct. *See* EO § 2(b) (threatening prosecution of those "*engaged in, or aiding and abetting*, the printing, production, shipment, or distribution of ballots . . ." (emphasis added)). This legal uncertainty will "inevitably lead citizens to steer far wider of the unlawful zone," *Grayned*,

---

[8] Jacob Wendler, *Trump DOJ redoubling election scrutiny efforts*, Politico (Apr. 19, 2026), https://www.politico.com/news/2026/04/19/trump-doj-redoubling-election-scrutiny-efforts-00880159.

[9] *See Update: Review of Claims of Noncitizen Registrants and Voters*, Ctr. for Election Innovations and Rsch. (Feb. 2026), https://electioninnovation.org/research/noncitizen-analysis-update/.

408 U.S. at 109 (internal quotation omitted), and is likely to "operate[] to inhibit the exercise of individual freedoms," including the freedom to vote and have one's vote counted, *Cramp v. Bd. of Pub. Instruction of Orange Cnty.*, 368 U.S. 278, 287 (1961).

### 3. Practical implications

The practical consequences of this risk of arbitrary enforcement are severe and present another reason that this Court should grant an injunction to "preserve the status quo." *CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*, 48 F.3d 618, 620 (1st. Cir. 1995). Local election officials already operate under challenging conditions. These officials have resigned in large numbers in recent years, due in part to a rise in threats and harassment against election workers.[10] A 2024 survey found that 38% of election workers reported experiencing threats, harassment, or abuse for doing their jobs.[11] Now, as local election officials are already struggling to retain talent, the EO imposes new burdens that, if allowed to go into effect, would likely result in further attrition. The EO would similarly make it more difficult for local election officials and local governments to recruit poll workers and other volunteers who could be subject to severe criminal penalties simply for giving what they understand to be an eligible voter a ballot.

Similarly, because the scope of illegal actors and conduct under the EO are broadly defined, applying to "public or private entities" who are "engaged in, or aiding and abetting," activities that include "the printing, production, shipment, or distribution of ballots," EO § 2(b), it could have downstream effects. The EO may make it more difficult for election officials to work with contractors, instill fear in postal service employees or other actors involved in the delivery of

---

[10] Andrew Howard, *Election officials grapple with a brain drain as threats rise*, Politico (Feb. 3, 2026), https://www.politico.com/news/2026/02/03/election-officials-threat-midterms-00761210.

[11] Ruby Edlin & Lawrence Norden, *Poll of Election Officials Finds Concerns About Safety, Political Interference*, Brennan Ctr. for Just. (May 1, 2024), https://www.brennancenter.org/our-work/analysis-opinion/poll-election-officials-finds-concerns-about-safety-political.

ballots, and discourage a broad range of activities needed to administer a federal election. *Amici*

and others like them cannot effectively do their jobs under such conditions.

### C.    Local election officials and local governments similarly risk losing critical funding if they fail to properly implement the EO

Just as the EO raises the stakes of serving as an election official by increasing the threat of

investigation and prosecution, it also increases the likelihood that localities will suffer through the

loss of election funding. Section 5 of the EO states "[t]he Attorney General and the heads of

executive departments and agencies (agencies) with relevant authority shall take all lawful steps

to deter and address noncompliance with Federal law, *including withholding Federal funds from

noncompliant States and localities* where such withholding is authorized by law." EO § 5

(emphasis added). The possibility of losing federal funding for elections will impact how *amici*

operate. For example, in jurisdictions where local officials heavily rely on federal funding to

administer elections, *amici* might be forced to adopt interpretations of the EO that disadvantage

voters in order to maintain these financial resources. As one district court recently explained, an

executive order that "use[s] the spending power in a way that compels local jurisdictions to adopt

certain policies" by threatening withholding of funds based on "compliance" with the executive

order "crosses the line from pressure to compulsion." *City & Cnty. of San Francisco v. Trump*, 783

F. Supp. 3d 1148, 1194 (N.D. Cal. 2025). Here, local election officials who rely on federal funding

to administer elections will have little choice but to comply with the EO, even where it potentially

conflicts with state or federal law or risks disenfranchising voters.

### D.    These burdens and risks create an impossible choice for local election officials, risking voter disenfranchisement

Plaintiffs plainly demonstrate that the EO on its face risks disenfranchising eligible voters.

*See* PI Br. 6-9, 26-27; MSJ Br. 24-25. Section 2(a) directly harms the goal of promoting the right

13

to vote because, as discussed, the State Citizenship List will inevitably result in the wrongful exclusion of voters, including those who recently moved, those who were naturalized, and others whose personal information is not up to date in a federal database. EO § 2(a). Section 3(b) similarly disenfranchises potentially eligible voters by demanding that USPS "shall not transmit mail-in or absentee ballots" to any individual unless that person is enrolled on the Mail-In and Absentee Participation List. *Id.* § 3(b)(iii). Like the State Citizenship List, this list is very likely to exclude eligible voters. Even if individuals who are improperly excluded from these lists can correct the errors, the EO significantly increases the burden to exercise the right to vote.

Beyond the EO's direct impacts on the right to vote, the EO also puts local election officials in an impossible bind. Local election officials have a responsibility to promote the fundamental right to vote. 52 U.S.C. § 20501(a). As a result, *amici* will need to choose between issuing ballots to individuals who are lawfully registered in the state, but who do not appear on one or both federally-issued lists (which have been compiled based on unreliable citizenship verification mechanisms), and risking criminal prosecution themselves or refusing to issue these ballots and risking disenfranchising eligible voters. Understandably, some local officials may feel obligated to rely on the federal government's lists, despite the likelihood that they contain inaccurate information, and cause otherwise-eligible voters to be excluded. Forcing local election officials to make this choice is untenable.

## II.    The EO's Provisions Are Unlawful and Would Cause Significant Confusion in Election Administration

As explained, local election officials will bear the burden of implementing the EO. Beyond the risks of prosecution, withholding of financial resources, and potential impact on voters, *amici* direct the Court's attention to some of the specific ways in which the EO is unworkable and would disrupt local election administration.

14

**A.      The State Citizenship List presents unique challenges for local election officials**

The EO purportedly seeks to "protect[] the integrity of Federal elections," EO § 1, but *amici* and other local election officials already maintain robust systems to ensure that their voter registration lists are accurate and that only eligible voters can cast a vote, in compliance with federal law. *See, e.g.*, Or. Rev. Stat. §§ 247.292, 247.555, 247.563, 247.570 (requiring regular updates to voter registration lists); *see also* 18 U.S.C. § 611 (already prohibiting noncitizen voting in federal elections). The State Citizenship List's reliance on federal databases not designed to produce voter eligibility data will exclude eligible voters. Local election officials will then have a limited amount of time to determine how to incorporate the State Citizenship List into the state's preexisting voter registration lists, and to work with voters to correct errors in the State Citizenship List. Even if an official properly corrects an error on the list, the EO provides no guarantee that the federal government will correct the State Citizenship List. And because states may not receive these lists until as late as 60 days before the election, local officials will need to expend significant resources working with voters to ensure they are properly on the voter rolls and engaging in voter education, during the time that they would typically focus on administering the election.

The most significant disruptions are likely to occur on Election Day, when large numbers of previously eligible voters arrive at their polling location only to learn that they are not registered to vote because they did not appear on the State Citizenship List. Local election officials and poll workers will need to expend significant Election Day resources assisting these voters while navigating the legal uncertainties that the EO presents. Election Day confusion will likely have follow-on effects including longer lines, greater confusion about polling locations, and ultimately, the possibility of widespread voter disenfranchisement.

15

**B.    USPS involvement in voter eligibility verification presents unique challenges for local election officials**

As with their systems for ensuring only eligible citizens are registered to vote, states already maintain robust processes to ensure that mail ballots are only sent to eligible voters. The EO disrupts this process by mandating that the USPS "shall not transmit mail-in or absentee ballots from any individual" unless that individual appears on the USPS's "Mail-In and Absentee Participation List" compiled by the USPS and sent to the State. EO § 3(b)(iii)-(iv). In other words, it inserts the USPS into the process as an election administration agency while discounting the important role that local election officials play.

First, the EO's proposed timelines present a logistical nightmare for local election officials. It demands that a final rule of the USPS "shall be issued no later than 120 days from the date of this order," meaning July 27, 2026. *Id.* § 3(d). This will leave little time for localities that design and print their ballot envelopes in bulk well ahead of the election. Similarly, it commands that, for states that choose to send "a list of voters eligible to vote in a Federal election in such State to whom the State intends to provide a mail-in or absentee ballot to be transmitted via the USPS," they must do so "no fewer than 60 days before the election." *Id.* § 3(b)(ii). This date, however, is impractical because every state and territory allows voters to request absentee ballots closer to the election and requests for absentee ballots typically accelerate in the months leading up to the election.[12] Local election officials will not have the names of individuals to present to USPS in time for the proposed list receipt date.

---

[12] *See* Charles Stewart, *President Trump's latest election executive order is a case study in how-hard-could-it-be-ism.*, Substack: Playing with Election Data (Apr. 22, 2026), https://playingwithelectiondata.substack.com/p/president-trumps-latest-election.

16

Then, although the EO does not state when it will be sent, the federal government will provide each state with its state-specific Mail-In and Absentee Participation List sometime after the state sends its list, meaning within 60 days of an election. EO § 3(b)(iv). The EO does not require that the rulemaking leave states with an opportunity to update the list after it is received, and even if it could, the limited time means that local election officials would be under significant strain. And because many voters request absentee ballots to an address other than the address where they are registered, there are likely to be significant inaccuracies in the Mail-In and Absentee Participation Lists.[13] Local election officials, as the parties who typically send out mail ballots, will be forced to navigate the confusion caused by the various lists.

Finally, on the back end, many voters who rely on mail voting and planned to receive a mail ballot may not receive one. Even if voters properly request a mail ballot, a USPS employee may refuse or simply decide not to deliver it, recognizing that they too are subject to the EO's direction to impose criminal penalties. *See* EO § 2(b) (prioritizing prosecution for the "distribution of ballots" to ineligible individuals). Local election officials will need to resolve widespread voter confusion as they attempt to administer all other aspects of a federal election. For the reasons stated, *supra* Part I.D, as the parties who actually send ballots, local election officials will be in an impossible position, risking criminal prosecution if they send ballots to individuals who do not appear on the federal government's list and potentially jeopardizing a voter who receives such a ballot. Similarly, by failing to provide ballots to eligible voters, local election officials place themselves in potential legal jeopardy under state and federal criminal law. *See, e.g.*, 52 U.S.C.

---

[13] *See* Stewart, *supra* n.12.

17

§ 10307(a) (prohibiting refusing to permit an eligible voter to vote).[14] Much like the chaos resulting from the State Citizenship Lists, local election officials may need to dedicate significant time to voter education, enhance resources for interactions with voters who did not receive their ballots, and address confusion on Election Day as significantly more voters are forced to vote in person.

<b>CONCLUSION</b>

The EO would cause significant disruption to election administration, placing election officials and their workers in legal jeopardy and risking voter disenfranchisement. Because many local election officials and local governments are deep into their preparation for the 2026 midterm elections and because the changes the EO proposes are unlawful, this Court should grant Plaintiff's motions for preliminary injunctive relief and summary judgment.

Dated: May 1, 2026                          Respectfully submitted,


_/s/ Jonathan B. Miller_
Jonathan B. Miller (BBO #663012)
Alex M. Goldstein *
PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115
Oakland, CA 94609
Phone: (510) 214-6960
jonathan.miller@publicrightsproject.org
alex.goldstein@publicrightsproject.org


*Pro hac vice application forthcoming*

*Counsel for Amici Curiae*

---

[14] The mail voting lists and State Citizenship List also place local election officials in potential legal jeopardy because they require these officials to share highly sensitive voter information with the federal government, potentially in violation of state and federal privacy laws. The EO demands a significant amount of data sharing without considering the necessary data infrastructure that could securely store voters' personally identifying information ("PII"), compatibility with state-level databases, or additional resources needed for data security.

**ADDITIONAL COUNSEL**

ROSALYN GUY-MCCORKLE
County Solicitor
445 Fort Pitt Boulevard, Suite 300
Pittsburgh, PA 15219
*Solicitor for Allegheny County,*
  *Pennsylvania*

DAN GRIESER
County Solicitor
55 E. Court Street
Doylestown, PA 18902
*Attorney for Bucks County, Pennsylvania*

MICHAEL FIRESTONE
Corporation Counsel
One City Hall Square, Room 615
Boston, MA 02201
*Attorney for the City of Boston,*
  *Massachusetts*

TONY LOPRESTI
County Counsel
70 West Hedding Street
East Wing, 9th Floor
San José, CA 95110
*Counsel for the County of Santa Clara,*
  *California*

SUSAN BLITCH
County Counsel
188 W. Alisal Street
3rd Floor
Salinas, CA 93901
*County Counsel on behalf of the County of*
  *Monterey, California*

19

### Appendix A—List of *Amici Curiae*

Allegheny County, Pennsylvania

Lisa Lawitzke
*Clerk, Bellevue Township, Michigan*

City of Boston, Massachusetts

Bucks County, Pennsylvania

Michael Siegrist
*Clerk, Canton Township, Michigan*

Braxton White
*Commissioner, County of Clarion, Pennsylvania*

Greg Kimsey
*Auditor, Clark County, Washington*

Aubrey Sonderegger
*Recorder, Coconino County, Arizona*

Kristin Connelly
*Clerk-Recorder & Registrar of Voters, Contra Costa County, California*

Beau Harbin
*Legislator, County of Cortland, New York*

Justin Douglas
*Commissioner, Dauphin County, Pennsylvania*

Dawn Marie Sass
*Clerk / Deputy Treasurer, Town of Exeter, Wisconsin*

Domonique Clemons
*County Clerk & Register of Deeds, Genesee County Clerk's Office, Michigan*

Barb Byrum
*Clerk, Ingham County, Michigan*

20

Julie Wise
*Director of Elections, King County, Washington*

Chris Swope
*Clerk, City of Lansing, Michigan*

Jo Ellen Litz
*Commissioner, Lebanon County, Pennsylvania*

Jimmy Sabatino
*Chair, Luzerne County Council, Pennsylvania*

Katie Rosenberg
*County Board Supervisor, Marathon County, Wisconsin*

County of Monterey, California

County of Santa Clara, California

Katharine Clark
*Clerk, Santa Fe County, New Mexico*

Lisa Brown
*County Clerk / Register of Deeds, Oakland County, Michigan*

Lisa Deeley
*Commissioner, City of Philadelphia, Pennsylvania*

Rich Coglianese
*Board of Elections Member, Union County, Ohio*

Jilline Dobratz
*Clerk, City of West Bend, Wisconsin*

21

## CERTIFICATION OF SERVICE

I hereby certify that a copy of the foregoing was this day served on all counsel via the court's electronic service system.

*/s/ Jonathan B. Miller*
Jonathan B. Miller (BBO#663012)
Public Rights Project

Dated: May 1, 2026

22