**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

STATE OF CALIFORNIA, *et al.*,

    *Plaintiffs*,

      v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

    *Defendants.*

Case No. 1:26-cv-11581-IT

**BRIEF OF *AMICI CURIAE* STATES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, DECLARATORY RELIEF, AND PERMANENT INJUNCTION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................................................iii

INTEREST OF *AMICI CURIAE* ....................................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................................ 1

ARGUMENT ......................................................................................................................... 2

I.    Plaintiffs Are Not Entitled to Summary Judgment or Injunctive Relief on Their
Challenges to Section 2(a) of the Executive Order ..........................................................2

  A. Plaintiffs lack standing to challenge Section 2(a) of the Executive Order.................... 2

  B. Plaintiffs' challenges to Section 2(a) are not ripe ............................................... 7

  C. Plaintiffs' challenge to Section 2(a) is doomed on the merits because the President
  has authority to gather and organize information within the Executive Branch ........ 8

II.   Plaintiffs Are Not Entitled to Summary Judgment or Injunctive Relief on Their
Challenges to Section 2(b) of the Executive Order ........................................................11

III.  Plaintiffs Are Not Entitled to Summary Judgment or Injunctive Relief on Their
Challenges to Section 3(b) of the Executive Order ........................................................13

  A. Plaintiffs lack standing to challenge Section 3(b) ..........................................................13

  B. Plaintiffs' challenges to Section 3(b) are not ripe .........................................................15

  C. Plaintiffs are unlikely to succeed in showing that the President cannot direct USPS to
  engage in rulemaking.......................................................................................................17

CONCLUSION .................................................................................................................... 20

CERTIFICATE OF SERVICE ............................................................................................ 24

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Wright,*
  468 U.S. 737 (1984) ................................................................. 1, 2, 4, 5

*Am. Petroleum Inst. v. E.P.A.,*
  683 F.3d 382 (D.C. Cir. 2012) ..................................................... 16

*Ass'n of Am. Physicians & Surgeons, Inc. v. Sebelius,*
  901 F. Supp. 2d 19 (D.D.C. 2012) .................................................. 7

*Babbitt v. United Farm Workers Nat. Union,*
  442 U.S. 289 (1979) ........................................................................ 15

*Belmont Abbey Coll. v. Sebelius,*
  878 F. Supp. 2d 25 (D.D.C. 2012) .................................................. 4

*Carney v. Adams,*
  592 U.S. 53 (2020) ........................................................................... 7

*Church v. Biden,*
  573 F. Supp. 3d 118 (D.D.C. 2021) ............................................... 17

*City of Fall River, Mass. v. FERC,*
  507 F.3d 1 (1st Cir. 2007) ............................................................. 15

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) .................................................................. 2, 4, 12

*Clinton v. Jones,*
  520 U.S. 681 (1997) .......................................................................... 8

*Common Cause v. Trump,*
  506 F. Supp. 3d 39 (D.D.C. 2020) ................................................. 16

*Dep't of Navy v. Egan,*
  484 U.S. 518 (1988) .......................................................................... 9

*Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs,*
  873 F. Supp. 2d 363 (D.D.C. 2012) ............................................... 17

*Franklin v. Massachusetts,*
  505 U.S. 788 (1992) ........................................................................ 18

iii

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
   561 U.S. 477 (2010) ................................................................................................. 19

*Georgia v. Meadows,*
   88 F.4th 1331 (11th Cir. 2023)............................................................................. 9, 10

*Humphrey's Executor v. United States*
   295 U.S. 602 (1935) ............................................................................................ 19, 20

*In re Murray Energy Corp.,*
   788 U.S. at 334–35 .................................................................................................. 17

*Inst. for Free Speech v. Johnson,*
   148 F.4th 318 (5th Cir. 2025) ................................................................................. 13

*Kennedy v. Braidwood Mgmt., Inc.,*
   606 U.S. 748 (2025) ................................................................................................. 18

*KH Outdoor, L.L.C. v. Clay Cnty.,*
   482 F.3d 1299 (11th Cir. 2007)............................................................................... 13

*Laird v. Tatum,*
   408 U.S. 1 (1972) ..................................................................................................... 12

*Myers v. United States,*
   272 U.S. 52 (1926) .............................................................................................. 19, 20

*Nat'l Park Hospitality Ass'n v. Dep't of the Interior*,
   538 U.S. 803 (2003) ................................................................................................. 15

*Nixon v. Adm'r of Gen. Servs.,*
   433 U.S. 425 (1977) ................................................................................................... 9

*Nixon v. Fitzgerald,*
   457 U.S. 731, 102 S. Ct. 2690, 73 L. Ed. 2d 349 (1982) ...................................... 8, 18

*O'Neil v. Canton Police Dep't,*
   116 F.4th 25 (1st Cir. 2024)............................................................................... 12, 13

*Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.,*
   489 F.3d 1279 (D.C. Cir. 2007) ................................................................................. 5

*Reno v. Catholic Soc. Servs., Inc.,*
   509 U.S. 43 (1993) ................................................................................................... 15

*Roe v. Healey,*
  78 F.4th 11 (1st Cir. 2023) ........................................................................ 2

*Seila L. LLC v. Consumer Fin. Prot. Bureau,*
  591 U.S. 197 (2020) ................................................................................ 20

*Simon v. E. Ky. Welfare Rts. Org.,*
  426 U.S. 26 (1976) .................................................................................... 4

*SPARTA Ins. Co. v. Pennsylvania Gen. Ins. Co.,*
  621 F. Supp. 3d 169 (D. Mass. 2022) ....................................................... 4

*Steel Co. v. Citizens for a Better Env't,*
  523 U.S. 83 (1998) .................................................................................... 2

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014) ................................................................................ 12

*Texas v. United States,*
  523 U.S. 296 (1998) .................................................................................. 7

*Texas State LULAC v. Elfant,*
  52 F.4th 248 (5th Cir. 2022) ................................................................... 13

*Trump v. New York,*
  592 U.S. 125 (2020) ........................................................................ 7, 8, 14

*Trump v. Slaughter,*
  146 S. Ct. 18 (2025) ................................................................................ 19

*Trump v. Thompson,*
  20 F.4th 10 (D.C. Cir. 2021) ................................................................... 11

*Trump v. United States,*
  603 U.S. 593 (2024) ................................................................................ 10

*U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd.,*
  540 U.S. 736 (2004) ................................................................................ 20

*United States v. Arthrex, Inc.,*
  594 U.S. 1 (2021) .................................................................................... 19

*United States v. Chem. Found.,*
  272 U.S. 1 (1926) .................................................................................... 16

*W.R. Grace & Co. v. EPA,*
   959 F.2d 360 (1st Cir. 1992) ................................................................................. 15

*Wayte v. United States,*
   470 U.S. 598 (1985) ............................................................................................. 11

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952) ............................................................................................... 9

**Constitutional Provisions**

U.S. Const. art. II, § 1, cl. 1 ................................................................................... 19

U.S. Const. art. II, § 3 ........................................................................... 10, 14, 15, 19

**Statutes**

5 U.S.C. § 704.......................................................................................................... 17

18 U.S.C. § 611 ..................................................................................................... 9, 11

39 U.S.C. 401 ...................................................................................................... 16, 18

39 U.S.C. § 404....................................................................................................... 18

52 U.S.C. § 20511 ................................................................................................ 9, 11

52 U.S.C. § 21083(a) ............................................................................................. 10

## INTEREST OF *AMICI CURIAE*

*Amici* Alabama, Florida, Indiana, Kansas, Louisiana, Missouri, Montana, Nebraska, Oklahoma, South Carolina, South Dakota, and Texas ("*Amici* States") have a concrete interest in receiving Executive Order No. 14399's ("EO") contemplated State Citizenship List resource, securing their elections, and ensuring that all legal mail votes are counted.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Court should reject Plaintiffs' motions for summary judgment, declaratory relief, and permanent injunction, and simultaneously dismiss their claims. Fundamentally, Plaintiffs' claims are all premature. There is no final agency action in this case, and Plaintiffs therefore do not even know what they are challenging. *See, e.g.*, Doc. 65, California Compl. ¶ 136 (stating it is "unclear whether DHS and SSA have access to reliable sources of information pertaining to residence, among other things"). Plaintiffs therefore lack standing and a cause of action to pursue their claims. That defect infects all of Plaintiffs' claims, which rest on extensive speculation about what final agency actions the EO will lead to and how those actions might be implemented by independent third parties not before the Court. *Allen v. Wright*, 468 U.S. 737, 757 (1984) (holding that plaintiffs did not have standing where the injury was "highly indirect and 'results from the independent action of some third party not before the court'") (citation omitted). The prudential ripeness doctrine also strongly counsels against considering Plaintiffs' constitutional arguments before final agency actions exist. And finally, Plaintiffs offer no viable statutory authority for their proposed injunctive relief—which would effectively bar the President from ordering a federal

---

[1] *Amici* States respectfully preserve their argument that they are entitled to be heard as intervener defendants on this motion. An appeal of this Court's denial of intervention remains pending.

agency to initiate rulemaking. Even if they could, such a statute would violate Article II of the Constitution by intruding on the President's ability to supervise the Executive Branch.

## ARGUMENT

I. **Plaintiffs Are Not Entitled to Summary Judgment or Injunctive Relief on Their Challenges to Section 2(a) of the Executive Order.**

A. **Plaintiffs lack standing to challenge Section 2(a) of the Executive Order.**

To establish Article III standing, Plaintiffs must plausibly allege that they suffered a cognizable injury fairly traceable to Defendants, and that the injury is likely to be redressed by a favorable judicial decision. *See Allen,* 468 U.S. at 751. Also, because Plaintiffs seek "forward-looking" relief, they must show they are suffering an ongoing injury or face an immediate threat of injury. *Roe v. Healey*, 78 F.4th 11, 20–21 (1st Cir. 2023). Plaintiffs cannot show either of these.

Fundamentally, Plaintiffs must prove an "injury in fact"—a harm suffered by the plaintiff that is "concrete" and "actual or imminent, not 'conjectural' or 'hypothetical.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998) (citations omitted). The threatened injury must be "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409–10, 414 n.5 (2013). A "reasonable likelihood" of future harm is insufficient. *Id.*

Applying these principles here, Plaintiffs lack standing to challenge Section 2(a). Fatal to their standing theories, Plaintiffs' briefing ignores the reality that any use of the State Citizenship List is *optional*. Indeed, Section 2(a) merely orders the provision of information to States. *See* EO § 2(a) (directing the Secretary of Homeland Security to "take appropriate action to compile and transmit to the chief election official of each State a list of individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and

2

who maintain a residence in the subject State").  There is nothing in Section 2(a) ordering the States to take any sort of action with respect to their voting based on the State Citizenship List.

The allegation that Section 2 "superintend[s] and control[s] States' maintenance of their voter rolls" is illusory and appears nowhere in the EO's text.  California Compl. ¶ 154; *see also id.* ¶ 155 (speculating that "[u]pon receipt of the State Citizenship List, state elections officials must either rapidly remove voters from the rolls who are omitted from that list and refuse them a ballot … or face risk of criminal prosecution").  Plaintiffs have not claimed any concrete injury stemming from the mere transmission of this list to the States as an optional resource, nor can they.

*First*, the Plaintiffs claim that Section 2(a) harms them because it "transgress[es] Plaintiff States' constitutional power to prescribe the time, place, and manner of federal elections" and "attempts to coerce Plaintiff States to act contrary to existing state laws and practices related to voter rolls and the determination of voter eligibility."  California Compl. ¶ 138.  Again, nothing in the text of Section 2(a) proscribes States from doing anything or mandates any action in response to the State Citizenship List, EO § 2(a), and Plaintiffs' speculation to the contrary should be rejected.  *See* Doc. 106, California Br. at 21 ("Upon receipt [of the State Citizenship List], State's elections officials must either rapidly remove voters from the rolls who are omitted from that List and refuse them a ballot.").

*Second*, Plaintiffs allege that Section 2(a) will harm them by "introduc[ing] chaos as the 2026 midterm election approach, imposing a significant burden on Plaintiff States' electoral systems."  California Compl. ¶ 139.  They also claim that "citizens who access their records on the State Citizenship List and find that they are not listed will likely turn to Plaintiff States with questions about why they are not listed."  *Id.* ¶ 143.  But this is extraordinarily speculative and vague.  Courts routinely reject these kinds of hypothetical standing theories that speculate about

3

how third parties will respond to government action or that involve multiple contingent links between the challenged conduct and the alleged harm. *See Allen*, 468 U.S. at 757 (holding that plaintiffs did not have standing where the injury was "highly indirect and 'results from the independent action of some third party not before the court.'") (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41 (1976)); *Clapper*, 568 U.S. at 414 ("Plaintiffs cannot rely on speculation about the unfettered choices made by independent actors not before the courts.") (quotations and citations omitted). "Put another way … harm that is possible *or even likely* will not suffice." *Belmont Abbey Coll. v. Sebelius*, 878 F. Supp. 2d 25, 34 (D.D.C. 2012) (emphasis added); *see also SPARTA Ins. Co. v. Pennsylvania Gen. Ins. Co.*, 621 F. Supp. 3d 169, 176 (D. Mass. 2022) ("[A]llegations of *possible* future injury are insufficient.") (emphasis in original) (quotations and citations omitted). Plaintiffs' allegations rely on several layers of speculation that cannot satisfy these standards.

The first layer of speculation focuses on the allegation that the State Citizenship List will be inaccurate because the SAVE database is purportedly incomplete and so "[t]he State Citizenship List will inevitably suffer from the same defects as SAVE." California Compl. ¶¶ 133–36; *see also* California Br at 22 ("Erroneous omissions from State Citizenship Lists are inevitable due to flawed federal citizenship data."). But *even* assuming the SAVE database has inaccuracies, Section 2(a) makes clear that the Lists will be based on *other* sources of information, including "Federal citizenship and naturalization records, SSA records, SAVE data, and other relevant Federal databases." EO § 2(a). Plaintiffs do not know what these databases are and even admit that it is "unclear whether DHS and SSA have access to reliable sources of information pertaining to residence, among other things." California Compl. ¶ 136. Thus, without knowing all the sources that federal agencies will use, it is completely speculative for Plaintiffs to suggest that the State

Citizenship List will contain inaccurate data.  At best, Plaintiffs offer a conjectural assertion of an "increase[d] … risk" of inaccuracy, *id.*, which is insufficient.  *See Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1297–98 (D.C. Cir. 2007) ("'increased risk' is" not by "itself [a] concrete, particularized, and actual injury for standing purposes"—harm must be "actual" or "imminent," not merely "increased").

Also, even if the List does contain some errors, States may "routinely supplement and provide suggested modifications or amendments to the State Citizenship List."  EO § 2(a).  This is another safeguard against mistakes.  Section 2(a) also explicitly states that "[a]n individual's identification on the State Citizenship List does not indicate that the individual has been properly registered to vote in the State."  *Id.*  State and Federal laws and State procedures must still be followed for an individual to be registered to vote."  *Id.*  Plaintiffs' claimed injury thus assumes that the federal government and States will not collaborate to produce an accurate List.

The next level of speculation is that States will use the State Citizenship Lists to prevent voters from receiving ballots.  However, fatally for Plaintiffs' standing, use of the Lists by the States is *optional*.  EO § 2(a). Plaintiffs' proposed injury thus depends on the independent actions of "third part[ies] not before the court."  *Allen*, 468 U.S. at 757.  Even if States do use the Lists, Plaintiffs' implicit assumption that States will automatically exclude registered voters whose names do not appear on the Lists is implausible.

*Third*, Plaintiffs claim that "the public's confusion over voting rules will generate a separate injury: damage to the public trust in States to administer elections fairly in accordance with state law."  California Compl. ¶ 146; *see also* California Br. at 24–25 (claiming that Plaintiffs will face goodwill and reputational injury from loss of public trust).  Plaintiffs do not explain how the transmission of the optional resource contemplated by Section 2(a) will cause "damage to the

5

public trust" or will prevent States from "administer[ing] elections fairly in accordance with state law." Nonetheless, this theory too is extraordinarily speculative and not fairly traceable to the EO.

*Fourth*, Plaintiffs claim that Section 2(a) will harm them by "disenfranchis[ing] Plaintiff States' voters." California Compl. ¶ 147. Their theory of injury thus also assumes that the States' use of the State Citizenship List will somehow prevent eligible voters from receiving ballots. In theory, the only way this could occur would be if States automatically exclude registered voters whose names do not appear on the initial State Citizenship List. But Plaintiffs do not indicate any intention of doing this and such speculation is implausible, let alone uncertain. Instead, the List will merely signal a need for verification that a given registered voter is, in fact, a U.S. Citizen and over eighteen years' old. In other words, States will not remove voters from the voter registration rules without employing proper, independent verifications. Thus, Plaintiffs' theory of injury is not just speculative—it is implausible.

Notwithstanding all this speculation, Plaintiffs cannot plausibly allege causation or redressability—because other, unchallenged federal programs already provide citizenship data to the States. States already receive this information from the federal government through the Systematic Alien Verification for Entitlements (SAVE) program, which enables them to verify that those registering to vote are eligible. *See USCIS Enhances Voter Verification Systems* (Nov. 3, 2025).[2] The program is administered by USCIS and already must comply with the Privacy Act. Much of the information at issue here is already disclosed to the States; the fact that Section 2(a) could result in the same information being provided in a more streamlined fashion cannot cause the injury Plaintiffs allege and invalidating Section 2(a) cannot redress it. *See Ass'n of Am. Physicians & Surgeons, Inc. v. Sebelius,* 901 F. Supp. 2d 19, 42 (D.D.C. 2012) (finding that relief

---

[2] https://www.uscis.gov/newsroom/news-releases/uscis-enhances-voter-verification-systems

from challenged agency action was not redressable where "any injuries to referring physicians that result from the opt-out requirement are caused by statutes and regulations that pre-date the agency actions plaintiffs[] challenge.").

### B. Plaintiffs' challenges to Section 2(a) are not ripe.

The ripeness doctrine also precludes consideration of Plaintiffs' challenges to Section 2(a). In addition to showing that "an injury that is concrete, particularized, and imminent rather than conjectural or hypothetical," *Carney v. Adams*, 592 U.S. 53, 60 (2020) (quotations omitted), Plaintiffs must show that the case is "ripe" – that is, not dependent on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998).

This case is riddled with contingencies and speculation that impede judicial review. Crucially, it is unknown whether the State Citizenship List will even be created, let alone the how it will be done, as Section 2(a) qualifies its directive to the Secretary of Homeland Security that it shall compile and transmit the lists "[t]o the extent feasible and consistent with applicable law." The Department of Homeland Security must therefore first assess whether it is feasible to create the State Citizenship Lists and, if it is, how it can do so in accordance with applicable law. The Supreme Court has held that an identical condition in an executive order rendered a challenge to it unripe for judicial intervention. *See Trump v. New York*, 592 U.S. 125, 131 (2020) (rejecting judicial review of presidential where directive was qualified being "feasible" and "practicable"). Indeed, where "the President qualified his directive by providing that the Secretary should gather information 'to the extent practicable' and take action 'to the extent feasible,'" "[a]ny prediction how the Executive Branch might eventually implement this general statement of policy is 'no more than conjecture' at this time." *Id.*  Like the executive order in *Trump v. New York*, Section 2(a)

7

"may not prove feasible to implement in any manner whatsoever, let alone in a manner substantially likely to harm any of the plaintiffs here." *Id.* at 132. Until the Secretary makes these determinations, judicial resolution of this dispute is premature.

### C. Plaintiffs' challenge to Section 2(a) is doomed on the merits because the President has authority to gather and organize information within the Executive Branch.

Plaintiffs are also unlikely to succeed in challenging Section 2(a) because, fundamentally, their lawsuit fails to explain how courts can second-guess the President's ability organize information already within the Executive Branch's possession. They cannot. The President has inherent authority to manage information within the Executive Branch's possession—especially when, as here, no statute suggests otherwise.

The Constitution vests the executive power in the President alone, establishing him as "the chief constitutional officer of the Executive Branch, entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity." *Clinton v. Jones*, 520 U.S. 681, 699 n.29 (1997). "This grant of authority establishes the President as the chief constitutional officer of the Executive Branch, entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity … [including] management of the Executive Branch." *Nixon v. Fitzgerald*, 457 U.S. 731, 750, 102 S. Ct. 2690, 2701, 73 L. Ed. 2d 349 (1982). This control naturally extends to personnel, resources, and materials throughout the Executive Branch. For example, when the Supreme Court upheld the Presidential Recordings and Materials Preservation Act's rules for collecting and archiving presidential materials, the court emphasized that the Act did not infringe on separation of power principles because "the control over the materials remains in the Executive Branch." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 441 (1977). In so doing, the Court implicitly recognized the constitutional tradition of presidential control over presidential materials and information. *Cf. Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988) ("[The President's authority

8

to classify and control access to information bearing on national security … flows primarily from th[e] constitutional investment of power in the President and exists quite apart from any explicit congressional grant.").

*Amici* States agree with Plaintiffs that the Supreme Court's framework in *Youngstown Sheet & Tube Co.* is useful. *See* California Br. at 7. But Plaintiffs misapply that framework. Given the President's inherent authority to supervise and manage the Executive Branch, this case falls in Justice Jackson's second category of presidential power, "[w]hen the President acts in absence of either a congressional grant or denial of authority." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J. concurring). That mean**s** he can "rely upon his own independent powers." *Id.*

Here, Plaintiffs cannot point to a statute that prohibits the President from compiling citizenship data already in the possession of the Executive Branch. Under *Youngstown*, Plaintiffs' claim necessarily fails. Plaintiffs are simply mistaken when they suggest that the President needs to point to statutory authority allowing him to compile the State Citizenship Lists.

Even if the President did not have inherent authority to compile citizenship information within the Executive Branch's possession, all (presumably) agree he is empowered to act "'in relation to another branch's constitutionally authorized act'—*i.e.*, an act of Congress." *Georgia v. Meadows*, 88 F.4th 1331, 1347 (11th Cir. 2023). Congress has made it a crime to provide a fraudulent ballot and for anyone other than eligible voters to cast ballots, *see* 18 U.S.C. § 611; 52 U.S.C. § 20511, and the Supreme Court has recognized that "the President's duty to 'take Care that the Laws be faithfully executed' plainly encompasses enforcement of federal election laws passed by Congress." *Trump v. United States*, 603 U.S. 593, 627 (2024) (quoting U.S. Const. art. II, § 3). Because the State Citizenship Lists could—potentially—be used to help enforce federal

9

statutory prohibitions on non-citizen voting, Section 2(a) of the EO is valid "in relation to . . . an act of Congress." *Meadows*, 88 F.4th at 1347.

In response, Plaintiffs suggest that Congress has *implicitly* limited the President's ability to make state-level lists of voting-age citizens by giving the States the responsibility of creating voter registration lists. *See* California Br. at 8–9 (citing 52 U.S.C. § 21083(a) (HAVA provision requiring the States to create a "computerized statewide voter registration list"), *and id.* § 20507(a) (NVRA provision charging the "administration of voter registration for elections for Federal office" to the States)). But the State Citizenship Lists are *not* meant to displace state voter registration lists—a point the EO itself makes clear. EO § 2(a). Rather, the intent is for States to use this *optional* federal resource to check their own voter registration lists for non-citizens. *Id.* Plaintiffs are thus simply mistaken when they assert that the State Citizenship Lists would "encroach[] on States' and Congress's broad power to provide a complete code for congressional elections." California Br. at 12.

Plaintiffs also argue that an *ultra vires* claim should still be available to challenge Section 2(a) because the President has no constitutional authority to "interfere with state elections officials' duties and authority." California Br. at 12. But Section 2(a) does not interfere with election procedures at all, and Plaintiffs do not explain how the mere furnishing of the State Citizenship Lists impacts these procedures. The EO itself states that "State and Federal laws and State procedures must still be followed for an individual to be registered to vote," indicating plainly that the Lists are not meant to modify or supplant State election laws. EO § 2(a). None of the Plaintiffs identify any authority for the proposition that the mere compiling of information already in the Executive Branch's possession runs afoul of Article II.

\*　　\*　　\*

10

Contrary to the apparent belief of some litigation activists, the federal courts lack authority to second-guess every conceivable choice the President makes. *See Trump v. Thompson,* 20 F.4th 10, 35 (D.C. Cir. 2021) ("Article III courts are generally ill-equipped to superintend or second guess the expert judgment of the sitting President about the current needs of the Executive Branch[.]"). Just as courts surely could not second-guess a presidential directive to use staples instead of paperclips for multipage documents, courts do not have a roving commission to micromanage how the President manages information already within the federal government's possession.

## II.    Plaintiffs Are Not Entitled to Summary Judgment or Injunctive Relief on Their Challenges to Section 2(b) of the Executive Order.

Plaintiffs have also failed to meet their burden for an injunction to enjoin Section 2(b) because they cannot show they have standing to challenge it. Section 2(b) directs the Attorney General to investigate and, as appropriate, prosecute "State and local officials," "individuals," and "public or private entities" who issue ballots to individuals not eligible to vote in a Federal election. EO § 2(b). Plaintiffs cannot show any actual or imminent injury from the enforcement of unchallenged election laws. They do not dispute that, under federal and state law, only of age United States citizens can vote and that the provision of fraudulent ballots is unlawful. *See* 18 U.S.C. § 611; 52 U.S.C. § 20511. The simple directive that the Attorney General enforce these laws does not confer standing. The directive issued in Section 2(b) is also a matter of federal prosecutorial discretion and is not subject to judicial review. *See Wayte v. United States*, 470 U.S. 598, 607 (1985) ("The decision to prosecute is particularly ill-suited to judicial review.").

Even if courts could review those decisions, Plaintiffs' claim that Section 2(b) requires that "State's elections officials must either rapidly remove voters from the rolls who are omitted from that List … or face the risk of investigation and criminal prosecution" does not create standing.

11

California Br. at 21.  Nothing in Section 2 imposes this choice because, as explained above, the use of the State Citizenship List is voluntary.  This is therefore an implausible reading of an order that *supports* "the right to vote . . . for citizens" and directs investigation of those who furnish ballots to ineligible non-citizens.  EO §§ 1, 2(b).  But regardless of how Plaintiffs read the EO, a plaintiff's subjective and irrational fear of prosecution is simply not enough to confer standing under Article III.  *See Laird v. Tatum*, 408 U.S. 1, 13–14 (1972) ("Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.").

Instead, where a plaintiff has yet to face prosecution under a law it seeks to challenge, it must establish Article III standing by alleging "[(1)] an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [(2)] there exists a credible threat of prosecution thereunder."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quotations and citations omitted).  In other words, Plaintiffs must show that the threat is both credible and "imminent," *id.* at 156, which also requires showing a "live controversy about an actual or imminent application of [the challenged law] sufficient to present the constitutional issues in clean-cut and concrete form," *O'Neil v. Canton Police Dep't*, 116 F.4th 25, 31–32 (1st Cir. 2024).

The fanciful notion that Plaintiffs will be charged because of Section 2(b) depends on a "highly attenuated chain of possibilities."  *Clapper*, 568 U.S. at 410.  Plaintiffs would have to allege an intention to violate one of the election statutes under which the President directed enforcement.  That is, they would need to intentionally provide ballots to ineligible voters, which they do not claim to have any intention of doing.  *See O'Neil*, 116 F.4th at 31–32 (holding that appellants did not Article II standing bring pre-enforcement challenge to statutes where they had

12

not pleaded the specific conduct that could be the target of future enforcement). Also, Plaintiffs would have to prove a "credible threat of prosecution" simply for "provid[ing] ballots to registered voters," which the Executive Order does not prohibit. *See id.*; California Br. at 26. This is facially implausible. Again, there are too many "dominoes that would have to fall" to confer standing. *Texas State LULAC v. Elfant*, 52 F.4th 248, 257 (5th Cir. 2022) (finding no credible threat of prosecution for violation of election law where the circumstances leading to prosecution were speculative and depended in large part on the action of third parties). Plaintiffs' alleged fear of a chilling effect is therefore insufficient.

In any event, Plaintiffs fail to demonstrate redressability. Even if this Court enjoins Section 2(b), existing unchallenged laws would still prohibit the provision and use of fraudulent ballots; that reality makes Plaintiffs' fear-of-prosecution injury not redressable. *See KH Outdoor, L.L.C. v. Clay Cnty.*, 482 F.3d 1299, 1301, 1303–04 (11th Cir. 2007) (holding that injury was not redressable because even if the court were to strike the challenged provision, there were other unchallenged regulations that would still have prohibited the act at issue); *Inst. for Free Speech v. Johnson*, 148 F.4th 318, 331 (5th Cir. 2025) ("[R]edressability is undermined where an independent and unchallenged law also causes the plaintiff's injury."). Plaintiffs' request for a summary judgment should therefore be rejected as applied to Section 2(b) of the EO, and their challenges to it should be dismissed for lack of standing.

## III. Plaintiffs Are Not Entitled to Summary Judgment or Injunctive Relief on Their Challenges to Section 3(b) of the Executive Order

### A. Plaintiffs lack standing to challenge Section 3(b)

Section 3 directs the United States Postal Service to *initiate* rulemaking procedures for a rule requiring ballots to be mailed in officially marked envelopes that bear tracking codes. EO § 3(b)(i). Any forthcoming rule shall also provide for a "State-specific Mail-In and Absentee

13

Participation List" "that the USPS shall provide each State with a list of individuals . . . who are enrolled with the USPS . . . for mail-in or absentee ballots provided by such State." *Id.* § 3(b)(iv). Additionally, the forthcoming rule shall provide that States "may choose" to provide the USPS "a list of voters eligible to vote" absentee. *Id.* § 3(b)(ii). Finally, under the EO, the forthcoming rule shall provide that the USPS may "not transmit" absentee ballots from unidentified individuals who are not enrolled "on a State-specific list." *Id.* § 3(b)(iii).

To have standing, a challenged policy must be sufficiently concrete to assess whether a threatened injury is imminent. *See New York*, 592 U.S. at 131–32. Here, that is impossible because a notice of proposed rulemaking has not even been issued yet—much less a final rule. *Cf. id.* And Plaintiffs admit that they are uncertain about what a potential USPS rule would provide for, admitting that the Executive Order "does not specify how [USPS] 'enroll[ment]' will be effectuated, nor the entity charged with effectuating it." California Compl. ¶ 128. Without knowledge even of the basic contours of the USPS's forthcoming rule, Plaintiffs lack standing and ripeness to challenge Section 3. *See New York*, 592 U.S. at 131–32 (denying the plaintiffs standing because "[a]ny prediction how the Executive Branch might eventually implement this general statement of policy is 'no more than conjecture' at this time").

Unable to even articulate what they are challenging, Plaintiffs fail to articulate a concrete injury caused by Section 3 of the EO. Plaintiffs claim that Section 3 will prevent eligible voters from voting. *See* California Br. at 24–25. But Section 3 simply directs to the USPS to initiate rulemaking—it does not regulate the States directly and it does not directly inhibit *anyone*'s voting rights. Thus, Plaintiffs' alleged injury is not sufficiently traceable to Section 3 because Plaintiffs are not regulated by the EO. *See Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298

14

(1979) (To challenge a statute prospectively, Plaintiffs must allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute.").

## B.  Plaintiffs' challenges to Section 3(b) are not ripe.

Alternatively, even if this Court finds that Plaintiffs have standing, the Court should reject their challenges to Section 3 as prudentially unripe.  *See Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807–08 (2003) (quoting *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993)) ("Ripeness is a justiciability doctrine" that is "'drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.'"). "[P]remature review not only can involve judges in deciding issues in a context not sufficiently concrete to allow for focus and intelligent analysis, but it also can involve them in deciding issues unnecessarily, wasting time and effort." *W.R. Grace & Co. v. EPA,* 959 F.2d 360, 366 (1st Cir. 1992) (internal quotation omitted).  This principle "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Nat'l Park Hosp. Ass'n*, 538 U.S. at 807 (citation omitted).   To determine whether a claim satisfies prudential ripeness, courts consider: (1) the "fitness of the issues for judicial decision"; and (2) the "hardship to the parties of withholding court consideration." *City of Fall River, Mass. v. FERC*, 507 F.3d 1, 6 (1st Cir. 2007) (internal quotation omitted).  Assessing whether an issue is "fit" for adjudication requires courts to consider "whether the issue presented is purely legal, as opposed to factual, and the degree to which any challenged agency action is final." *W.R. Grace & Co.*, 959 F.2d at 364.

Plaintiffs fail to establish the first prong for prudential ripeness because no concrete legal dispute fit for adjudication exists here.  At the outset, Section 3 provides a broad outline of what the USPS regulation will include, but the administrative process remains ongoing and the processes for implementing the EO have not yet been published.  *See* EO § 3(b)(iv) (directing

15

"[p]roposed provisions specifying that the USPS shall provide each State with a list of individuals (Mail-In and Absentee Participation List) who are enrolled with the USPS, *pursuant to a process specified in the rulemaking directed by this subsection*" (emphasis added)); *id.* § 3(b)(v) (directing unspecified "procedures enabling each State to routinely supplement and provide suggested modifications or amendments to the State's Mail-In and Absentee Participation List"). It would also be imprudent to review an executive order directing rulemaking when Plaintiffs cannot allege what the ultimate rule will provide. *See, e.g.*, California Compl. ¶ 128.

In allowing ongoing administrative proceedings to be completed, courts "respect the Executive Branch's interest in 'crystallizing its policy before that policy is subjected to judicial review.'" *Common Cause v. Trump*, 506 F. Supp. 3d 39, 46 (D.D.C. 2020) (quoting *Am. Petroleum Inst. v. E.P.A.*, 683 F.3d 382, 387 (D.C. Cir. 2012)). Where, as here, "the possibility that further [administrative] consideration will actually occur before implementation is not theoretical, but real," "[j]udicial intervention at this time would inappropriately interfere with ongoing action within the Executive Branch." *Id.* at 45. Moreover, the EO's direction that USPS's action be "pursuant to 39 U.S.C. 401 and other applicable authority," in "compl[iance] with the Privacy Act and all applicable use agreements," and "consistent with applicable State law" underscores the intention that said action be conducted lawfully. EO § 3(b)(iv)–(v). The "presumption of regularity," which requires courts to presume that public officers have "properly discharged their official duties" absent evidence to the contrary, supports this reading of Section 3. *United States v. Chem. Found.*, 272 U.S. 1, 14–15 (1926).

There has also not been any final agency action with respect to Section 3. Section 3 simply directs the USPS to *initiate* rulemaking about mail-in and absentee ballots, and it specifies that "any final rule" by the USPS "shall be issued no later than 120 days from the date of this order."

16

EO § 3(d).  A notice of proposed rulemaking is an "intermediate agency action," not a "final" one.

5 U.S.C. § 704; *In re Murray Energy Corp.*, 788 U.S. at 334–35.  Thus, Plaintiffs cannot

prematurely sue with the deadline for the USPS's "final rule" still three months away.  EO § 3(d).

Given that USPS has not yet taken any final agency action, Plaintiffs likewise fail to show

that "delayed judicial review would cause them 'immediate and significant hardship'" to satisfy

the second prong for prudential ripeness.  *Church v. Biden*, 573 F. Supp. 3d 118, 136 (D.D.C. 2021)

(quoting *Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs*, 873 F. Supp. 2d 363, 371 (D.D.C.

2012)).  Premature adjudication of USPS's actions in the way Plaintiffs desire "denies the agency

an opportunity to . . . apply its expertise" in implementing the EO consistent with its regular

rulemaking procedures.  *See Finca Santa Elena, Inc.*, 873 F. Supp. 2d at 369 (citation omitted).

For these reasons, Plaintiffs' challenges to Section 3 are not ripe for adjudication.

C. **Plaintiffs are unlikely to succeed in showing that the President cannot direct USPS to engage in rulemaking.**

In asking this Court to enjoin the President from issuing instructions to a federal agency,

Plaintiffs are proposing an extraordinary intrusion on the President's constitutional authority.  But

they fail to show any statute that clearly directs this extraordinary result.  And even if a statute did

prevent the President from supervising USPS, such a statute would be constitutional.

1. Plaintiffs must, but cannot, identify a clear statement from Congress preventing the President from supervising USPS.

Courts require clear statements from Congress before they will conclude Congress intended

to interfere with the President's authority to supervise the executive branch. For example, courts

require a clear statement that Congress intended to limit the President's ability to freely remove

executive officials. *See, e.g.*, *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 778 (2025). As

another example, in *Franklin v. Massachusetts*, the Supreme Court held that where "[t]he President

is not explicitly excluded from the APA's purview, but he is not explicitly included, either," "textual silence is not enough to subject the President to the provisions of the APA." *Franklin*, 505 U.S. at 800–01. Instead, "an express statement by Congress" is required. *Id.*; *see also Nixon v. Fitzgerald*, 457 U.S. 731, 748 n. 27 (1982) (Court would require an explicit statement by Congress before assuming Congress had created a damages action against the President). These clear statement rules exist due to "respect for the separation of powers and the unique constitutional position of the President." *Franklin*, 505 U.S. at 800–01.

Plaintiffs do not identify any clear statutory statements preventing the President from directing USPS to engage in rulemaking.  Rather, they cite statutory provisions that assign powers to others without an express exclusion of presidential authority.  For example, Plaintiffs cite to 39 U.S.C. § 404, which describes the specific powers of the Postal Service, California Br. at 15, but it does not "explicitly" exclude the President from exercising supervisory authority. *Franklin*, 505 U.S. at 800–01.  The President is not even mentioned at all.  *See* 39 U.S.C. § 404.  The same is true of 39 U.S.C. § 401, which grants USPS authority to "adopt, amend, and repeal such rules and regulations," but it does not prohibit the President from directing such actions.  In short, these provisions are not the "explicit" denials of presidential authority that the Supreme Court demands. *Braidwood Management*, 606 U.S. at 778.

        2.  <u>Any statute preventing the President from directing USPS rulemakings is unconstitutional.</u>

Even if Plaintiffs can identify a statute clearly prohibiting the President from directing USPS rulemaking, it would be unconstitutional.  The Constitution vests the entirety of the executive power in the President. U.S. Const. art. II, § 1, cl. 1.  In exercising this power, the President must be able to control and supervise his subordinates in order to "take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 3; *see Free Enter. Fund v. Pub. Co. Acct.*

18

*Oversight Bd.*, 561 U.S. 477, 483 (2010). Indeed, "the activities of executive officers may take legislative and judicial forms, but they are exercises of—indeed, under our constitutional structure they *must be* exercises of—the executive Power, for which the President is ultimately responsible." *United States v. Arthrex, Inc.*, 594 U.S. 1, 17 (2021) (quotations and citations omitted). Thus, the "thousands of officers [who] wield executive power" in the federal government "acquire[] [their] legitimacy and accountability to the public through 'a clear and effective chain of command' down from the President." *Id.* at 11 (quoting *Free Enterprise Fund*, 561 U.S. at 498).

Given those constitutional rules, Congress cannot bar the President from supervising USPS. The Constitution protects the President's ability to "discharge his own constitutional duty of seeing that the laws be faithfully executed." *Myers v. United States*, 272 U.S. 52, 135 (1926). Indeed, in *Myers*, the Supreme Court has already held that Congress cannot interfere with the President's ability to supervise the U.S. Postal Service. There, the Supreme Court held that Article II prevents Congress from restricting the President's removal powers over post office officials. *See id.* If Congress cannot prevent the President from firing postal officials, it follows naturally that Congress cannot prohibit the President from giving directives to postal officials.

Nor does the Supreme Court's decision in *Humphrey's Executor v. United States* save Plaintiffs' claims. 295 U.S. 602 (1935). The Supreme Court has already signaled its intent to overrule *Humphrey's Executor* and stayed an order preventing the removal of an FTC Commissioner. *See Trump v. Slaughter*, 146 S. Ct. 18 (2025). But even if *Humphrey's Executor* is not overruled, the Supreme Court in *Humphrey's* explicitly suggested its rationale did not insulate postal officials from removal—on the rationale that such officials perform "executive functions." 295 U.S. at 627 ("The office of a postmaster is so essentially unlike the office now involved that the decision in the Myers Case cannot be accepted as controlling our decision here.

19

A postmaster is an executive officer restricted to the performance of executive functions."); *see also U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd.*, 540 U.S. 736, 747 (2004) ("Postal Service has many powers more characteristic of Government than of private enterprise, including its state-conferred monopoly on mail delivery, the power of eminent domain, and the power to conclude international postal agreements.").

Nor could Plaintiffs analogize USPS to "financial institutions like the Second Bank and the Federal Reserve," which "can claim a special historical status" because they "have historically enjoyed some insulation from the President." *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 222 n.8 (2020). Unlike the Federal Reserve, USPS does not share the same historical lineage of independence. For most of the country's history, the Postmaster General was a member of the President's Cabinet, and it was not until 1970 that Congress attempted to give the agency more independence. *See Flamingo Indus.*, 540 U.S. at 740 (providing historical overview). Article II of the Constitution therefore prohibits Congress from interfering with the President's authority to supervise USPS—including by directing rulemaking. *See Myers*, 272 U.S. at 135.

## CONCLUSION

For the foregoing reasons, *Amici* States respectfully request that the Court deny Plaintiffs' motion for summary judgment, declaratory relief, and permanent injunction, and dismiss their claims.

20

Date: May 7, 2026

Respectfully submitted,

**STEVE MARSHALL**
ALABAMA ATTORNEY GENERAL

*/s/ A. Barrett Bowdre*
A. Barrett Bowdre*
  *Solicitor General*
STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36104
Telephone: (334) 353-8892
Fax: (334) 353-8400
Barrett.Bowdre@AlabamaAG.gov

**CATHERINE L. HANAWAY**
MISSOURI ATTORNEY GENERAL

*/s/ Louis J. Capozzi III*
Louis J. Capozzi III, DC Bar No. 90018764*
  *Solicitor General*
J. Michael Patton*
  *Deputy Solicitor General*
Benjamin S. Gilberg*
  *Deputy Solicitor General*
Missouri Attorney General's Office
815 Olive Street, Suite 200
St. Louis, MO 63101
Tel. (573) 645-9662
Fax (573) 751-0774
Louis.Capozzi@ago.mo.gov
Michael.Patton@ago.mo.gov
Benjamin.Gilberg@ago.mo.gov

**JAMES UTHMEIER**
FLORIDA ATTORNEY GENERAL

*/s/ David M.S. Dewhirst*
David M.S. Dewhirst*
  *Solicitor General*
Jason J. Muehlhoff*
  *Chief Deputy Solicitor General*
Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
david.dewhirst@myfloridalegal.com
jason.muehlhoff@myfloridalegal.com

**THEODORE E. ROKITA**
INDIANA ATTORNEY GENERAL

/s/ *James A. Barta*
James. A Barta, DC Bar No. 1032613*
  *Solicitor General*
Office of the Indiana Attorney General
302 W. Washington Street
IGC South, Fifth Floor
Indianapolis, IN 46204-2770
Phone: (317) 232-0709
Fax: (317) 232-7979
James.Barta@atg.in.gov

21

**KRIS W. KOBACH**
KANSAS ATTORNEY GENERAL

*/s/ James R. Rodriguez*
James R. Rodriguez*
*Assistant Attorney General*
Kansas Office of the Attorney General
Topeka, Kansas 66612
Phone: (785) 368-8197
jay.rodriguez@ag.ks.gov


**AUSTIN KNUDSEN**
MONTANA ATTORNEY GENERAL

*/s/ Christian B. Corrigan*
Christian B. Corrigan*
 *Solicitor General*
Montana Department of Justice
215 N. Sanders Helena, MT 59601
(406) 444-2707 (o)
Christian.Corrigan@mt.gov


**GENTER DRUMMOND**
OKLAHOMA ATTORNEY GENERAL

*/s/ Garry M. Gaskins, II*
Garry M. Gaskins, II*
 *Solicitor General*
Office of the Attorney General of Oklahoma
313 NE Twenty-First St.
Oklahoma City, OK 73105
(405) 521-3921
garry.gaskins@oag.ok.gov

**ELIZABETH B. MURRILL**
LOUISIANA ATTORNEY GENERAL

*/s/ J. Benjamin Aguiñaga*
J. Benjamin Aguiñaga*
 *Solicitor General*
Louisiana Department of Justice
1885 N. Third St.
Baton Rouge, LA 70802
(225) 506-3746
AguinagaB@ag.louisiana.gov


**MICHAEL T. HILGERS**
NEBRASKA ATTORNEY GENERAL

/s/ *Cody S. Barnett*
Cody S. Barnett*
 *Solicitor General*
Nebraska Department of Justice
1445 K Street, Room 2115
Lincoln, Nebraska 68508
Tel.: (402) 471-2683
Fax: (402) 471-3297
cody.barnett@nebraska.gov


**ALAN WILSON**
SOUTH CAROLINA ATTORNEY GENERAL

*/s/ Joseph D. Spate*
Joseph D. Spate*
 *Deputy Solicitor General*
1000 Assembly Street
Columbia, South Carolina 29201
Tel. (803) 734-3371
Fax (803) 734-3677
josephspate@scag.gov

22

**MARTY J. JACKLEY**
SOUTH DAKOTA ATTORNEY GENERAL

/s/ *Grant Flynn*
Grant Flynn**
 *Assistant Attorney General*
South Dakota Office of the Attorney General
1302 East SD Highway 1889,
Suite 1
Pierre, SD 57501-8501
Telephone: (605) 773-3215
Email: grant.flynn@state.sd.us


/s/ *Ian D. Prior*
Ian D. Prior (Bar No. 655704)
America First Legal Foundation
611 Pennsylvania Ave S.E. No. 231
Washington, D.C. 20003
(410) 205-9681
ian.prior@aflegal.org

**KEN PAXTON**
TEXAS ATTORNEY GENERAL

s/ *David Bryant*
David Bryant*
 *Senior Special Counsel*
Office of the Attorney General of Texas
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2100
david.bryant@oag.texas.gov


\* *Admitted pro hac vice*

\*\* *Pro hac vice forthcoming*

23

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 7, 2026, the above was filed electronically through the Court's electronic filing system to be served electronically on counsel for the parties.

/s/ *Louis J. Capozzi III*
