**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF MASSACHUSETTS, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>    Defendants. | Case No. 1:26-cv-11549-IT |
| STATE OF CALIFORNIA, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>    Defendants. | Case No. 1:26-cv-11581-IT |

**DEFENDANTS' COMBINED MEMORANDUM IN SUPPORT OF THEIR MOTIONS TO DISMISS AND IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR <u>A PRELIMINARY INJUNCTION AND SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

INTRODUCTION.................................................................................................................... 1

BACKGROUND ................................................................................................................... 2

I.      Executive Order 14,399 ............................................................................................ 2

II      Litigation Background ............................................................................................. 4

ARGUMENT ....................................................................................................................... 6

I.      **These suits should be dismissed.**.................................................................... 7

        A.      Plaintiffs lack Article III standing.......................................................... 7

        B.      Plaintiffs' claims are not ripe. ............................................................... 12

        C.      Plaintiffs' APA claims fail to challenge any final agency action. ........ 16

        D.      Plaintiffs fail to identify any viable cause of action for their statutory
                claims. ...................................................................................................... 23

        E.      Plaintiffs' claims challenging the enforcement priorities and enforcement
                discretion of the Executive Branch are independently unreviewable. .... 25

        F.      The President and the Department of Commerce should be dismissed. ... 30

II.     **Plaintiffs' claims fail on the merits (or are likely to fail on the merits).** ..... 31

III.    **The remaining preliminary-injunction factors also support denial of the
        *LWVMA* Plaintiffs' Motion for a Preliminary Injunction**........................... 37

        A.      The *LWVMA* Plaintiffs have not carried their burden to demonstrate
                irreparable harm. ...................................................................................... 38

        B.      The balance of equities and the public interest disfavor injunctive relief. ........... 42

IV.     *California* **Plaintiffs are not entitled to summary judgment at this time.**................... 43

V.      **At a minimum, Plaintiffs' requested relief is overbroad.**........................... 45

        A.      Any equitable relief should be narrowly tailored and respect the Executive
                Order's severability clause........................................................................ 45

        B.      The Court should not issue any injunction against the President. ........ 46

        C.      The Court should require Plaintiffs to post an injunction bond........... 48

CONCLUSION ................................................................................................................... 48

## TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*Abbott Labs. v. Gardner*,
   387 U.S. 136 (1967) ............................................................................................... 12, 13

*AFL-CIO v. Dep't of Labor*,
   778 F. Supp. 3d 56 (D.D.C. 2025) ................................................................................... 24

*Aid Ass'n for Lutherans v. USPS*,
   321 F.3d 1166 (D.C. Cir. 2003) ...................................................................................... 17

*Akebia Therapeutics, Inc. v. Azar*,
   976 F.3d 86 (1st Cir. 2020) ............................................................................................. 32

*Alexander v. Sandoval*,
   532 U.S. 275 (2001) ................................................................................................... 23, 24

*Am. Fed'n of Tchrs. v. Bessent*,
   152 F.4th 162 (4th Cir. 2025*), abrogated on other grounds by*
   AFL-CIO v. SSA, 2026 WL 969670 (4th Cir. Apr. 10, 2026) ................................................. 24

*Armstrong v. Exceptional Child Ctr., Inc.*,
   575 U.S. 320 (2015) ....................................................................................................... 46

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ....................................................................................................... 11

*Ass'n of Flight Attendants-CWA v. Huerta*,
   785 F.3d 710 (D.C. Cir. 2015) ........................................................................................ 21

*Babbitt v. United Farm Workers Nat'l Union*,
   442 U.S. 289 (1979) ....................................................................................................... 12

*Bell v. New Jersey*,
   461 U.S. 773 (1983) ....................................................................................................... 17

*Bennett v. Spear*,
   520 U.S. 154 (1997) ....................................................................................................... 16

*Beverly Health & Rehab. Servs., Inc. v. Feinstein*,
   103 F.3d 151 (D.C. Cir. 1996) ........................................................................................ 28

*Bldg. & Const. Trades Dep't., AFL-CIO v. Allbaugh*,
   295 F.3d 28 (D.C. Cir. 2002) ............................................................................... 34, 35, 36

*Blum v. Holder*,
  744 F.3d 790 (1st Cir. 2014).................................................................................... 12, 41

*Brown v. Fed. Election Comm'n*,
  386 F. Supp. 3d 16 (D.D.C. 2019)................................................................................. 12

*Califano v. Yamasaki*,
  442 U.S. 682 (1979)...................................................................................................... 45

*Capen v. Campbell*,
  134 F.4th 660 (1st Cir. 2025)............................................................................. 31, 37, 38

*Castro v. Scanlan*,
  86 F.4th 947 (1st Cir. 2023)........................................................................................... 10

*Cell Assocs., Inc. v. Nat'l Institutes of Health*,
  579 F.2d 1155 (9th Cir. 1978) ...................................................................................... 24

*Center for Democracy & Technology v. Biden*,
  No. 21-5062, 2021 WL 11659822 (D.C. Cir. Aug. 9, 2021)......................................... 8

*Centro de Trabajadores Unidos v. Bessent*,
  167 F.4th 1218 (D.C. Cir. 2026)............................................................................. 21, 22

*Chardon-Dubos v. Biden*,
  No. CV 23-1138 (SCC), 2024 WL 4373386 (D. Puerto Rico, Sept. 1, 2024).............. 8

*Citizens for Responsibility & Ethics v. FEC*,
  993 F.3d 880 (D.C. Cir. 2021)....................................................................................... 28

*Cty. of Chelsea v. Trump*,
  802 F. Supp. 3d 289 (D. Mass. 2025) ............................................................................ 8

*Cty. & Cnty. of Denver v. N.Y. Trust Co.*,
  229 U.S. 123 (1913)....................................................................................................... 31

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013)..................................................................................................... 7, 9

*College v. United States HHS*,
  798 F. Supp. 3d 77 (D. Mass. 2025) ............................................................................. 25

*Corp. Techs., Inc. v. Harnett*,
  731 F.3d 6 (1st Cir. 2013)............................................................................................. 38

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*,
452 F.3d 798 (D.C. Cir. 2006) ............................................................................... 22

*Ctr. for Democracy & Tech. v. Trump*,
507 F. Supp. 3d 213 (D.D.C. 2020) ............................................................... 8, 10, 11

*DNC v. Trump*,
No. 25-cv-587 (AHA), 2025 WL 1573181 (D.D.C. June 3, 2025) ........................... 11

*Doe v. Stephens*,
851 F.2d 1457 (D.C. Cir. 1988) ............................................................................. 24

*Doe 2 v. Trump*,
319 F. Supp. 3d 539 (D.D.C. 2018) .................................................................. 31, 47

*Drake v. FAA*,
291 F.3d 59 (D.C. Cir. 2002) ................................................................................ 28

*Equal Rts. Ctr. v. Uber Techs., Inc.*,
525 F. Supp. 3d 62 (D.D.C. 2021) .......................................................................... 10

*Ernst & Young v. Depositors Econ. Prot. Corp.*,
45 F.3d 530 (1st Cir. 1995) ................................................................................... 12

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .................................................................................... 8, 10, 11

*FDA v. Wages & White Lion Invs., LLC*,
604 U.S. 542 (2025) ............................................................................................. 33

*FDIC v. Bank of Am., N.A.*,
783 F. Supp. 3d 1 (D.D.C. 2025) ............................................................................ 17

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ...................................................................................... *passim*

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010) ............................................................................................. 46

*Gill v. Whitford*,
585 U.S. 48 (2018) ............................................................................................... 45

*Glob. Naps, Inc. v. Verizon New England, Inc.*,
489 F.3d 13 (1st Cir. 2007) ................................................................................... 48

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*,
    527 U.S. 308 (1999)..................................................................................................... 46

*Harper v. Werfel*,
    118 F.4th 100 (1st Cir. 2024) .................................................................................... 16

*Harris v. Adams*,
    757 F. Supp. 3d 111 (D. Mass. 2024) ....................................................................... 38

*Heckler v. Chaney*,
    470 U.S. 821 (1985)....................................................................................... 26, 27, 28

*In re Bluewater Network*,
    234 F.3d 1305 (D.C. Cir. 2000) ................................................................................ 17

*In re Murray Energy Corp.*,
    788 F.3d 330 (D.C. Cir. 2015) ....................................................................... 1, 17, 40

*Indep. Equip. Dealers Ass'n v. EPA*,
    372 F.3d 420 (D.C. Cir. 2004) .................................................................................. 21

*J.G.G. v. Trump*,
    No. 25-5067, 2025 WL 914682 (D.C. Cir. Mar. 26, 2025) ...................................... 46

*League of Women Voters v. DHS*,
    No. 25-cv-3501 (SLS), 2025 WL 3198970 (D.D.C. Nov. 17, 2025) ................................ 20, 21

*League of United Latin Am. Citizens v. Exec. Off. of President*,
    No. 25-cv-946 (CKK), 2026 WL 252420 (D.D.C. Jan. 30, 2026) .......................... 19

*Lincoln v. Vigil*,
    508 U.S. 182 (1993).............................................................................................. 26, 28

*Los Angeles v. Lyons*,
    461 U.S. 95 (1983).................................................................................................... 14

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)............................................................................................ 7, 8, 29

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990).................................................................................................. 14

*LULAC v. Exec. Off. of President*,
    808 F. Supp. 3d 29 (D.D.C. 2025)............................................................................ 23

*Maryland v. King*,
567 U.S. 1301 (2012)...................................................................................................... 43

*Matos ex. rel. Matos v. Clinton School Dist.*,
367 F.3d 68 (1st Cir. 2004)............................................................................................. 38

*McInnis-Miesnor v. Maine Medical Ctr.*,
319 F.3d 63 (1st Cir. 2003)............................................................................................. 12

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
526 U.S. 172 (1999)........................................................................................................ 46

*Mississippi v. Johnson*,
71 U.S. (4 Wall.) 475 (1866) .............................................................................. 31, 46, 47

*Mittleman v. Postal Regulatory Comm'n*,
757 F.3d 300 (D.C. Cir. 2014)........................................................................................ 17

*Munaf v. Geren*,
553 U.S. 674 (2008)........................................................................................................ 31

*Murthy v. Missouri*,
603 U.S. 43 (2024)............................................................................................................ 9

*Nat'l Ass'n of Gov't Emps. v. Yellen*,
120 F.4th 904 (1st Cir. 2024).......................................................................................... 10

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
538 U.S. 803 (2003)........................................................................................................ 12

*Nat'l Treasury Emps. Union v. Nixon*,
492 F.2d 587 (D.C. Cir. 1974)........................................................................................ 47

*Nat'l Urb. League v. Trump*,
783 F. Supp. 3d 61 (D.D.C. 2025).............................................................................. *passim*

*New York v. Trump*,
485 F. Supp. 3d 422 (S.D.N.Y. 2020)............................................................................. 13

*Newdow v. Roberts*,
603 F.3d 1002 (D.C. Cir. 2010)...................................................................................... 47

*Nixon v. Fitzgerald*,
457 U.S. 731 (1982)........................................................................................................ 47

*Nkihtaqmikon v. Impson*,
    503 F.3d 18 (1st Cir. 2007) ................................................................................ 23

*Northern Air Cargo v. USPS*,
    674 F.3d 852 (D.C. Cir. 2012) ............................................................................ 17

*NRC v. Texas*,
    605 U.S. 665 (2025) ..................................................................................... 24, 25

*Nyunt v. Chairman, Broad. Bd. of Governors*,
    589 F.3d 445 (D.C. Cir. 2009) ............................................................................ 24

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
    523 U.S. 726 (1998) ........................................................................................... 14

*Platte River Whooping Crane Critical Habitat Maint. Tr. v. FERC*,
    962 F.2d 27 (D.C. Cir. 1992) .............................................................................. 10

*Raines v. Byrd*,
    521 U.S. 811 (1997) ........................................................................................... 29

*Reno v. Cath. Soc. Servs., Inc.*,
    509 U.S. 43 (1993) ............................................................................................. 12

*Sec'y of Lab. v. Twentymile Coal Co.*,
    456 F.3d 151 (D.C. Cir. 2006) ............................................................................ 28

*Seila Law LLC v. CFPB*,
    591 U.S. 197 (2020) ........................................................................................... 43

*Sierra Club v. Costle*,
    657 F.2d 298 (D.C. Cir. 1981) ............................................................................ 34

*Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*,
    554 U.S. 269 (2008) ........................................................................................... 29

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ........................................................................................ 9, 14

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ................................................................................ 11, 12, 41

*Sussman v. U.S. Marshals Serv.*,
    494 F.3d 1106 (D.C. Cir. 2007) .......................................................................... 24

*Swan v. Clinton,*
    100 F.3d 973 (D.C. Cir. 1996) ....................................................................... 47

*Texas v. United States,*
    523 U.S. 296 (1998) ....................................................................................... 12

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ............................................................................. 7, 29, 36

*Trump v. Am. Fed'n of Gov't Emps.,*
    145 S. Ct. 2635 (2025) ............................................................................ 15, 33

*Trump v. New York,*
    592 U.S. 125 (2020) ................................................................................ *passim*

*Trump v. United States,*
    603 U.S. 593 (2024) ....................................................................................... 35

*USPS v. Gregory,*
    534 U.S. 1 (2001) ........................................................................................... 33

*U.S. ex rel. McLennan v. Wilbur,*
    283 U.S. 414 (1931) ....................................................................................... 47

*United Presbyterian Church in the USA v. Reagan,*
    738 F.2d 1375 (D.C. Cir. 1984) .................................................................... 11

*United States v. Armstrong,*
    517 U.S. 456 (1996) ....................................................................................... 28

*United States v. Nixon,*
    418 U.S. 683 (1974) ....................................................................................... 36

*United States v. Salerno,*
    481 U.S. 739 (1987) ....................................................................................... 36

*United States v. Texas,*
    599 U.S. 670 (2023) ............................................................................. 6, 29, 36

*Westcott v. McHugh,*
    39 F. Supp. 3d 21 (D.D.C. 2014) .................................................................. 24

*Whitmore v. Arkansas,*
    495 U.S. 149 (1990) .................................................................................... 8, 10

*Wilbur v. U.S. ex rel. Kadrie*,
   281 U.S. 206 (1930) ............................................................................................... 47

*Wildlife v. Perciasepe*,
   714 F.3d 1317 (D.C. Cir. 2013) ..................................................................... 10, 11

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) .................................................................................................. 37

*Woodhull Freedom Found. v. United States*,
   948 F.3d 363 (D.C. Cir. 2020) ............................................................................. 12

*Zambrana-Marrero v. Suarez-Cruz*,
   172 F.3d 122 (1st Cir. 1999) ................................................................................ 43

**STATUTES**

5 U.S.C. § 552a ............................................................................................... 19, 24

5 U.S.C. § 701(a)(2) .................................................................................... *passim*

5 U.S.C. § 704 ............................................................................................ 6, 16, 23

18 U.S.C. § 611(a) ................................................................................... 1, 3, 4, 28

21 U.S.C. § 301 .................................................................................................... 27

39 U.S.C. § 101(a) ............................................................................................... 25

39 U.S.C. § 410(a) ............................................................................................... 17

39 U.S.C. § 3001(m) ............................................................................................ 17

52 U.S.C. § 10307(e) ........................................................................................... 28

**FEDERAL RULES**

Federal Rule of Civil Procedure 12(b) .............................................................. 23, 48

Federal Rule of Civil Procedure 65(c) ...................................................................... 48

**ADMINISTRATIVE AND EXECUTIVE MATERIALS**

*Ensuring a Lawful and Accurate Enumeration and Apportionment Pursuant to
  the Decennial Census*,
  Exec. Order 13,986, 86 Fed. Reg. 7,015 (Jan. 20, 2021), *revoked by*
  Exec. Order 14,148, 90 Fed. Reg. 8,237 (Jan. 20, 2025).......................................................... 15

*Implementing the President's "Department of Government Efficiency" Workforce
  Optimization Initiative*,
  Exec. Order 14,210, § 3(c), 90 Fed. Reg. 9,669 (Feb. 11, 2025)............................................ 15

*Ensuring Citizenship Verification and Integrity in Federal Elections*,
  Executive Order 14,399, 91 Fed. Reg. 17,125 (Mar. 31, 2026)........................................*passim*

**OTHER AUTHORITIES**

Sophie Nieto-Munoz, *Democrat Analilia Mejia Wins Special House Election*,
  New Jersey Monitor (April 16, 2026, at 8:09 pm),
  https://newjerseymonitor.com/2026/04/16/analilia-mejia-special-house-election/ ............ 39, 42

**<u>INTRODUCTION</u>**

The President of the United States signed Executive Order 14,399 on March 31, 2026. This Executive Order is an intra-Executive Branch directive from the President to his subordinates, which by itself changes nothing about the administration of any election. This litigation, nonetheless, began only two days later. As a result of Plaintiffs' rush to the courthouse, these two suits were each filed well before any agency had taken any steps to implement the Executive Order—and before the agency defendants even *knew* how they might try to implement the President's directions, or on what timeline. Even to this day, none of the possible future agency actions contemplated by the Executive Order have been finalized—and some have not even started.

As one particularly obvious example, although it is black-letter administrative law that courts "do not have authority to review proposed agency rules," *In re Murray Energy Corp.*, 788 F.3d 330, 334 (D.C. Cir. 2015) (Kavanaugh, J.), the core of this lawsuit seeks to short-circuit future rulemaking at the United States Postal Service—not just before a final rule has been published, but before a rule has even been *proposed*. That is not how this works. Whatever concerns Plaintiffs may have about possible future agency actions that may be taken to implement the Executive Order, there is currently nothing to litigate, much less to enjoin. Both as a practical matter and a doctrinal matter, the government cannot defend—and this Court cannot opine on—the validity of agency actions that do not exist, and the critical parameters of which have not even been decided.

To be clear, all agree that U.S. citizens may vote by mail when permitted by state and federal law. And all agree that non-citizens may not vote in federal elections—by mail or otherwise. *See, e.g.*, 18 U.S.C. § 611(a). Nobody has an interest in widespread, haphazard, or unlawful disenfranchisement of eligible U.S. citizen voters. But that is not what the Executive Order aims to do, and (more importantly here) that is certainly not how agencies intend to implement it. This Court need not (and should not) adopt the most pessimistic interpretation of how the Order *could* be implemented, as Plaintiffs do. After all, further clarity may be coming soon, and may result in different (or fewer, or narrower) questions to litigate than those raised in Plaintiffs' heated filings.

- 1 -

Of course, if any or all of Plaintiffs' speculative fears turn out to be real, and some agency takes some discrete action that causes some concrete injury (or is going to imminently cause such an injury), Plaintiffs can seek relief at that time. But at least "[a]t present, this case is riddled with contingencies and speculation that impede judicial review." *Trump v. New York*, 592 U.S. 125, 131 (2020) (dismissing pre-implementation challenge to Presidential Memorandum on standing and ripeness grounds). Accordingly, Plaintiffs' motions for a preliminary injunction and for summary judgment should each be denied, and both these premature suits should be dismissed—without prejudice—in their entirety.

## BACKGROUND

**I.    Executive Order 14,399**

On March 31, 2026, President Trump issued Executive Order 14,399, *Ensuring Citizenship Verification and Integrity in Federal Elections*, 91 Fed. Reg. 17,125 (Mar. 31, 2026) ("Executive Order", "Order", or "E.O."). As relevant here, the Order does three different things.

**State Citizenship Lists.** First, the Order directs the "Secretary of Homeland Security . . . in coordination with the Commissioner of [the Social Security Administration]" to "the extent feasible and consistent with applicable law" to "compile and transmit" "a list of individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State," *i.e.*, the "State Citizenship List." E.O. § 2(a). "The State Citizenship List shall be derived from Federal citizenship and naturalization records, SSA records, SAVE data, and other relevant Federal databases." *Id.* Additionally, "[t]he Secretary of Homeland Security shall establish procedures to (i) allow individuals to access their individual records as well as to update or correct them in advance of elections; and (ii) enable States to routinely supplement and provide suggested modifications or amendments to the State Citizenship List transmitted thereto." *Id.*

The Order also directs the Secretary of Homeland Security to "establish the infrastructure necessary to compile, maintain, and transmit the State Citizenship List" "within 90 days of the date" of the Order, which is by June 29, 2026. *Id.* § 4(c). The Secretary of Homeland Security,

the SSA Commissioner, and the Secretary of Commerce are charged with coordinating to implement the State Citizenship Lists. *Id.* § 4(a). The State Citizenship List "shall be updated and transmitted to State election officials no fewer than 60 days before each regularly scheduled Federal election." *Id.* § 2(a).

The Order does not specify any particular purpose or intended use for the State Citizenship Lists, and (other than their creation by the Department of Homeland Security ("DHS") and transmission to States) does not require anyone inside or outside of the federal government to do anything with those lists. As of this filing, no such lists have been created, nor has any of the "infrastructure" contemplated by Section 4(c) of the Order. *See* Ex. 1, Decl. of M. Mayhew ("Mayhew Decl.") ¶¶ 5-8; Ex. 2, Decl. of J.B. MacBride ("MacBride Decl.") ¶¶ 4-6.

**Postal Service Rulemaking.** Second, the Order directs the United States Postal Service ("USPS" or "the Postal Service") "to initiate a proposed rulemaking" with regards to ballot mail for Federal elections to conform to certain design requirements and to develop procedures for individuals to be enrolled on "State-specific Mail-In and Absentee Participation List[s]." E.O. § 3. Those lists would be distinct from the State Citizenship Lists contemplated by Section 2(a). The Order directs the Postal Service to begin the proposed rulemaking "within 60 days of" the Order, which is May 30, 2026. *Id.* § 3(b). The Order further states that "[a]ny final rule" that could result from this rulemaking "shall be issued no later than 120 days from the date" of the Order, which is July 29, 2026. *Id.* § 3(d). The Order also identifies some proposed provisions for inclusion in the notice of proposed rulemaking, *id.* § 3(b)—though it does not say anything about whether any or all of those provisions should also appear in any final rule. As of this filing, no notice of proposed rulemaking has been issued. *See* Ex. 3, Decl. of S. Monteith ("Monteith Decl.") ¶ 4.

**Criminal Enforcement Priorities.** Third, the Order generally tasks the "Attorney General and the heads of executive departments" to "take all lawful steps to deter and address noncompliance with Federal law." E.O. § 5. The Order further directs that "[e]vidence of violations of existing Federal laws . . . may be referred to the Department of Justice for consideration of investigation or charges under 18 U.S.C. 2(a), 18 U.S.C. 241, 18 U.S.C. 371, 18 U.S.C. 611(a), 18

U.S.C. 1001, 18 U.S.C. 1015, 52 U.S.C. 10307, and 52 U.S.C. 20511." *Id.* And the Order provides that "[t]he Attorney General shall prioritize the investigation and, as appropriate, the prosecution of State and local officials or any others involved in the administration of Federal elections who issue Federal ballots to individuals not eligible to vote in a Federal election, including under 18 U.S.C. 2(a), 18 U.S.C. 241, 18 U.S.C. 371, 18 U.S.C. 611(a), 18 U.S.C. 1001, 18 U.S.C. 1015, 52 U.S.C. 10307, and 52 U.S.C. 20511." *Id.* § 2(b). The Order further states that "States and localities *should* preserve, for a 5-year period, all records and materials—excluding ballots cast—evidencing voter participation in any Federal election." *Id.* § 5 (emphasis added).

## II.    Litigation Background

Executive Order 14,399 was issued on March 31, 2026. 91 Fed. Reg. 17,125 (Mar. 31, 2026). Two days later, on April 2, 2026, the *LWVMA* Plaintiffs[1] filed suit. The *LWVMA* Plaintiffs challenge the Order in its entirety under six causes of action, invoking separation of powers, *ultra vires*, federalism, First and Fifth Amendment, Voting Rights Act, Privacy Act, and Administrative Procedure Act (APA) claims. *LWVMA* Compl., ECF No. 1 ¶¶ 120-205.

The next day, on April 3, 2026, the *California* Plaintiffs[2] filed suit. The *California* Plaintiffs challenge sections 2, 3, and 5 of the Order under three causes of action, invoking "Separation of Powers," "Elections and Electors Clause," and "Commandeering" theories. *California* Compl.,

---

[1] *LWVMA* was brought by League of Women Voters of Massachusetts, League of Women Voters Lotte E. Scharfman Memorial Education Fund, League of Women Voters of the United States, League of Women Voters Education Fund, Association of Americans Resident Overseas, U.S. Vote Foundation, OCA-Asian Pacific American Advocates, and Delta Sigma Theta Sorority, Inc. against President Donald J. Trump, United States Postal Service, United States Postal Service Board of Governors, Department of Homeland Security, Social Security Administration, U.S. Citizenship and Immigration Services, and various department and agency heads and officials in their official capacities. *LWVMA* Compl., ECF No. 1 ¶¶ 19-55.

[2] *California* was brought by the States of California, Nevada, Washington, Arizona, Colorado, Connecticut, Delaware, Illinois, Maine, Maryland, Michigan, Minnesota, New Jersey, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont, and Wisconsin, the Commonwealths of Massachusetts and Virgina, the District of Columbia, and Josh Shapiro (in his official capacity as Governor of the Commonwealth of Pennsylvania). *California* Compl., ECF No. 1 ¶¶ 14-52.

ECF No. 1 ¶¶ 116-127, 146-182. On April 17, 2026, the *California* Plaintiffs filed their First Amended Complaint. *California* FAC, Doc. No. 65.  The First Amended Complaint added U.S. Citizenship and Immigration Services and the United States Department of Commerce as defendants (as well as their leadership in their official capacities).  *Id.* ¶¶ 43-44, 55-56.  The First Amended Complaint also added additional theories to Plaintiffs' First Cause of Action, including that the Order allegedly interferes with "the States' authority to determine the qualifications of voters in federal primary elections." *Id.* ¶ 159.

On April 16, 2026, Defendants filed motions to transfer both cases to the U.S. District Court for the District of Columbia.  *LWVMA* ECF No. 19; *California* ECF No. 55.  The Court denied the motions to transfer.  *LWVMA* ECF No. 98; *California* ECF No. 126.

On April 21, 2026, Proposed Intervenor States[3] moved to intervene as Defendants. *LWVMA* ECF No. 44; *California* ECF No. 73.  All parties opposed (in whole or in part), *see LWVMA* ECF Nos. 79, 86; *California* ECF Nos. 109, 113.  This Court granted permissive intervention in *LWVMA*.  *See* Minute Order of May 1, 2026, *LWVMA* ECF No. 106.  This Court denied the motion to intervene in *California*.  *California* ECF No. 140.  Proposed Intervenor States have now appealed the denial of their intervention motion in *California* to the First Circuit.  *California* ECF No. 141.  As of the date of this filing, that matter remains on appeal.

On April 22, 2026, this Court issued an order consolidating these two cases.  *LWVMA* ECF No. 57; *California* ECF No. 88.

On April 23, 2026, the *LWVMA* Plaintiffs filed their motion for preliminary injunction and supporting papers.  ECF Nos. 73, 74, 75.  The *California* Plaintiffs filed their motion for summary judgment and supporting papers that same day.  ECF Nos. 97, 100, 103, 104, 105, 106.

Separate from this litigation, three additional cases challenging this Executive Order are also pending in the U.S. District Court for the District of Columbia: *DSCC v. Trump*, No. 26-cv-

---

[3] States of Alabama, Florida, Indiana, Kansas, Louisiana, Missouri, Montana, Nebraska, Oklahoma, South Carolina, South Dakota, and Texas (collectively "Proposed Intervener States").

1114 (D.D.C. Apr. 1, 2026), *League of United Latin American Citizens v. Exec. Office of the President*, No. 26-cv-1132 (D.D.C. Apr. 2, 2026), and *NAACP v. Trump*, No. 26-cv-1151 (D.D.C. Apr. 3, 2026). Those three cases have also been consolidated. *DSCC v. Trump*, No. 26-cv-1114 (D.D.C. Apr. 9, 2026), Order Consolidating Cases, ECF No. 27. Plaintiffs in the District of Columbia litigation have moved for a preliminary injunction and Defendants have moved to dismiss. Briefing on those motions is ongoing. A hearing on Plaintiffs' motions for preliminary injunction has been set for May 14, 2026. *See DSCC* Minute Order of April 30, 2026.

## ARGUMENT

These suits should be dismissed, without prejudice, in their entirety. Most fundamentally, that is because "[a]t present, this case is riddled with contingencies and speculation that impede judicial review," *Trump v. New York*, 592 U.S. at 131, which is fatal to the subject-matter jurisdiction of this Court under settled principles of Article III standing and ripeness. On top of that, Plaintiffs fail to challenge any "final agency action" under the APA, 5 U.S.C. § 704, and fail to identify any other viable cause of action for their statutory claims. In addition, Plaintiffs' challenges to policies of enforcement discretion are "committed to agency discretion by law" under 5 U.S.C. § 701(a)(2), and similarly fail to cause any Article III injury that is "traditionally redressable in federal court." *United States v. Texas*, 599 U.S. 670, 676 (2023).

Before any agency has implemented the Executive Order, Plaintiffs face no actual (or imminent) harm—irreparable or otherwise. For similar reasons, Plaintiffs cannot succeed on the merits of any facial challenge to the Executive Order itself, as agencies fully intend (and should be presumed) to interpret it lawfully, rather than unlawfully. And there is no public interest in enjoining ongoing government deliberations. Instead, the Court should "[l]et[] the Executive Branch's decisionmaking process run its course," *Trump v. New York*, 592 U.S. at 134—without prejudice to the possibility of exercising judicial review later, if necessary, over any final agency action that causes Plaintiffs any injury.

Of course, if Plaintiffs' speculative and pessimistic predictions about how the Order *might* be implemented turn out to be right, they can sue (or even seek preliminary relief) at that time.

But until then, Plaintiffs' suits should be dismissed, and their pending motions for a preliminary injunction and summary judgment should be denied.

## I.    THESE SUITS SHOULD BE DISMISSED.

This litigation—initiated just two days after the President signed Executive Order 14,399—is premature. Because Plaintiffs seek relief against agency actions that do not yet exist—and that might never exist in the form that Plaintiffs speculate—Plaintiffs cannot establish standing, ripeness, or final agency action subject to review under the APA. In addition, several claims are subject to dismissal as improper efforts to manage the enforcement discretion of the Executive Branch, which is committed to agency discretion by law. For these reasons, these suits should be dismissed, in their entirety, without prejudice. If and when the Executive Branch takes some action to implement the Executive Order, any Plaintiff who has suffered a concrete injury (or faces an imminent one) can seek relief at that time—at a time when the parties and the Court will have a better understanding of what (if anything) the government is actually *doing* to carry out the directives in Executive Order 14,399. But at least at this early stage, these lawsuits seek nothing more than an advisory opinion about the legality of possible future agency actions—actions that might ultimately bear little resemblance to the speculative assumptions that animate Plaintiffs' filings. Article III thus requires dismissal.

### A.    Plaintiffs lack Article III standing.

"[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). At least before the Executive Order has actually been implemented—and especially now, before the government (much less Plaintiffs) even *knows* how the Executive Order will be implemented—Plaintiffs cannot satisfy these basic prerequisites for judicial review.

To support standing, "an injury must be concrete, particularized, and actual or imminent." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted). "Although imminence

is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending." *Id.* (emphasis omitted) (quoting *Lujan*, 504 U.S. at 564 n.2). To that end, the Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient." *Id.* (alteration in original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)); *see also FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) ("[T]he injury must be actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon."). In addition, "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish." *Lujan*, 504 U.S. at 562 (citation omitted).

Executive Order 14,399 is an intra-Executive Branch directive from the President to his subordinates—which, of its own force, does not change anything at all about elections in any State. It does not require anyone outside the government—and certainly not any of the Plaintiffs—to do (or refrain from doing) anything at all. Generally, these sorts of "intra-governmental mandates" in an Executive Order "do not inflict on Plaintiffs an injury in fact." *Nat'l Urb. League v. Trump*, 783 F. Supp. 3d 61, 77 (D.D.C. 2025); *see also, e.g.*, *Ctr. for Democracy & Tech. v. Trump*, 507 F. Supp. 3d 213, 222 (D.D.C. 2020) (no standing to challenge an Executive Order that "does not apply to private parties," and instead "only sets a course of government processes into motion")*, vacated as moot sub nom. Center for Democracy & Technology v. Biden*, No. 21-5062, 2021 WL 11659822 (D.C. Cir. Aug. 9, 2021). *Cf., e.g.*, *Chardon-Dubos v. Biden*, 2024 WL 4373386 at *3 (D. Puerto Rico Sept. 1, 2024) (no concrete injury because the Executive Order in question did not create a Central Bank Digital Currency but instead directed executive officers to provide assessments and legislative proposals); *Cty. of Chelsea v. Trump*, 802 F. Supp. 3d 289, 295 (D. Mass. 2025) (denying injunctive relief because it was "speculative" that inclusion on a list of sanctuary cities caused any imminent loss of federal funding, despite Executive Orders contemplating possible future cuts to that funding). So too here.

- 8 -

Ultimately, Plaintiffs' real concern is not with the Executive Order, standing alone—which does not do anything other than guide possible future policymaking within the Executive Branch. Instead, Plaintiffs fear (1) the possible future creation of State Citizenship Lists by DHS (assuming creation of such a list turns out to be "feasible" and "consistent with applicable law," E.O. § 2(a)); (2) a possible future rule that may be issued by the Postal Service (of uncertain scope, for which neither a notice of proposed rulemaking nor a final rule has been announced); and (3) possible future criminal investigations or prosecutions. But currently, any injury based on possible future agency actions implementing the Executive Order is far "too speculative for Article III purposes," *Clapper*, 568 U.S. at 409—after all, it is unknown how the relevant agencies will implement it, or on what timeline, or under what parameters, or using what processes. Indeed, the agencies *themselves* are still deliberating regarding the Executive Order's possible future implementation. *See* Monteith Decl. ¶ 3; Mayhew Decl. ¶ 5; MacBride Decl. ¶ 5. That genuine and ongoing uncertainty is fatal to any theory of standing that relies on predictions about possible future agency actions. *See, e.g.*, *Nat'l Urb. League*, 783 F. Supp. 3d at 82 (in denying a preliminary-injunction motion challenging an Executive Order, explaining that "uncertainty cuts against Plaintiffs here because they bear the burden of 'mak[ing] a clear showing that [they] are likely to establish each element of standing'" (alteration in original) (quoting *Murthy v. Missouri*, 603 U.S. 43, 58, 144 (2024))).

By the same token, the sharp disconnect between Plaintiffs' complaints (which challenge the Executive Order) and their possible future injuries (which would stem, if at all, from future implementation actions) also gives rise to an independently fatal causation (or traceability) problem. In short, "the source of any injury to the plaintiffs is the action that the [government] *might* take in the future to" implement the Executive Order—"not the policy itself 'in the abstract.'" *Trump v. New York*, 592 U.S. at 133-34 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009)). That is also fatal to these suits, which challenge (and, at least as currently pled, only could challenge) the Executive Order itself—after all, the future implementation actions that Plaintiffs fear do not even exist, at least as of the date of this filing. And they certainly did not exist on the day this litigation began, two days after issuance of the Executive Order. But "the relevant state

of affairs for the purpose of determining standing to sue in the context of a motion to dismiss are facts known to the plaintiff at the time the complaint is filed, regardless of what may have transpired in the interim." *Equal Rts. Ctr. v. Uber Techs., Inc.*, 525 F. Supp. 3d 62, 76 (D.D.C. 2021) (K.B. Jackson, J.); *see also, e.g.*, *Castro v. Scanlan*, 86 F.4th 947, 959 (1st Cir. 2023) (requiring plaintiff to show an injury "at the time that he filed his complaint" in order to satisfy "the injury-in-fact component of the standing inquiry").

Ultimately, whether considered a problem of injury or causation, "Article III standing requires more than the possibility of potentially adverse regulation." *Defs. of Wildlife v. Perciasepe*, 714 F.3d 1317, 1324-25 (D.C. Cir. 2013). That is true even where (as here) the contours of that possible future regulation are, in some way, foreshadowed by other legal documents (*i.e.*, the Executive Order), even "using a specific timeline." *Id.*; *see also Ctr. for Democracy & Tech.*, 507 F. Supp. 3d at 222 (no standing to challenge Executive Order 13,295, which directed two federal agencies to "expeditiously propose regulations" preventing online censorship by social-media companies (citation and emphasis omitted)). In the interim, Plaintiffs' rights are "not impaired by the initiation of a rulemaking" or other policymaking process—after all, they "will not be precluded from participating in the rulemaking and, if [the government] decides to issue a final rule," they are "not precluded from challenging that rule." *Perciasepe*, 714 F.3d at 1325; *see also Platte River Whooping Crane Critical Habitat Maint. Tr. v. FERC*, 962 F.2d 27, 35 (D.C. Cir. 1992) ("Allegations of injury based on predictions regarding future legal proceedings are, however, 'too speculative to invoke the jurisdiction of an Art[icle] III Court.'" (alteration in original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 157 (1990)); *Nat'l Ass'n of Gov't Emps. v. Yellen*, 120 F.4th 904, 910 (1st Cir. 2024) ("Allegations of *possible* future injury are not sufficient.") (cleaned up).

To be clear, this result does not foreclose the possibility of future judicial review. As agencies eventually implement the Order, "Defendants might, of course, interpret and apply the [Executive Order] in a way that creates a cognizable injury traceable to their conduct." *Nat'l Urb. League*, 783 F. Supp. 3d at 82-83. "[T]hat is when Plaintiffs would have the requisite 'personal stake'" that supports standing. *Id.* at 81 (emphasis omitted) (quoting *All. for Hippocratic Med.*,

- 10 -

602 U.S. at 379).  Any concretely injured Plaintiff can sue at that time—challenging whatever allegedly unlawful agency actions cause them an actual (or imminent) injury.  But "[u]ntil then, Plaintiffs are at most 'concerned bystanders' to internal Executive Branch processes." *Id.* (quoting *All. for Hippocratic Med.*, 602 U.S. at 382); *see also, e.g.*, *United Presbyterian Church in the USA v. Reagan*, 738 F.2d 1375 (D.C. Cir. 1984) (Scalia, J.) (no standing to challenge Executive Order on the theory that it might lead to agencies taking future adverse actions against the plaintiffs); *Ctr. for Democracy & Tech.*, 507 F. Supp. 3d at 223 ("To be sure, the government might issue regulations that CDT does not like.  But it is just as possible that it will not.  'Article III standing requires more than the possibility of potentially adverse regulation.'" (emphasis omitted) (quoting *Perciasepe*, 714 F.3d at 1324-25)); *DNC v. Trump*, No. 25-cv-587 (AHA), 2025 WL 1573181, at *6 (D.D.C. June 3, 2025) ("[T]he committees' allegation of current burdens out of fear that the President or Attorney General will apply section seven of the executive order to the FEC or its Commissioners, reasonable or not, is not Article III injury.").

Finally, *California* Plaintiffs' claims under Count Three, purporting to challenge an allegedly "Unlawful Document Preservation Mandate," do not change that result.  *See California* FAC ¶¶ 179-89.  In short, that is because there is no "mandate" that applies to them—as the text of the Order confirms.  Plaintiffs' argument to the contrary derives from a single sentence of the Executive Order, which reads (in its entirety) as follows: "States and localities *should* preserve, for a 5-year period, all records and materials—excluding ballots cast—evidencing voter participation in any Federal election."  E.O. § 5 (emphasis added).  But that is not a legal mandate at all, not even a plausible one (*see Ashcroft v. Iqbal*, 556 U.S. 662, 683 (2009)), given the use of the word "should."  The President, to be clear, obviously believes that States *should* preserve these election-related documents for at least five years—and the Order says as much.  And it might very well be prudent to do so.  But any State that takes a different approach is not violating the Order.  State and Local officials thus face no legal consequences—much less any "substantial risk" of enforcement—from that provision of the Order.  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014) (holding that "the threat of future enforcement" must be "substantial" to confer Article III

- 11 -

standing); *see also, e.g.*, *Blum v. Holder*, 744 F.3d 790, 803 (1st Cir. 2014) (holding that plaintiffs lacked standing to bring pre-enforcement challenge to statute when plaintiffs faced no credible threat of prosecution).[4]  Plaintiffs thus also lack standing to challenge that precatory sentence in the Order (and, in any event, have no practical need for relief).

### B.      Plaintiffs' claims are not ripe.

Plaintiffs' claims independently fail because they are not ripe.  "Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'"  *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967)).  The "ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993).  "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Texas v. United States*, 523 U.S. 296, 300 (1998) (cleaned up).  "Federal courts cannot—and should not—spend their scarce resources on what amounts to shadow boxing."  *McInnis-Miesnor v. Maine Medical Ctr.*, 319 F.3d 63, 72 (1st Cir. 2003) (quoting *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 537 (1st Cir. 1995).  Courts typically consider both "the fitness of the issues for judicial

---

[4] Moreover, in a pre-enforcement challenge at the motion to dismiss stage, as here, the Court itself must determine whether the plaintiff's conduct is "arguably . . . proscribed by" the challenged government action. *Driehaus*, 573 U.S. at 162 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).  Accordingly, the Court must construe the legal effect of the challenged government action as part of the standing inquiry, even though normally it would assume plaintiffs' view of government action for standing purposes. *Woodhull Freedom Found. v. United States*, 948 F.3d 363, 371 (D.C. Cir. 2020); *see also Driehaus*, 573 U.S. at 162 (construing—rather than assuming plaintiff's interpretation of—challenged statute to determine whether plaintiffs conduct is "arguably proscribed"); *Brown v. FEC*, 386 F. Supp. 3d 16, 28 (D.D.C. 2019) (asking whether it is "reasonably clear" that plaintiff's conduct will fall within the relevant statute).

decision and the hardship to the parties of withholding court consideration." *Id.* at 301 (quoting *Abbott Labs.*, 387 U.S. at 149).

Even if Plaintiffs could show standing, their claims are not ripe. The Supreme Court's decision in *Trump v. New York*—dismissing as unripe another premature challenge to a not-yet-implemented Presidential directive—is all-but-dispositive here (as a matter of standing, ripeness, or both). In that case, President Trump issued a memorandum during the 2020 decennial census that "announced a policy of excluding 'from the apportionment base aliens who are not in a lawful immigration status.'" *Trump v. New York*, 592 U.S. at 129-30 (quoting Presidential Memorandum, *Excluding Illegal Aliens from the Apportionment Base Following the 2020 Census*, 85 Fed. Reg. 44,679, 44,680 (July 21, 2020)). That directive also called for "implementation 'to the maximum extent feasible and consistent with the discretion delegated to the executive branch.'" *Id.* (quoting 85 Fed. Reg. at 44,680).

Without waiting for the President's policy to be implemented, however, a group of plaintiffs sued immediately, arguing that "the exclusion of aliens on the basis of legal status would contravene the requirement . . . that the President state the 'whole number of persons in each State' for purposes of apportionment." *Trump v. New York*, 592 U.S. at 130 (quoting *New York v. Trump*, 485 F. Supp. 3d 422, 477 (S.D.N.Y. 2020)). To show standing, they argued that "the memorandum was chilling aliens and their families from responding to the census, thereby degrading the quality of census data used to allocate federal funds and forcing some plaintiffs to divert resources to combat the chilling effect." *Id.* A three-judge court entered broad injunctive relief. *See id.*

The Supreme Court vacated the injunction and remanded with instructions to dismiss for lack of jurisdiction, holding that "standing and ripeness inquiries both lead to the conclusion that judicial resolution of this dispute is premature." *Id.* at 134. In doing so, the Court acknowledged that "[t]he President, to be sure, ha[d] made clear his desire to exclude aliens without lawful status from the apportionment base." *Id.* at 131. Even so, "the President qualified his directive by providing that the Secretary should gather information 'to the extent practicable' and that aliens should be excluded 'to the extent feasible.'" *Id.* (quoting 85 Fed. Reg. at 44,680). As a result,

- 13 -

"[a]ny prediction how the Executive Branch might eventually implement this general statement of policy [was] 'no more than conjecture' at th[at] time." *Id.* (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983)). For example, the Supreme Court explained that the President's "policy may not prove feasible to implement in any manner whatsoever, let alone in a manner substantially likely to harm any of the plaintiffs here." *Id.* at 132.

So too here. Much like the Presidential Memorandum at issue in *Trump v. New York*, Executive Order 14,399 also specifies that key provisions shall be implemented only "[t]o the extent feasible and consistent with applicable law, including but not limited to the Privacy Act." E.O. § 2(a); *see also id.* § 7(b) (instructing that the Executive Order "shall be implemented consistent with applicable law."). And Section 3 of the Order requires multiple discrete implementation steps, including an as-yet-unpublished notice of proposed rulemaking and the (possible) eventual publication of a final rule, the scope of which is not dictated by the Order. *Id.* § 3. In sum, just as in *Trump v. New York*, "[t]he Government's eventual action will reflect both legal and practical constraints, making any prediction about future injury just that—a prediction." 592 U.S. at 133. By the same token, "the source of any injury to the plaintiffs is the action that the Secretary or President *might* take in the future to" implement the Executive order—"not the policy itself 'in the abstract.'" *Id.* at 133-34 (quoting *Summers*, 555 U.S. at 494).

Under these circumstances, "[l]etting the Executive Branch's decisionmaking process run its course" would "bring[] 'more manageable proportions' to the scope of the parties' dispute." *Id.* at 134 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990)). "And in the meantime the plaintiffs suffer no concrete harm from the challenged policy itself, which does not require them 'to do anything or to refrain from doing anything'" at all. *Trump v. New York*, 592 U.S. at 134 (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998)).[5]

---

[5] As it turns out, the Supreme Court's decision to order dismissal of *Trump v. New York* on standing and ripeness grounds was vindicated by subsequent events: the Presidential Memorandum at issue there turned out *not* to be "feasible to implement in any manner whatsoever" before the end of President Trump's first term. 592 U.S. at 132. That Presidential Memorandum was

Justice Sotomayor recently invoked similar reasoning in litigation over another Executive Order, concurring in the grant of the government's motion for a stay. *See Trump v. Am. Fed'n of Gov't Emps.*, 145 S. Ct. 2635 (2025). In that case, Executive Order 14,210 provided that "Agency Heads shall promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law, and to separate from Federal service temporary employees and reemployed annuitants working in areas that will likely be subject to the RIFs." Exec. Order 14,210, § 3(c), 90 Fed. Reg. 9,669 (Feb. 11, 2025). After a district court entered broad injunctive relief against that Executive Order (as well as a high-level implementing memorandum from the Office of Management and Budget (OMB)), the United States sought and obtained a stay from the Supreme Court. In its stay order, the Supreme Court "express[ed] no view on the legality of any Agency RIF and Reorganization Plan produced or approved pursuant to the Executive Order and Memorandum." *Am. Fed'n of Gov't Emps.*, 145 S. Ct. at 2635. It didn't have to—because the injunction was improperly "based on [the district court's] view about the illegality of the Executive Order and Memorandum, not on any assessment of the plans themselves," which were "not before th[e] Court." *Id.* Much the same could be said of Plaintiffs' filings here.

In concurring in the grant of a stay, Justice Sotomayor emphasized her view "that the President cannot restructure federal agencies in a manner inconsistent with congressional mandates." *Id.* (Sotomayor, J., concurring). Even so, she acknowledged that "the relevant Executive Order directs agencies to plan reorganizations and reductions in force 'consistent with applicable law.'" *Id.* (citation omitted). And because "[t]he plans themselves [were] not before th[e] Court, at th[at] stage," the Supreme Court "ha[d] no occasion to consider whether they can and will be carried out consistent with the constraints of law." *Id.*

---

eventually revoked by President Biden, apportionment proceeded as usual, and no further litigation was necessary. *See Ensuring a Lawful and Accurate Enumeration and Apportionment Pursuant to the Decennial Census*, Exec. Order 13,986, 86 Fed. Reg. 7,015 (Jan. 20, 2021), *revoked by* Exec. Order 14,148, 90 Fed. Reg. 8,237 (Jan. 20, 2025). That is one benefit of adherence to the ripeness doctrine—the possibility that the parties' dispute will narrow or resolve itself without the need for judicial involvement.

Again, the same logic applies here.  If any agency takes some final action to implement the Executive Order in a way that causes any actual (or imminent) concrete injury to Plaintiffs, they can sue then.  But "[a]t present, this case is riddled with contingencies and speculation that impede judicial review."  *Trump v. New York*, 592 U.S. at 131.  *See also, e.g.*, *Nat'l Urb. League*, 783 F. Supp. 3d at 79 (no jurisdiction to challenge provision of an Executive Order requiring creation of a list, because the "provision does not tell the OMB Director to do anything with the list once he gets it").  This litigation should thus be dismissed as unripe—without prejudice—in its entirety.

## C.    Plaintiffs' APA claims fail to challenge any final agency action.

At least some of Plaintiffs' claims are purportedly brought under the APA.  *See, e.g.*, *LWVMA* Compl. ¶¶ 185-205, at 54 ¶ 3 (requesting that the Court "[d]eclare Section 2 of the Executive Order contrary to law and vacate it under the APA").  But "[t]he APA provides for judicial review of 'final agency action for which there is no other adequate remedy in a court.'"  *Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024) (quoting 5 U.S.C. § 704).  "To be considered 'final,' the agency action must satisfy two conditions."  *Id.*  "First, it 'must mark the 'consummation' of the agency's decisionmaking process."  *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)).  "Second, 'the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.'"  *Id.* (quoting *Bennett*, 520 U.S. at 178).  Neither prong is satisfied here, for any facet of the Executive Order, or its (hypothetical, possible) future implementation.  Although the Executive Order certainly *contemplates* possible future agency actions that might satisfy the final-agency-action requirement—for example, the eventual publication of a final rule by the Postal Service—Plaintiffs cannot sue until those actions are actually finalized.

**1. Section 3(b) – Postal Service Rulemaking.**  The core of Plaintiffs' challenge (and all claims against the Postal Service) centers upon Section 3(b).  Under that provision, the Postmaster General is directed to "initiate a proposed rulemaking" to "protect the integrity of the mail as a medium for transmitting Federal election ballots and establish uniform standards for mail-in or absentee ballot services implemented through the . . . Postal Service."  E.O. § 3(b).  As of this filing, however, no such proposed rulemaking has been initiated.  Monteith Decl. ¶ 4.  But even if

a proposed rule had been published—as one may be soon—a *proposed* rule (essentially, by definition) would still not be a *final* agency action subject to review under the APA.[6]

This one is easy: it is black-letter administrative law that proposed rules (rather than final rules) are not final agency action subject to review under the APA. In short, as the D.C. Circuit has squarely held more than once, courts "may review final agency rules," but "do not have authority to review proposed rules." *In re Murray Energy*, 788 F.3d 330 at 334 (Kavanaugh, J.); *see also, e.g.*, *In re Bluewater Network*, 234 F.3d 1305, 1313 (D.C. Cir. 2000) ("[A]n agency's pronouncement of its intent to defer or to engage in future rulemaking generally does not constitute final agency action reviewable by this court."); *FDIC v. Bank of Am., N.A.*, 783 F. Supp. 3d 1, 24 (D.D.C. 2025) ("[P]roposed rules are not 'final agency actions' that this court has authority to review."). After all, "a proposed rule is just a proposal." *In re Murray Energy*, 788 F.3d at 334. And here, Plaintiffs sued even *before* a proposed rule was published. That is plainly impermissible. So to the extent that Plaintiffs seek to challenge the possible future implementation of Section 3(b) under the APA, any such claims should be dismissed for lack of final agency action.

**2. Section 2(a) – State Citizenship Lists.** Section 2(a) of the Executive Order contemplates the eventual preparation and transmission of "State Citizenship Lists" by DHS, consisting

---

[6] To be precise, although most final agency action is subject to APA review, Congress has exempted many actions by the Postal Service, stating that certain provisions of the APA do not apply "to the exercise of the powers of the Postal Service." 39 U.S.C. § 410(a); *see, e.g.*, *Northern Air Cargo v. USPS*, 674 F.3d 852, 858 (D.C. Cir. 2012); *Mittleman v. Postal Regulatory Comm'n*, 757 F.3d 300, 305 (D.C. Cir. 2014); *Aid Ass'n for Lutherans v. USPS*, 321 F.3d 1166, 1173 (D.C. Cir. 2003). In those circumstances, a form of ultra vires review may be applicable to certain Postal Service determinations. *See Mittleman*, 757 F.3d at 305; *Aid Ass'n for Lutherans*, 321 F.3d at 1173. Congress has also created an exception-to-the-exception for certain "proceedings concerning the mailability of matter," 39 U.S.C. § 3001(m), which *are* subject to normal APA review. Because the Postal Service has not yet issued any proposed rule, it is not yet clear what precise form of judicial review would be available to review any final rule. The Court need not resolve that question now, however, because (1) it is undisputed that some form of judicial review would eventually be available for any final rule, and (2) all potentially available forms of judicial review would still require a final action by the Postal Service. *See Bell v. New Jersey*, 461 U.S. 773, 777-79 (1983) (even outside the context of APA review, explaining that "[t]he strong presumption is that judicial review will be available only when agency action becomes final").

"of individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State." E.O. § 2(a). But at least at this time, no such lists have been compiled. *See* Mayhew Decl. ¶ 7. And the Order leaves significant uncertainty about whether, when, and in what form those lists might be compiled in the future. The Order likewise says nothing at all about what (if anything) anyone will actually *do* with any such lists. *See DSCC v. Trump*, No. 26-cv-1114 (D.D.C. Apr. 20, 2026), Proposed Mot. to Dismiss of Intervenor States at 13 ("The State Citizenship List does not impose any legal obligations on the States, nor does the Executive Order force States to use the List."), ECF No. 77-3. Accordingly, the President's inchoate directive—currently under consideration at DHS, *see* Mayhew Decl. ¶ 5—is not final agency action. The legal validity of lists that may be created (in some form) in the future can be decided (if at all) in the future, when the Court—and even the government itself—actually *knows* what sort of lists are being constructed or sent, in what manner, and for what purpose.

**a.** For starters, on its face, Section 2(a) explicitly applies only "[t]o the extent feasible and consistent with applicable law, including but not limited to the Privacy Act of 1974." E.O. § 2(a). DHS has not yet made any determination that preparing these lists is either "feasible" or "consistent with applicable law," including (but not limited to) the Privacy Act. *Id.*; *see* Mayhew Decl. ¶ 5; *see also* MacBride Decl. ¶ 5. So as of this filing, it is not even clear whether or when these lists will be created—much less in what form, based on what data, or how they might be used.

That is fatal to these claims. To illustrate why: the *LWVMA* Plaintiffs argue that the Privacy Act's routine-use exception, for example, could only be invoked to justify this sort of information-gathering *after* the government updates the relevant Systems of Record Notices ("SORNs") that govern the collection and sharing of this information under the Privacy Act. *See, e.g.*, *LWVMA* Compl. ¶ 185-205 (arguing that "No SORN has been published to reflect the creation of the new system of records contemplated by Section 2 of the Executive Order" and that SORN publication is required at least 30 days prior to "new or expanded routine use" of records). But, in Section 2(a), the President directed DHS to consider those very questions. It is doing so now. *See* Mayhew

Decl. ¶ 5. In heeding the President's explicit directive to consider the possible applicability of the Privacy Act, perhaps DHS will *agree* with Plaintiffs about the need for (or at least the prudence of) an amendment to the relevant SORNs to explicitly identify this as a new "routine use."

That is far from a fanciful possibility. Indeed, DHS and SSA recently took a similar approach in a related context, by publishing new SORNs to resolve any doubts as to whether certain other information-sharing related to voter-verification efforts was consistent with the Privacy Act (thus mooting some ongoing litigation on that subject). *See, e.g.*, *League of United Latin Am. Citizens v. Exec. Off. of President*, No. 25-cv-946 (CKK), 2026 WL 252420, at *54 (D.D.C. Jan. 30, 2026) (dismissing "claims under the Privacy Act seeking injunctive relief against the recent changes to the SAVE and Numident systems" as "moot" because DHS and SSA "have now adopted a 'routine use' that covers the challenged uses of data" (citation omitted)). That is a process that requires public notice, and (at least) a 30-day comment period—in which Plaintiffs and others may submit their views to the agency on many of the topics addressed in their briefs. *See* 5 U.S.C. § 552a(e)(4), (e)(11). During such a comment process, perhaps the government will be persuaded by some of Plaintiffs' concerns. Perhaps not. But either way, that would resolve a significant portion of Plaintiffs' Privacy Act-related arguments. And regardless, these sorts of unresolved contingencies make clear that there is currently no final agency action for this Court to review. (They also further confirm that these claims are not ripe, as they would benefit from further factual development. *See supra*, Section I.B.)

**b.** The President himself is plainly aware that further steps will be necessary before implementation of Section 2(a). Section 4(c), for example, directs DHS to "establish the infrastructure necessary to compile, maintain, and transmit the State Citizenship List described in section 2(a) of this order." E.O. § 4(c). As a result, until that "necessary" "infrastructure" has been erected, the State Citizenship Lists contemplated by Section 2(a) remain hypothetical and inchoate. Similarly, the President also explicitly directed DHS to "establish procedures to (i) allow individuals to access their individual records as well as to update or correct them in advance of elections; and (ii) enable States to routinely supplement and provide suggested modifications or amendments

- 19 -

to the State Citizenship List transmitted thereto." *Id.* § 2(a). Again, until those "procedures" have been designed and implemented, it is impossible to know whether they will mitigate or resolve some or all of Plaintiffs' concerns.

For example, the *LWVMA* Plaintiffs express concern that State Citizenship Lists will be "incomplete and inaccurate, due to the gaps and limitations of the data available to federal agencies." *LWVMA* Compl. ¶ 202. But the Order does not resolve the question of what databases will be used to generate any such lists. *See* E.O. § 2(a) ("The State Citizenship List shall be derived from Federal citizenship and naturalization records, SSA records, SAVE data, and other relevant Federal databases."). That decision is left to agency officials. And USCIS has not yet made any recommendations or final decisions on that subject. *See* Mayhew Decl. ¶ 9. That Plaintiffs profess greater confidence and certainty than the officials charged with implementing this Order about the "relevant Federal databases" that might be used for these lists is curious. The Court should not reach the merits based on unsupported assumptions about possible future agency actions.

So although, for example, the *LWVMA* Plaintiffs express concerns about alleged inaccuracies in DHS's "Systematic Alien Verification for Entitlements" or "SAVE" system, *see, e.g.*, *LWVMA* Compl. ¶¶ 91, 92, 99, 102, *LWVMA* PI Br. at 8-9—concerns that are exaggerated, for reasons partially explained in a recent opinion from the U.S. District Court for the District of Columbia, in denying a motion for a preliminary injunction on that very topic, *see League of Women Voters v. DHS*, No. 25-cv-3501 (SLS), 2025 WL 3198970, at *6-8 (D.D.C. Nov. 17, 2025)[7]—it is not even clear the extent to which SAVE data will feature in the possible future creation of these State Citizenship Lists or, if so, how it will be used. And again, even if SAVE is one of the

---

[7] *See, e.g.*, *League of Women Voters*, 2025 WL 3198970, at *7 ("Plaintiffs ask this Court to find irreparable injury because their SSA records are *likely* inaccurate, which *might* lead DHS to return an incorrect 'non-citizen' response to a request from their home state, which *might* then cause the state to terminate their voter registration or take other adverse actions. This falls well short of the requisite showing of irreparable harm."); *see also id.* ("[N]othing in the current record supports the Plaintiffs' assertion that in lieu of additional verification, a state would remove individuals from voter rolls, deny registration, or pursue criminal investigation based on an inconclusive SAVE response alone." (citation omitted)).

databases that is in some way involved in this process, the use of other (as-yet-unidentified) "other relevant federal databases" could mitigate or resolve Plaintiffs' concerns.

Ultimately, DHS may consider these very issues as it works to "establish the infrastructure necessary" to implement the President's directives. E.O. § 4(c). And perhaps unsurprisingly, in other related contexts, DHS has erred on the side of caution. For example, in providing voter-verification responses to States through SAVE, DHS uses a "manual verification process" to reduce the risk that a U.S. citizen will be incorrectly flagged as non-citizen because of inaccuracies in SSA data. *League of Women Voters*, 2025 WL 3198970, at \*7. Similar caution here could resolve many of Plaintiffs' accuracy fears. But before any of these "infrastructure" decisions have been made, there is nothing for Plaintiffs to challenge (and nothing for this Court to review). That is just as fatal to Plaintiffs' theory of final agency action as it is to Article III standing or ripeness.

**c.** Finally, even if all those feasibility and legality questions are resolved, and such a list *is* created, *creation* of a list of citizens, by itself, has no legal consequences for anyone, standing alone. And whether the possible future *transmission* of such a list qualifies as final agency action would depend on whether *transmission* of that list "determine[s] 'rights or obligations,' or produce[s] 'legal consequences.'" *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1235 (D.C. Cir. 2026) (quoting *Ass'n of Flight Attendants-CWA v. Huerta*, 785 F.3d 710, 713 (D.C. Cir. 2015)); *see also Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 428 (D.C. Cir. 2004) (Roberts, J.) (citing with approval the proposition that "agency action [is] not reviewable when no legal consequences flow from the agency's conduct" and that "practical consequences . . . are insufficient to bring an agency's conduct under our purview") (cleaned up).

But what States will do (if anything) with these lists is *also* unknown and subject to significant uncertainty. Early indications suggest a far less dramatic role than Plaintiffs' filings assume. *See, e.g.*, *DSCC v. Trump*, No. 26-cv-1114 (D.D.C. Apr. 20, 2026), Mem. in Support of Intervener States' Mot. To Dismiss at 13-16, ECF No. 77-3 (States explaining why it is "implausible" to assume that States will use the contemplated State Citizenship Lists "to somehow prevent eligible voters from receiving ballots" (citation omitted)).

- 21 -

All of this uncertainty-upon-uncertainty confirms the absence of any final agency action. After all, "if the practical effect of the agency action is not a *certain* change in the legal obligations of a party, the action is non-final for the purposes of judicial review" under the APA. *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 811 (D.C. Cir. 2006) (emphasis added) (citation omitted). And here, nothing is certain about the legal effect (if any) of whatever actions (if any) the government will take to produce lists that do not yet exist—and that might never exist in the form that Plaintiffs assume. And even if they do, States may ignore them, or use them for purposes that are plainly lawful—such as post-election law-enforcement activity relating to unlawful voting.

**3. Section 2(b) – Criminal Enforcement Priorities.** Finally, the *California* Plaintiffs— but not the *LWVMA* Plaintiffs—challenge Section 2(b), which (in their words) "directs the Attorney General to prioritize investigations and criminal prosecutions against elections officials" who commit certain voting-related crimes that are specified in the text of the Order. *California* FAC ¶ 163; *California* PI Br. at 5, 10-12. Changes to Executive Branch enforcement priorities are classically "committed to agency discretion by law" under 5 U.S.C. § 701(a)(2), as discussed below, *infra* at 25-30. For similar reasons, there is no "final agency action" relating to Section 2(b)—that would come (if ever) in the context of an actual criminal prosecution, which would itself provide the focal point for any permissible judicial review. Until then, any inchoate adjustment to the criminal investigation and enforcement priorities of the Executive Branch neither "mark[s] the 'consummation' of the agency's decisionmaking process" nor "produce[s] legal consequences" for anyone. *Centro de Trabajadores*, 167 F.4th at 1235 (quotation marks and citation omitted).

\*    \*    \*

Plaintiffs clearly believe that the issuance of Executive Order 14,399 portends some future agency action to which they are likely to have at least some objections—whether as a matter of policy, a matter of law, or both. Perhaps that prediction will turn out to be correct. Perhaps not. Either way, under the APA, they may only challenge *actual*—and final—agency action. This lawsuit, however, challenges only *hypothetical* agency actions, which have not yet happened, and

might never happen in the form that Plaintiffs speculate.  Accordingly, all APA claims should be dismissed for failure to challenge any "final agency action."  5 U.S.C. § 704.[8]

> **D.      Plaintiffs fail to identify any viable cause of action for their statutory claims.**

**1.**  Plaintiffs generally seem to assume (without much explanation) that the APA provides the relevant cause of action for their statutory claims.  *See, e.g.*, *LWVMA* Compl. ¶¶ 185-205 (citing the Privacy Act and the APA).  That is incorrect (at least) because of their failure to identify any "final agency action," 5 U.S.C. § 704, as discussed above.  In addition, with respect to their claims against the President—and thus, all of their claims challenging the Executive Order itself, rather than possible future implementation of that Order—Plaintiffs cannot sue under the APA because "the President is not an agency within the meaning of the" APA.  *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992); *accord LULAC v. Exec. Off. of President*, 808 F. Supp. 3d 29, 69 (D.D.C. 2025) ("[B]ecause 'the President is not an agency within the meaning of' the APA, the issuance of an executive order is not a final agency action that is reviewable within the APA framework.") (quoting *Franklin*, 505 U.S. at 796).

Without the APA, Plaintiffs identify no other viable cause of action for their statutory claims, as is their burden to demonstrate.  *See, e.g.*, *Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001) ("Without [statutory authorization], a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." (citation omitted)).

The *LWVMA* Plaintiffs do cite the Privacy Act, but the Privacy Act creates a cause of action only for adversely affected "individuals," 5 U.S.C. § 552a(g)(1)(D), not organizations, and even

---

[8] The First Circuit has sometimes suggested that "[t]he issue of whether there was final agency action implicates the jurisdiction of the federal courts."  *Puerto Rico v. United States*, 490 F.3d 50, 70 (1st Cir. 2007).  In other cases, however, the First Circuit has "held that the APA's finality requirement is not jurisdictional in nature."  *Nkihtaqmikon v. Impson*, 503 F.3d 18, 33 (1st Cir. 2007).  This Court need not resolve that question here, however, because whether the final-agency-action requirement is jurisdictional (and thus warrants dismissal under Rule 12(b)(1)) or is more appropriately understood as an element of an APA claim (and thus warrants dismissal under Rule 12(b)(6)), dismissal is warranted either way.

then allows for injunctive relief only in narrow circumstances that are plainly inapplicable here. *See, e.g.*, *Cell Assocs., Inc. v. NIH*, 579 F.2d 1155, 1157, 1159-60 (9th Cir. 1978) (holding that (1) the Privacy Act relief permits relief only to "individuals" and (2) injunctive relief is not available under 5 U.S.C. § 552a(g)(1)(D)); *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007) ("We have held that only monetary damages, not declaratory or injunctive relief, are available to § 552a(g)(1)(D) plaintiffs") (citing *Doe v. Stephens*, 851 F.2d 1457, 1463 (D.C. Cir. 1988)). In addition, generally, "a plaintiff cannot bring an APA claim to obtain relief for an alleged Privacy Act violation." *Westcott v. McHugh*, 39 F. Supp. 3d 21, 33 (D.D.C. 2014); *see also, e.g.*, *Am. Fed'n of Tchrs. v. Bessent*, 152 F.4th 162, 175-76 (4th Cir. 2025), *abrogated on other grounds by AFL-CIO v. SSA*, 2026 WL 969670 (4th Cir. Apr. 10, 2026) (en banc). And although some courts have held recently—and wrongly, in the government's view—that Privacy Act claims can be brought as APA claims, *see, e.g.*, *AFL-CIO v. Dep't of Labor*, 778 F. Supp. 3d 56, 81-82 (D.D.C. 2025), even that workaround cannot apply here, due to the lack of any final agency action and the President's exclusion from the APA.

Finally, Plaintiffs variously cite the Help America Vote Act (HAVA), the National Voter Registration Act (NVRA), the Uniformed and Overseas Citizens Access to Voting Act (UOCAVA), the Voting Rights Act, and the Postal Reorganization Act, for some of their merits arguments. But they fail to identify any applicable private right of action under any of those statutes, and Defendants are aware of none. That is fatal to any remaining statutory claims. *See, e.g.*, *Sandoval*, 532 U.S at 286-87.

**2.** Plaintiffs cannot solve their statutory cause-of-action problem by invoking principles of ultra vires review. *See LWVMA* Compl. ¶¶ 12, 141-55; *California* FAC ¶¶ 150-89. A statutory ultra vires claim "is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *NRC v. Texas*, 605 U.S. 665, 681-82 (2025) (quoting *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009)). "As it currently stands, ultra vires review applies only when an agency has taken action entirely in excess of its delegated powers and contrary to a *specific* prohibition in a statute." *President & Fellows of Harv. College v. HHS*, 798 F.

Supp. 3d 77, 133 (D. Mass. 2025) (cleaned up).  Even then, "[u]ltra vires review is also unavailable if, as is usually the case, a statutory review scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial review."  *NRC*, 605 U.S. at 681.

Plaintiffs point to nothing close to a statutory violation of that sort here.  Instead, they offer no more than the sort of "typical statutory-authority argument[s]" that do not suffice to state an ultra vires claim.  *Id.* at 682.  For example, rather than identify any specific statutory command that some agency has violated, Plaintiffs argue that the Executive Order (or some hypothetical future implementation action) somehow violates the Postal Service's general obligation to "provide prompt, reliable, and efficient services" and "postal services to all communities," 39 U.S.C. § 101(a); *see, e.g., LWVMA* Compl. ¶ 144; *California* FAC ¶ 174.  That is incorrect—but even if it were correct, the Postal Service has still not "taken action entirely in excess of its delegated powers and contrary to a *specific* prohibition in a statute" in a way that could support an ultra vires claim.  *President & Fellows of Harv. College*, 798 F. Supp. 3d at 133.

In any event, this form of statutory "ultra vires review is not available because" Plaintiffs also have "an alternative path to judicial review" through normal channels, including the APA itself.  *NRC*, 605 U.S. at 682; *see also supra at* 17 n.6 (discussing the possible applicability of a different form of ultra vires review that might govern review of certain possible future actions by the Postal Service).  Any injured Plaintiff can simply wait and sue any agency that actually takes some concrete action to implement the Order—if and when that action causes that Plaintiff some actual or imminent Article III injury (and can satisfy the other usual prerequisites for judicial review).  *See, e.g.*, *President & Fellows of Harv. College*, 798 F. Supp. 3d at 133 (ultra vires review is "unavailable if a statutory review scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial review" (quotation marks and citations omitted)).

### E.    Plaintiffs' claims challenging the enforcement priorities and enforcement discretion of the Executive Branch are independently unreviewable.

Although Plaintiffs' claims in these suits vary, at least some explicitly seek judicial review of the enforcement priorities and enforcement discretion of the Executive Branch.  Most obviously,

the *California* Plaintiffs explicitly challenge Section 2(b) of the Executive Order, which provides that "[t]he Attorney General shall prioritize the investigation and, as appropriate, the prosecution of State and local officials or any others involved in the administration of Federal elections who issue Federal ballots to individuals not eligible to vote in a Federal election, including under" a list of specifically identified federal criminal statutes.  E.O. § 2(b); *see California* FAC ¶ 163; *California* PI Br. at 5, 10-12.  The *California* Plaintiffs also take aim at Section 5, which provides that "[t]he Attorney General and the heads of executive departments and agencies (agencies) with relevant authority shall take all lawful steps to deter and address noncompliance with Federal law."  E.O. § 5.  And all Plaintiffs challenge Sections 2(a) and 3(b)—about creation of State Citizenship Lists and a Postal Service rulemaking concerning, *e.g.*, barcodes on mail-in ballots—all of which can facilitate possible future post-election enforcement of criminal laws relating to voting.  To the extent Plaintiffs seek judicial supervision of the Executive Branch's enforcement priorities or other exercises of enforcement discretion, those claims are not reviewable, under the APA or otherwise—even if Plaintiffs could otherwise overcome the other threshold obstacles set forth above.

**1.**  Under the APA, "before any review at all may be had, a party must first clear the hurdle of § 701(a)."  *Heckler v. Chaney*, 470 U.S. 821, 828 (1985).  5 U.S.C. § 701(a)(2) provides that APA review is unavailable to challenge "agency action" that is "committed to agency discretion by law."  "Over the years," the Supreme Court has interpreted Section 701(a)(2) to apply to various types of agency decisions that "traditionally" have been regarded as unsuitable for judicial review. *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993).  The textbook example is a discretionary change in law-enforcement priorities.  And even if brought as an ultra vires claim, an agency action that is committed to agency discretion under law would, by definition, not constitute the unequivocal statutory command that is the only appropriate avenue for such extra statutory review.

*Chaney* is instructive.  The Court there considered a challenge to the decision of the Food and Drug Administration ("FDA") not to enforce the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.*, against the "unapproved use of approved drugs" for capital punishment. *Chaney*, 470 U.S. at 824.  The Court refused to subject the agency's decision to APA review.  *Id.*

at 831. The Court observed that "an agency's decision not to prosecute or enforce, whether through civil or criminal process," is "generally committed to an agency's absolute discretion" and "unsuitab[le] for judicial review." *Id.* It explained that an enforcement decision "often involves a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," including "whether agency resources are best spent on this violation or another" and whether enforcement in a particular scenario "best fits the agency's overall policies." *Id.* The Court noted, in addition, that when an agency declines to enforce, it "generally does not exercise its coercive power over an individual's liberty or property rights, and thus does not infringe upon areas that courts often are called upon to protect." *Id.* at 832. And it recognized that agency enforcement discretion "shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch." *Id.* Accordingly, the Court concluded that, absent a statute "circumscribing an agency's power to discriminate among issues or cases it will pursue," the agency's "exercise of enforcement power" is "committed to agency discretion by law." *Id.* at 833, 835.

Here, the President's directives to his subordinates in Executive Order 14,399—in particular, about the investigation and enforcement of specified federal criminal statutes relating to voting—are exactly the type of enforcement prioritization that traditionally has been understood as unsuitable for judicial review and thus "committed to agency discretion" under Section 701(a)(2). Like the decision to adopt a policy of nonenforcement (as in *Chaney*), the decision to *increase* investigations, prosecutions, or other enforcement on a particular subject (here, unlawful voting) likewise "involves a complicated balancing" of factors that are "peculiarly within [the] expertise" of the Executive Branch, including determining how limited law-enforcement resources are best spent in light of the Executive Branch's overall priorities. *Chaney*, 470 U.S. at 831. Likewise, a decision to alter enforcement priorities, by itself, does not bring to bear the government's coercive power over any individual; that will occur only if any resulting enforcement or prosecution leads to an actual prosecution—which itself provides a focal point for any necessary judicial review.

- 27 -

The Executive Branch "retain[s] broad discretion to enforce the Nation's criminal laws." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (citation omitted).  Unsurprisingly then, criminal prosecutorial discretion is regularly exercised within the Department of Justice, both within and between presidential administrations, and separation-of-powers considerations under-score why it has never been considered amenable to APA review.  In short, "as *Chaney* makes clear, when prosecutorial discretion is at issue, the matter is presumptively committed to agency discretion by law." *Drake v. FAA*, 291 F.3d 59, 71 (D.C. Cir. 2002); *see also, e.g.*, *Citizens for Resp. & Ethics v. FEC*, 993 F.3d 880, 884 (D.C. Cir. 2021) (reaffirming principles of "unreview-able prosecutorial discretion to determine whether to bring an enforcement action" (citation omit-ted)); *Sec'y of Lab. v. Twentymile Coal Co.*, 456 F.3d 151, 157 (D.C. Cir. 2006) (discussing "the traditional nonreviewability of prosecutorial charging decisions"); *Beverly Health & Rehab. Servs., Inc. v. Feinstein,* 103 F.3d 151, 153 (D.C. Cir. 1996) (no judicial review that would "invade the realm of prosecutorial discretion").  Plaintiffs offer nothing to overcome that well-settled pre-sumption here.

"Of course," if Congress had meaningfully "circumscribe[d] agency discretion," then the government would not be "free simply to disregard statutory responsibilities" in the name of new enforcement priorities.  *Lincoln*, 508 U.S. at 193; *accord Chaney*, 470 U.S. at 833-34.  But here, there is no such statutory constraint.  Just the opposite: the criminal statutes cited in the Order confirm the broad discretion of the Executive Branch to enforce criminal prohibitions on unlawful voting-related activity.  *See, e.g.*, 18 U.S.C. § 611(a) (providing that, generally, "[i]t shall be un-lawful for any alien to vote in any election" for federal office); 52 U.S.C. § 10307(e) (criminal prohibition on "vot[ing] more than once" in a federal election); *id.* § 20511(2)(B) (criminal prohi-bition on "the procurement, casting, or tabulation of ballots that are known by the person to be materially false, fictitious, or fraudulent").

**2.**  For similar reasons, principles of Article III standing that are unique to the context of enforcement priorities also independently foreclose judicial review over these claims.  To establish standing, the Supreme Court has "stressed that the alleged injury must be legally and judicially

cognizable.'" *Texas*, 599 U.S. at 676 (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997)). "That 'requires, among other things,' that the 'dispute is traditionally thought to be capable of resolution through the judicial process'—in other words, that the asserted injury is traditionally redressable in federal court." *Id.* "In adhering to that core principle, the Court has examined 'history and tradition,' among other things, as 'a meaningful guide to the types of cases that Article III empowers federal courts to consider.'" *Id.* at 676-77 (quoting *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 274 (2008)). Ultimately, a lawsuit "may not proceed" where the "plaintiff has not suffered any physical, monetary, or cognizable intangible harm traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 427.

Although it is Plaintiffs' burden to demonstrate Article III standing, *see Lujan*, 504 U.S. at 561, and although "standing is not dispensed in gross," *TransUnion*, 594 U.S. at 431, when it comes to challenging enforcement priorities, they have made no effort to identify any injury "traditionally recognized as providing a basis for a lawsuit in American courts." *Id.* at 427. To the contrary, there is a well-established tradition *against* litigation over changes to Executive Branch enforcement priorities. That tradition reflects both Article II and Article III constraints. *See Texas*, 599 U.S. at 679-81. Article II vests the executive power in the President and directs him to take care that the laws are faithfully executed. U.S. Const. art. II, § 1, cl. 1; art. II, § 3. Decisions about "how to prioritize and how aggressively to pursue legal actions against defendants who violate the law" thus fall "within the discretion of the Executive Branch, not within the purview of private plaintiffs (and their attorneys)." *TransUnion*, 594 U.S. at 429. Accordingly, lawsuits challenging enforcement priorities "run up against the Executive's Article II authority to enforce federal law," *Texas*, 599 U.S. at 678, and "courts generally lack meaningful standards for assessing the propriety of enforcement choices" of the law-enforcement, investigation, and prosecution functions of the Executive Branch. *Id.* at 679. As a result, "federal courts lack Article III jurisdiction over suits that challenge the Executive's enforcement decisions." *Id.* at 685.

*       *       *

- 29 -

Accordingly, to the extent that Plaintiffs' claims seek to challenge Executive Branch enforcement discretion—most obviously, with respect to the *California* Plaintiffs' requests for relief against Sections 2(b) and 5 of the Order—those claims should be dismissed as (1) committed to agency discretion by law, or (2) for lack of any legally cognizable Article III injury.

## F.    The President and the Department of Commerce should be dismissed.

Even if Plaintiffs could overcome all of the threshold problems above, at a minimum, the President of the United States, the Department of Commerce, and the Secretary of Commerce (in his official capacity) should each be dismissed as Defendants in these suits.[9]

As for the Department of Commerce and the Secretary of Commerce, their only mention in the Executive Order is in Section 4(a), which provides that "[t]he Secretary of Homeland Security, the Commissioner of SSA, and the Postmaster General shall coordinate with the Secretary of Commerce in effectuating all relevant aspects of the implementation of this order."  E.O. § 4(a). Neither Plaintiffs' complaints, nor their preliminary-injunction motions contain any further allegations or information about what, exactly, Plaintiffs challenge relating to the Department of Commerce.  And even if the Department of Commerce plays some role in "coordination" of the implementation of this Executive Order, internal government deliberations have no legal effect, cause Plaintiffs no cognizable Article III injury, and are thus not subject to judicial review.  In any event, Plaintiffs do not even allege that the Department of Commerce has done *anything*—much less anything unlawful and injurious.  Accordingly, whether conceived of as a lack of Article III standing to sue the agency, or failure to state a claim upon which relief can be granted, the Department of Commerce (and the Secretary of Commerce in his official capacity) should be dismissed as Defendants in these suits.

As for the President, as discussed in greater detail above, he is not a proper subject of an APA challenge, *see supra* at 23 (citing *Franklin*, 505 U.S. at 800-01), and as discussed in greater

---

[9] The Department of Commerce and the Secretary of Commerce (in his official capacity) were added as Defendants by the *California* Plaintiffs in their First Amended Complaint.  *See California* FAC, ECF No. 65, ¶¶ 55-56.  They are not Defendants in *LWVMA*.  *See LWVMA* Compl.

detail below, he is also not properly subject to an injunction, *see infra* at 46-47 (citing *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866)).  Accordingly, the President should also be dismissed as a Defendant.  *See, e.g.*, *Doe 2 v. Trump*, 319 F. Supp. 3d 539, 542 (D.D.C. 2018) ("Given that the Court will not grant Plaintiffs the relief that they seek against the President himself, the President should be dismissed.").

## II.     PLAINTIFFS' CLAIMS FAIL ON THE MERITS (OR ARE LIKELY TO FAIL ON THE MERITS)

The Court should not reach the merits now, as Plaintiffs fail to satisfy numerous threshold requirements as set forth above.  *See, supra*, Section I.  Even so, if the Court does attempt to address the merits at this early stage—or, in the case of the *LMWVA* Plaintiffs, considers their likelihood of success on the merits in evaluating their preliminary-injunction motion—their arguments are meritless, overbroad, or (for the most part) based upon unsupported assumptions about the contours of possible future agency actions that do not yet exist (and might never exist in the form that Plaintiffs assume).

**1.**  Most obviously, Plaintiffs' claims fail (or are likely to fail) on the merits because this Court should never *reach* the merits, due to the multiple defects of jurisdiction and justiciability above.  *See supra*, Section I.  This Court need not go any further to deny Plaintiffs' motions.  *See, e.g.*, *Munaf v. Geren*, 553 U.S. 674, 691 (2008) ("Review of a preliminary injunction 'is not confined to the act of granting the injunction, but extends as well to determining whether there is any insuperable objection, in point of jurisdiction or merits, to the maintenance of the bill, and, if so, to directing a final decree dismissing it.'") (quoting *Cty. & Cnty. of Denver v. N.Y. Trust Co.*, 229 U.S. 123, 136 (1913)).  And if the *LWVMA* Plaintiffs are unlikely to succeed on the merits, this Court need not consider the remaining injunction factors.  *Capen v. Campbell*, 134 F.4th 660, 660 (1st Cir. 2025) ("If the movant fails to demonstrate a likelihood of success on the merits, the remaining elements are of little consequence.") (quoting *Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 92 (1st Cir. 2020)).

**2.**  In any event, as a practical matter, it is not *possible* to litigate the merits of this case at this time, on this record.  Deliberations regarding implementation of the Executive Order are still

ongoing.  *See* Monteith Decl. ¶ 3; Mayhew Decl. ¶ 5; MacBride Decl. ¶ 5.  Until those deliberations conclude and some or all of the relevant agencies actually take some real (rather than hypothetical) action, there is nothing for the parties to litigate, nor for the Court to enjoin or vacate.

As one example, on the merits, the *LWVMA* Plaintiffs argue that "the Order directs USPS not to transmit the ballots of voters not enrolled on state-specific, Mail-In and Absentee Participation Lists, despite UOCAVA's clear direction to USPS to deliver overseas voters' ballots." *LWVMA* PI Br. at 14.  But before the Postal Service has issued a proposed or final rule, this Court cannot conclude that the Postal Service has crossed some statutory boundary in UOCAVA (or any other statute) in implementing the Executive Order—which itself commands compliance only to the extent consistent with applicable law.  E.O. § 7(b) ("This order shall be implemented consistent with applicable law").  What if the proposed rule (or the final rule) specifically addresses Plaintiffs' concerns about UOCAVA?  More generally, what action by the Postal Service, exactly, is the Court supposed to review to answer the question of whether the Order's eventual implementation will comply with UOCAVA?  They do not say.

As a further example, the *California* Plaintiffs argue that Sections 2(a) and 2(b) of the Executive Order "threaten criminal prosecution for anyone who issues a ballot to a voter omitted from a State Citizenship List." *California* MSJ Br. at 10.  But the Order itself says nothing of the sort.  Indeed, the Order does not even mandate that States use the State Citizenship List at all.  *See* E.O. § 2.  The federal criminal statutes that govern elections and voting are entirely unchanged by this Executive Order.  And whatever implementation actions ultimately may affect Plaintiffs in other ways, they are free to challenge those implementation actions if and when they actually exist.

As yet another example, Plaintiffs argue that the State Citizenship Lists will "erroneously exclude 17-year old primary voters who are eligible under state law" and further argue that Section 2(b) of the Executive Order "invades the States' powers to set the qualifications for voters" because it "threatens elections officials with investigation and prosecution if they provide a ballot to eligible 17-year-olds, disregarding the States' constitutional prerogative." *California* MSJ Br. at 11, 13.  *See also LWVMA* PI Br. at 27 ("Once implemented, the Executive Order will disenfranchise

Plaintiffs' members given impending absentee and mail-ballot application deadlines for primary elections."). But the Order does not use the phrase "primary election," nor does it explicitly define "federal election" to include primary elections. Without agency implementation actions that clarify the definition of "federal election" within the Order, Plaintiffs' arguments about the possible effect of those hypothetical future actions on primary elections are premature, at best.

Plaintiffs' merits arguments are further undermined by the well-settled principle that government agencies are "entitled to a presumption of regularity." *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 577 (2025) (citation omitted); *see USPS v. Gregory*, 534 U.S. 1, 10 (2001) ("[A] presumption of regularity attaches to the actions of government agencies."). The agencies charged with implementation of the Order require time to translate the President's broad policy vision into lawful and specific government actions. In the interim, Plaintiffs do not suffer harm (and cannot suffer imminent harm) from possible future agency action that is presumed to follow all applicable legal constraints—particularly where, as here, the President himself explicitly ordered agencies to consider those very legal constraints before acting. *See* E.O. § 2(a) ("To the extent feasible and consistent with applicable law, including but not limited to the Privacy Act of 1974 . . . ."); § 4(c) ("consistent with applicable law, the Privacy Act, and all applicable use agreements"); § 5 ("shall take all lawful steps"); § 7(b) ("This order shall be implemented consistent with applicable law."); *see also Am. Fed'n of Gov't Emps.*, 145 S. Ct. at 2635 (Sotomayor, J., concurring) (acknowledging that because the "the relevant Executive Order" in that case "directs agencies to plan reorganizations and reductions in force consistent with applicable law," the Court had "no occasion to consider whether they can and will be carried out consistent with the constraints of law" at that stage, prior to implementation of that Executive Order).

Under these circumstances, the Court cannot conclude that the *LWVMA* Plaintiffs are likely to succeed on the merits of any of their claims—after all, the factual and legal landscape for those claims has not yet been settled. That uncertainty is independently fatal to Plaintiffs' preliminary-injunction motion, as it is their burden to make a "clear showing" that they are likely to succeed on the merits—not Defendants' burden to disprove the opposite. *Nat'l Urb. League*, 783 F. Supp.

- 33 -

3d at 82 (citation omitted).  And there is likewise no basis to enter summary judgment for the *California* Plaintiffs, based on hypothetical legal violations that they think *might* be forthcoming.

**3.**  At a broader level, even if this Court were to somehow try and address the merits at this premature stage, these cases challenge an order from the President to his own subordinates—not a directive to Plaintiffs or State election officials.  Particularly with its multiple explicit caveats about feasibility and legality, that Order standing alone is not *ultra vires*, does not violate the separation of powers, and does not violate any other constitutional or statutory provision.  And whatever may be said about possible future agency actions taken to *implement* the order, none of those are before the Court at this time—and might never be, at least in the form that Plaintiffs assume.  This Court should not accept Plaintiffs' invitation to opine on the legality of actions that do not yet exist.

The "executive Power shall be vested in a President of the United States of America."  U.S. Const. art. II, § 1, cl. 1.  Accordingly, "[t]he ordinary duties of officers prescribed by statute come under the general administrative control of the President by virtue of the general grant to him of the executive power, and he may properly supervise and guide their construction of the statutes under which they act in order to secure that unitary and uniform execution of the law which Article II of the Constitution evidently contemplated in vesting general executive power in the President alone."  *Sierra Club v. Costle*, 657 F.2d 298, 406 n.524 (D.C. Cir. 1981).  "Those officers are duty-bound to give effect to the policies embodied in the President's direction, *to the extent allowed by the law*."  *Bldg. & Const. Trades Dep't., AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) (emphasis added).

Executive Order 14,399 fits comfortably within this tradition, as "an exercise of the President's supervisory authority over the Executive Branch."  *Id.* at 33.  Like the Executive Order at issue in *Allbaugh*—which was likewise limited to implementation "[t]o the extent permitted by law"—Executive Order 14,399 is replete with limiting instructions to agencies (both about feasibility and legality).  *See* E.O. § 2(a) ("To the extent feasible and consistent with applicable law, including but not limited to the Privacy Act of 1974"); § 4(c) ("consistent with applicable law, the Privacy Act, and all applicable use agreements"); § 5 ("shall take all lawful steps"); § 7(b) ("This

order shall be implemented consistent with applicable law. . . .").  The effect of this language is that "if an executive agency . . . may lawfully implement the Executive Order, then it must do so; if the agency is prohibited, by statute or other law, from implementing the Executive Order, then the Executive Order itself instructs the agency to follow the law."  *Allbaugh*, 295 F.3d at 33.  In other words, the Order "is not self-executing." *Id.*  Accordingly, "[t]he mere possibility that some agency might make a legally suspect" act does not justify an injunction against the Order itself. *Id.*  Thus, Plaintiffs must either attack some agency's implementation of the Order—*e.g.*, a final rule promulgated by the Postal Service, if and when such a rule is issued—or instead advance a "facial challenge" showing that the Order "is without any valid application."  *Id*.

Neither option works here.  Plaintiffs cannot yet challenge any implementation of the Executive Order, for the simple reason that none of its provisions have yet been implemented via any final agency action (or anything close).  In any event, "Plaintiffs attack the executive order[] and ask for relief in ways confirming that their challenges are facial and not as-applied."  *Nat'l Urb. League*, 783 F. Supp. 3d at 88.  But Plaintiffs also cannot obtain an injunction against the Order itself, on its face—because it is subject to many lawful interpretations.

For example, one plainly valid application of the Order would be as a means for the President to manage the enforcement priorities of the Executive Branch relating to certain federal election-related crimes (identified in the Order itself). *See* U.S. Const. art. II, § 3 (The President "shall take Care that the Laws be faithfully executed"; *Trump v. United States*, 603 U.S. 593, 597 (2024) ("The Executive Branch has 'exclusive authority and absolute discretion' to decide which crimes to investigate and [which to] prosecute, including with respect to allegations of election crime.") (quoting *United States v. Nixon*, 418 U.S. 683, 693 (1974)); *Texas*, 599 U.S at 671 (noting "the Executive's Article II authority to decide 'how to prioritize and how aggressively to pursue legal actions against defendants who violate the law.'") (quoting *TransUnion*, 594 U.S. at 429).  The Order facilitates this core Article II function by directing the Attorney General and various agencies to deploy their resources in the investigation and enforcement of federal laws that "explicitly

prohibit non-citizens from registering to vote" and to prevent "violations of Federal criminal law" in this area.  E.O. § 1.

State Citizenship Lists, for example, might be used solely to facilitate this sort of post-election law-enforcement activity—after all, the purpose of those lists is not specified in the Order. Under that interpretation, non-inclusion on a State Citizenship List need not, for example, hinder the ability of any citizen to register to vote in their State under current procedures, nor to vote by mail.  Even at this early stage, several States have already described the State Citizenship Lists as an "optional resource" that states can use or ignore, because the Order "does not require States to use the State Citizenship List." *DSCC v. Trump*, No. 26-cv-1114 (D.D.C. Apr. 20, 2026), ECF No. 77-3 at 16; *see also id.* at 13-16 (States explaining why it is "implausible" to assume that States will use the contemplated State Citizenship Lists "to somehow prevent eligible voters from receiving ballots.").  Because of those (and other) possible interpretations—rather than Plaintiffs' speculative and pessimistic assumptions about how the Order *might* be implemented—a facial challenge to this Order cannot succeed.  *Cf. United States v. Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."); *see also Allbaugh*, 295 F.3d at 33 (extending the same principle to Executive Orders); *Nat'l Urb. League*, 783 F. Supp. 3d at 87 (a facial challenge to an Executive Order "is a big claim," and "making it 'comes at a cost'" (citation omitted)).

Another strategy to facilitate uncontroversially lawful post-election law-enforcement could involve the Postal Service promulgating a final rule that implements improved technology (*e.g.*, via "unique Intelligent Mail barcode") to improve tracking of absentee and mail-in ballots that are sent from State election officials to individual voters.  *See* E.O. § 3(b)(i)(B).  Such tracking could provide, where appropriate, federal law-enforcement agencies with useful information (aggregate or individualized) about the verified recipients of absentee and mail-in ballots issued in a particular jurisdiction.  After an election, if necessary, that data could then be compared to other data about the absentee and mail-in ballots actually cast in that jurisdiction.  Any discrepancies could be more

- 36 -

efficiently investigated, informing the allocation of finite law-enforcement resources.  And later, the investigation and potential prosecution of any suspected voter fraud might also be facilitated with evidence that a particular voter did (or did not) receive a verified mail-in or absentee ballot—with receipt confirmed through the tracking afforded by the unique Intelligent Mail barcode.

Ultimately, of course, the legality of these potential interpretations cannot be definitively addressed at this time—because Plaintiffs do not allege that any of the implementation actions have even been decided, much less finalized.  *See* Monteith Decl. ¶¶ 4-5; Mayhew Decl. ¶¶ 8-10; MacBride Decl. ¶ 6.  But even the *possibility* that the Order could be interpreted in a manner that is lawful is enough to defeat a facial challenge to the Order itself.  *See Nat'l Urb. League*, 783 F. Supp. 3d at 87-91.  And of course, if the Order is eventually implemented in a manner that Plaintiffs believe is both unlawful and injurious, they are free to sue (or seek injunctive relief) at that time.  An injunction now, however, is both unnecessary and inappropriate.

At bottom, Plaintiffs advance a maximalist interpretation of the Order, assume—contrary to the presumption of regularity and the text of the Order itself—that it will be implemented in a manner that violates the law, and then seek the extraordinary remedy of a preliminary injunction based solely on imagined harms stemming from their own speculative and unsupported assumptions.  This Court need not and should not take that approach.

### III.  THE REMAINING PRELIMINARY-INJUNCTION FACTORS ALSO SUPPORT DENIAL OF THE *LWVMA* PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION.

"A preliminary injunction is an 'extraordinary remedy never awarded as of right.'" *Capen*, 134 F.4th at 666 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).  "In determining whether to grant a preliminary injunction, the district court must consider: (i) the movant's likelihood of success on the merits of its claims; (ii) whether and to what extent the movant will suffer irreparable harm if the injunction is withheld; (iii) the balance of hardships as between the parties; and (iv) the effect, if any, that an injunction (or the withholding of one) may have on the public interest." *Capen*, 134 F.4th at 660 (quoting *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 9 (1st Cir. 2013)).

- 37 -

Defendants have already addressed why the *LWVMA* Plaintiffs are unlikely to succeed on the merits—that is, both because (1) they are unlikely to overcome any or all of the threshold obstacles of jurisdiction and justiciability set forth above, *see supra*, Section I, and (2) they are also unlikely to succeed on the merits, at least at this premature stage, *see supra*, Section II.  They fare no better on the remaining preliminary-injunction factors.

A.    **The *LWVMA* Plaintiffs have not carried their burden to demonstrate irreparable harm.**

The *LWVMA* Plaintiffs have failed to establish that a preliminary injunction is necessary to prevent imminent irreparable harm, which is enough to deny their motions.  *See Matos ex. rel. Matos v. Clinton School Dist.*, 367 F.3d 68, 73 (1st Cir. 2004) ("We need not discuss three of these elements [likelihood of success, balance of hardships, and public interest].  In most cases—and this case is no exception—irreparable harm is a necessary threshold showing for awarding preliminary injunctive relief.").  "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Harris v. Adams*, 757 F. Supp. 3d 111, 129 (D. Mass. 2024) (citations omitted).  The *LWVMA* Plaintiffs have not demonstrated imminent irreparable harm here.

**1.** For largely the same reasons that the *LWVMA* Plaintiffs have failed to show any actual or imminent injury in fact (*see supra*, Section I), *a fortiori* they have not shown that they will face imminent irreparable harm.

Again, this Executive Order by itself does not require the *LWVMA* Plaintiffs (or anyone outside of the Executive Branch) to do anything.  DHS, SSA, and the Department of Commerce are charged with coordinating in the possible creation of State Citizenship Lists.  E.O. §§ 2, 4.  The Postal Service is charged with publishing a proposed rule.  E.O. § 3.  And the "Attorney General and heads of executive departments" are charged with enforcement of existing criminal laws.  E.O. § 5.  But *Plaintiffs* need not do anything (or refrain from doing anything) under this Order.  Plaintiffs thus suffer no harm—let alone irreparable harm—from of the Order itself.

To further illustrate why the Executive Order itself has not (and will not) cause any irreparable harm, since the signing of the Executive Order, there has already been at least one federal election: the special election for New Jersey's 11th Congressional District, which was held on April 16, 2026. *See, e.g.*, Sophie Nieto-Munoz, *Democrat Analilia Mejia Wins Special House Election*, NEW JERSEY MONITOR (April 16, 2026, at 8:09 pm), https://newjerseymonitor.com/2026/04/16/analilia-mejia-special-house-election/. To Defendants' knowledge, that special election took place without incident (and certainly without harm to the *LWVMA* Plaintiffs or to the State of New Jersey, a *California* plaintiff)—underscoring the reality that Plaintiffs have not experienced (and will not experience) irreparable harm by virtue of the Executive Order alone. What Plaintiffs really fear are possible future steps that agencies may take to *implement* the Executive Order—but none of those have happened yet, and they might never happen in the form that Plaintiffs assume. That reality is fatal to the notion that Plaintiffs face any irreparable harm from this Executive Order.

**2.** The text of the Executive Order further confirms that at least at this time, it cannot be the cause of any irreparable harm. For example, there is no guarantee that any State Citizenship List will ever be compiled and transmitted, let alone in a manner that violates the Privacy Act or any other applicable law, so as to harm any Plaintiff. The Order contemplates the creation of that list within "90 days" of the signing of the Order, provided it is "feasible and consistent with applicable law." E.O. §§ 2(a) & 4(c). The agencies charged with creation of the State Citizenship List have until at least June 29, 2026, to comply with the Order—or, alternatively, to conclude that creating or transmitting such a list is *not* feasible or consistent with applicable law (or even to inform the President that additional time is necessary). Those deliberations are ongoing. *See* Mayhew Decl. ¶ 5; MacBride Decl. ¶ 5. Plaintiffs face no actual or imminent harm in the meantime. As of today, none of the agencies charged with compiling State Citizenship Lists have announced whether it will be feasible to do so, let alone in a form that will concretely injure Plaintiffs. And of course, if that uncertain future event eventually comes to pass, Plaintiffs are free to sue (or even seek temporary relief) at that time—targeting real (rather than hypothetical) agency action.

- 39 -

Similarly, Plaintiffs' concerns about a future Postal Service rulemaking are just that—concerns—there can be no actual or imminent harm (irreparable or otherwise) from a not-yet-issued *proposed* rule. As then-Judge Kavanaugh once put it, "a proposed rule is just a proposal." *In re Murray Energy*, 788 F.3d at 334. Even once the Postal Service takes up the President's direction to initiate a rulemaking, there is no guarantee (nor any requirement in the Executive Order) that the rulemaking actually lead to a final rule, nor that any final rule would harm any Plaintiff in the ways that they assume. In any case, the Postal Service has "120 days" from the date of the Order, or until July 29, 2026, to issue any final rule. E.O. § 3(d). Even if the Postal Service adheres strictly to that schedule, Plaintiffs are not harmed (nor subject to imminent harm) in the interim. And Plaintiffs can express their concerns directly to the Postal Service as part of the notice-and-comment process, which the agency will consider before finalizing any rule. *See* Monteith Decl. ¶ 5. And again, ultimately, if Plaintiffs do eventually face any imminent harm caused by the publication of a final rule, Plaintiffs can sue (or even seek a preliminary injunction) at that time.

At bottom, this Court should not endorse Plaintiffs' efforts to short-circuit the administrative process by adopting a maximalist interpretation of the Order, before the relevant agencies have implemented it at all—much less in a way that causes any irreparable harm.

**3.** All of the *LWVMA* Plaintiffs' arguments to the contrary lack merit. They contend that they are irreparably harmed in two ways: (1) Plaintiffs' own core activities and missions in voter education and participation; and (2) disenfranchisement of some of Plaintiffs' members. *See LWVMA* PI Brief, ECF No. 74 at 20-28. As to Plaintiffs' own activities, *LWVMA* Plaintiffs point to disruption to "Plaintiffs' ongoing voter education" efforts, "responding to fear and confusion from members," and suspension of LWVMA's efforts to translate "Massachusetts-specific voter information" into "Haitian Creole and Portuguese." *Id.* at 22-23. Crucially, however, *LWVMA* Plaintiffs do not explain *how* the Executive Order itself, without further implementing steps, causes any concrete harm. Nothing in the Order compels Plaintiffs to stop voter outreach and education efforts. Nothing in the Order prevents translation of voter information to other languages. And vague and speculative assertions of "fear and confusion" about possible future government are not

irreparable harm sufficient to justify injunctive relief. *Id.* at 22; *see Driehaus*, 573 U.S. at 164 (holding that "the threat of future enforcement" must be "substantial" to confer standing); *Blum*, 744 F.3d at 803 (plaintiffs lacked standing to bring pre-enforcement challenge to statute when plaintiffs faced no credible threat of prosecution).

Eventually turning from the Executive Order itself to its possible future implementation, the *LWVMA* Plaintiffs go on to state that the "Order's implementation will compound this irreparable harm" in distinct ways. *Id.* at 23. But this argument effectively concedes that any feared irreparable harm would result from the Order's possible future *implementation*, which requires further agency action. Such agency action may come in a form that does not harm Plaintiffs, especially given the presumption of regularity and the text of the Executive Order itself, which calls for implementation only if feasible and consistent with law. Plaintiffs' speculative fears would only qualify as irreparable harm if the Order is actually implemented (or will imminently be implemented) in a way that is both unlawful and injurious. At least at this time, Plaintiffs have not carried their burden to establish anything of the sort—after all, none of the key implementation actions have even been decided yet, much less finalized. *See* Monteith Decl. ¶¶ 3-5; Mayhew Decl. ¶¶ 5-10; MacBride Decl. ¶¶ 5-6. If the agencies themselves don't yet know what they plan to do, then there is no basis for this Court to accept Plaintiffs' speculative assumptions of harm.

Plaintiffs' claims of irreparable injury as to their members fare no better. To be clear, there is nothing in the record suggesting that any of the *LWVMA* Plaintiffs' members has been disenfranchised. The language used in Plaintiffs' brief is telling—"[t]he Order *will* irreparably harm many of Plaintiffs' members by removing their only viable option to vote." *Id.* at 26 (emphasis added). And they further assert that, "*[o]nce implemented*, the Executive Order *will* disenfranchise Plaintiffs' members . . ." *Id.* at 27 (emphasis added). But again, those future predictions of possible future harm rely entirely on Plaintiffs' unsupported assumptions about government actions that have not yet taken place, and might never take place in the form that Plaintiffs assume. *See* Monteith Decl. ¶¶ 3-5; Mayhew Decl. ¶¶ 5-10; MacBride Decl. ¶¶ 5-6. Lawful implementation

of this Order need not result in any disenfranchised voters.  Regardless, if future implementation actions give any credence to Plaintiffs' concerns, they can seek further relief at that time.

Again, this is evidenced by the apparently routine administration of the recent special election in New Jersey, which took place on April 16, 2026—over two weeks after the Executive Order was issued.  *See* Sophie Nieto-Munoz, *supra* at 39.  Plaintiffs have not alleged (and Defendants are unaware of) any issues with the sending or counting of mail-in ballots in the special election of the sort that Plaintiffs express alarm about in their filings.  Likewise, Plaintiffs have not asserted that any ballot was intercepted by the Postal Service as a result of the Executive Order, nor of any incident where the Postal Service refused to accept for delivery a mail-in or absentee ballot that a New Jersey voter attempted to mail based on non-compliance with the Order.  And Plaintiffs have not asserted in their papers any impact to any voting rights or privacy interests of any of Plaintiffs or their members in connection with that election.  None of this is surprising—because the Order itself does not affect the legal rights, obligations, or status of Plaintiffs' or their members.

Plaintiffs may respond that the recent special election in New Jersey occurred very shortly after issuance of the Executive Order—so shortly that it took place before any of the policy changes contemplated by the Order had taken effect.  Exactly—that is the core problem with these lawsuits, which were filed even *closer* in time to the issuance of the Executive Order than the special election in New Jersey.  The point of the New Jersey example is to demonstrate that it is the possible future *implementation* of the Executive Order that would be the cause of any (currently hypothetical) harm—not the Executive Order itself.  That is why Plaintiffs cannot show irreparable harm now, before that implementation has even happened.

### B.        The balance of equities and the public interest disfavor injunctive relief.

The balance of equities and public interest also disfavor injunctive relief.  Ultimately, the *LWVMA* Plaintiffs request an injunction that would restrain the President from overseeing the Executive Branch.  Such an order would harm the public interest, given the Framers' decision to vest all of "[t]he executive Power" in the President and entrust him with the sole constitutional responsibility to "take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 1, cl. 1; *id.* § 3;

*Seila Law LLC v. CFPB*, 591 U.S. 197, 203 (2020); *cf. Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (citation omitted)).  On the other side of the balance, the *LWVMA* Plaintiffs' interest is slight.  At least at this time, they merely seek to prevent hypothesized harm based on speculation about a series of future contingencies that have not yet come to pass and may never come to pass.

## IV.    *CALIFORNIA* PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT AT THIS TIME.

"A district court may grant summary judgment only 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Zambrana-Marrero v. Suarez-Cruz*, 172 F.3d 122, 125 (1st Cir. 1999) (quoting Fed. R. Civ. P. 56(c)).  At least at this time, summary judgment in favor of the *California* Plaintiffs is inappropriate, for at least three reasons.

First, the *California* Plaintiffs lack Article III standing and their claims are not ripe for review and should be dismissed.  *See, supra*, Sections I.A and I.B.  To the extent that the *California* Plaintiffs bring APA claims of non-final agency action, bring claims that have no viable causes of action, challenge the enforcement priorities and discretion of the executive branch, and bring challenges against inappropriate defendants, such claims should also be dismissed.  *See, supra*, Sections I.C, I.D, I.E, and I.F.  Dismissal of these claims would thus moot the *California* Plaintiffs' motion for summary judgment.

Second, even if the *California* Plaintiffs survive all threshold challenges to their claims, their claims are premature or otherwise fail on the merits, for the same reasons that the *LWVMA* Plaintiffs' are unlikely to succeed on the merits of their preliminary-injunction motion. *See, supra*, Section II.B.  That also warrants denial of the *California* Plaintiffs' motion for summary judgment.

Third, even for more conventional reasons, at least at this time, there exist numerous genuine disputes of material facts, making summary judgment inappropriate.  *Compare* Plaintiff States' Local Rule 56.1 Statement of Undisputed Facts, ECF No. 105 ¶¶ 4, 22-32, 36-39, 44-59,

63-69 *with* Defendants' Local Rule 56.1 Statement of Undisputed Facts, ECF No. 155; *see also* Monteith Decl. ¶¶ 3-5; Mayhew Decl. ¶¶ 5-10; MacBride Decl. ¶¶ 5-6.

For example, the *California* Plaintiffs assert that they "will have to engage in the [DHS] process" to supplement the State Citizenship List "[i]n order to minimize the risk of voter disenfranchisement" and that "[a]ny erroneous omissions in the USPS Mail Ballot List will disenfranchise voters by precluding USPS from returning their voted mail ballots to election officials." Plaintiff States' Local Rule 56.1 Statement of Undisputed Facts, ECF No. 105 ¶¶ 22, 58.

But those assertions baselessly assume, for example, that States must purge persons who do not appear on the State Citizenship List from voter rolls—despite the absence of any such mandate in the Order. The *California* Plaintiffs also prematurely assume that any final rule issued by USPS will necessarily result in the refusal of the Postal Service to accept delivery of ballots from voters to election officials, under certain (as yet unidentified) circumstances. *But see* Monteith Decl. ¶¶ 3-5. In fact, the agencies named in the Executive Order continue to deliberate about the feasibility of implementing the Order consistent with applicable law, and have not reached any final decisions. *See, e.g.*, *id.* ¶ 4 ("[W]e have not yet published a proposed rule, nor have we reached any final decisions about the substance of a proposed rule."); Mayhew Decl. ¶ 5 ("Those deliberations include consideration of feasibility and consistency with applicable law"); MacBride Decl. ¶ 6 ("SSA has not yet made any final decisions about its role in implementation of the Executive Order."). Because the Executive Order itself does not mandate that State Citizenship Lists be used to remove any voter from the voter rolls, and because no proposed rule (let alone final rule) has been promulgated by USPS, at least at this time there are genuine disputes as to material facts that preclude summary judgment in favor of the *California* Plaintiffs.

To be sure, Defendants do not expect that this case is ultimately likely to require the resolution of many (if any) factual disputes. If and when the government takes some action to implement the Executive Order, this case may very well be appropriate for resolution via cross-motions for summary judgment at that time, without the need for any discovery. *See California* Joint Mot. for Dispositive Mot. Briefing Schedule, ECF No. 37 at 4, ¶ 2 ("[T]he parties agree and propose to

waive discovery and to waive presentation of any administrative record"). But Plaintiffs' premature motion for summary judgment—filed during a state of genuine and ongoing uncertainty about how the government intends to implement the Executive Order—comes far too early for the *California* Plaintiffs to carry their burden at summary judgment to show the absence of any genuine dispute of material fact. Accordingly, even if this Court were to reject all of Defendants' other arguments, summary judgment for Plaintiffs would still be inappropriate at this time.

## V.    AT A MINIMUM, PLAINTIFFS' REQUESTED RELIEF IS OVERBROAD.

Even if Plaintiffs could prevail on any of their claims, their requested relief is overbroad in several respects, and subject to important equitable limitations.

### A.    Any equitable relief should be narrowly tailored and respect the Executive Order's severability clause.

It is a bedrock principle of equity that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Accordingly, any equitable relief "must be 'limited to the inadequacy that produced [the] injury in fact.'" *Gill v. Whitford*, 585 U.S. 48, 66 (2018) (citation omitted). So, to the extent that the Court determines that any particular feature of the Order likely violates the law, and causes particular Plaintiffs an Article III injury, any equitable relief should be limited to remedying that specific violation.

Any doubt on this point is resolved by the text of the Order itself, which provides expressly that "[i]f any provision of this order, or the application of any provision to any agency, person, or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other agencies, persons, or circumstances shall not be affected thereby." E.O. § 6. This Court should respect that severability clause here, if necessary. *Cf. Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 508 (2010) ("Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem, severing any problematic portions while leaving the remainder intact.") (quotations and citation omitted). Because "the

- 45 -

unconstitutionality of a part of an Act does not necessarily defeat or affect the validity of its remaining provisions," the "normal rule" is "that partial, rather than facial, invalidation is the required course." *Id.* (quotations and citations omitted); *see also Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 173 (1999) (assuming without deciding that "the severability standard for statutes . . . also applies to Executive Orders.").

### B.    The Court should not issue any injunction against the President.

Even if some injunctive relief were appropriate here, it should not run against the President. Although courts of equity may in some circumstances permit suits to "enjoin unconstitutional actions by . . . federal officers," *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015), the availability of such relief depends on whether it "was traditionally accorded by courts of equity," *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999).

There is no tradition of equitable relief against the President. *See J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at \*13 (D.C. Cir. Mar. 26, 2025) (per curiam) (Henderson, C.J., concurring) ("At common law, the Chancellor could not grant 'any relief against the king, or direct any act to be done by him.' This historic limitation carries forward to today and strips the federal courts of equitable 'jurisdiction . . . to enjoin the President in the performance of his official duties.'" (citations omitted)). To the contrary, federal courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Mississippi*, 71 U.S. at 501. The Supreme Court reaffirmed that principle in *Franklin v. Massachusetts*, 505 U.S. at 800-01, in declining to construe the APA to supply a cause of action against the President "[o]ut of respect for the separation of powers and the unique constitutional position of the President." That tradition properly respects the President's "unique position in the constitutional scheme." *See Nixon v. Fitzgerald*, 457 U.S. 731, 748 n.27, 749-50 (1982) (declining to assume that implied damages "cause[s] of action run[] against the President of the United States"); *see also Franklin*, 505 U.S. at 827 (Scalia, J., concurring in part and concurring in the judgment).

In this case, similarly, the "reasons why courts should be hesitant to grant" injunctive "relief are painfully obvious" given the President's unique constitutional role and potential tension

- 46 -

with the separation of powers. *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996). Although, for the reasons above, no relief at all is proper here, if the Court were to conclude otherwise, relief could only be directed at subordinate officials. *See id.* Indeed, for the same reasons, the President should be dismissed as a party. *See supra* at 31 (citing *Doe 2 v. Trump*, 319 F. Supp. 3d at 541).

The narrow exception potentially left open by *Mississippi* for injunctions seeking to direct the Executive to perform "ministerial" functions does not apply here. Left unresolved by that decision was "whether a court could compel the President to perform a ministerial act" (there, adjusting federal employee compensation under a statute). *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 607 (D.C. Cir. 1974). "A ministerial duty . . . is one in respect to which nothing is left to discretion." *Mississippi*, 71 U.S. at 498. Such a duty must be "so plainly prescribed as to be free from doubt and equivalent to a positive command." *Wilbur v. U.S. ex rel. Kadrie*, 281 U.S. 206, 218 (1930); *see also U.S. ex rel. McLennan v. Wilbur*, 283 U.S. 414, 420 (1931). But the acts of the President here in issuing the Order are not "ministerial." Rather, the Order entails an exercise of the President's discretion in supervising and directing the Executive Branch, and an injunction invalidating that order would countermand that discretion—not direct the President to carry out a "ministerial" task.

Nor could Plaintiffs' (mostly unexplained) references to the Declaratory Judgment Act warrant issuance of a declaration in lieu of an injunction. The D.C. Circuit, for example, has observed that courts "have never submitted the President to declaratory relief," *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010), built on Justice Scalia's separate opinion in *Franklin*, which properly regarded declaratory relief as unavailable against the President under the same historical tradition denying injunctive relief against the President, 505 U.S. at 827-28 (Scalia, J., concurring in part and concurring in the judgment). Declaratory relief is therefore unavailable for essentially the same reasons as an injunction.

- 47 -

C.      **The court should require Plaintiffs to post an injunction bond.**

If the Court orders any injunctive relief, it should also order the relevant Plaintiffs to post security.  Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunctive relief "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined."  Accordingly, "[s]ince a preliminary injunction may be granted on a mere probability of success on the merits, generally the moving party must demonstrate confidence in his legal position by posting bond in an amount sufficient to protect his adversary from loss in the event that future proceedings prove that the injunction issued wrongfully.  The bond, in effect, is the moving party's warranty that the law will uphold the issuance of the injunction." *Glob. Naps, Inc. v. Verizon New England, Inc.*, 489 F.3d 13, 21 (1st Cir. 2007) (citation omitted).  So, in the event the Court issues preliminary relief, it should also require Plaintiffs to post an appropriate bond, commensurate with the scope of any such order.

## CONCLUSION

For these reasons, these cases should be dismissed in their entirety under Federal Rule of Civil Procedure 12(b)(1) or 12(b)(6).  Plaintiffs' motions for a preliminary injunction and for summary judgment should each be denied.

Dated: May 7, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division

JOSEPH E. BORSON
Assistant Branch Director
Federal Programs Branch

/s/ Stephen M. Pezzi
STEPHEN M. PEZZI
 Senior Trial Counsel (D.C. Bar. No. 995500)
ESAM K. AL-SHAREFFI
 Trial Attorney (D.C. Bar No. 90010174)
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Telephone: (202) 305-8576
E-mail: stephen.pezzi@usdoj.gov