**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| LEAGUE OF WOMEN VOTERS OF MASSACHUSETTS, *et al.*, <br>         *Plaintiffs,* <br><br>     v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br>         *Defendants*. | No. 1:26-cv-11549-IT |
| CALIFORNIA, *et al.*, <br>         *Plaintiffs*, <br><br>     v. <br><br> DONALD J. TRUMP, President of the United States, *et al.*, <br>         *Defendants.* | No. 1:26-cv-11581-IT |

**BRIEF OF FEDERATION FOR AMERICAN IMMIGRATION REFORM
AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

MATTHEW JAMES O'BRIEN
Federation for American Immigration Reform
25 Massachusetts Ave., NW, Ste 330
Washington, DC 20001
(202) 328-7004
mobrien@fairus.org

Counsel for *Amicus Curiae*
Federation for American Immigration Reform

## CORPORATE DISCLOSURE STATEMENT

*Amicus curiae* the Federation for American Immigration Reform is a 501(c)(3) not for profit charitable organization incorporated in the District of Columbia. FAIR has no parent corporation. It does not issue stock.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ................................................................. i

TABLE OF AUTHORITIES.................................................................................... iii

STATEMENT OF INTEREST............................................................................... 1

SUMMARY OF THE ARGUMENT ...................................................................... 1

ARGUMENT ...................................................................................................... 2

    I.    Limiting the electorate in each State to U.S. citizens is a prerequisite to preserving a republican form of government. ................................................................................ 2

    II.    In his executive order, the President exercised his constitutional authority and obligation to guarantee to every State a republican form of government. ........................................... 6

    III.    Neither the President's nor his subordinates' actions taken at his behest are judicially reviewable. ......................................................................................... 7

CONCLUSION.................................................................................................... 11

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Cases**

*Am. Foreign Serv. Ass'n v. Trump*,
   2025 U.S. App. LEXIS 15297 (D.C. Cir. 2025) ........................................................9

*Ambach v. Norwick*,
   441 U.S. 68 (1979)........................................................................................................3

*Baker v. Carr*,
   369 U.S. 186 (1962)....................................................................................................7, 8

*Cabell v. Chavez-Salido*,
   454 U.S. 432 (1982)....................................................................................................2, 3

*Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*,
   333 U.S. 103 (1948)......................................................................................................9

*Dalton v. Specter*,
   511 U.S. 462 (1994) ....................................................................................................10

*Detroit Int'l Bridge Co. v. Gov't of Can.*,
   189 F. Supp. 3d 85 (D.D.C. 2016) ..............................................................................10

*Foley v. Connelie*,
   435 U.S. 291 (1978)...............................................................................................2, 3, 4

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992).....................................................................................................8, 9

*Lincoln v. Vigil*,
   508 U.S. 182 (1993)......................................................................................................9

*Mississippi v. Johnson*,
   71 U.S. 475 (1867)........................................................................................................9

*New York v. United States*,
   505 U.S. 144 (1992).......................................................................................................8

*Reynolds v. Sims*,
   377 U.S. 533 (1964).......................................................................................................3

*Tulare Cty. v. Bush,*
   185 F. Supp. 2d 18 (D.D.C. 2001) ..............................................................................10

*United States v. Escobar-Temal*,
   161 F.4th 969 (6th Cir. 2025)............................................................................................6

*United States v. George S. Bush & Co.*,
   310 U.S. 371 (1940)..........................................................................................................9

*Webster v. Doe*,
   486 U.S. 592 (1988)..........................................................................................................9

**Constitution**

U.S. Const., Art. II, § 1, cl. 1 ............................................................................................6

U.S. Const., Art. IV, § 4 ...............................................................................................1, 6

U.S. Const., Preamble .......................................................................................................4

**Miscellaneous**

Executive Order 14399, *Ensuring Citizenship Verification and Integrity in Federal Elections*,
   91 Fed. Reg. 17125 (Mar. 31, 2026) ................................................................................6

**STATEMENT OF INTEREST[1]**

*Amicus curiae* Federation for American Immigration Reform (FAIR) is a nonprofit corporation and membership organization that was founded in 1979 and has its principal place of business in Washington, D.C. FAIR's mission is to advocate for immigration policies that are in America's best interest. In pursuit of this mission, FAIR regularly participates in litigation involving immigration law enforcement, border integrity, and the scope of executive authority over the entry of aliens into the United States. Because these cases involve executive power to prevent aliens from voting in federal elections, FAIR has a strong interest in these cases.

**SUMMARY OF THE ARGUMENT**

Under the Constitution, the President and Congress have the duty and power to "guarantee to every State in this Union a Republican Form of Government …." U.S. Const., Art. IV, § 4 (the "Guarantee Clause"). The Supreme Court has repeatedly recognized that our republican form of government rests on the right of citizen self-government and that American citizens comprise the body politic of the United States. President Trump, exercising his constitutional authority and obligation under the Guarantee Clause to guarantee a republican form of government to every State in the Union, directed agencies to compile a list of U.S. citizens who reside in each State (State Citizenship List) and transmit that list to the chief election official in each State prior to each federal election.

---

[1] No counsel for a party in this case authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation of this brief. No person other than *amicus curiae*, its members, or its counsel made a monetary contribution to the preparation or submission of this brief.

1

Actions by the President to meet the federal government's obligation to guarantee a republican form of government in the several States are nonjusticiable because there is no justiciable standard against which to test the President's directives.

Even if the President's actions were justiciable, the identification of U.S. citizens who reside in each State is reasonably related to the President's duty to guarantee a republican form of government in each State. Transmitting to the various States a list of U.S. citizens who reside in each State provides them with a tool to help ensure that the electorate is limited only to such citizens. Accordingly, the compilation and transmittal of the State Citizenship Lists by agency officials, pursuant to the President's order, are direct exercises of Executive power under Article IV of the Constitution; as such, they may not be enjoined. Also, the Administrative Procedure Act (APA) does not apply to presidential actions, including actions of subordinate executive officers who implement a President's directive issued under his constitutional authority. Therefore, these actions are unreviewable under the APA.

## ARGUMENT

I.   **Limiting the electorate in each State to U.S. citizens is a prerequisite to preserving a republican form of government.**

The Supreme Court has repeatedly recognized that our republican form of government rests on the right of citizen self-government and that American citizens comprise the body politic of the United States. When faced with claims that municipal laws barring aliens from governmental functions—such as being police officers or public schoolteachers, or voting— offended the Equal Protection Clause, the Supreme Court repeatedly has held that, because there is a right to citizen self-government, barring aliens from these functions did not offend the Equal Protection Clause. *Foley v. Connelie*, 435 U.S. 291 (1978) (police officers); *Cabell v. Chavez-*

*Salido*, 454 U.S. 432 (1982) (probation officers); *Ambach v. Norwick*, 441 U.S. 68 (1979) (public schoolteachers).

In recognizing the right to citizen self-government, the Court declared: "The exclusion of aliens from basic governmental processes is not a deficiency in the democratic system but a *necessary consequence* of the community's process of political self-definition." *Cabell*, 454 U.S. at 439-440 (emphasis added). The Court held that American citizens comprise the body politic of the United States. "Self-government, whether direct or through representatives, begins by defining the scope of the community of the governed and thus of the governors as well: Aliens are by definition those outside of this community." *Id.*; *see also Reynolds v. Sims*, 377 U.S. 533, 565 (1964) ("But representative government is in essence self-government through the medium of elected representatives of the people, and each and every citizen has an inalienable right to full and effective participation in the political processes of his State's legislative bodies."); *Foley*, 435 U.S. at 295-96 ("The act of becoming a citizen is more than a ritual with no content beyond the fanfare of ceremony. A new citizen has become a member of a Nation, part of a people distinct from others. The individual, *at that point*, belongs to the polity and is entitled to participate in the processes of democratic decision-making. Accordingly, we have recognized a State's historical power to exclude aliens from participation in its democratic political institutions as part of the sovereign's *obligation* to preserve the basic conception of a political community.") (internal citation omitted) (emphases added). "[A] democratic society is *ruled by its people*. *Thus*, it is clear that a State may deny aliens the right to vote, or to run for elective office, for these lie at the heart of our political institutions." *Foley*, 435 U.S. at 296 (emphasis added). Such restrictions "represent[] the choice, and *right, of the people to be governed by their citizen peers*." *Id.* (emphasis added). "[A]lthough we extend to aliens the right to education and public

3

welfare, along with the ability to earn a livelihood and engage in licensed professions, the right

to govern is reserved to citizens." *Id.* at 297.

The right to citizen self-government is not only presupposed by the Constitution (by

flowing, as the Supreme Court recognized, from the basic theory of representative democracy),

but it also follows from the ultimate sovereignty of the American people—that is, U.S. citizens—

that is set forth, with the Declaration of Independence as a backdrop, in the text of the

Constitution. In the first sentence of the Constitution, "We the People of the United States"

"ordain and establish" the Constitution. U.S. Const., Preamble. Indeed, the proposition that the

people are sovereign and coterminous with U.S. citizens was emphatically the view of the

founding generation. As set forth in a recent case in the Sixth Circuit:

> In general, the founders viewed "the people" as the citizens responsible for legitimating a democratic government. As James Madison explained, since "the people were in fact, the fountain of all power," their participation legitimated both the Constitution they ratified and the laws of the Congress they elected. 2 *The Records of the Federal Convention of 1787*, at 476 (M. Farrand ed., 1911) [hereinafter *Farrand's Records*]; James Madison, *Notes on a Speech to Congress* (1787) ("[I]n Elective Govt., all power in people."). It was therefore imperative, as John Adams recognized, that any democratic assembly must be "an exact Portrait, in Miniature, of the People at large" to ensure it represents "equal Interests among the People." 3 John Adams, *The Adams Papers* 80 (Robert J. Taylor ed., 1979); *see also* 5 Alexander Hamilton, *The Papers of Alexander Hamilton* 36 (Harold C. Syrett ed., 1962). For "the people," explained Thomas Jefferson, "will not acknowledge as laws any acts not considered and assented to by the major part of their delegates." Thomas Jefferson, *Notes on the State of Virginia* 131 (Boston, Lilly & Wait 1832). The founders consistently viewed participation in democratic governance as limited to American citizens, whom they referred to collectively as "the people."
>
> To limit "the people" who engaged in self-government, the founders sharply distinguished between American citizens and "aliens," who were subjects of foreign sovereigns. The clearest articulation of this view appeared in George Washington's Farewell Address, jointly authored by Washington, James Madison, and Alexander Hamilton. The Address started from the premise that "[t]he basis of our political systems is the right of the people to make and to alter their constitutions of government." George Washington, *Farewell Address* 11 (U.S. Senate Hist. Off. 2017) (1796). "[U]ntil changed by an explicit and authentic act of the whole

4

people," the Address continued, that Constitution was "sacredly obligatory upon all." *Id.* But constitutional government—a "blessing" of "a free people"—faced external threat from "the insidious wiles of foreign influence." *Id.* at 4, 20. The "great rule of conduct" for the young republic was "hav[ing] with [foreign nations] as little *political* connection as possible," precisely because their "influence [wa]s one of the most baneful foes of republican government." *Id.* at 20-21. Only "[i]f we remain one people" could we hope to "defy material injury from external [i.e., foreign] annoyance." *Id.* at 21-22. As the Address underscored, the founders believed democratic governance necessitated a strict division between citizens and aliens. Far from entitling aliens to constitutional rights, foreign "political connection[s]" posed a grave threat to the security and stability of "the people."

Thomas Jefferson shared his predecessor's views. Like Washington, Jefferson worried that "civil government" based on the "freest principles" could not persist in a state that permitted foreigners to arrive and immediately gain "all the rights of citizenship." Jefferson, *supra*, at 91. He therefore insisted on a strict distinction between citizens and aliens: "A foreigner" did not "acquir[e] every right of a native citizen" until he was naturalized, the culmination of a formal process that required both residency and an oath of allegiance. *Id.* at 90-91, 140; *see also id.* at 143. Before then, Jefferson stressed that aliens were barred from conveying property, bringing suits for money damages in courts, and engaging in the political process. *Id.* at 162-63. Consequently, as he observed, one of the primary political priorities of certain state governments, including Virginia's, was "defin[ing] with precision the rules whereby aliens should become citizens." *Id.* at 143. To preserve democratic government, Jefferson advocated for a rigid division between "citizens," who had civic and political rights, and "aliens," who did not.

The Federalist Papers employed similar vocabulary to link "the people" to consent-based government. As the dedication page announces, the Federalist Papers were written "To the People of the state of New-York." The Federalist No. 1, at 1 (Alexander Hamilton) (Clinton Rossiter ed., 1961). The intended audience, then, was "the People" who would ultimately vote for or against the Constitution. This usage didn't stop at the front matter. Madison, for example, wrote in Federalist No. 46 that "[t]he federal and State governments are in fact but different agents and trustees of the people." The Federalist No. 46, at 294 (James Madison). And in Federalist No. 57, he emphasized "the right and the capacity of the people to choose their own rulers." The Federalist No. 57, at 353 (James Madison). Not to be outdone, Hamilton echoed Madison's word choice in Federalist No. 22, arguing that "[t]he fabric of American empire ought to rest on the solid basis of THE CONSENT OF THE  PEOPLE . . . that pure, original fountain of all legitimate authority." The Federalist No. 22, at 152 (Alexander Hamilton) (emphasis in original). So Madison and Hamilton, like their contemporaries, believed "the people" were the citizens who consented to their government, not foreigners without a say in the process.

. . .

5

As the Massachusetts high court explained, "the people, in making the constitution, intended that the supreme power of legislation should not be delegated, but by citizens." *In re Opinion of Justs.*, 7 Mass. 523, 525 (1811). Absent a clear statement from "the people," political rights are automatically "restrained to such inhabitants and residents as are *citizens*." *Id.*

*United States v. Escobar-Temal*, 161 F.4th 969, 989-90, 992-93 (6th Cir. 2025) (Thapar, J.,

concurring).

In short, limiting the electorate in each State solely to U.S. citizens is a prerequisite to

preserving a republican form of government and maintaining public confidence in elections.

**II.      In his executive order, the President exercised his constitutional authority and obligation to guarantee to every State a republican form of government.**

In Executive Order 14399, *Ensuring Citizenship Verification and Integrity in Federal*

*Elections*, 91 Fed. Reg. 17125 (Mar. 31, 2026), President Trump directed agencies to compile a

list of U.S. citizens who reside in each State (State Citizenship List) and transmit that list to the

chief election official in each State prior to each federal election. *Id.*. Plaintiffs wrongly claim

that the President has no authority to direct his executive subordinates to compile and transmit

State Citizenship Lists. *See LWVMA v. Trump*, No. 1:26-cv-11549, ECF No. 1 at ¶¶ 5-6; *State of*

*California v. Trump*, No. 1:26-cv-11581, ECF No. 65 at ¶ 154.

On the contrary, the Constitution charges the United States government, including the

President, with the power and duty to "guarantee to every State in this Union a Republican Form

of Government …." U.S. Const., Art. IV, § 4 (the "Guarantee Clause"). The President is a

principal component of that government, since "executive Power shall be vested in a President of

the United States of America." U.S. Const. Art. II, § 1, cl. 1.

In Executive Order 14399, President Trump invoked his authority and obligation under

the Guarantee Clause, and his order is an exercise of that authority and obligation. Compiling

and transmitting a State Citizenship List to all States provides them with a powerful tool to limit

the electorate solely to U.S. citizens and thereby uphold the right to citizen self-government. As shown above, the maintenance of that right is essential to a republican form of government. Notably, nothing in Executive Order 14399 requires the States to take any specific action with respect to the State Citizenship Lists. Accordingly, nothing in the order impinges on Congress's or the States' authority to regulate federal elections. Instead, it merely orders the provision of information that would be instrumental in protecting the right to citizen self-government, and thus is an exercise of the President's authority and obligation to guarantee to States a republican form of government.

### III. Neither the President's nor his subordinates' actions taken at his behest are judicially reviewable.

The President's order is unreviewable for a number of reasons. First, actions under the Guarantee Clause raise nonjusticiable political questions. Second, courts may not enjoin the President. Third, presidential actions—which include actions of subordinates taken pursuant to an order by the President given under his constitutional authority—are unreviewable under the APA.

The Court cannot review the President's judgment that State Citizenship Lists will protect the exclusive right of citizens of the United States to vote in federal elections and therefore safeguard a republican form of government to the States. Indeed, the question of what measures the President (or Congress) may take in order to guarantee to each State a republican form of government is a nonjusticiable political question committed by the Constitution to the political branches.

In *Baker v. Carr*, the Supreme Court set forth the political question standard as follows:

> It is apparent that several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the surface of any case held to involve a political question is

7

> found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. 186, 217 (1962).

Under this standard, the question of whether the President may compile and transmit State Citizenship Lists to the various States in order to ensure each of them a republican form of government is nonjusticiable and committed to the political branches of the federal government by the Constitution. *See, e.g.*, *New York v. United States*, 505 U.S. 144, 184 (1992) ("In most of the cases in which the Court has been asked to apply the [Guarantee] Clause, the Court has found the claims presented to be nonjusticiable under the 'political question' doctrine.") (citations omitted).

But even assuming that the President's actions under the Guarantee Clause were justiciable, *see id.* at 186 (indulging the assumption that the Guarantee Clause provides a justiciable question), the identification of U.S. citizens who reside in each State is reasonably related to the President's duty to guarantee a republican form of government in each State. Transmitting to the various States a list of U.S. citizens who reside in each State provides them with a tool to help ensure that the electorate is limited only to such citizens, a prerequisite to ensuring a republican form of government.

In any event, courts may not "enjoin the President in the performance of his official duties." *Franklin v. Massachusetts*, 505 U.S. 788, 802-03 (1992). The President's immunity from injunction serves a critical role: ensuring that the President is protected in carrying out his constitutional responsibilities. Allowing courts to enjoin the President would turn the judiciary

8

into a branch that micromanages the Executive. *See e.g. Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 114 (1948) (holding that it is improper for courts effectively to issue "advisory opinions" to the President); *Mississippi v. Johnson*, 71 U.S. 475, 499 (1867) (warning that attempts by the judiciary to "enforce the performance" of the President's duties is "an absurd and excessive extravagance"). To permit judicial review of a President's discretion would invade his executive authority. *United States v. George S. Bush & Co.*, 310 U.S. 371, 379-80 (1940). Thus, where the Constitution delegates a power to the President, judicial review is not available. And the President may not be compelled to perform his responsibilities as others see fit applies equally when individuals challenge the unconstitutionality of an executive action. *Mississippi*, 71 U.S. at 499 ("It is true that in the instance before us the interposition of the court is not sought to enforce action by the Executive under constitutional legislation, but to restrain such action under legislation alleged to be unconstitutional. But we are unable to perceive that this circumstance takes the case out of the general principles which forbid judicial interference with the exercise of Executive discretion.").

The Plaintiffs also claim that the Executive Order violates the APA. But the APA applies only to agencies. *E.g. Lincoln v. Vigil*, 508 U.S. 182, 190-92 (1993), *Webster v. Doe*, 486 U.S. 592, 599 (1988) (holding that the APA applies only to a "final agency action"). The President is not an agency, and thus the APA does not apply to him or his actions. *Franklin*, 505 U.S. at 796 ("We hold that the final action complained of is that of the President, and the President is not an agency within the meaning of the Act. Accordingly, there is no final agency action that may be reviewed under the APA standards."); *Am. Foreign Serv. Ass'n v. Trump*, 2025 U.S. App. LEXIS 15297, *4-5 (D.C. Cir. 2025). *See also Franklin*, 505 U.S. at 800-801 (determining that although the "President is not explicitly excluded from the APA's purview" nor "explicitly included,"

"[o]ut of respect for the separation of powers and the unique constitutional position of the President, we find that textual silence is not enough to subject the President to the provisions of the APA"); *Tulare Cty. v. Bush*, 185 F. Supp. 2d 18, 28 (D.D.C. 2001) ("A court has subject-matter jurisdiction to review an agency action under the APA only when a final agency action exists. Because the President is not a federal agency within the meaning of the APA, presidential actions are not subject to review pursuant to the APA.") (citations omitted).

The same unreviewability attaches to the actions of his subordinates here. Whether an action is that of the President or the head of an agency, for purposes of APA reviewability, hinges not on whether agency personnel help perform a given action, but on whether the authority to take that action is, on the one hand, statutorily or constitutionally entrusted to the President or, on the other, delegated by Congress to an agency. *See*, *a fortiori*, *Dalton v. Specter*, 511 U.S. 462, 477 (1994) ("Where a statute … commits decisionmaking to the discretion of the President, judicial review of the President's decision is not available."). As the United States District Court for the District of Columbia has explained:

> [A]n unreviewable presidential action must involve the exercise of discretionary authority vested in the President; an agency acting on behalf of the President is not sufficient by itself. Since the Constitution vests the powers of the Executive Branch in one unitary chief executive officer, *i.e.*, the President, an agency always acts on behalf of the President. Nonetheless, there is a difference between actions involving discretionary authority delegated by Congress to the President and actions involving authority delegated by Congress to an agency. Courts lack jurisdiction to review an APA challenge in the former circumstances, regardless of whether the President or the agency takes the final action. However, "[w]hen the challenge is to an action delegated to an agency head but directed by the President, a different situation obtains: then, the President effectively has stepped into the shoes of an agency head, and the review provisions usually applicable to that agency's action should govern." Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2351 (2001).

*Detroit Int'l Bridge Co. v. Gov't of Can.,* 189 F. Supp. 3d 85, 104 (D.D.C. 2016).

10

Here, the President issued his executive order under his constitutional authority to guarantee to the States a republican form of government. Thus, his subordinates' actions carrying it out are presidential actions unreviewable under the APA.

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss should be granted.

Dated:  May 12, 2026

Respectfully submitted,

/s/ Matthew James O'Brien
MATTHEW JAMES O'BRIEN
Federation for American Immigration Reform
25 Massachusetts Ave., NW, Ste 330
Washington, DC 20001
(202) 328-7004
obrien@fairus.org

*Counsel for Amicus Curiae*
Federation for American Immigration Reform

11

**CERTIFICATE OF COMPLIANCE**

Counsel for *amicus curiae* certifies that this Brief complies with the length and formatting requirements applicable to memoranda filed in support of or opposition to motions in this Court, including Local Rule 7.1(b)(4) and Judge Talwani's Standing Order Regarding Motion Practice. Counsel further certifies that all text, including footnotes, is in at least 12-point font, and that the tables of contents and authorities are not counted toward the page limit.

Counsel further certifies that any memorandum exceeding ten pages includes a table of contents and a table of authorities, consistent with Judge Talwani's Standing Order Regarding Motion Practice.

/s/ Matthew James O'Brien

**CERTIFICATE OF SERVICE**

I hereby certify that on May 12, 2026, I electronically filed the foregoing Brief of *Amicus Curiae* with the Clerk of Court for the United States District Court for the District of Massachusetts by using the CM/ECF system. Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.

/s/ Matthew James O'Brien