**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| STATE OF CALIFORNIA, et al.,<br><br>                    *Plaintiffs,*<br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, et al.,<br><br>                    *Defendants.* | Case No. 1:26-cv-11581-IT |

**PLAINTIFF STATES' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND REPLY IN SUPPORT OF PLAINTIFF STATES' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**Page**

Introduction ...................................................................................................1

Argument ......................................................................................................1

    I.      Plaintiff States' Claims Are Justiciable ............................................1

          A.      Plaintiff States Have Established Article III Standing........................2

          B.      Plaintiff States' Claims Are Ripe.......................................................9

    II.     The EO Is Judicially Reviewable.................................................13

          A.      Plaintiff States Have a Non-Statutory Cause of Action to Challenge the EO ................................................................................13

          B.      This Court May Properly Review Section 2(b)'s Threats of Prosecution...................................................................................15

    III.    The Challenged Provisions Violate the Constitution....................17

          A.      Section 2 Is Unconstitutional .............................................................18

                1.      Neither the Constitution Nor Any Statute Authorizes Section 2(a) ..............................................................................19

                2.      Section 2(b)'s Threats of Prosecution Are Legally Baseless and Unconstitutionally Coercive ...........................21

          B.      Section 3 Is Unconstitutional .............................................................23

                1.      The EO's New Restrictions on Mail Voting Are Unconstitutional.....................................................................23

                2.      The EO's New Ballot Mail Design Mandates Are Unconstitutional.....................................................................25

          C.      Section 5 Is Similarly Unconstitutional ...........................................26

    IV.    Plaintiff States Are Entitled to the Relief Sought .......................27

    V.     The Court Should Not Require an Injunction Bond ....................29

    VI.    The Court Should Not Dismiss Any Defendants ........................30

Conclusion ..................................................................................................30

# TABLE OF AUTHORITIES

**Page**

CASES

*Abbott v. Perez*
    585 U.S. 579 (2018)..................................................................................................8, 28

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*
    458 U.S. 592 (1982)..................................................................................................2, 5, 8

*Am. Fed'n of Gov't Emps. v. Trump*
    782 F. Supp. 3d 793 (N.D. Cal. 2025) ........................................................................11

*Arizona v. Inter Tribal Council of Arizona, Inc.*
    570 U.S. 1 (2013)......................................................................................................23, 24

*Armstrong v. Exceptional Child Ctr., Inc.*
    575 U.S. 320 (2015)........................................................................................................15

*Bldg. & Const. Trades Dep't v. Allbaugh*
    295 F.3d 28 (D.C. Cir. 2002)........................................................................................20

*Blum v. Holder*
    744 F.3d 790 (1st Cir. 2014)..........................................................................................22

*Bost v. Ill. State Bd. of Elections*
    607 U.S. 71 (2026)............................................................................................................2

*California v. Trump*
    786 F. Supp. 3d 359 (D. Mass. 2025) .................................................................. *passim*

*California v. Trump*
    805 F. Supp. 3d 387 (D. Mass. 2025) ........................................................................9, 14

*Campanale & Sons, Inc. v. Evans*
    311 F.3d 109 (1st Cir. 2002)..........................................................................................26

*Chardon-Dubos v. Biden*
    2024 WL 4373386 (D.P.R. Sept. 1, 2024)....................................................................12

*Citizens for Resp. & Ethics in Wash. v. Fed. Election Comm'n*
    993 F.3d 880 (D.C. Cir. 2021)......................................................................................16

*City & Cnty. of S.F. v. Trump*
    897 F.3d 1225 (9th Cir. 2018) ...................................................................................4, 14

*City of Chelsea v. Trump*
    802 F. Supp. 3d 289 (D. Mass. 2025) ..........................................................................12

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*City of Providence v. Barr*
   954 F.3d 23 (1st Cir. 2020)................................................................................19

*Clinton v. New York*
   524 U.S. 417 (1998).........................................................................................29

*CoxCom, Inc. v. Chaffee*
   536 F.3d 101 (1st Cir. 2008).............................................................................27

*Ctr. for Democracy & Tech. v. Trump*
   507 F. Supp. 3d 213 (D.D.C. 2020)..................................................................12

*Defs. of Wildlife v. Perciasepe*
   714 F.3d 1317 (D.C. Cir. 2013)........................................................................12

*Dem. Nat'l Comm. v. Wis. State Legislature*
   141 S. Ct. 28 (2020)...........................................................................................4

*Dep't of Navy v. Egan*
   484 U.S. 518 (1988).........................................................................................20

*Doe v. Trump*
   157 F.4th 36 (1st Cir. 2025).......................................................................14, 28

*Doe v. Trump*
   766 F. Supp. 3d 266 (D. Mass. 2025) ..............................................................27

*Drake v. FAA*
   291 F.3d 59 (D.C. Cir. 2002) ...........................................................................16

*Duke Power Co. v. Carolina Env't Study Grp.*
   438 U.S. 59 (1978).............................................................................................9

*El-Ganayni v. U.S. Dep't of Energy*
   591 F.3d 176 (3d Cir. 2010)...............................................................................3

*FDA v. Wages & White Lion Invs., LLC*
   604 U.S. 542 (2025).........................................................................................18

*First Choice Women's Res. Ctrs., Inc. v. Davenport*
   608 U.S. __, 2026 WL 1153029 (Apr. 29, 2026) .............................................2

*Fish v. Kobach*
   840 F.3d 710 (10th Cir. 2016) .........................................................................29

*Foisie v. Worcester Polytechnic Inst.*
   967 F.3d 27 (1st Cir. 2020)................................................................................2

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Franklin v. Massachusetts*
  505 U.S. 788 (1992)......................................................................................14, 15, 29

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*
  561 U.S. 477 (2010)....................................................................................14, 21, 23, 24

*Georgia v. Meadows*
  88 F.4th 1331 (11th Cir. 2023) ...................................................................................19

*Heckler v. Chaney*
  470 US. 821 (1985).......................................................................................................16, 25

*HIAS, Inc. v. Trump*
  985 F.3d 309 (4th Cir. 2021) .......................................................................................4

*Holder v. Humanitarian Law Project*
  561 U.S. 1 (2010).........................................................................................................22

*In re Admin. Subpoena No. 25-1431-019*
  800 F. Supp. 3d 229 (D. Mass. 2025) .........................................................................23

*In re Grand Jury Subpoenas*
  ___ F. Supp. 3d ___, 2026 WL 710202 (D.D.C. Mar. 13, 2026) .................................23

*Ex parte Jackson*
  96 U.S. 727 (1877).......................................................................................................24

*Jensen v. R.I. Cannabis Control Comm'n*
  160 F.4th 18 (1st Cir. 2025)......................................................................................3, 11

*Kansas v. United States*
  249 F.3d 1213 (10th Cir. 2001) ..................................................................................27

*La. Pub. Serv. Comm'n v. FCC*
  476 U.S. 355 (1986)....................................................................................................19

*League of United Latin Am. Citizens v. Exec. Off. of the President*
  ___ F. Supp. 3d ___, 2026 WL 252420 (D.D.C. Jan. 30, 2026) .................14, 15, 20, 21

*League of United Latin Am. Citizens v. Exec. Off. of the President*
  780 F. Supp. 3d 135 (D.D.C. 2025)............................................................12, 13, 18, 30

*Lincoln v. Vigil*
  508 U.S. 182 (1993)......................................................................................................16

*Long Island Care at Home, Ltd. v. Coke*
  551 U.S. 158 (2007).....................................................................................................13

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Louisiana v. Biden*
55 F.4th 1017 (5th Cir. 2022) ............................................................................2

*Louisiana v. Biden*
622 F. Supp. 3d 267 (W.D. La. 2022)..............................................................4

*Lujan v. Defs. of Wildlife*
504 U.S. 555 (1992)..........................................................................................26

*Mail Ord. Ass'n of Am. v. USPS*
986 F.2d 509 (D.C. Cir. 1993)........................................................................26

*Marin Audubon Soc'y v. FAA*
121 F.4th 902 (D.C. Cir. 2024)......................................................................25

*Maryland v. King*
567 U.S. 1301 (2012)..................................................................................27, 29

*Massachusetts v. U.S. Dep't of Health and Hum. Servs.*
923 F.3d 209 (1st Cir. 2019)............................................................................2

*Medellín v. Texas*
552 U.S. 491 (2008)..........................................................................................17

*Mille Lacs Band of Chippewa Indians v. Minnesota*
124 F.3d 904 (8th Cir. 1997) ..........................................................................14

*Minnesota v. Mille Lacs Band of Chippewa Indians*
526 U.S. 172 (1999)..........................................................................................14

*Missouri v. Biden*
662 F. Supp. 3d 626 (W.D. La. 2023).............................................................29

*Morales v. Trans World Airlines, Inc.*
504 U.S. 374 (1992)..........................................................................................28

*Murphy Co. v. Biden*
65 F.4th 1122 (9th Cir. 2023) ....................................................................14, 29

*Myers v. United States*
272 U.S. 52 (1926)............................................................................................20

*N.H. Lottery Comm'n v. Rosen*
986 F.3d 38 (1st Cir. 2021)........................................................................16, 17

*N.H. Right to Life Pol. Action Comm. v. Garner*
99 F.3d 8 (1st Cir. 1996).................................................................................28

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Nat'l Ass'n of Gov't Emps., Inc. v. Yellen*
120 F.4th 904 (1st Cir. 2024)..................................................................5

*Nat'l Fed'n of Indep. Bus. v. OSHA*
595 U.S. 109 (2022)..............................................................................25

*Nat'l Urb. League v. Trump*
783 F. Supp. 3d 61 (D.D.C. 2025)..................................................6, 11, 12

*Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*
407 F. Supp. 2d 323 (D. Mass. 2005)....................................................28

*New York v. McMahon*
784 F. Supp. 3d 311 (D. Mass. 2025).....................................................30

*New York v. Trump*
133 F.4th 51 (1st Cir. 2025)........................................................4, 10, 11, 18

*Newdow v. Roberts*
603 F.3d 1002 (D.C. Cir. 2010)...............................................................29

*Nixon v. Adm'r of Gen. Servs.*
433 U.S. 425 (1977)...............................................................................20

*Nuclear Regulatory Commission v. Texas*
605 U.S. 665 (2025)...............................................................................15

*O'Connell v. Shalala*
79 F.3d 170 (1st Cir. 1996).....................................................................13

*Obama for Am. v. Husted*
697 F.3d 423 (6th Cir. 2012) ..................................................................28

*Pacito v. Trump*
797 F. Supp. 3d 1227 (W.D. Wash. 2025)................................................29

*Pineda v. Skinner Servs., Inc.*
22 F.4th 47 (1st Cir. 2021)......................................................................30

*Platte River Whooping Crane Critical Habitat Maint. Tr. v. FERC*
962 F.2d 27 (D.C. Cir. 1992)....................................................................5

*President & Fellows of Harvard College v. HHS*
798 F. Supp. 3d 77 (D. Mass. 2025) .......................................................15

*Printz v. United States*
521 U.S. 898 (1997)..........................................................................22, 26

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Purcell v. Gonzalez*
    549 U.S. 1 (2006)..................................................................................................2, 28

*R.I. Ass'n of Realtors, Inc. v. Whitehouse*
    199 F.3d 26 (1st Cir. 1999)...............................................................................2, 6, 10

*Reddy v. Foster*
    845 F.3d 493 (1st Cir. 2017).....................................................................................9

*Rhode Island v Trump*
    781 F. Supp. 3d 25 (D.R.I. 2025) ...........................................................................20

*Rhode Island v. Trump*
    810 F. Supp. 3d 283 (D.R.I. 2025)..........................................................................15

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*
    102 F.3d 12 (1st Cir. 1996)......................................................................................28

*Sanchez ex rel. D.R.-S. v. United States*
    671 F.3d 86 (1st Cir. 2012).......................................................................................6

*Sec'y of Lab. v. Twentymile Coal Co.*
    456 F.3d 151 (D.C. Cir. 2006)................................................................................16

*Sierra Club v. Costle*
    657 F.2d 298 (D.C. Cir. 1981).................................................................................20

*Sierra Club v. Trump*
    929 F.3d 670 (9th Cir. 2019) ..................................................................................29

*Smith v. Meese*
    821 F.2d 1484 (11th Cir. 1987) ..............................................................................17

*Stone v. Trump*
    400 F. Supp. 3d 317 (D. Md. 2019)........................................................................29

*Susan B. Anthony List v. Driehaus*
    573 U.S. 149 (2014)........................................................................................2, 5, 16

*Susman Godfrey LLP v. Exec. Off. of the President*
    789 F. Supp. 3d 15 (D.D.C. 2025)...........................................................................13

*Tex. & Pac. Ry. Co. v. Abilene Cotton Co.*
    204 U.S. 426 (1907)..................................................................................................4

*Texas v. Equal Emp. Opportunity Comm'n*
    2022 WL 22869778 (N.D. Tex. May 26, 2022) .......................................................11

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Texas v. United States*
523 U.S. 296 (1998)..........................................................................................9

*Trump v. American Federation of Government Employees*
606 U.S. ___, 145 S. Ct. 2635 (2025).........................................................10, 11

*Trump v. New York*
592 U.S. 125 (2020).....................................................................................10, 11

*United States v. Armstrong*
517 U.S. 456 (1996)........................................................................................17

*United States v. Classic*
313 U.S. 299 (1941)........................................................................................21

*United States v. Texas*
599 U.S. 670 (2023)........................................................................................16

*USPS v. Council of Greenburgh Civic Ass'ns*
453 U.S. 114 (1981)........................................................................................15

*USPS v. Flamingo Indus. (USA) Ltd.*
540 U.S. 736 (2004)........................................................................................26

*Virginia v. Am. Bookseller's Ass'n, Inc.*
484 U.S. 383 (1988)........................................................................................17

*Washington v. Trump*
814 F. Supp. 3d 1173 (W.D. Wash. 2026).........................................10, 12, 15

*Youngstown Sheet & Tube Co. v. Sawyer*
343 U.S. 579 (1952).................................................................................. *passim*

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I
§ 4, cl. 1......................................................................................................20
§ 8, cl. 7......................................................................................................25

U.S. Const. art. II
§ 1, cl. 2......................................................................................................20

U.S. Const. art. III..............................................................................................2, 3

**TABLE OF AUTHORITIES**
**(continued)**

Page

FEDERAL STATUTES

39 U.S.C.
    § 201................................................................................................................26
    § 401(2)...........................................................................................................23
    § 502(a)...........................................................................................................26
    § 3661.............................................................................................................23
    § 3661(b).........................................................................................................26
    § 3661(c).........................................................................................................26

52 U.S.C.
    § 20502...........................................................................................................21
    § 20503(a).......................................................................................................19
    § 20507...........................................................................................................24
    § 20509...........................................................................................................24
    § 20701...........................................................................................................21
    § 21083...........................................................................................................24
    § 21083(a)(1)(A)............................................................................................19
    § 21085...........................................................................................................24
    § 30101(1)(A).................................................................................................21
    § 30101(1)(C).................................................................................................21
    § 30101(1)(D).................................................................................................21

REGULATORY MATERIALS

39 C.F.R. § 111.3(b)–(e) (2020) ...............................................................................26

90 Fed. Reg. 9669 (Feb. 11, 2025) ...........................................................................11

Executive Order No. 14399, *Ensuring Citizenship Verification and Integrity
    in Federal Elections* ............................................................................ *passim*

COURT RULES

Fed. R. Civ. P. 65(c) .................................................................................................30

L.R. 56.1 .....................................................................................................................3

OTHER AUTHORITIES

H.R. Rep. No. 91-1104 (1970) (Conf. Rep.), as reprinted in 1970
    U.S.C.C.A.N. 3649 ...........................................................................................26

## INTRODUCTION

Defendants' latest filing is most notable for what it does not include.  Neglecting much of Plaintiffs' motion, Defendants tellingly make almost no attempt to defend Executive Order No. 14399 ("EO") on its merits.  Instead, Defendants primarily claim that the EO is too uncertain for judicial review, resisting what the EO plainly says: that particular agencies must take specific actions on a fixed timeline.  The EO is already causing Plaintiff States concrete harms that will only grow as States continue administering the midterm elections.  Defendants do not meaningfully contest those harms or any other facts that Plaintiff States have proffered.  Whether the President's unprecedented and damaging order is constitutional is a pure question of law that the Court can and should resolve now.  Indeed, longstanding principles establish that Plaintiff States' constitutional claims are properly before the Court.

What little Defendants offer on the merits fails to identify any constitutional or statutory authority for the EO's challenged provisions, as there are none.  Section 2 attempts to assert control over States' voter rolls by creating federal voter eligibility lists—with no statutory basis—and improperly threatening States' elections officials with criminal prosecution if they provide ballots to voters excluded from those lists; Section 3 supplants Plaintiff States' mail voting systems with a United States Postal Service-administered system, in violation of that agency's governing statutes and State and congressional authority; and Section 5 extends elections-related document preservation requirements despite conflicting state and federal law.

These provisions far exceed the President's authority, invade States' and Congress's constitutional power, and unlawfully commandeer Plaintiff States to implement presidential policy.  The Court should deny Defendants' motion and permanently enjoin these provisions.

## ARGUMENT

### I.    PLAINTIFF STATES' CLAIMS ARE JUSTICIABLE

Defendants contend that this Court lacks jurisdiction to hear Plaintiff States' challenges to the EO.  Defs. Mtn. and Opp., Doc. No. 157 at 18–27, 39–41, 42, 54.  They argue that Plaintiff

1

States have neither alleged nor established Article III standing, and that the harms articulated by Plaintiff States are speculative and unripe. *Id.* Defendants are wrong on both counts.

**A.  Plaintiff States Have Established Article III Standing**

Standing exists if a plaintiff demonstrates (1) an injury in fact, that is (2) fairly traceable to the defendant's conduct, and (3) redressable by a favorable judicial decision. *Foisie v. Worcester Polytechnic Inst.*, 967 F.3d 27, 35 (1st Cir. 2020). A threatened injury confers standing when it "is 'certainly impending' or there is a 'substantial risk' that [it] will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("*SBA List*") (citation omitted).

Plaintiff States have established that the EO is causing them ongoing and imminently threatened harms, including (1) harm to their sovereign and constitutional power "to create and enforce a legal code" governing voter registration, voter roll maintenance, the provision of ballots, and mail voting, *see Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982); Pltfs. Statement of Undisputed Material Facts ("PSUF"), Doc. No. 105 at 2–5, 6–8, 9, 18–20, 23–24, 27–28, 36–39 ¶¶ 6–11, 12–13, 14, 31–35, 40, 45–46, 58–59, 60 (demonstrating that implementation of the EO will countermand and disrupt administration of state election laws); (2) fiscal injury stemming from preparing and implementing plans to address the EO, analyzing and updating the EO's voter lists, training elections officials, educating voters, changing ballot mail, and preserving documents for years longer than currently required, all of which will divert resources from other elections work, *see Massachusetts v. U.S. Dep't of Health and Hum. Servs.*, 923 F.3d 209, 221–223 (1st Cir. 2019); *Louisiana v. Biden*, 55 F.4th 1017, 1033–34 (5th Cir. 2022); Doc. No. 105 at 11–18, 22, 26–27, 28–32, 33–35, 39, 40–43 ¶¶ 22–30, 38, 44, 47–51, 53–57, 63, 66–69; (3) credible threats of criminal investigation and prosecution of state and local elections officials, *see R.I. Ass'n of Realtors, Inc. v. Whitehouse*, 199 F.3d 26, 30–31 (1st Cir. 1999); *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 608 U.S. __, 2026 WL 1153029, *9 (Apr. 29, 2026); Doc. No. 105 at 18–19, 21–23 ¶¶ 31–32, 36–38; and (4) damage to Plaintiff States' reputation as stewards of elections, *see Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 78 (2026); *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam); Doc.

2

No. 105 at 15–16, 18, 22–23, 36–37 ¶¶ 28, 31, 39, 58–59.  Plaintiff States also adequately alleged these harms in their First Amended Complaint.  *See* Doc. No. 65 at 34–36.

Defendants do not contest that any of these harms are cognizable Article III injuries.  Nor do they identify any factual dispute about the work that Plaintiff States will have to undertake to address the EO, the burdens of those tasks, or their interference with election administration. Defendants also expressly concede that they do not dispute a host of facts that support these harms, including Plaintiff States' ongoing administration of federal elections, Defs. Response to PSUF, Doc. No. 155 at 2 ¶¶ 6–9, the history of errors in federal citizenship verification, *id.* at 3 ¶¶ 15–18, constant changes to voter eligibility due to relocations and naturalizations, *id.* at 3–4 ¶¶ 19–21, and the scale of mail voting in Plaintiff States, *id.* at 7 ¶¶ 41–43.[1]

Instead, Defendants solely attempt to dispute whether the EO will be carried out according to its terms.  Doc. No. 155 at 3–10 ¶¶ 22–32, 36–37, 44–59, 63–69.[2]  But the EO leaves no doubt on that score, directing specific actions on definite timelines and in unmistakably mandatory language.  EO §§ 2–5; *see Jensen v. R.I. Cannabis Control Comm'n*, 160 F.4th 18, 24–25 (1st Cir. 2025) ("The fact that the Commission had not yet promulgated final rules and regulations implementing the[] challenged provisions did not mean that the eventual promulgation was an uncertain or contingent event.").  The preamble of the EO announces that these definite provisions are "hereby ordered," thus immediately delegating authority to federal agencies to carry out its mandates, *see El-Ganayni v. U.S. Dep't of Energy*, 591 F.3d 176, 190 n.9 (3d Cir. 2010), and requiring them to do so, *see* Doc. No. 157 at 35 ("[I]f an executive agency . . . may lawfully implement the Executive Order, then it must do so."  (citation omitted)).  That federal

---

[1] Defendants decline to address several facts describing Plaintiff States' existing election practices and procedures by characterizing those facts as "legal conclusions."  Doc. No. 155 at 3 ¶¶ 11–14, 34, 40.  But whether characterized as a matter of law or fact, Defendants nowhere contest these uncontroversial propositions relating to the fluidity of voter rolls up to and on Election Day, Doc. No. 105 at 6–9 ¶¶ 12–14; Plaintiff States' verification of voter eligibility at registration, *id.* 6, ¶ 11; authorization in Qualifications States for certain 17-year-olds to vote in federal primary elections if the voter will be 18 years old by the next federal general election, *id.* at 9, 19–20 ¶¶ 14, 34; and Plaintiff States' mail voting programs, *id.* at 23–24 ¶ 40.

[2] These replies are unresponsive to the facts as stated.  This leaves the facts uncontroverted, and they should be deemed admitted under L.R. 56.1.

3

agencies are still deliberating about the EO does not neutralize its mandatory language or leave uncertainty about its impacts.  Mayhew Decl., Doc. No. 156-1 at 2 ¶ 5; MacBride Decl., Doc. No. 156-2 at 2 ¶ 5; Montieth Decl., Doc. No. 156-3 at 2 ¶ 3.  Rather, as discussed below, Defendants' declarations only show that those agencies are endeavoring to implement the EO.

Defendants' citation to the saving clause and related language in the EO also does not cast doubt on the EO's implementation or the resulting harms.  "The Supreme Court has long rejected interpretations of sweeping saving clauses that prove absolutely inconsistent with the provisions of the act in which they are found."  *California v. Trump*, 786 F. Supp. 3d 359, 381 (D. Mass. 2025) ("*California I*") (quotations omitted).  That is, the EO "'cannot be held to destroy itself' through a saving clause."  *Id.* at 382 (quoting *Tex. & Pac. Ry. Co. v. Abilene Cotton Co.*, 204 U.S. 426, 446 (1907)).  Courts routinely reject similar attempts "to immunize" executive orders from review based on saving clauses that "would nullify the 'clear and specific' substantive provisions" of the order.  *HIAS, Inc. v. Trump*, 985 F.3d 309, 325 (4th Cir. 2021) (quoting *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1239 (9th Cir. 2018)); *see also New York v. Trump*, 133 F.4th 51, 69–70 (1st Cir. 2025); *Louisiana v. Biden*, 622 F. Supp. 3d 267, 289–290 (W.D. La. 2022).  Defendants' argument that federal agencies may yet determine that they cannot lawfully implement the EO, *see, e.g.*, Doc. No. 157 at 20, impermissibly reads the EO as "destroy[ing] itself" through a saving clause.  *See California I*, 786 F. Supp. 3d at 381–382.

The EO's specific and mandatory directives are causing injury *now*, exacerbated by the ongoing work of administering fast-approaching elections.  *See, e.g.*, Doc. No. 105 at 4, 17–18, 35–36 ¶¶ 8, 30, 56–57; Rosenberg Decl., Doc. No. 100-7 at 13 ¶ 26 ("The six months preceding an election is a time-consuming period of high pressure and not one that seasoned election administrators ever chose to make major changes to the election process."); Holmes Decl., Doc. No. 100-4 at 18 ¶ 43 ("many questions from confused voters" about the EO are "already making it harder to fulfill" election responsibilities); Doc. No. 155 at 2 ¶¶ 6–7; *see also Dem. Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring).  Further injuries from the EO's implementation are imminent.  *See, e.g.*, Doc. No. 105 at 11–18, 26, 28–

34, 35–36 ¶¶ 22–28, 30, 44, 47, 49–55, 57; Lean Decl., Doc. No. 100-1 at 6, 15 ¶¶ 17, 40

(planning to review EO's voter lists must begin "as soon as possible").[3]  These injuries

distinguish the cases Defendants cite, which turn on anticipated future harms deemed far too

speculative, such as harms that would only materialize if the federal government defaulted on its

debt, *cf. Nat'l Ass'n of Gov't Emps., Inc. v. Yellen*, 120 F.4th 904, 910 (1st Cir. 2024), and even

circumstances under which litigants "concede[] that [they] currently suffer[] no hardship," *Platte

River Whooping Crane Critical Habitat Maint. Tr. v. FERC*, 962 F.2d 27, 35 (D.C. Cir. 1992);

*see also* Doc. No. 157 at 21.

That the EO's mandates are both unequivocal and already injurious plainly satisfies the

"certainly impending" harm standard.  *SBA List*, 573 U.S. at 158; *see Alfred L. Snapp*, 458 U.S.

at 601.  Defendants' arguments to the contrary are wrong and addressed below.

**Section 2.**  Section 2 requires the Department of Homeland Security ("DHS") to create,

distribute, and establish a process for updating State Citizenship Lists, and the Attorney General

to prioritize investigation and prosecution of elections officials who issue ballots to purportedly

ineligible voters.  Defendants highlight a single clause in Section 2(a) supposedly moderating the

obligation to compile the Lists: "[t]o the extent feasible and consistent with applicable law."  But

every other directive in the paragraph is set out in mandatory terms: "State Citizenship List *shall*

be derived from . . . SAVE data" among other records, the Lists "*shall* be updated and

transmitted" to election officials "no fewer than 60 days before each regularly scheduled Federal

election," and DHS "*shall* establish procedures" for individuals and states to offer corrections.

EO § 2(a) (emphasis added); *see also id.* § 4(c) (setting deadline to establish necessary

infrastructure without mentioning feasibility).  Section 2(b) is likewise mandatory.

---

[3] Defendants claim that New Jersey's recent special congressional election, held after the EO was issued, "took place without incident" or harm to the State, undermining Plaintiff States' claims of injury.  Doc. No. 157 at 50.  Defendants are wrong.  New Jersey was forced to contend with confusion and outreach from elections officials about the EO—disruption that "could represent a fraction of" what is soon to come.  Barber Decl., Doc. No. 100-15 at 3, 4 ¶¶ 10, 11.

These directives threaten, and are already inflicting, numerous harms on Plaintiff States. Section 2 imposes fiscal injuries, including the immediate need to prepare for reviewing and correcting the State Citizenship Lists, Doc. No. 105 at 14 ¶ 26, and draft guidance for and train elections officials, *id.* at 15 ¶ 27.  The public-facing nature of the State Citizenship Lists also creates a need for public education.  *See id.* at 15–16, 18 ¶¶ 28, 31; EO § 2(a) (requiring DHS to allow individuals to access and update their records).  Upon receipt of the State Citizenship List, States will need to cross-check and correct the wrongful omission of eligible voters.  Doc. No. 105 at 11–14 ¶¶ 22–26.  The history of errors in DHS's flagship tool for confirming citizenship status highlights the care Plaintiff States must take in conducting this analysis.  *See* Doc. No. 105 at 9–10 ¶¶ 16–18 ("The SAVE system has erroneously flagged citizens as non-citizens."); *see also* Strodtbeck Decl., Doc. No. 100-13 at 2–3 ¶¶ 4–5 (detailing errors and irregularities in SAVE data).[4]  On top of all of this, elections officials face the threat of criminal investigation and prosecution if they do not adhere to the State Citizenship Lists, inflicting sovereign harm. Doc. No. 105 at 19–22 ¶¶ 33–37; *Whitehouse*, 199 F.3d at 33.

Defendants disagree, arguing that Section 2(a) speaks only to the "possible future creation of State Citizenship Lists by DHS," Doc. No. 157 at 20, based on its provision that the Lists will be created "[t]o the extent feasible and consistent with applicable law," EO § 2(a).  But the EO itself undercuts this position.  Section 2(a)'s detailed and mandatory scheme, which even sets out a timeline for implementation, contradicts Defendants' implication that DHS might simply throw in the towel.  *See id.* §§ 2(a), 4(c).  Perfunctory caveats about consistency with law cannot neutralize the EO's plain language.  *See California I*, 786 F. Supp. 3d at 381–382; *Nat'l Urb. League v. Trump*, 783 F. Supp. 3d 61, 86–87 (D.D.C. 2025).  The DHS declaration illustrates the

---

[4] Defendants' answer to these well-documented accuracy concerns—that DHS could engage in a "manual verification process" of the millions of voters that make up the Lists by the time they are publicized in early September, *see* Doc. No. 157 at 32—blinks reality.  Such "'[b]ald assertions and unsupportable conclusions are not enough to create a genuine issue of material fact,'" *Sanchez ex rel. D.R.-S. v. United States*, 671 F.3d 86, 97 (1st Cir. 2012), nor do they relieve Plaintiff States of the need to analyze the accuracy of the State Citizenship Lists.

point, affirming that DHS leadership has ordered staff "to develop a recommendation . . . for DHS's implementation of" the EO.  Mayhew Decl., Doc. No. 156-1 at 3 ¶ 6.

Defendants and the Amici States also argue that nothing in Section 2(a) requires Plaintiff States to use or respond to the State Citizenship Lists.  *See* Doc. No. 157 at 29; Doc. No. 153 at 9.  But this misconstrues Section 2(a) and its consequences for Plaintiff States.  Section 2(a) is structured to require Plaintiff States to conduct immediate and ongoing review and supplementation to mitigate potential disenfranchisement.  *See* Doc. No. 105 at 11 ¶ 22.  States must also train elections officials, *id.* at 15 ¶ 27, and conduct widespread public outreach, *id.* at 15–16 ¶ 28.  Section 2(b) heightens the necessity of that work by threatening criminal prosecution for elections officials who issue a ballot to an ineligible voter—with eligibility defined in terms functionally identical to the set of individuals who are to be captured on the State Citizenship Lists.  *See* EO § 2(a), (b).  In this way, Section 2 tells States which voters may receive a ballot, with enforcement accomplished via prosecution.  Notably, Defendants never expressly disclaim the threat that failure to abide by the State Citizenship Lists exposes state and local officials to federal prosecution.  Quite the opposite; Defendants repeatedly point out that the Lists "can facilitate possible future post-election enforcement of criminal laws relating to voting."  Doc. No. 157 at 37; *id.* at 47 (same); *see also* Doc. No. 105 at 21–22 ¶¶ 36–37 (elections officials fear prosecution for issuing ballots to voters excluded from the Lists).  For these reasons, Plaintiff States cannot simply ignore the Lists.

**Section 3.**  Section 3 requires the United States Postal Service ("USPS") to promulgate and enforce various rules directly regulating mail ballots and their delivery.  Like Section 2, Section 3 deploys unquestionably mandatory language.  It directs that USPS must initiate a proposed rulemaking "within 60 days of the date of this order," that the rulemaking "shall include" each of the specific provisions listed in Section 3(b)(i) through 3(b)(v), and that any final rule "shall be issued no later than 120 days from the date of this order."  EO § 3(b), (d).

Section 3 inflicts multiple current and imminent injuries.  Plaintiff States must immediately prepare and implement training and guidance for elections officials, as well as public outreach to

7

inform voters of the ramifications of the USPS Mail Ballot Lists. *See* Doc. No. 105 at 33–34 ¶¶ 54–55. The regulations will also require Plaintiff States to expend time and resources to compile and provide USPS a list of eligible voters (the State Mail Ballot Lists), and then expend additional resources reviewing and supplementing the USPS Mail Ballot Lists, all to minimize disenfranchisement. *See id.* at 25–33 ¶¶ 43–53. Furthermore, Plaintiff States will have to immediately redesign their mail ballots, then secure USPS approval of the redesign to ensure that postal service for mail ballots remains available. *See id.* at 37–39 ¶¶ 60–63; *see also* Doc. No. 155 at 9 ¶ 63 ("Undisputed that making design changes to mail ballot envelopes or adding Intelligent Mail barcodes would add costs to Plaintiff States in the abstract."). Considering Section 3 orders USPS to promulgate the regulations before the next general election, Plaintiff States must begin preparing for these projects now. *See* Doc. No. 105 at 35–36 ¶ 57.

Section 3 also inflicts sovereign harms related to Plaintiff States' mail ballot programs by overriding States' choices—made pursuant to their constitutional prerogative—about who can utilize mail ballots and when voters can apply to do so. *See* Doc. No. 105 at 23, 25–26, 36–37 ¶¶ 40, 43, 58–59 (voters excluded from the USPS Mail Ballot Lists may be deprived of their state law right to vote by mail); *see also* Marks Decl., Doc. No. 100-20 at 19 ¶ 56 (describing how non-delivery by USPS is likely to violate voters' state law right to cast a provisional ballot when original is rejected). Such interference with sovereign decisions establishes a cognizable injury. *See Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018); *Alfred L. Snapp*, 458 U.S. at 601.

As with Section 2, Defendants insist that Section 3 merely contemplates a "possible future rule that may be issued by the Postal Service." Doc. No. 157 at 20. Such "ongoing uncertainty," they claim, "is fatal" to Plaintiff States' standing. *Id.* But there is no "uncertainty" about whether the regulations will be issued or what they will require. The President has ordered that the contemplated regulations be issued within 120 days of the EO, *see* EO § 3(d), and "shall include, at minimum," specific terms concerning the States' provision of information to USPS, the distribution of USPS Mail Ballot Lists, a ban on delivery of ballot mail from voters not included on the Lists, a procedure for States to supplement and correct the Lists, and specific

ballot envelope designs and review as a precondition for delivery of such mail, *see* EO § 3(b). USPS's declaration reflects this inevitability, reporting that USPS is considering "how"—not whether—"to implement the directives in the Executive Order operationally," and then explaining what will happen "[o]nce"—not if—"the Postal Service issues a proposed rule." Monteith Decl., Doc. No. 156-3 at 3 ¶¶ 3–5.  It is the provisions the EO mandates, not peripheral details that might eventually be specified by rulemaking, that injure Plaintiff States.

Because Section 3 "dictate[s] the precise contents of the new rule," Plaintiff States must prepare for its imminent adoption.  *See California v. Trump*, 805 F. Supp. 3d 387, 398 (D. Mass. 2025) ("*California II*") (quotations omitted).  Defendants' insistence that Plaintiff States face no current injury and can bring suit only after USPS has adopted the President's regulations, *see* Doc. No. 157 at 22, displays a stunning naivete about the complexity of administering elections.

**Section 5**.  Section 5 seemingly requires Plaintiff States to preserve election records far longer than existing federal and state law.  That preservation imposes immediate economic burdens because Plaintiff States must engage in costly, large-scale document retention for a longer period.  Doc. No. 105 at 40–42 ¶¶ 67–69.  Defendants dispute only the interpretation of the EO—addressed further below—and not the underlying facts substantiating the harm that flows from a five-year preservation requirement.  Doc. No. 155 at 9–10 ¶¶ 67–69.

### B.  Plaintiff States' Claims Are Ripe

Ripeness turns on whether challenged conduct is sufficiently certain, on both prudential and constitutional grounds, to render a plaintiff's claim fit for judicial resolution, and whether a delay in resolution will cause hardship.  *See Texas v. United States*, 523 U.S. 296, 300–301 (1998); *see also Reddy v. Foster*, 845 F.3d 493, 499 (1st Cir. 2017) (the doctrines of standing and ripeness are "interrelated").  Plaintiff States' numerous ongoing and imminently threatened injuries associated with the EO substantiate not only this dispute's fitness for adjudication, but also serious hardship that overwhelmingly favors judicial intervention.  *See* Pltfs. MSJ Mem. of Law, Doc. No. 106 at 36–38.  Further factual development will not "significantly advance [the Court's] ability to deal with the legal issues presented," *Duke Power Co. v. Carolina Env't Study*

9

*Grp.*, 438 U.S. 59, 81–82 (1978), especially since the EO "gives a precise shape" to the dispute, "posing a specific legal question fit for judicial review," *Whitehouse*, 199 F.3d at 33.

Defendants hang much of their entire ripeness argument on two Supreme Court cases: *Trump v. New York*, 592 U.S. 125 (2020) and *Trump v. American Federation of Government Employees*, 606 U.S. ___, 145 S. Ct. 2635 (2025).  Doc. No. 157 at 24–27.  These cannot bear the weight Defendants give them.

*New York* concerned a challenge to a presidential memorandum announcing a policy of excluding persons not in lawful immigration status from the apportionment base following the 2020 census.  The memorandum instructed the Secretary of Commerce "to the maximum extent feasible . . . to provide information permitting the President, to the extent practicable, to exercise [his] discretion to carry out the policy."  592 U.S. at 130.  The Supreme Court found the challenge nonjusticiable because it contained "contingencies and speculation that impede judicial review."  *Id.* at 131.  Defendants argue that this EO is similarly uncertain.  Doc. No. 157 at 25.

But this case differs from *New York* in three critical ways.  First, the *New York* court concluded that plaintiffs "suffer[ed] no concrete harm from the challenged policy itself" before the Secretary completed his work.  592 U.S. at 134.  Here, the President's specific, mandatory directives are already causing hardship by forcing Plaintiff States to prepare to address the EO and divert resources from other critical election administration tasks, all amid an ever-diminishing election calendar.  *See* Doc. No. 105 at 17–18, 35–36 ¶¶ 30, 57.

Second, the *New York* court found that the case concerned a chain of contingent government actions hinging on future discretionary determinations by the President and federal agencies.  592 U.S. at 130–134.  As a result, the court concluded that any anticipated injury to the plaintiffs could be no more than "a prediction."  *Id.* at 133.  Here, the EO is specific and directive as to what federal agencies must do and when, immediately injuring Plaintiff States, which must grapple with its fallout as election administrators.  *See, e.g.*, Doc. No. 105 at 17–18, 35–36 ¶¶ 30, 56–57; *see Washington v. Trump*, 814 F. Supp. 3d 1173, 1206 (W.D. Wash. 2026) (distinguishing *New York* because executive order required federal action "to compel Plaintiffs"

10

in a way that "will cause harm"); *Texas v. Equal Emp. Opportunity Comm'n*, 2022 WL 22869778, at *11 (N.D. Tex. May 26, 2022) (same because challenged "'guidance is not merely explanatory'" (citation omitted)).

Third and finally, in *New York*, the federal government conceded that "the government [could] not feasibly implement the memorandum" by excluding millions of undocumented persons from the apportionment base. 592 U.S. at 133. Here, Defendants identify no feasibility constraints that might bar DHS from creating and transmitting the EO's lists, prevent the U.S. Department of Justice from prosecuting based upon it, or stymie USPS from adopting and effectuating the President's mandated regulations.

Defendants' reliance on *American Federation of Government Employees* is similarly misplaced. There, an executive order commanded federal agencies to "submit a plan to reduce the size of the Federal Government's workforce" by "undertak[ing] preparations to initiate large-scale reductions in force." 90 Fed. Reg. 9669, 9670 (Feb. 11, 2025). The Office of Management and Budget subsequently instructed federal agencies to submit documentation regarding their plans for employee reduction. *Am. Fed'n of Gov't Emps. v. Trump*, 782 F. Supp. 3d 793, 804 (N.D. Cal. 2025). The Supreme Court stayed the district court's injunction, but the decision does not help Defendants. First, only Justice Sotomayor's solo concurrence addressed ripeness; the Court's order was based on its evaluation of the likelihood of success on the merits. *Trump v. Am. Fed'n of Gov't Emps.*, 145 S. Ct. 2635 (2025). Regardless, the policy at issue there left much unclear: which agencies would slash personnel, how many employees they would cut, and the timeframe on which that would take place. Here, the EO specifies the actions agencies must accomplish and when. *See Jensen*, 160 F.4th at 24–25; *supra* § I(A). Plaintiff States cannot wait to sue later—they face fiscal and sovereign harms now.

Defendants also rely heavily on *National Urban League v. Trump*, but that case strongly supports the justiciability of Plaintiff States' claims. While Defendants focus on the court's analysis of provisions that were solely intra-governmental or had no direct impact on plaintiffs, *see Nat'l Urb. League*, 783 F. Supp. 3d at 79–83, the court found standing and ripeness satisfied

11

as to other provisions for reasons equally applicable here. Namely, the plaintiffs had standing to challenge provisions "that make it more likely that Plaintiffs will lose access to money" or required plaintiffs to perform some action, which Plaintiff States have plainly shown as to the EO. *Id.* at 83–87. Ripeness was also satisfied as to provisions issuing "straightforward directive[s]," making the substance of their implementation "clear even if agencies might use slightly different formulations." *Id.* at 86. The court declined to speculate, as Defendants urge the Court to do here, "that the agencies will disregard these clear mandates when implementing the provisions." *Id.*

Defendants also cite other cases concerning executive orders that did not contain the kind of straightforward directives at issue here or addressed intra-governmental processes with no immediate effects on plaintiffs. *See Ctr. for Democracy & Tech. v. Trump*, 507 F. Supp. 3d 213, 217, 223–224 (D.D.C. 2020) (order did "not apply to private parties" and only set "government processes into motion" without prescribing rules to be adopted); *Chardon-Dubos v. Biden*, 2024 WL 4373386, at *3 (D.P.R. Sept. 1, 2024) (order required Federal Reserve to conduct an assessment of a digital currency proposal and deliver reports and legislative proposals); *City of Chelsea v. Trump*, 802 F. Supp. 3d 289, 295–296 (D. Mass. 2025) (cities lacked standing to challenge sanctuary city order where no agencies had identified them as targets for related funding cuts). *National Urban League* and the cases challenging an earlier elections-related executive order are a better guide for addressing the EO's specific directives and immediate consequences. *See Nat'l Urban League*, 783 F. Supp. 3d at 83–87; *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 184–185 (D.D.C. 2025) ("*LULAC I*"); *Washington*, 814 F. Supp. 3d at 1199–200, 1207; *California I*, 786 F. Supp. 3d at 378–379.

This is not a case in which, as Defendants claim, "the contours of that possible future regulation are" merely "in some way, foreshadowed." Doc. No. 157 at 21 (citing *Defs. of Wildlife v. Perciasepe*, 714 F.3d 1317, 1324–25 (D.C. Cir. 2013)). Rather, the President has

12

dictated the substance of USPS's rulemaking.[5]  *See LULAC I*, 780 F. Supp. 3d at 184–185 (challenge to executive order requiring rulemaking ripe where order "dictates the precise contours of the mandated requirement"); *Susman Godfrey LLP v. Exec. Off. of the President*, 789 F. Supp. 3d 15, 41 (D.D.C. 2025) (finding challenge to executive order ripe where order "provide[d] a clear preview of what [guidance] will do," even though guidance had not been issued and its "precise contours" had "not been set"), *appeal docketed*, No. 25-5310 (D.C. Cir. 2025).  Plaintiff States must therefore immediately commence burdensome preparations for administering elections under those regulations.

## II.    THE EO IS JUDICIALLY REVIEWABLE

Defendants' arguments that this Court is barred from reviewing Plaintiff States' claims are unfounded.  Well-established precedent authorizes judicial review of executive orders under a non-statutory cause of action where, as is the case here, the President's orders violate the Constitution.  Judicial review of constitutional or statutory defects in threatened prosecutions and prosecutorial policies is equally well established.

### A.    Plaintiff States Have a Non-Statutory Cause of Action to Challenge the EO

Defendants attempt to avoid judicial review by arguing that Plaintiff States lack a cause of action to challenge the EO.  Doc. No. 157 at 35–36.  Defendants misunderstand the nature of Plaintiff States' constitutional ultra vires challenges, which differ from the *statutory* ultra vires claims they discuss.  *See id.*  Perhaps due to this confusion, they make no effort to address the precedent invoked in Plaintiff States' moving papers.  *Compare id. with* Doc. No. 106 at 18–19.

It is well established that a plaintiff may rely on an equitable cause of action to challenge ultra vires presidential acts.  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582, 585–

---

[5] Defendants interpret the EO to illogically mandate only the substance of the *proposed* rule, even though Section 3(d) sets a 120-day deadline for a "final rule pursuant to this section," plainly encompassing the specific mandates of Section 3.  In any event, an agency's final rule "must be a logical outgrowth of the rule proposed," *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007) (citations and quotations omitted), or "a lineal descendant of, and in character with, the earlier proposed rule," *O'Connell v. Shalala*, 79 F.3d 170, 180 (1st Cir. 1996).  *Cf.* Doc. No. 157 at 14, 20, 25, 27 (arguing that final rule could differ).

589 (1952); *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) ("[T]he President's actions may still be reviewed for constitutionality."); *Doe v. Trump*, 157 F.4th 36, 46–47 (1st Cir. 2025) ("The Government does not question the District Court's ruling that . . . the plaintiffs have equitable causes of action to challenge the EO[.]"); *Murphy Co. v. Biden*, 65 F.4th 1122, 1130 (9th Cir. 2023) (finding claim "that the President violated separation of powers by directing" agency head to violate law "could be considered constitutional and therefore reviewable"); *California II*, 805 F. Supp. 3d at 403–404 ("[P]laintiffs 'are entitled to bring a non-statutory cause of action questioning the legality of [an] Executive Order'"; citing additional authority); *League of United Latin Am. Citizens v. Exec. Off. of the President*, ___ F. Supp. 3d ___, 2026 WL 252420, at *25 (D.D.C. Jan. 30, 2026) ("*LULAC II*") (plaintiffs "may seek equitable relief from unconstitutional Government action by proceeding 'directly under the Constitution'" (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010))).

Plaintiff States invoke this equitable cause of action by asserting separation of powers claims.[6] *See* Doc. No. 65 at 36–45. Defendants implicitly acknowledge the constitutional nature of this action by claiming that the power to issue the EO flows from the President's own constitutional authority. Doc. No. 157 at 45. Where Plaintiff States demonstrate that the President's directives are contrary to federal statutes, they do so to illustrate the President's lack of power over elections and USPS. *See Youngstown*, 343 U.S. at 637 (Jackson, J., concurring) (presidential power is "at its lowest ebb" when the President "takes measures incompatible with the expressed or implied will of Congress"). Indeed, courts regularly look to statutory conflicts in evaluating the lawfulness of presidential acts. *See, e.g.*, *Mille Lacs Band of Chippewa Indians v. Minnesota*, 124 F.3d 904, 915–916 (8th Cir. 1997) (citing incompatibility with 1830 Removal Act in finding unconstitutional an 1850 executive order terminating certain American Indian tribes' profit rights), *aff'd sub nom. Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172 (1999); *City & Cnty. of S.F.*, 897 F.3d at 1232; *Rhode Island v. Trump*, 810 F. Supp. 3d

---

[6] Defendants suggest that Plaintiff States bring Administrative Procedure Act ("APA") claims. *See, e.g.*, Doc. No. 157 at 54. They do not. *See* Doc. No. 65 at 36–45.

283, 309–310 (D.R.I. 2025); *California I*, 786 F. Supp. 3d at 380–381, 383–384. At bottom, Plaintiff States assert that by issuing the EO, "the President has wrongly exercised [elections] powers that the Constitution vests in Congress and the States alone," *see LULAC II*, 2026 WL 252420, at *26, and has encroached on Congress's legislative power over USPS, *see USPS v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 121–122 (1981).

The constitutional nature of Plaintiff States' claims also renders Defendants' arguments regarding the statutory ultra vires framework inapt. *Nuclear Regulatory Commission v. Texas*, 605 U.S. 665 (2025) ("*NRC*") involved a challenge to agency action for purportedly exceeding its statutory authority where the availability of judicial review was explicitly addressed by statute. *See NRC*, 605 U.S. at 668–669. In contrast, this case challenges the EO as exceeding the President's constitutional authority, and no relevant statute addresses judicial review. *See Franklin*, 505 U.S. at 801 (holding that President's actions are not reviewable under APA); *see also Washington*, 814 F. Supp. 3d at 1210 (distinguishing *NRC* and concluding "there is no statutory review scheme that would provide Plaintiffs" with review of executive order). Likewise, *President & Fellows of Harvard College v. HHS*, 798 F. Supp. 3d 77, 133 (D. Mass. 2025) concerned a challenge to funding cuts made by a task force formed pursuant to an EO for which APA review was available—review that Defendants acknowledge is not available here. *See id.* at 93–94, 133–134; Doc. No. 157 at 34. In fact, that court specifically acknowledged the availability of ultra vires claims "pursuant to its 'equitable power[ ]' to 'enjoin unconstitutional actions by state and federal officers.'" *Harv. Coll.*, 798 F. Supp. 3d at 108 n.11 (quoting *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327–328 (2015)). Plaintiff States' constitutional ultra vires claims fall within well-established precedent permitting review of constitutional challenges to presidential action.

**B.    This Court May Properly Review Section 2(b)'s Threats of Prosecution**

Defendants next argue that Section 2(b), which orders the Attorney General to prioritize the criminal investigation and prosecution of elections officials and others who issue ballots to "individuals not eligible to vote in a Federal election," EO § 2(b), is immune from review as an

15

exercise of prosecutorial discretion, Doc. 157 at 36–40.  This contention misunderstands Plaintiff States' claims and ignores well-established precedent allowing pre-enforcement challenges to threatened prosecutions.  The Court should reject Defendants' misdirection on this point.

Defendants mischaracterize Plaintiff States' challenge as disputing the prioritization of certain legitimate criminal investigations over others.  Rather, Plaintiff States argue that the EO threatens criminal investigation and prosecution on a legally baseless theory and does so to improperly conscript Plaintiff States and their elections officials to carry out a presidential policy.  *See* Doc. No. 106 at 20–22.  Precedent allows this challenge.

When the Executive threatens to prosecute particular acts, parties may challenge the anticipated prosecution on constitutional or statutory grounds.  *SBA List*, 573 U.S. at 158–159; *N.H. Lottery Comm'n v. Rosen*, 986 F.3d 38, 61–62 (1st Cir. 2021).  Defendants' cases concerning decisions *not* to prosecute do not call into question this longstanding principle.  *See United States v. Texas*, 599 U.S. 670, 678 (2023) (State lacked standing to challenge the Executive's decision "*not* to arrest or prosecute" undocumented immigrants); *Heckler v. Chaney*, 470 US. 821, 831 (1985) ("an agency's decision not to prosecute or enforce" is subject to a presumption against judicial review); *Citizens for Resp. & Ethics in Wash. v. Fed. Election Comm'n*, 993 F.3d 880, 885 (D.C. Cir. 2021) (non-enforcement decision was unreviewable); *Drake v. FAA*, 291 F.3d 59, 70–71 (D.C. Cir. 2002) (same).[7]  Each of those cases is marked by "[t]he absence of coercive power over the plaintiff."  *Texas*, 599 U.S. at 678.  Here, the coercive power that Section 2(b) brings to bear on elections officials is at the very heart of Plaintiff States' claim.  Plaintiff States' pre-enforcement challenge to the EO's specific threats falls well within established precedent allowing judicial review.

---

[7] *Heckler*, *Citizens for Responsibility and Ethics*, and *Drake* all concerned the APA's bar on review of matters committed to agency discretion, which is inapplicable here.  *Heckler*, 470 U.S. at 829–834; *Citizens for Resp. & Ethics in Washington*, 993 F.3d at 884–885; *Drake*, 291 F.3d at 70.  Defendants' additional APA authorities are inapposite for the same reason.  *See Lincoln v. Vigil*, 508 U.S. 182, 192–193 (1993) (agency allocation of lump-sum appropriation not subject to APA review); *Sec'y of Lab. v. Twentymile Coal Co.*, 456 F.3d 151, 155–156 (D.C. Cir. 2006) (agency's choice to charge one defendant rather than another, where the statute allowed enforcement against either, not subject to APA review).

The coercive power of Section 2(b) also answers the justiciability concerns embedded in Defendants' arguments about reviewability. *See* Doc. No. 157 at 39–41. Article III injury and causation are satisfied because Section 2(b) "is aimed directly at" Plaintiff States and their elections officials, who, absent judicial review, "will have to take significant and costly compliance measures or risk criminal prosecution." *Virginia v. Am. Bookseller's Ass'n, Inc.*, 484 U.S. 383, 392 (1988). Standing and ripeness are both established by this credible threat of prosecution for issuing ballots to voters omitted from the State Citizenship Lists. *See N.H. Lottery Comm'n*, 986 F.3d at 50, 52–53; Doc. No. 105 at 19–22 ¶¶ 33–37 (elections officials intend to issue ballots to voters as required by law and fear prosecution for providing ballots to voters omitted from Lists); Doc. No. 155 at 3–7 (failing to controvert these facts).

This Court may also review Plaintiff States' commandeering challenge based on Section 2(b)'s threat. As Defendants' own cases acknowledge, prosecutorial power is "'subject to constitutional constraints.'" *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (citation omitted). When the Executive Branch fails in its duty "to uphold and support the Constitution" in the exercise of that power, the "judicial branch has the power and the obligation to redress the violation." *Smith v. Meese*, 821 F.2d 1484, 1493 (11th Cir. 1987) (reversing dismissal of constitutional challenge to an alleged policy of discriminatory prosecutions related to voting).

## III.   THE CHALLENGED PROVISIONS VIOLATE THE CONSTITUTION

Defendants offer conspicuously little argument on the merits of this action, instead invoking the presumption of regularity and reiterating their arguments that implementation of the EO is too uncertain to be litigated now. *See* Doc. No. 157 at 42–48. Defendants fail to grapple with Plaintiff States' arguments that the EO is facially unconstitutional because it exceeds the President's authority and violates the separation of powers.

"The President's authority to act . . . 'must stem either from an act of Congress or from the Constitution itself.'" *Medellín v. Texas*, 552 U.S. 491, 524 (2008) (quoting *Youngstown*, 343 U.S. at 585). Neither supports the challenged provisions of the EO. The Constitution does not grant the President any specific powers over elections. *See LULAC I*, 780 F. Supp. 3d at 159

17

(Executive power over federal elections "does not appear to have crossed the Framers' minds"). Likewise, the President's mandates are nowhere to be found in the applicable federal election law, and in fact run contrary to numerous statutes.

When acting contrary to Congress's expressed will, the President's power is "at its lowest ebb." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring). The Court can sustain the EO's challenged provisions "only by disabling the Congress from acting upon the subject" and finding that the Constitution grants the President "exclusive" and "conclusive" power over the matter. *Id.* at 637–638. And it should scrutinize any claim to that power "with caution, for what is at stake is the equilibrium established by our constitutional system." *Id.* at 638.

Defendants fail to meaningfully argue—let alone establish—that the EO survives scrutiny under this framework. The presumption of regularity is no answer to Plaintiff States' arguments that the President has *already* overstepped his authority. Courts apply the presumption to resolve factual disputes related to agency action. *See, e.g.*, *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 577 (2025) (applying presumption to factual question about agency reliance on memorandum). It does not "'shield [the EO] from a thorough, probing, in-depth review,'" *New York v. Trump*, 133 F.4th 51, 73 (1st Cir. 2025) (citation omitted), nor "require a court to assume that the President's exercise of power is lawful," *LULAC I*, 780 F. Supp. 3d at 178. Instead, the presumption "attaches only *after* the Court concludes that the President is" acting lawfully. *Id.* In this case, the absence of presidential authority to issue the EO is dispositive.

## A.   Section 2 Is Unconstitutional

Defendants' silence and omissions on the merits of Plaintiff States' challenge to Section 2 speak decibels louder than the few arguments they do make. They identify no federal statute that authorizes the State Citizenship List program, and their attempt to ground it in the Constitution is unavailing. Defendants do not even attempt to counter Plaintiff States' arguments that Section 2's threats of prosecutions are both baseless and designed to unconstitutionally coerce elections officials to implement the State Citizenship Lists.

### 1.    Neither the Constitution Nor Any Statute Authorizes Section 2(a)

Defendants' arguments as to Section 2(a) fail to satisfy the fundamental constitutional requirement that the President's authority to order DHS and the Social Security Administration ("SSA") to create, maintain, and disseminate State Citizenship Lists for use in federal elections must stem from either a federal statute or the Constitution.  *See Youngstown*, 343 U.S. at 585.

Defendants provide no statutory basis for DHS and SSA to administer the President's State Citizenship List program.  *See* Doc. No. 157 at 42–48 (failing to identify *any* statute authorizing the EO's directives).  This is unsurprising, as no statute authorizes DHS or SSA to create, maintain, and disseminate such Lists for any purpose, much less for verification of "Federal election voter eligibility."  *See* EO § 1; *see also* Doc. No. 105 at 2 ¶ 5 (White House described EO as "ordering citizenship verification for Federal elections").  Instead, Congress has explicitly left responsibility for voter rolls and registration with the States.  52 U.S.C. § 21083(a)(1)(A) (mandating that "each State" must establish a "computerized statewide voter registration list defined, maintained, and administered at the State level"); *see also id.* § 20503(a) (requiring States to "establish procedures to register to vote in elections for Federal office").

Defendants argue the State Citizenship Lists could be validly used to "facilitate . . . post-election law-enforcement activity" in connection with the criminal statutes cited in the EO.  Doc. No. 157 at 47; *see also id.* at 37.  But focusing on potential *uses* of the State Citizenship Lists is no answer to the lack of statutory authority for DHS and SSA to implement the program in the first place.  As federal agencies, DHS and SSA have "'no power to act . . . unless and until Congress confers power upon" them.  *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)).

Lacking a statutory basis for Section 2(a), Defendants turn to the President's constitutional power.  Doc. No. 157 at 45–48.  But they do not and cannot cite any constitutional power related to elections that could justify the State Citizenship List program, as "[t]he Constitution does not grant the President any specific powers over elections."  *California I*, 786 F. Supp. 3d at 373; *see* U.S. Const. art. I, § 4, cl. 1 & art. II, § 1, cl. 2; *accord Georgia v. Meadows*, 88 F.4th 1331, 1346

19

(11th Cir. 2023); *LULAC II*, 2026 WL 252420 at *43.  Defendants do not attempt to defend the EO's invocation of the Guarantee Clause as authority for the President's mandates, for good reason: the Guarantee Clause does not confer any such authority.  *See* Doc. No. 106 at 20–21.

Defendants gesture at the President's authority under the Vesting and Take Care Clauses, Doc. No. 157 at 45–46, but neither Clause enables him to create new election programs without statutory authority.  *See Rhode Island v Trump*, 781 F. Supp. 3d 25, 51 (D.R.I. 2025) (citing authorities).  Defendants' own cases underscore the point: the President has responsibility to oversee the execution of "duties . . . *prescribed by statute*."  *Sierra Club v. Costle*, 657 F.2d 298, 406 n.524 (D.C. Cir. 1981) (emphasis added) (quoting *Myers v. United States*, 272 U.S. 52, 135 (1926)); *see also Bldg. & Const. Trades Dep't v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) (same).  "No matter how broadly one reads either . . . Clause, the President's power to supervise and control Executive Branch officials does not authorize him or his subordinates to intrude on the exclusive powers of Congress and the States."  *LULAC II*, 2026 WL 252420, at *33.

Amici States argue that the President has inherent constitutional power to direct agencies to "organize information already within the Executive Branch's possession," Doc. No. 153 at 14, but both their characterization of Section 2(a) and their authorities miss the mark.  As to the EO, Section 2(a) is not limited to merely organizing information within the Executive Branch; rather, it mandates the creation of an entirely new program complete with deadlines to distribute State Citizenship Lists to state elections officials, public-facing procedures for individuals and States to suggest corrections to the Lists, and enforcement via threatened criminal prosecutions.  EO § 2(a), (b).  Amici States' inapt cases regarding presidential papers and security clearances do not come close to offering sound constitutional footing for this new program.  *See Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 445–446 (1977) (upholding Congress's power "to regulate Executive Branch documents" and information, including presidential papers); *Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988) (recognizing President's constitutional authority as Commander in Chief to grant, deny, or revoke security clearances).

20

The separation of powers principle holds that "[e]ach Branch of our Federal Government must neither 'arrogate power to itself' nor 'impair another in the performance of its constitutional duties.'" *LULAC II*, 2026 WL 252420, at *33 (quoting *Free Enter. Fund*, 561 U.S. at 500). Defendants do not rebut Plaintiff States' argument that Section 2(a) encroaches on the States' and Congress's exclusive "power to regulate federal election procedures." *See id.* at *43. Their attempts to sidestep the EO's invasion of States' power to determine voter qualifications are nothing less than wishing the problem away, illogically suggesting that federal elections may not include primary elections. *See* Doc. No. 157 at 43–44. But this question is already decisively answered by case law and statutes defining federal elections to include primaries. *See, e.g.*, *United States v. Classic*, 313 U.S. 299, 319–320 (1941); 52 U.S.C. §§ 20502, 20701, 30101(1)(A), (C), (D). For the reasons set out in Plaintiff States' moving papers, Section 2(a) violates the separation of powers and is unconstitutional.

2.    **Section 2(b)'s Threats of Prosecution Are Legally Baseless and Unconstitutionally Coercive**

Defendants fail to meaningfully engage with the merits of Plaintiff States' challenge to Section 2(b), which addresses both the baseless nature of the threats and their unconstitutional use to coerce Plaintiff States to withhold ballots from voters omitted from the State Citizenship Lists, and even to assist in maintaining the Lists themselves. *See* Doc. No. 106 at 21–24. Instead, they focus their defense of Section 2(b) on the argument that this Court should not review its legality, which is incorrect for the reasons set out above. *See* Doc. No. 157 at 36–40.

Section 2(b) issues an unmistakable threat to criminally investigate and prosecute elections officials who issue ballots to voters that the federal government considers "not eligible to vote in a Federal election" based on their omission from a State Citizenship List. Defendants fail to even acknowledge Plaintiff States' point that the mere act of issuing a ballot to a voter who turns out to be ineligible does not rise to the level of a federal crime under *any* of the statutes cited by the EO. *Compare* Doc. No. 106 at 21 *with* Doc. No. 157 at 43. A voter's omission from a State Citizenship List is insufficient to establish the knowing or willful conduct necessary for criminal

21

liability due to (1) the possibility of errors and omissions in the Lists, (2) the verification of voter eligibility required for registration, (3) the absence of an adequate opportunity for omitted voters to establish eligibility, and (4) the omission of 17-year-olds who are eligible primary voters in some States.  Doc. No. 106 at 21 (citing Doc. No. 105 at 6, 9–11 ¶¶ 11, 14, 16–21).  Defendants do not and cannot rebut any of this.[8]  Accordingly, to dispel the improper threats currently hanging over elections officials' heads, this Court should clarify that issuing a ballot to a voter omitted from a State Citizenship List does not per se violate the federal criminal statutes cited in Section 2(b), without further evidence of knowing or willful conduct.

Strikingly, Defendants' brief *confirms* the threats to Plaintiff States and their elections officials by twice suggesting that the State Citizenship Lists could be used for the purpose of enforcing criminal statutes.  *See* Doc. No. 157 at 37, 47.  That purpose, which was already clear from the EO itself, is one essential reason why Plaintiff States are not free to "ignore" the State Citizenship Lists.  *Cf. id.* at 36.  Precisely because issuing a ballot to a voter omitted from a List raises a risk of prosecution under the EO, Plaintiff States have no choice but to take on the burdensome tasks of analyzing the Lists, investigating omissions, attempting to update and correct them, and providing guidance and training related to the Lists.  Doc. No. 105 at 11–18 ¶¶ 22–28, 30.  That risk of prosecution also operates as the sharp edge of Section 2, designed to coerce States to withhold ballots from omitted voters.  *Id.* at 21 ¶ 36.

In these ways, Sections 2(a) and 2(b) together unconstitutionally conscript "the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program" based on nothing more than presidential fiat.  *Printz v. United States*, 521 U.S. 898, 935 (1997), *cited in* Doc. No. 106 at 24.  Defendants offer no meaningful response to this argument.  They also offer no response to Plaintiff States' arguments that these provisions

---

[8] Defendants' odd suggestion that agencies may not apply the EO to primary elections, *see supra* at 21, is particularly unpersuasive as to Section 2(b).  That section's threat of prosecution is effective *now*, based on the EO itself, and does not require any further agency action.  The government notably fails to disavow prosecution in connection with federal primaries.  *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 15–16 (2010); *Cf. Blum v. Holder*, 744 F.3d 790, 800–803 (1st Cir. 2014).

violate the separation of powers by usurping control over voter eligibility determinations; threatening prosecution of elections officials for issuing ballots in accordance with state law; and undermining state and federal statutory schemes governing voter registration, voter roll maintenance, and balloting.  *See* Doc. No. 106 at 23–24; *Free Enter. Fund*, 561 U.S. at 500. Finally, Defendants fail to address Plaintiff States' argument that Section 2(b) abuses prosecutorial power by using threats of prosecution to interfere with the duties of elections officials.  *See* Doc. No. 106 at 22 (citing *In re Grand Jury Subpoenas (Federal Reserve)*, ___ F. Supp. 3d ___, 2026 WL 710202 at *8 (D.D.C. Mar. 13, 2026) and *In re Admin. Subpoena No. 25-1431-019,* 800 F. Supp. 3d 229, 239 (D. Mass. 2025) *appeal docketed*, No. 26-1093 (1st Cir. 2026)).  Plaintiff States should prevail on this challenge based on these concessions alone.

### B.    Section 3 Is Unconstitutional

Defendants also hardly defend Section 3 on the merits.  Simply put, the President has no statutory or constitutional authority to require the States and USPS to compile mail voter eligibility lists and prohibit USPS from transmitting mail ballots from voters not on a USPS Mail Ballot List, EO § 3(b)(ii)–(v), nor to mandate that USPS require ballot mail to take a specific form.  *Id.* § 3(b)(i)(A)–(C).  Section 3 is thus unconstitutional.  *See Youngstown*, 343 U.S. at 585.

Pursuant to its constitutional authority, Congress has enacted substantive requirements governing USPS and set out a procedure for USPS to promulgate regulations, which must be consistent with its governing statutes.  *See* 39 U.S.C. §§ 401(2), 3661.  Plaintiff States have likewise exercised their constitutional power over elections to provide for mail voting.  *See Arizona v. Inter Tribal Council of Arizona, Inc*., 570 U.S. 1, 8–9 (2013) ("*ITCA*"); Doc. No. 105 at 23–24 ¶ 40.  Section 3 pays no heed to those laws, instead mandating policies that encroach on the States' and Congress's constitutional prerogatives.

### 1.    The EO's New Restrictions on Mail Voting Are Unconstitutional

Defendants fail to meaningfully contest Plaintiff States' challenge to the President's new restrictions on mail voting.  *See* Doc. No. 106 at 25–28.  Rather, Defendants contend that it is not even possible for the Court to evaluate the merits due to uncertainty and disputes of fact

regarding what USPS's final rule will do.  *See* Doc. No. 157 at 45–48, 54–55.  But there is nothing uncertain or contingent about the President's order to USPS to craft a rule that "shall include" the President's specific mail voting policies and "shall be issued" within 120 days.  EO § 3(b)(ii)–(iv), (d); *see also supra* § I(A).

Plaintiff States have shown that Section 3 violates Congress's exclusive constitutional power to enact law governing "the entire postal system of the country," *Ex parte Jackson*, 96 U.S. 727, 732 (1877), and Plaintiff States' power to provide for and administer mail voting, *see ITCA*, 570 U.S. at 8–9 (recognizing States' broad power to regulate federal elections); *see also* Doc. No. 106 at 28.  Section 3's new mail ballot rules are nothing less than an attempt to seize control of States' mail voting programs.  Section 3(b)(iii) mandates the interception of mailed ballots for individuals not enrolled on a USPS Mail Ballot list, directly interfering with States' election administration.  Sections 3(b)(ii) and 3(b)(iv) impose further burdens on States and improperly insinuate a federal agency into tracking voter eligibility.  There can be no question that Section 3 "arrogate[s] power" over elections to the President and "impairs [States] in the performance of their constitutional duties."  *Free Enter. Fund*, 561 U.S. at 500.

The statutory conflicts identified by Plaintiff States further establish that the EO violates the separation of powers.  *See, e.g.*, *California I*, 786 F. Supp. 3d at 382–384 (executive order's conflict with UOCAVA supported holding that the order exceeded President's authority); *supra* § II(A).  The President's directives violate federal statutes by expanding non-postal services and categories of non-mailable matter, discriminating among mail users, and contravening USPS's universal mail service obligation and UOCAVA duties.  Doc. No. 106 at 25–28.  Section 3 also runs afoul of Congress's decision to leave the creation and administration of voter registration lists to States—not USPS.  *See supra* § III(A)(1); 52 U.S.C. §§ 20507, 20509, 21083, 21085.

Defendants do not attempt to reconcile USPS's governing statutes with Section 3(b)(ii)–(v).  *Compare* Doc. No. 106 at 25–28 *with* Doc. No. 157 at 45–48.  At most, Defendants speculate that a future USPS regulation could resolve some of these plain violations of law, Doc.

24

No. 157 at 43, but do not identify *any* lawful way that USPS could implement those aspects of Section 3.  Defendants cannot rewrite Section 3, which directly violates those laws in any form.

These irremediable statutory conflicts demonstrate the unlawfulness of the President's directives and are therefore dispositive on the merits.  Agencies like USPS are "'creatures of statute'" that "'possess only the authority that Congress has provided them.'"  *Marin Audubon Soc'y v. FAA*, 121 F.4th 902, 914 (D.C. Cir. 2024) (quoting *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022)).  The President has no authority to order agencies like USPS to violate their governing statutes, particularly when Congress has enacted those laws under its own exclusive constitutional power.  *See Heckler*, 470 U.S. at 833 ("Congress did not set agencies free to disregard legislative direction in the statutory scheme that the agency administers."); *see also* U.S. Const., art. I, § 8, cl. 7.

Defendants gloss over these infirmities by claiming that the Vesting and Take Care Clauses empower the President to exercise supervisory authority over USPS.  Doc. No. 157 at 45–46.  But, again, this supervisory authority does not equate to constitutional power to mandate agency actions beyond (much less contrary to) statutory mandate.  *See supra* § III(A)(1).  Nor does the President's constitutional power authorize him to seize authority over elections that belongs to the States and Congress.  By imposing new restrictions on mail voting without constitutional or statutory authorization—indeed, in a way that directly conflicts with USPS's statutory mandates and the States' constitutional power to provide for mail voting—the EO violates the separation of powers.  *See Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).

### 2.    The EO's New Ballot Mail Design Mandates Are Unconstitutional

Likewise, the President has no authority to order USPS to require changes to ballot envelope design and review.  *See* EO § 3(b)(i)(A)–(B).  Congress has specified that significant regulatory changes like those in the EO must be made in consultation with the independent and bipartisan Postal Regulatory Commission and the public.  *See* 39 U.S.C. § 502(a) (Commission composition requirements); *id.* § 3661(b) (USPS must submit regulatory changes that "generally affect service on a nationwide or substantially nationwide basis" to Commission, requesting an

25

advisory opinion); *id.* § 3661(c) (Commission must hold public hearing before issuing opinion); 39 C.F.R. § 111.3(b)–(e) (2020) (substantive changes to Domestic Mail Manual standards are revised through a public notice-and-comment process).  This open and deliberative process is consistent with Congress's designation of USPS as "an independent establishment," 39 U.S.C. § 201, and its broader project of "reduc[ing] political influences on [USPS's] operations."  *USPS v. Flamingo Indus. (USA) Ltd.*, 540 U.S. 736, 740 (2004); *see also Mail Ord. Ass'n of Am. v. USPS*, 986 F.2d 509, 519 (D.C. Cir. 1993) (summarizing Congress's efforts to ensure USPS has "independence from political pressures" and "seal off [USPS] from partisan political influence"); H.R. Rep. No. 91-1104, at 1 (1970) (Conf. Rep.), as reprinted in 1970 U.S.C.C.A.N. 3649, 3650. USPS has adopted standards and recommendations for ballot mail pursuant to that process, none of which impose the requirements found in the EO.  *See* Doc. No. 106 at 29–30.

The EO "flouts this procedure."  *California I*, 786 F. Supp. 3d at 380.  A top-down mandate for new requirements, regardless of input from the Commission and the public, is not "in line with [what] Congress had envisioned."  *Id.* at 380 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 585 (1992) (Stevens, J., concurring), and *Campanale & Sons, Inc. v. Evans*, 311 F.3d 109, 118 (1st Cir. 2002)).  The President cannot override Congress's design for changes to USPS's regulations and require States to adhere to a particular mail ballot envelope design and review process.  This component of Section 3 is also ultra vires and unconstitutional.  *See Youngstown*, 343 U.S. at 585; *Printz*, 52 U.S. at 935.

### C.    Section 5 Is Similarly Unconstitutional

Defendants argue that Section 5's directive to elections officials to preserve certain elections materials for five years is strictly precatory and "State and Local officials thus face no legal consequences . . . from that provision of the Order."  Doc. No. 157 at 22.  Yet the surrounding provisions—which threaten criminal prosecution and cast those materials as evidence of criminal violations—strongly suggest the President's intention to impose a new mandate.  *See* EO § 5; Doc. No. 106 at 30–31.  Any such mandate cannot be reconciled with the States' and Congress's power over elections, which both entities have exercised to set more

26

limited preservation requirements.  Doc. No. 106 at 31.  If the Court accepts Defendants' interpretation that Section 5 is strictly precatory, however, Plaintiff States respectfully request that the Court expressly find that it does not impose any requirements on Plaintiff States.

## IV.    PLAINTIFF STATES ARE ENTITLED TO THE RELIEF SOUGHT

Plaintiff States are entitled to the permanent injunction and declaratory relief that they seek, including declaratory relief against the President.  Defendants have not shown otherwise.

Plaintiff States are entitled to a permanent injunction because they are suffering substantial injuries that are not accurately measurable or compensable by money damages and the balance of hardships and public interest favor an injunction.  *See CoxCom, Inc. v. Chaffee*, 536 F.3d 101, 112 (1st Cir. 2008).  Plaintiffs face imminent and irreparable injuries to their sovereign power to regulate elections; unrecoverable fiscal harms, including the diversion of resources; a threat of criminal enforcement against state and local officials; and harm to their reputation as stewards of elections.  Moreover, since the public has an interest in federal agencies and officials following the law and in preventing election disruption and voter disenfranchisement, the balance of hardships and public interest favor an injunction.

As set out above, Plaintiff States are currently suffering and will suffer a suite of serious harms.  *See supra* § I.  Injuries where "sovereign interests and public policies [are] at stake" are irreparable, *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001), and by preventing States from "effectuating statutes"—including duly enacted state laws regarding voter registration, issuing ballots, and mail voting—the EO inflicts irreparable injury, *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted).

The EO also inflicts irreparable fiscal injury by creating "serious administrative upheaval." *See Doe v. Trump*, 766 F. Supp. 3d 266, 285 (D. Mass. 2025), *vacated in part on other grounds*, 157 F.4th 36.  To address the EO's impact on state elections, Plaintiff States must at minimum immediately make data comparison plans, allocate resources for implementation, and create and undertake educational outreach to officials and the public.  Doc. No. 105 at 11–18, 26–36, 38–43 ¶¶ 22–30, 44–57, 62–69.  This diversion of resources will result in Plaintiff States' "inability to

27

enforce [their] duly enacted plans," which "clearly inflicts irreparable harm." *Abbott*, 585 U.S. at 602 n.17; *see also Doe v. Trump*, 157 F.4th at 79 (irreparable harm shown by States' "unrecoverable costs" from modifying systems and guidance in response to executive order).

Irreparable harm also stems from the EO's threat to prosecute Plaintiff States' elections officials. *See N.H. Right to Life Pol. Action Comm. v. Garner*, 99 F.3d 8, 13 (1st Cir. 1996). The choice imposed on Plaintiff States—submit to an unconstitutional decree or expose themselves and their officials to prosecution—constitutes irreparable injury. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) (relief proper where party must either "continually violate the [] law and expose themselves to potentially huge liability; or violate the law once as a test case and suffer the injury of obeying the law during . . . the proceedings").

Finally, damage to Plaintiff States' reputations as stewards of elections likewise constitutes irreparable harm. *See Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996) ("[I]njury to goodwill and reputation . . . is often held to be irreparable."). The EO threatens to unfairly harm public trust in Plaintiff States' elections administration many times over, including through its threats of prosecution, interference with mail voting, and foreseeable disenfranchisement and voter confusion. These harms strike at "the functioning of our participatory democracy." *See Purcell*, 549 U.S. at 4.

Defendants fail to address Plaintiff States' arguments that the equities and public interest weigh heavily in favor of the requested relief. *See* Doc. No. 157 at 53-54 (addressing only the *LWVMA* plaintiffs' position). The public interest here follows the merits because "[t]he public has an important interest in making sure government agencies follow the law." *Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*, 407 F. Supp. 2d 323, 343 (D. Mass. 2005), *aff'd*, 463 F.3d 50 (1st Cir. 2006). Defendants' own citation supports Plaintiff States' position, as the EO prevents States from "'effectuating statutes'" governing elections. *See Maryland*, 567 U.S. at 1303 (citation omitted), *cited in* Doc. No. 157 at 54.

The public also has a strong interest in preventing disenfranchisement and late-stage disruption to election administration. *See Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir.

28

2012) ("The public interest . . . favors permitting as many qualified voters to vote as possible."). That is "[b]ecause there can be no 'do-over' or redress of a denial of the right to vote after an election." *Fish v. Kobach*, 840 F.3d 710, 752 (10th Cir. 2016). As described above, the EO will disenfranchise Americans by leaving them unclear on their eligibility and registration status; coercing elections officials to deny ballots to voters omitted from State Citizenship Lists; and prohibiting USPS from delivering ballots cast by voters eligible to use a mail ballot under state and federal law. The public interest thus requires enjoining the EO's challenged provisions.

The scope of the requested relief against the President is also proper. Plaintiff States have omitted him from their request for injunctive relief. Doc. No. 97-1 at 2–4. They have, however, properly sought a declaration that the EO exceeds his constitutional power. *Id.* at 2. Defendants point only to an out-of-circuit case that observes that courts "have never submitted the President to declaratory relief." Doc. No. 157 at 58 (citing *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010)). Defendants note that *Newdow* relied on Justice Scalia's partial concurrence in *Franklin*, 505 U.S. at pages 827–828. But, as other courts have observed, six years after *Franklin*, the Supreme Court expressly submitted the President to declaratory relief in *Clinton v. New York*, 524 U.S. 417, 433 n.22 (1998). *See Missouri v. Biden*, 662 F. Supp. 3d 626, 682 (W.D. La. 2023); *Stone v. Trump*, 400 F. Supp. 3d 317, 359 (D. Md. 2019). Today, courts have jurisdiction to declare executive orders unlawful where that declaration will redress the plaintiffs' injuries. *See, e.g.*, *Pacito v. Trump*, 797 F. Supp. 3d 1227, 1237 (W.D. Wash. 2025); *Sierra Club v. Trump*, 929 F.3d 670, 696–697 (9th Cir. 2019) (district court's grant of declaratory relief against the President and other defendants was proper); *Murphy Co.*, 65 F.4th at 1129–30 (court has jurisdiction over claim for declaratory relief against presidential proclamation allegedly in excess of authority). Here, declaratory relief will protect Plaintiff States' constitutional prerogative to regulate and administer elections.

## V.    THE COURT SHOULD NOT REQUIRE AN INJUNCTION BOND

Defendants seek a bond pursuant to Federal Rules of Civil Procedure 65(c) "[i]f the Court orders any injunctive relief." Doc. No. 157 at 59. But that rule applies only to preliminary or

temporary injunctive relief, not to the permanent relief Plaintiff States seek. Fed. R. Civ. P. 65(c). Regardless, this Court has discretion to issue an injunction without requiring such a bond, *Pineda v. Skinner Servs., Inc.*, 22 F.4th 47, 57 (1st Cir. 2021) (citing cases), and should do so here for three additional reasons: (1) Defendants do "not suggest and [have] not demonstrated that [they] will suffer a monetary loss from this Court's injunction," *California I*, 786 F. Supp. 3d at 395; *see also* Doc. No. 157 at 59; (2) "'[t]he First Circuit has recognized an exception to the bond requirement in suits to enforce important federal rights or public interests,' as is precisely the case here," *New York v. McMahon*, 784 F. Supp. 3d 311, 373–374 (D. Mass. 2025) (citation omitted); and (3) requiring a bond "'would risk deterring other litigants from pursuing their right to judicial review of unlawful executive action,'" *California I*, 786 F. Supp. 3d at 395 (quoting *LULAC I*, 780 F. Supp. 3d at 225).

## VI. THE COURT SHOULD NOT DISMISS ANY DEFENDANTS

Defendants assert that the Court should dismiss the President, Department of Commerce, and Secretary of Commerce. Doc. No. 157 at 41–42. But these parties all play a critical role in the EO's issuance and implementation, as Defendants acknowledge, *see id.* at 41 (citing EO § 4(a)), and would therefore be properly covered by any declaratory or, as to the Department and Secretary, injunctive relief. Plaintiff States have sought neither APA nor injunctive relief against the President, leaving Defendants' arguments on that score irrelevant. *Id.*

## CONCLUSION

For the foregoing reasons, Plaintiff States respectfully request that the Court grant Plaintiff States' motion for summary judgment and deny Defendants' motion to dismiss.

Dated: May 14, 2026          Respectfully submitted.

**ROB BONTA**
Attorney General of California

By: */s/ Michael S. Cohen*
Michael S. Cohen*
   *Deputy Attorney General*
Thomas S. Patterson*
   *Senior Assistant Attorney General*
Seth E. Goldstein*
   *Supervising Deputy Attorney General*
Anne P. Bellows*
Kevin L. Quade*
Lisa C. Ehrlich*
Malcolm A. Brudigam*
Robert William Setrakian*
   *Deputy Attorneys General*
1300 I Street, P.O. Box 944255
Sacramento, CA 95814
(916) 210-6090
Michael.Cohen@doj.ca.gov
Seth.Goldstein@doj.ca.gov
Anne.Bellows@doj.ca.gov
Kevin.Quade@doj.ca.gov
Lisa.Ehrlich@doj.ca.gov
Malcolm.Brudigam@doj.ca.gov
William.Setrakian@doj.ca.gov

*Counsel for the State of California*


**AARON FORD**
Attorney General of Nevada

By: */s/ K. Brunetti Ireland*

K. Brunetti Ireland*
   *Chief of Special Litigation*
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
(702) 486-9246
KIreland@ag.nv.gov

*Counsel for the State of Nevada*


**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

By: */s/ Vanessa A. Arslanian*
M. Patrick Moore (BBO No. 670323)
   *First Assistant Attorney General*
Vanessa A. Arslanian (BBO No. 688099)
   *State Trial Counsel*
Jared B. Cohen (BBO No. 689217)
Jak Kundl (BBO No. 713951)
   *Assistant Attorneys General*
One Ashburton Place
Boston, MA 02108
(617) 963-2107
Vanessa.Arslanian@mass.gov
Pat.Moore@mass.gov
Jared.B.Cohen@mass.gov
Jak.Kundl@mass.gov

*Counsel for the Commonwealth of Massachusetts*


**NICHOLAS W. BROWN**
Attorney General of Washington

By: */s/ Tera M. Heintz*
Tera M. Heintz*
Cristina Sepe*
Karl D. Smith*
   *Deputy Solicitors General*
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200
tera.heintz@atg.wa.gov
cristina.sepe@atg.wa.gov
karl.smith@atg.wa.gov

*Counsel for the State of Washington*

*(additional counsel on following page)*

31

**KRISTIN K. MAYES**
Attorney General of the State of Arizona

By: */s/ Kara Karlson*
Kara Karlson*
Karen J. Hartman-Tellez*
Joshua M. Whitaker*
Syreeta Tyrell*
 *Assistant Attorneys General*
2005 North Central Ave.
Phoenix, AZ 85004
(602) 542-8118

*Counsel for the State of Arizona*


**WILLIAM TONG**
Attorney General of Connecticut

By: */s/ Maura Murphy*
Maura Murphy*
 *Deputy Associate Attorney General*
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5020

*Counsel for the State of Connecticut*


**KATHLEEN JENNINGS**
Attorney General of the State of Delaware

By: */s/ Ian R. Liston*
Ian R. Liston*
 *Director of Impact Litigation*
Vanessa L. Kassab*
 *Deputy Attorney General*
820 N. French Street
Wilmington, DE 19801
(302) 683-8899

*Counsel for the State of Delaware*


**PHILIP J. WEISER**
Attorney General for the State of Colorado

By: */s/ Shannon Stevenson*
Shannon Stevenson*
 *Solicitor General*
Peter Baumann*
 *Senior Assistant Attorney General*
1300 Broadway
Denver, Colorado 80203
(720) 508-6400

*Counsel for the State of Colorado*


**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: */s/ Virginia A. Williamson*
Virginia A. Williamson*
 *Assistant Attorney General*
200 Saint Paul Place
Baltimore, MD 21202
(410) 576-6584

*Counsel for the State of Maryland*


**DANA NESSEL**
Attorney General of Michigan

By: */s/ Neil Giovanatti*
Neil Giovanatti*
Erik Grill*
 *Assistant Attorneys General*
P.O. Box 30736
Lansing, MI 48909
(517) 335-7659

*Counsel for the State of Michigan*

*(additional counsel on following page)*

32

**BRIAL L. SCHWALB**
Attorney General of the District of Columbia

By: */s/ Eliza H. Simon*
Eliza H. Simon*
 *Senior Counsel*
400 6th St. NW
Washington, D.C. 20001
(202) 741-5221

*Counsel for the District of Columbia*

**KEITH ELLISON**
Attorney General for the State of Minnesota

By: */s/ Angela Behrens*
Angela Behrens*
Allen Cook Barr*
 *Assistant Attorney General*
Lindsey E. Middlecamp*
 *Special Counsel*
445 Minnesota Street, Suite 600
St. Paul, MN, 55101
(651) 300-0711

*Counsel for the State of Minnesota*

**KWAME RAOUL**
Attorney General for the State of Illinois

By: */s/ Vikas Didwania*
Vikas Didwania*
 *Complex Litigation Counsel*
Alex Hemmer*
 *Deputy Solicitor General*
Holly F.B. Berlin*
 *Assistant Attorney General*
115 S. LaSalle St.
Chicago, IL 60603
(312) 814-5526

*Counsel for the State of Illinois*

**JENNIFER DAVENPORT**
Attorney General of New Jersey

By: */s/ Meghan K. Musso*
Meghan K. Musso*
Jonathan Mangel*
Joshua P. Bohn*
 *Deputy Attorneys General*
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5276

*Counsel for the State of New Jersey*

**AARON M. FREY**
Attorney General for the State of Maine

By: */s/ Katherine W. Thompson*
Katherine W. Thompson*
 *Special Counsel*
6 State House Station
Augusta, ME 04333-0006
(207) 626-8800

*Counsel for the State of Maine*

**RAÚL TORREZ**
Attorney General of New Mexico

By: */s/ Bailey Colfax*
Bailey Colfax*
 *Assistant Attorney General*
408 Galisteo Street
Santa Fe, NM 87501
(505) 490-4060

*Counsel for the State of New Mexico*

*(additional counsel on following page)*

33

**LETITIA JAMES**
Attorney General of New York

By: */s/ Colleen K. Faherty*
Colleen K. Faherty*
    *Special Trial Counsel*
Rabia Muqaddam*
    *Chief Counsel, Federal Initiatives*
28 Liberty Street
New York, NY 10005
(212) 416-6046

*Counsel for the State of New York*


**JEFF JACKSON**
Attorney General of North Carolina

Laura Howard
Chief Deputy Attorney General

By: */s/ Daniel P. Mosteller*
Daniel P. Mosteller*
    *Associate Deputy Attorney General*
114 W. Edenton Street
Raleigh, NC 27603

*Counsel for the State of North Carolina*


**DAN RAYFIELD**
Attorney General, State of Oregon

By: */s/ Thomas H. Castelli*
Thomas H. Castelli*
    *Special Assistant Attorney General*
100 SW Market Street
Portland, OR 97201
(971) 673-1880

*Counsel for the State of Oregon*


**CHARITY R. CLARK**
Attorney General for the State of Vermont

By: */s/ Ryan P. Kane*
Ryan P. Kane*
    *Deputy Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-2153

*Counsel for the State of Vermont*


**JAY JONES**
Attorney General for the Commonwealth of Virginia

By: */s/ Tillman J. Breckenridge*
Tillman J. Breckenridge*
    *Solicitor General*
202 North Ninth Street
Richmond, VA 23219

*Counsel for the Commonwealth of Virginia*


**PETER F. NERONHA**
Attorney General of Rhode Island

By: */s/ Kyla Duffy*
Kyla Duffy*
    *Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400

*Counsel for the State of Rhode Island*

*(additional counsel on following page)*

34

| | |
|---|---|
| **JOSHUA L. KAUL**<br>Attorney General for the State of Wisconsin | **JOSH SHAPIRO**<br>Governor of the Commonwealth of Pennsylvania |
| By: */s/ Lynn Lodahl*<br>Lynn Lodahl*<br>    *Assistant Attorney General*<br>17 West Main Street<br>Madison, WI 53707-7857<br>(608) 264-6219 | By: */s/ Michael J. Fischer*<br>Michael J. Fischer*<br>Jacob B. Boyer*<br>    *Deputy General Counsel*<br>30 North Third Street, Suite 200<br>Harrisburg, PA 17101<br>(717) 831-2847 |
| *Counsel for the State of Wisconsin* | *Counsel for the Governor of the Commonwealth of Pennsylvania* |

*\*Admitted pro hac vice or pro hac vice applications forthcoming*

## CERTIFICATE OF SERVICE

I, Michael S. Cohen, hereby certify that I served a true copy of the above document upon all counsel of record via this Court's electronic filing system.

Dated:  May 14, 2026

*/s/ Michael S. Cohen*

Michael S. Cohen
Deputy Attorney General
*Counsel for the State of California*

35