**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF MASSACHUSETTS, *et al.*,<br><br>    *Plaintiffs*,<br><br>  v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>    *Defendants*. | No. 1:26-cv-11549 (IT) |

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*,<br><br>    *Plaintiffs*,<br><br>  v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>    *Defendants*. | No. 1:26cv11581 (IT) |

**BRIEF OF STATE AND LOCAL ELECTION OFFICIALS AND ELECTION EXPERTS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT AND PRELIMINARY AND PERMANENT INJUNCTIONS**

SAMANTHA P. BATEMAN*
KYLE R. FREENY*
ROSA L. BAUM*
WASHINGTON LITIGATION GROUP
1717 K Street N.W., Suite 1120
Washington, D.C. 20006
(202) 521-8750
sbateman@washingtonlitigationgroup.org

ANA MUÑOZ

*Counsel for Amici Curiae State and Local Election Officials and Election Experts*

*\* Motions for admission pro hac vice pending*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... iii

INTERESTS OF *AMICI CURIAE* ...................................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................................... 2

ARGUMENT ..................................................................................................................... 4

I.   The EO violates the Constitution and various federal statutes................................. 4

  A.  The EO marks an unconstitutional intrusion by the Executive, contravening the
      Constitution's clear reservation of electoral authority to states and Congress. ............. 4

  B.  The EO also violates several existing federal statutes regulating voting....................... 7

II.  As a practical matter, implementing this EO would wreak havoc on electoral processes and
     pose intolerable risks for the integrity of federal elections. ..................................... 12

  A.  The centralized, federally maintained voter lists contemplated by the EO would
      heighten security risks for elections and sensitive voter data. .................................... 13

  B.  The EO would needlessly complicate electoral procedures and would inevitably inject
      errors and administrative chaos into the process. ........................................................ 15

  C.  The EO requires USPS to undertake tasks for which it is unauthorized and ill-
      equipped................................................................................................................. 22

  D.  The EO improperly threatens state and local election officials with federal prosecution
      for doing their jobs.................................................................................................. 24

CONCLUSION.................................................................................................................. 25

APPENDIX: *AMICI CURIAE* ............................................................................................. i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Fed. of State, County and Municipal Employees, AFL-CIO v. Soc. Security Admin.*,
No. 1:25-cv-00596-ELH, 2026 WL 176431 (D. Md. Jan. 16, 2026) ...................................... 15

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
570 U.S. 1 (2013) ................................................................................................................. 5

*Bellito v. Snipes*,
935 F.3d 1192 (11th Cir. 2019) .......................................................................................... 9

*Biden v. Nebraska*,
600 U.S. 477 (2023) ........................................................................................................... 7

*California v. Trump*,
786 F. Supp. 3d 259 (D. Mass. 2025) ........................................................................ 2, 6, 12

*Dalton v. Specter*,
511 U.S. 462 (1994) ........................................................................................................... 4

*Foster v. Love*,
522 U.S. 67 (1997) ............................................................................................................. 4

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
No. 1:25-cv-00946 (CKK), 2026 WL 880056 (D.D.C. Mar. 31, 2026) .................................... 2

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
780 F. Supp. 3d 135 (D.D.C. 2025) ........................................................................ 5, 6, 7, 12, 13

*McDonald v. Bd. of Election Comm'rs of Chicago*,
394 U.S. 802 (1969) ........................................................................................................... 5

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
526 U.S. 172 (1999) ........................................................................................................... 4

*Munro v. Socialist Workers Party*,
479 U.S. 189 (1986) ........................................................................................................... 5

*Oregon v. Mitchell*,
400 U.S. 112 (1970) ......................................................................................................... 10

*Pub. Interest Legal Found. v. Benson*,
136 F.4th 613 (6th Cir. 2025) ............................................................................................ 9

*Smiley v. Holm*,
285 U.S. 355 (1932) ........................................................................................................... 5

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ........................................................................................................... 4

**Constitution, Statutes, and Regulations**

39 U.S.C. § 404(a)(1)........................................................................................... 22

39 U.S.C. § 404(e)(2)........................................................................................... 22

42 U.S.C. 1320b-7 ............................................................................................... 19

52 U.S.C. § 10502(d) ........................................................................................... 10

52 U.S.C. § 20302(a)(8)(A) .................................................................................... 9

52 U.S.C. § 20303(b) .............................................................................................. 9

52 U.S.C. § 20304(b)(2) .......................................................................................... 9

52 U.S.C. § 20504(c)(2)(C) ................................................................................... 16

52 U.S.C. § 20507(a)(3)..................................................................................... 8, 11

52 U.S.C. § 20507(a)(4)........................................................................................... 8

52 U.S.C. § 20507(c)(2)(A) ................................................................................... 11

52 U.S.C. § 21083(a)(1)(A) ..................................................................................... 8

52 U.S.C. § 21083(a)(2)(A)(i) ................................................................................. 8

52 U.S.C. § 21083(a)(2)(B)(i) .................................................................................. 8

52 U.S.C. § 21083(a)(2)(B)(ii) ................................................................................ 8

52 U.S.C. § 21083(a)(5)(A)(1) ............................................................................... 16

52 U.S.C. § 21085 ................................................................................................... 9

Exec. Order No. 14248, 90 Fed. Reg. 14005 (Mar. 25, 2025)............................ *passim*

Help America Vote Act, Pub. L. No. 107-252, 116 Stat. 1666 (2002)...................... 7

U.S. Const. amend. XVII ......................................................................................... 5

U.S. Const. art. I, § 2............................................................................................... 5

U.S. Const. art. I, § 4............................................................................................... 4

U.S. Const. art. II, § 1 .............................................................................................5

Voting Rights Act Amendments of 1970, Pub. L. No. 91-285, § 202, 84 Stat. 314 ................... 10

**Other Authorities**

Adam Sella, *Postal Service, Already Under Pressure, Now Faces
    Trump's Mail Ballot Order*, NY Times (Apr. 11, 2026) .......................................... 23

Center for Election Innovation & Research, *Update: Review of
    Claims of Noncitizens Registrants and Voters* (Feb. 2026) ................................... 17

Dep't of Homeland Sec., Privacy Impact Assessment for the Systematic
    Alien Verification Entitlements Program, DHS Ref. No. DHS/USCIS/PIA-006(d)
    (Oct. 31, 2025)........................................................................................................ 20

H.R. Rep. No. 107-329, pt. 1 (2001)........................................................................... 14

Hamilton, Alexander, The Federalist No. 59 ............................................................... 6

House Comm. on Oversight and Gov't Reform, 114th Cong.,
*The OPM Data Breach: How the Government Jeopardized Our*
*National Security for More than a Generation* (Sept. 7, 2016)................................ 15

Jen Fifield & Zach Despart, *A federal tool to check voter citizenship*
*keeps making mistakes. It led to confusion in Texas*,
The Texas Trib. (Feb. 13, 2026) .............................................................................. 20

Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal*
*Tool to Check Voter Citizenship Keeps Making Mistakes*,
ProPublica (Feb. 13, 2026) ..................................................................................... 20

Jonathan Auerbach & Steve Pierson, *Does voting by mail increase fraud?*
*Estimating the change in reported voter fraud when states switch to elections*
*by mail*, Am. Stat. Ass'n, Off. of Sci. Pol'y (Oct. 26, 2020).................................. 17

Jude Joffe-Block, *6 facts about false noncitizen voting claims and*
*the election*, NPR (updated Nov. 5, 2024)............................................................... 17

Letter from Nancy Morales Gonzalez, Assoc. Gen. Counsel for Soc. Sec. Admin.,
to Jon Sherman, Litig. Dir. & Senior Counsel for Fair Elections Ctr. (July 13, 2023) ............ 19

M.I.T. Election Data & Sci. Lab, *Voting by mail and absentee*
*voting* (updated Feb. 28, 2024) ............................................................................... 17

National Conference of State Legislatures, *Table 5: Applying for an Absentee*
*Ballot, Including Third-Party Registration Drives* (updated Feb. 24, 2026) ........... 18

Senate Select Comm. on Intelligence, 116th Cong., *Russian Active*
*Measures Campaigns and Interference in the 2016 U.S. Election*,
Vol. I at 3-28 (Nov. 2020) ....................................................................................... 14

Special Counsel Robert S. Mueller, III, *Report on the Investigation into*
*Russian Interference in the 2016 Presidential Election*, Vol. I (2019) .................... 15

## INTERESTS OF *AMICI CURIAE*

*Amici Curiae* ("Amici") are a bipartisan group of current and former state and local election officials who are or were charged with the responsibility for administering elections, including federal elections, within their jurisdictions, as well as election experts from the Center for Election Innovation and Research ("CEIR") who support their work.[1]  Amici include 52 officials from a diverse range of states and localities, including 19 states.  Given their roles and responsibilities, Amici have a strong interest in the fair and efficient administration of elections, in safeguarding the integrity of elections and electoral results, in avoiding threats of baseless prosecutions of election officials, and in protecting the Constitutionally derived rights of states and localities to adopt rules and regulations governing elections within their borders.

Amici strongly concur with plaintiffs in these consolidated cases that the challenged executive order ("EO" or "Order"), "Ensuring Citizenship Verification and Integrity in Federal Elections,"[2] is both unconstitutional on its face and unlawful under numerous federal statutes. Based on their extensive on-the-ground experience and expertise in administering elections, Amici also write to explain the myriad practical problems that would result from the EO, if it were permitted to take effect.  As further explained below, the EO would inject chaos and uncertainty into the electoral process, heightening risks to election integrity, upsetting states' and localities' carefully-considered voting procedures, and inevitably causing errors that could disenfranchise significant numbers of eligible American voters.  These risks are particularly intolerable given the EO's tight deadlines and the backdrop of the rapidly approaching November 2026 elections.

---

[1] A complete list of signatories can be found in the Appendix.  Amici state that no counsel for a party to this case authored this brief in whole or in part; no party or counsel for a party contributed monetarily to the preparation or submission of any portion of this brief; and no person other than counsel for Amici contributed money that was intended to fund preparing or submitting the brief. Amici have concurrently filed a motion seeking the Court's leave to file this brief.

[2] *See* Exec. Order No. 14399, 91 Fed. Reg. 17125 (Mar. 31, 2026), https://perma.cc/LVY4-3ATL.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

This EO marks just the latest unconstitutional attempt by the current President to interfere with the administration of federal elections.  Just last year, a court in this District enjoined a prior voting-related order—Executive Order No. 14248, 90 Fed. Reg. 14005 (Mar. 25, 2025)—as "unlawful and unconstitutional." *California v. Trump*, 786 F. Supp. 3d 259, 296 (D. Mass. 2025); *see also* Final Judgment, *League of United Latin Am. Citizens v. Exec. Off. of the President*, No. 1:25-cv-00946 (CKK), 2026 WL 880056 (D.D.C. Mar. 31, 2026) (same).  But undeterred, on March 31, 2026, the President signed this Order.

Although the Order is styled as an exercise of "the Federal Government's constitutional obligation to guarantee a republican form of Government," Exec. Order No. 14399, 91 Fed. Reg. 17125, 17125 (Mar. 31, 2026), it is a naked power grab by the Executive in an area with which— by the Framers' explicit design—the President should have nothing to do.  The Constitution could not be clearer that the authority to regulate and administer elections is reserved to the states in the first instance, superintended only by laws duly enacted by Congress.  Presidential executive orders have no role whatsoever to play in this process.  The Court should enjoin the EO on that basis alone.

But as Amici can tell this Court based on their extensive personal experience administering elections in jurisdictions across the country, the challenged EO is also disastrous from a practical perspective.  It mandates the creation and maintenance of various federally maintained lists, derived from federal databases and purportedly reflecting U.S. citizens who are eligible to vote in each state.  But in doing so, it usurps the traditional—and statutorily mandated—roles of states in maintaining their own voting lists, instead supplanting them with federal lists that are all but guaranteed to contain substantial errors.  This is not only contrary to the Constitution, but also common sense.  There is no basis for injecting the federal government into an area that states and

2

localities have long proven able to manage on their own—particularly not when the federal lists contemplated by the EO are so poorly conceived and ill-defined.

The EO also conflicts with provisions in existing federal laws concerning the timing and procedures for requesting, mailing, and receiving mail-in and absentee ballots. And although the Order purports to "enhance election integrity via the United States Mail," 40 Fed. Reg. at 17125, § 1, it in fact directs the U.S. Postal Service ("USPS") to engage in functions, including maintaining voting rolls and verifying voter eligibility, that USPS has not been authorized or equipped by Congress to conduct. The end result is that, if permitted to take effect, the EO would almost certainly disenfranchise significant numbers of eligible voters. Moreover, in Amici's considered judgment, it would be impossible to implement the various procedures contemplated by the EO without running afoul of other timing requirements for absentee and mail-in balloting—particularly given the short time remaining before the upcoming November 2026 mid-term elections.

Finally, the EO will create chaos and confusion for election officials and voters alike. It will complicate Amici's jobs during the critical—and already quite busy—time period immediately preceding elections. It will expose our electoral systems to heightened risks of outside interference and undermine public confidence in elections and election results. And Amici are particularly concerned by the EO's threats of criminal investigation and prosecution of election officials, which raises the specter that they will be targeted simply for doing their jobs.

To be clear: Amici do not submit this brief from a partisan perspective. This ill-considered and unlawful EO would alarm Amici no matter who signed it, and no matter which candidates or political parties (if any) it might help or harm. Amici write only in service of their own roles and responsibilities as guardians of free and fair elections, which this EO threatens to seriously undermine. No President is permitted to regulate elections by unilateral executive order. Accordingly, the Court should grant plaintiffs' pending motions and enjoin the EO.

3

**ARGUMENT**

**I.    The EO violates the Constitution and various federal statutes.**

The challenged EO represents an extraordinary attempt by the Executive to impose sweeping changes to electoral procedures governing absentee and mail-in voting in federal elections throughout the country.  This blatant power grab is unconstitutional on its face, as it unlawfully usurps electoral authority that the Constitution explicitly allocates to states and Congress, not the President.  Moreover, far from being authorized by any federal authority, the EO in fact violates several federal statutes relating to voting rights and electoral procedures.

**A. The EO marks an unconstitutional intrusion by the Executive, contravening the Constitution's clear reservation of electoral authority to states and Congress.**

From the outset, the EO violates fundamental constitutional principles of federalism and separation of powers regarding the administration of federal elections.  It is a basic structural feature of our Nation's government that the President's authority to act must "stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952); *see also Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 188-89 (1999) (same); *Dalton v. Specter*, 511 U.S. 462, 472 (1994) (explaining that the President lacks authority to act "unconstitutionally *or* beyond his statutory powers").  In this case, however, not only does no such Presidential authority exist, but the Constitution in fact mandates that other sovereign governments and a different branch of the federal government shall administer and regulate federal elections, leaving no room for the Presidential interference represented by this EO.

Start with the Constitution's Elections Clause, which explicitly provides that the "Times, Places and Manner of holding Elections for [U.S.] Senators and Representatives, shall be prescribed in each State by the Legislature thereof," subject only to a superseding act of Congress.  U.S. Const. art. I, § 4, cl. 1 ("[B]ut the Congress may at any time by Law make or alter such [state] Regulations, except as to the Places of [choosing] Senators."); *see also Foster v. Love*, 522 U.S. 67, 69 (1997).

4

The Supreme Court has repeatedly recognized the "broad" scope of this clause, *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8 (2013), which encompasses everything from voter registration, *see Smiley v. Holm*, 285 U.S. 355, 366 (1932), to the form and content of ballots, *see Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986). Under the Elections Clause, states—limited only by duly enacted Congressional laws—have the power to administer voting by mail, including determining which voters are eligible to receive and cast absentee and mail-in ballots. *See McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802, 809-11 (1969).

Moreover, the Constitution also entrusts to states the authority to prescribe qualifications for voting in federal elections. The Voter Qualifications Clause provides that Members of the U.S. House of Representatives must be elected by voters who "have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature." U.S. Const. art. I, § 2, cl. 1. And the Seventeenth Amendment likewise prescribes that voters for U.S. Senators "shall have the qualifications requisite for electors of the most numerous branch of the State legislatures." U.S. Const. amend. XVII. As another court previously explained when invalidating key aspects of a prior executive order regarding elections, "[b]ecause the States determine who is eligible to vote for their state legislators, the Constitution indirectly grants the States authority to determine who is eligible to vote for federal legislators as well." *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 156-57 (D.D.C. 2025) ("*LULAC I*"). Meanwhile, with regard to presidential elections, the Electors Clause empowers each State to appoint electors to the Electoral College, which in turn votes to elect the President, "in such Manner as the Legislature thereof [*i.e.*, of that State] may direct." U.S. Const. art. II, § 1, cl. 2. Congress then has the power to "determine the Time of [choosing] the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States." U.S. Const. art. II, § 1, cl. 4.

In contrast to these explicit grants of authority to states and Congress, the Constitution makes no provision whatsoever for Presidential involvement in regulating or administering federal elections, including in determining which voters may cast ballots or by what means.  The Framers engaged in substantial debate about the appropriate authority to regulate elections and electors, and they ultimately reached a constitutional compromise between "submit[ing] the regulation of elections . . . in the first instance" to the states, where such regulation would "be both more convenient and more satisfactory," while simultaneously "reserv[ing] to [Congress] a right to interpose" nationwide regulations where necessary and appropriate.  The Federalist No. 59 (A. Hamilton).  But "[t]he Constitution does not grant the President any specific powers over elections." *California v. Trump*, 786 F. Supp. 3d at 373.  "In fact, Executive regulatory authority over federal elections does not appear to have crossed the Framers' minds . . . ." *LULAC I*, 780 F. Supp. 3d at 159 (citing Federalist No. 59).

Given the plain text of all these Constitutional provisions, this EO marks a patently unconstitutional intrusion by the Executive Branch.  By, *inter alia*, instructing USPS not to "transmit mail-in or absentee ballots from any individual" who has not been "enrolled" on federally maintained "Mail-In and Absentee Participation List[s]," 40 Fed. Reg. at 17126, § 3(b)(iii)-(iv), the EO effectively imposes new voting requirements and regulations that were not enacted by Congress or by any state.  It thus unconstitutionally arrogates to the Executive a power that he does not possess, while usurping the constitutionally allocated roles of the states and Congress regarding federal elections, in contravention of basic principles of federalism and separation of powers.

Indeed, the constitutional violation here is all the more apparent because this unilateral Presidential decree comes on the heels of the President's failure to persuade Congress to enact the so-called "Safeguard American Voter Eligibility" ("SAVE") Act, which would have imposed some

of the same or similar voting restrictions.[3]  And it is black-letter law that a President may not use an executive order to "seiz[e] the power of the Legislature," or to enact by executive fiat a program "that Congress has chosen not to enact itself."  *Biden v. Nebraska*, 600 U.S. 477, 503 (2023); *see LULAC I*, 780 F. Supp. 3d at 155 ("[N]o statutory delegation of authority to the Executive Branch permits the President to short-circuit Congress's deliberative process by executive order."). Because that is precisely what this EO attempts to do, it is unconstitutional.

### B.  The EO also violates several existing federal statutes regulating voting.

In addition to those fundamental constitutional defects, the EO also contravenes important provisions in several existing federal laws regarding voting rights and voting procedures.[4]

1.      For starters, the EO's provisions directing the creation and maintenance of federally maintained lists of voters—which will apparently be used in some form to restrict which voters may receive absentee or mail-in ballots through the U.S. mails—conflict with federal laws confirming and implementing states' constitutionally derived authority to compile and perform required maintenance on their own voting lists.  More specifically, the Help America Vote Act ("HAVA"), enacted in 2002, *see* Pub. L. No. 107-252, 116 Stat. 1666, 1708 (2002), provides in Section 303(a) that

> each State, acting through the chief State election official, shall implement, in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, *maintained, and administered at the State level* that contains the name and registration information of every legally registered voter in the State and assigns a unique identifier to each legally registered voter in the State.

---

[3] *See* Mary Clare Jalonick, *Republican Voter ID Bill Stalls in Senate Despite Trump Demands*, AP News (updated Feb. 26, 2026), https://perma.cc/55M3-N2JZ.

[4] As explained by the plaintiffs in their motions for summary judgment, the EO likely violates many other laws, as well.  But Amici direct their focus here primarily toward those statutes that are most relevant to their own work.

52 U.S.C. § 21083(a)(1)(A) (emphasis added).  The statute also mandates that "*the appropriate State or local election official shall perform list maintenance* with respect to the computerized list on a regular basis," including by removing ineligible voters "in accordance with the provisions of the National Voter Registration Act of 1993" ("NVRA").  *Id.* § 21083(a)(2)(A)(i) (emphasis added); *see also* 52 U.S.C. § 20507(a)(3)-(4) (section 8 of NVRA, providing, among other things, that states shall "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists," and that states may not remove the names of registered voters except through such a general program for reason of death or a change in residence, "at the request of the registrant," or under the authority of state law for "reason of criminal conviction or mental incapacity").  And HAVA directs that "[t]he list maintenance performed under [the Act] shall be conducted in a manner that ensures that (i) the name of each registered voter appears in the computerized list [and that] (ii) only voters who are not registered or who are not eligible to vote are removed from the computerized list."  52 U.S.C. § 21083(a)(2)(B)(i)-(ii).

This statutory scheme thus reflects Congress's clear intent that state and local election officials—not federal agencies—will create and maintain lists of registered voters eligible to vote in federal elections within each state, and that they will perform all necessary maintenance and revisions to such lists in accordance with applicable law.  But the EO conflicts with this framework by instead directing the creation of separate federally maintained lists of eligible voters from each state, including DHS-maintained lists "derived from Federal citizenship and naturalization records, SSA [Social Security Administration] records . . . and other relevant Federal databases," 91 Fed. Reg. at 17125, § 2(a), and USPS-maintained lists of individuals "who are enrolled with the USPS . . . for mail-in or absentee ballots," *id*. at 17126, § 3(b)(iv).  And although it is not entirely clear how exactly this all will operate in practice, the Order contemplates that the USPS must refuse to transmit any mail-in or absentee ballots from voters who do not appear on a federal list of

"individuals . . . enrolled with the USPS," even if those voters *do* appear on states' own HAVA- and NVRA-compliant lists. *Id.* § 3(b)(iii)-(iv). This EO, therefore, once again improperly interjects the Executive Branch into matters that both the Constitution and federal statutes have appropriately reserved for state and local electoral authorities. *See* 52 U.S.C. § 21085 ("The specific choices on the methods of complying with the requirements" of voter list maintenance and voter eligibility determinations "shall be left to the discretion of the State[s]"). And it does so despite repeated court findings that states and localities are already appropriately complying with applicable federal law concerning required voter list maintenance.[5]

2.        Moreover, in addition to conflicting with those statutory provisions regarding the maintenance of voter lists, the EO also runs headlong into other provisions of federal law concerning the timing and other procedures for mailing and receiving absentee and mail-in ballots.

For example, the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), as amended in 2009 by the Military and Overseas Voter Empowerment ("MOVE") Act, requires that states send federal absentee ballots to military and other overseas voters at least 45 days before a federal election. *See* 52 U.S.C. § 20302(a)(8)(A). Marked federal absentee ballots must then be delivered to the appropriate election authorities via USPS on an expedited basis, *see id.* § 20304(b)(2), "in the manner provided by law for absentee ballots in the State involved," 52 U.S.C. § 20303(b). And with respect to Presidential and Vice-Presidential elections, the Voting Rights Act ("VRA"), as amended in 1970, also specifies that "each State *shall* provide by law" for the

---

[5] *See, e.g.*, *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 626-27 (6th Cir. 2025) (affirming district court finding "that undisputed evidence established that Michigan's program of removing deceased registrants fell squarely within the NVRA's reasonable-effort requirement" for maintaining voting rolls); *Bellitto v. Snipes*, 935 F.3d 1192, 1195 (11th Cir. 2019) (concluding that "the district court did not clearly err in finding that Broward's Election Supervisor conducted a program reasonably designed to" remove former voters who had become ineligible due to death or change in address, as required by the NVRA).

casting of absentee ballots "by all duly qualified residents of such State who may be absent from their election district or unit in such State on the day such election is held and who have applied therefor not later than seven days immediately prior to such election."  52 U.S.C. § 10502(d) (emphasis added); *see also* Voting Rights Act Amendments of 1970, Pub. L. No. 91-285, § 202, 84 Stat. 314, 316-17 (1970).  By enacting this 1970 amendment, "Congress provided uniform national rules for absentee voting in presidential and vice-presidential elections" to "insure a fully effective voice to all citizens in national elections."  *Oregon v. Mitchell*, 400 U.S. 112, 134 (1970).

This EO, however, directly interferes with those Congressionally enacted requirements, and in fact would render compliance with those statutes impossible.  The EO provides that states may notify the USPS, "no fewer than 90 days prior to a Federal election," that they intend to allow for absentee or mail-in voting, and that each state should then submit to USPS, "no fewer than 60 days before the election," a list of voters to whom the state "intends to provide a mail-in or absentee ballot to be transmitted via the USPS."  91 Fed. Reg. at 17127, § 3(b)(ii).[6]  Although the EO again leaves several significant gaps regarding how the process will operate in practice, the order appears to contemplate that USPS will then perform some type of data review or other data collection (potentially including cross-checking with the other federally maintained voting lists specified in the EO, and/or allowing or even requiring voters to affirmatively add their names to the USPS-maintained lists) in order to "enroll" individuals on the State-specific lists of voters who are authorized to have their mail-in or absentee ballots transmitted by USPS.  *See id.* § 3(b)(iv).  The EO then directs USPS to provide those lists of "enrolled" voters to the states, "along with unique ballot envelope identifiers, such as bar codes, for mail-in or absentee ballots provided to such individuals."  *Id.*  And it requires the adoption of rules ensuring that USPS will not transmit any

---

[6] Amici fully expect each of the states where they work to continue to provide for the availability of mail-in and absentee voting in upcoming elections, as that is required by applicable state laws.

10

mail-in or absentee ballot from any individual who was not "enrolled" on such a "State-specific list . . . with the USPS." *Id*. § 3(b)(iii).

It is entirely unclear how this complicated but ill-explained process will actually unfold. As explained further below, USPS has no expertise in complex data-matching and list maintenance, in sharp contrast to the decades of experience that Amici and other local election officials have. But regardless of the specific details, it is clear that the EO's directive to USPS to limit transmission of ballots only to those voters "enrolled" with USPS runs directly contrary to the statutory protections that UOCAVA provides for uniformed and overseas civilian voters, as well as the VRA's protections for absentee voting in Presidential elections. Neither UOCAVA nor the VRA includes or countenances any limitation on the availability of absentee voting solely to voters whose names appear on lists maintained by USPS or any other federal authority.[7]

Finally, under the express terms of the NVRA, states are forbidden from removing voters from their voting rolls within 90 days of any federal election—absent death, affirmative request by the voter, or "as provided by State law, by reason of criminal conviction or mental incapacity." 52 U.S.C. § 20507(a)(3); *id.* § 20507(c)(2)(A) ("A State shall complete, *not later than 90 days prior to the date of a primary or general election for Federal office*, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters.") (emphasis added). But this EO is highly likely to bring states into conflict with that established federal law, as well. The Order apparently contemplates that USPS will somehow compare the lists of potential mail-in or absentee ballot recipients provided by the states (which lists may be

---

[7] Moreover, given the complexities of the process that is apparently contemplated for "enrolling" mail-in and absentee-eligible voters with USPS, it is all but impossible to imagine that USPS could complete all the tasks anticipated by the EO and still comply, for example, with UOCAVA's 45-day timing requirement for delivering absentee ballots in advance of an election. *See* 52 U.S.C. § 20302(a)(8)(A).

11

submitted to USPS no fewer than 60 days before an election, *see* 91 Fed. Reg. at 17126, § 3(b)(ii)), with the separate federally maintained national voter list compiled by DHS, and that USPS will then send states the lists of "individuals . . . enrolled with the USPS . . for mail-in or absentee ballots provided by [each] State," *id*. § 3(b)(iv).  Combined with the Order's directive to USPS not to transmit ballots from anyone not "enrolled" on such a USPS-maintained list, *id*. § 3(b)(iii), and the overt threats of potential federal criminal investigation and prosecution of election officials who are deemed to run afoul of the EO, *see id*. at 17126-27, §§ 2(b), 3(c), & 5, the upshot is that the EO aims to effectively remove voters and preclude them from casting their ballots in federal races.  But troublingly, it does all of this within the same 90-day period before an election when Congress has already mandated that states must largely leave their voter rolls intact.  *See* 52 U.S.C. § 20507(c)(2)(A).  Yet the EO does not even mention that provision of the NVRA, let alone explain how its timing requirements can be squared with that statute's plain text.

In short, because the EO is "contrary to the manifest will of Congress, as expressed in the text, structure, and context of the NVRA[,] . . . HAVA," and other federal statutes (*e.g.*, UOCAVA), it cannot stand.  *California v. Trump*, 786 F. Supp. 3d at 380 (quoting *LULAC I*, 780 F. Supp. 3d at 195).

## II.     As a practical matter, implementing this EO would wreak havoc on electoral processes and pose intolerable risks for the integrity of federal elections.

Even beyond the obvious unlawfulness and unconstitutionality of the EO, Amici are also keenly aware that as a purely practical matter, implementing this EO—particularly with so little time remaining before the rapidly approaching November 2026 midterm elections—would wreak havoc on electoral processes nationwide.  It would displace longstanding election procedures with which voters are familiar—and that are already working quite well—in favor of a federally managed system that is novel, ill-conceived, and poorly explained, and that relies on federal agencies like USPS that are not equipped to handle the tasks assigned to them by the EO.  The end

12

result would be chaos—before, during, and after the elections—and there would be serious attendant risks that significant numbers of eligible voters would be disenfranchised.

The EO would also interfere with Amici's work as local election officials at a critical time in the electoral cycle. In the 90 days before an election—the same time period during which the EO seems to contemplate that USPS will be comparing the voter lists from every state to a new, poorly-conceived, and almost certainly error-plagued federal database of voters—Amici are already overwhelmingly busy preparing a secure election and serving our voters. During that crucial time period, Amici must perform key tasks including confirming and preparing voting locations, printing ballots, programming and testing voting equipment, training poll workers, and publishing essential voter information. Adding into this mix the unlawful and confusing EO, along with its ominous threats of bringing the federal criminal law enforcement apparatus to bear against election officials, will only further complicate Amici's already difficult jobs. In view of these and the other irreparable harms identified by the plaintiffs, this Court should enjoin the Order.

### A. The centralized, federally maintained voter lists contemplated by the EO would heighten security risks for elections and sensitive voter data.

At the outset, this EO is unprecedented not just in its naked power grab by the Executive Branch, which is not entrusted with any such electoral authority under the Constitution, but also in its attempt to centralize voter data on federally maintained lists with a nationwide scope. That is not how voting lists have ever worked in this country, by conscious design of the Framers. Dating back to the Founding, voting rolls have historically been maintained in a decentralized fashion, by individual states and localities. *See, e.g.*, *LULAC I*, 780 F. Supp. 3d at 158-59 (explaining that the Framers abandoned any effort to "adopt[] a universal approach" to determining voter eligibility and maintaining records of eligible voters, because "[i]n the end, leaving this power with the States was the only practical solution").

13

This decentralization is a feature, not a bug, of our nation's electoral system. As Amici know first-hand, state and local election officials are closer to the facts on the ground in their respective jurisdictions, ensuring greater responsiveness to voters' needs and concerns, as well as to the inherently fluid nature of voting rolls (as individuals' eligibility to vote in particular elections or particular jurisdictions can change over time—*e.g.*, when voters move, turn 18 years of age, die, or naturalize). And as explained in greater detail below, the voter eligibility data that is already maintained by states and localities is in fact much *more* accurate than anything that could be assembled by DHS, USPS, or any other agency at the federal level.

Decentralization has also proven to be a key security feature of our electoral system. With voter data and voting technology decentralized across numerous states and localities, our overall federal electoral system can remain resilient, even in those rare instances when malign actors may target our election infrastructure.[8] Moreover, this "dispersal of responsibility for election administration has made it impossible for [any] single centrally controlled authority to dictate how elections will be run, and thereby be able to control the outcome." H.R. Rep. No. 107-329, pt. 1, at 31-32 (2001) (outlining reasons why the historical system whereby "elections in this country have been administered at the state and local level . . . has many benefits that must be preserved").

---

[8] "State [and] local [election] official[s]" are required to—and in fact do—"provide adequate technological security measures to prevent the unauthorized access to" their electronically maintained voting lists. 52 U.S.C. § 21083(a)(3). But, of course, no such security measure is infallible, and there have been isolated occurrences of successful breaches of voter data, particularly by foreign actors, in recent years. *See, e.g.*, Senate Select Comm. on Intelligence, 116th Cong., *Russian Active Measures Campaigns and Interference in the 2016 U.S. Election*, Vol. I at 3-28 (Nov. 2020), https://perma.cc/5TKY-8V3A (detailing "extensive activity" directed by the Russian government "against U.S. election infrastructure at the state and local level" in connection with the 2016 elections, which resulted in successful data breaches in Illinois and one other state, although "[t]he Committee has seen no evidence that any votes were changed").

By contrast, having all federal voter data consolidated in a single location, on the type of nationalized, federally maintained voting lists contemplated by this EO, would create an inviting target for any actors—including foreign malign actors—intent on destabilizing our elections. *See, e.g.*, Special Counsel Robert S. Mueller, III, *Report on the Investigation into Russian Interference in the 2016 Presidential Election*, Vol. I, at 50-51 (2019), https://perma.cc/P2S5-L22A (describing Russian intelligence efforts to access state and local databases of registered voters). That risk of harm is compounded by the kind of sensitive personal information that would almost certainly be contained on the nationwide voting lists mandated under the EO. *See* 91 Fed. Reg. at 17125 § 2(a) (directing that voting lists shall be compiled, among other sources, from "SSA records," presumably including voters' Social Security numbers). And it is all the more concerning given that the federal government has demonstrated poor data security protocols for other sensitive data in the past.[9]

### B. The EO would needlessly complicate electoral procedures and would inevitably inject errors and administrative chaos into the process.

In addition to those heightened security risks, the EO would also sow chaos in election administration, resulting in widespread confusion and almost certainly disenfranchising many

---

[9] *See, e.g.*, House Comm. on Oversight and Gov't Reform, 114th Cong., *The OPM Data Breach: How the Government Jeopardized Our National Security for More than a Generation* v (Sept. 7, 2016), https://perma.cc/8BAN-MP2C (detailing coordinated cyber-theft of highly sensitive personally identifiable information ("PII") contained in the "personnel files of 4.2 million former and current government employees and security clearance background investigation information on 21.5 million individuals")*; see also Am. Fed. of State, County and Municipal Employees, AFL-CIO v. Soc. Security Admin.*, No. 1:25-cv-00596-ELH, 2026 WL 176431 (D. Md. Jan. 16, 2026) (government filing describing apparent transmission of "PII derived from SSA systems of record" by member of "Department of Government Efficiency" ("DOGE") team, "including names and addresses of approximately 1,000 people," along with an incident in which DOGE employee signed an unauthorized "Voter Data Agreement" with a partisan advocacy group and exchanged communications suggesting that he may "have been asked to assist the advocacy group by accessing SSA data to match to [state] voter rolls").

eligible voters.    Amici harbor grave concerns that if allowed to take effect, this EO would undermine their efforts to administer free and fair elections in which voters can trust.

1.        Although the EO purports to "reduc[e] the risk of fraud" by, among other things, enforcing federal laws "prohibit[ing] non-citizens from registering to vote or voting in Federal elections," 91 Fed. Reg. at 17125, § 1, there is no credible evidence to support the claim that these sweeping voting changes are necessary on that basis.    In fact, as already discussed, states and localities already maintain and continually update their voter rolls, consistent with the requirements of federal laws like the NVRA and HAVA.    And that process includes robust procedural safeguards that help to ensure compliance with citizenship, residency, and other pre-requisites for voting.    The NVRA, for example, requires that all voters swear to their eligibility, including citizenship, under penalty of perjury when they register to vote.    52 U.S.C. § 20504(c)(2)(C).    In addition, HAVA mandates that for all voters who were not registered to vote before 2002, or who are re-registering in a different county or location since that date, their "application for voter registration . . . may not be accepted or processed by a State unless the application includes . . . the applicant's driver's license number . . . [or] the last 4 digits of the applicant's social security number."    52 U.S.C. § 21083(a)(5)(A)(i).    And as Amici know from their work, the driver's license numbers and Social Security numbers provided by voters enable state and local election officials to compare their voter registration data to information maintained in other databases, such as state motor vehicle agency databases, further enhancing officials' ability to ensure that the voter lists are accurate.

The specter of large groups of non-citizens casting ballots in federal elections, particularly via mail-in voting, is a frequently invoked bogeyman by this Administration.[10]    But it is not a

---

[10] *See, e.g.*, Linda Qiu, *Fact-Checking Republicans' Misleading Claims About Elections*, N. Y. Times (Apr. 7, 2026), https://www.nytimes.com/2026/04/07/us/politics/trump-mail-voting-elections-fact-check.html.

16

concern that is borne out by reality.  "Available data shows noncitizen voting is incredibly rare"—so vanishingly rare as to be almost non-existent.  Jude Joffe-Block, *6 facts about false noncitizen voting claims and the election*, NPR (updated Nov. 5, 2024), https://perma.cc/G4HH-JDJN (citing, *e.g.*, a survey conducted after the 2016 election in jurisdictions with high immigrant populations, which found "just 30 cases of suspected noncitizens voting out of 23.5 million votes cast, or 0.0001%"); *see also* Center for Election Innovation & Research, *Update: Review of Claims of Noncitizens Registrants and Voters* (Feb. 2026), https://perma.cc/BLE2-HBHN ("[S]weeping allegations about noncitizen registrations or voting appear to arise from misunderstandings, mischaracterizations, or outright fabrications about complex voter data.").  Similarly, voting researchers have confirmed that, "[a]s with all forms of voter fraud, documented instances of fraud related to [mail-in or absentee voting] are rare."  M.I.T. Election Data & Sci. Lab, *Voting by mail and absentee voting* (updated Feb. 28, 2024), https://perma.cc/XAE9-6VLV.[11]

In short, as Amici well know, the electoral processes administered by state and local election officials throughout the country are already working quite well, leaving no need for the type of sweeping federal interference purportedly authorized by this EO.

2.      Implementing the EO would introduce administrative chaos and errors into this mix. The EO would interpose at least two federal middlemen between state and local election officials and the voters whom they serve: (1) DHS, which is charged with "tak[ing] appropriate action to compile and transmit to the chief election official of each State a list of individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election

---

[11] *See also* Jonathan Auerbach & Steve Pierson, Am. Stat. Ass'n, Off. of Sci. Pol'y, *Does voting by mail increase fraud? Estimating the change in reported voter fraud when states switch to elections by mail* (Oct. 26, 2020), https://perma.cc/HQ5N-7GNJ (comparing the number of voter fraud cases in vote-by-mail states to the number of cases in non-vote-by-mail states and finding "no evidence that voting by mail increases the risk of voter fraud overall").

and who maintain a residence in the subject State (State Citizenship List)," 91 Fed. Reg. at 17125, § 2(a); and (2) USPS, which is required to "provide each State with a list of individuals (Mail-In and Absentee Participation List) who are enrolled with the USPS, pursuant to a process specified in the rulemaking directed by this subsection, for mail-in or absentee ballots provided by such State," *id.* at 17126, § 3(b)(iv).  The EO does not make clear how these federally maintained lists (the "State Citizenship List" and the "Mail-In and Absentee Participation List") will interact, either with each other or with the voting lists maintained by the states themselves.  It does not specify what states are required to do with the lists that they receive from these federal agencies.  And although the EO invites each state to provide, at least 60 days before the election, its own "list of voters eligible to vote in a Federal election in such State to whom the State intends to provide a mail-in or absentee ballot to be transmitted via the USPS," *id.* § 3(b)(ii), it also does not explain what USPS will do with such lists, or what consequences may follow from a state's failure to submit its list.[12]  But it does mandate that USPS must refuse to transmit federal ballots for any individual who has not "been enrolled" on a USPS-maintained "Mail-In and Absentee Participation List." *id*. § 3(b)(iii)-(iv).  And it threatens criminal investigation and prosecution of "State and local officials or any others involved in the administration of Federal elections who issue Federal ballots to

---

[12] It is also entirely unclear how states can be expected to comply with the EO's 60-day deadline, given that they will not know that far in advance exactly which of their voters intend to vote by mail in a particular election.  Every State in the country allows voter requests for mail-in and/or absentee ballots to come in well after that 60-day mark; indeed, many states allow such requests to be submitted up until the week before an election, and "[e]ighteen states have statutory deadlines [under state law] for absentee/mail ballot applications that are fewer than seven days before the election."  National Conference of State Legislatures, *Table 5: Applying for an Absentee Ballot, Including Third-Party Registration Drives* (updated Feb. 24, 2026), https://perma.cc/Y7YB-9WUF .  And while the EO does indicate that states can "supplement and provide suggested modifications or amendments to the . . . Mail-In and Absentee Participation List[s]," 91 Fed. Reg. at 17127, § 3(b)(v), that still leaves precious little time before an election for states to update their lists, and for USPS to then cross-check and adjust its own lists accordingly.  Moreover, troublingly, the EO also includes no recourse for states or voters if USPS does not accept states' "suggested" amendments to the voting lists.  *Id*.

18

individuals not eligible to vote in a Federal election," *id.* § 2(b), while also threatening to "withhold[] Federal funds from noncompliant States and localities," *id.* at 17127, § 5.

While many specific details are left undefined, what is apparent is that under any conceivable application, the implementation of this EO will cause massive confusion among voters and election officials alike, gum up the works of local election administration in the critical days before an election, and cause errors that will risk disenfranchising many eligible voters. The EO mandates, for example, that DHS shall compile its state-specific lists of eligible voters using "Federal databases" and records, including "SSA records" and "SAVE data" (*i.e.*, data from DHS's Systematic Alien Verification for Entitlements program, *see* 42 U.S.C. § 1320b-7). 91 Fed. Reg. at 17125, § 2(a). The problem, however, is that these federal records were not designed to, and cannot in fact, accurately reflect individuals' citizenship and eligibility to vote, let alone in a manner that is accurately divided by those individuals' current state of residence.

SSA has admitted that because "the citizenship [data] SSA maintains merely represents a snapshot of the individual's citizenship status at the time of their interaction with SSA" (*i.e.*, when the individual applies for a Social Security number, which frequently precedes their becoming a naturalized citizen), its "records do not provide definitive information about an individual's citizenship status." Letter from Nancy Morales Gonzalez, Assoc. Gen. Counsel for Soc. Sec. Admin., to Jon Sherman, Litig. Dir. & Senior Counsel for Fair Elections Ctr. (July 13, 2023), https://perma.cc/KS2N-U2US. And multiple sources, including another federal court, have recognized that "SAVE information ha[s] a high rate of inaccuracy." *Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 261 (4th Cir. 2021) (noting that in North Carolina, for example, "about 75% of individuals who later provided proof of citizenship continued to be listed

19

as noncitizens in the SAVE system.").[13]   Indeed, DHS itself has acknowledged that "due to misspelling of names, transposed numbers, or incomplete information, the SAVE Program may produce inaccurate results" regarding citizenship.   Dep't of Homeland Sec., DHS Ref. No. DHS/USCIS/PIA-006(d), Privacy Impact Assessment for the Systematic Alien Verification Entitlements "SAVE" Program 19 (Oct. 31, 2025), https://perma.cc/G92ULYPM.

Compounding those problems, cross-checking among the various systems and records is often impossible as a practical matter, because the DHS (*i.e.*, SAVE) and SSA data sources do not use the same numeric identifiers for searching their records.  *See* Off. of the Gen. Counsel, Letter from SSA to Fair Elections Ctr., at 2.  And neither federal database is likely to include the drivers' license numbers that most states and localities use as their primary identifier for registered voters. Moreover, any federally created voting list could not possibly keep pace with the fluidity of voting eligibility, as individuals move (including across state lines), turn 18 years of age, or become naturalized U.S. citizens, even within the weeks preceding an election.  Amici have personal experience and expertise with handling such fluid voter-eligibility changes within their specific localities, but the EO does not make clear how federal agencies would be expected to address them on a nationwide basis, particularly as election dates approach.  And although the EO anticipates that states will be permitted to "routinely supplement and provide suggested modifications or amendments" to the federally maintained lists, 91 Fed. Reg. at 17125, 17127, §§ 2(a)(ii), 3(b)(v), that process itself would be cumbersome and frequently impossible (because of the mismatch in

---

[13] *See also* Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes*, ProPublica (Feb. 13, 2026), https://perma.cc/LG9X-YRYH (documenting that "SAVE has made persistent mistakes, particularly in assessing the status of people born outside the U.S.," and it routinely "misidentifie[s]" valid U.S. citizen voters as non-citizens); Jen Fifield & Zach Despart, *A federal tool to check voter citizenship keeps making mistakes. It led to confusion in Texas*, The Texas Trib. (Feb. 13, 2026), https://perma.cc/XKE2-YMNQ (noting that in some Texas counties, more than half of the individuals falsely identified by SAVE as non-citizens were in fact citizens who were eligible to vote).

20

identifiers, as already explained), and it could leave states, localities, and voters without any recourse if the federal government rebuffs their "suggested" revisions.

The upshot of these issues is that implementing the EO would put Amici and other election officials on the horns of an untenable dilemma: They would either have to rely on the federal government's flawed and inaccurate lists, thereby denying many eligible voters their constitutional right to vote. Or they would have to expose themselves to the risk of federal criminal investigation and the loss of federal funding. Neither option is consistent with either law or logic.

3.    Even beyond the intolerable risks of actual errors denying American citizens the franchise, this EO will cause significant confusion, burden Amici and the electoral apparatuses they administer, and undermine voters' confidence in elections and election officials. It will inevitably result in many (understandable) questions from concerned voters, which Amici and other election officials will be required to field during the extremely busy season immediately preceding elections, all while the EO itself adds to their already significant workloads. Moreover, it may well require state and local officials to re-design or re-issue their ballots, also on a short timetable. For example, if the federal government, applying its flawed records, refuses to transmit a federal ballot via USPS, but state records accurately show that the individual in question is in fact duly eligible to vote (and the election includes both federal and state races), then the state would need to arrange for a state-election-only ballot to be transmitted to and from such a voter. States would have to rely on USPS to transmit those state-only ballots, but it is not at all clear how a state should design its outer envelopes to make clear to USPS that the enclosed ballots are for state elections only. Nor is it clear how a state could confirm and ensure that such ballots were in fact properly delivered by USPS. There is no precedent for this approach, but Amici and other election officials may be required to invent one on-the-fly.

21

Finally, these administrative burdens are only heightened by the very short time period remaining before the upcoming midterm elections.  As noted, the EO itself leaves many critical questions unanswered, pending the outcome of rulemaking procedures that are mandated to conclude by July 29, 2026.  *See id*. at 17127, § 3(d) ("Any final rule pursuant to this section shall be issued no later than 120 days from the date of this order.").  But that leaves only a little over three months before the November 3, 2026 elections.[14]  Meanwhile, ballots must be provided via mail to eligible UOCAVA voters 45 days before that, *i.e.*, by September 19, 2026.  In Amici's considered judgment, it would be impossible to implement these substantial changes to the nation's election infrastructure on such a timetable, without sowing further chaos and errors and ultimately destabilizing the integrity (both real and perceived) of upcoming electoral processes and outcomes.

### C.  The EO requires USPS to undertake tasks for which it is unauthorized and ill-equipped.

The EO suffers from another fundamental flaw: it assigns to the USPS responsibilities that fall far outside its statutory mission and institutional competence.  *See* 39 U.S.C. § 404(a)(1), (e)(2) (tasking USPS with "the collection, handling, transportation, delivery, forwarding, returning, and holding of mail," while prohibiting the agency from performing "any nonpostal service, except that the Postal Service may provide nonpostal services which were offered as of January 1, 2006"— which decidedly did *not* include any services relating to determining voter eligibility).  Consistent with its statutory mandate, USPS plays a critical but limited role in the electoral process: namely, serving as a neutral carrier of election mail, including absentee and mail-in ballots.  Election

---

[14] It is also inconceivable that states and localities could administer the broad-reaching changes contemplated by the EO in connection with primary elections, which will occur even earlier—and in some states are already ongoing.  But the EO itself does not specify whether it applies to primary elections, or only to general elections, leaving election officials to guess about that, as well.

officials across the country depend on USPS to perform that function in a timely, accurate, and nonpartisan manner. The EO would upend that longstanding role.

Under the EO, USPS is no longer merely a carrier of ballots; it is instead transformed into a gatekeeper of voter eligibility. The Order directs USPS to participate in the creation, maintenance, and enforcement of "Mail-In and Absentee Participation List[s]," and to refuse transmission of ballots for any voter not "enrolled" on such lists. 91 Fed. Reg. at 17126, § 3(b)(iii)-(iv). As described above, that function—determining which individuals are eligible to receive and cast ballots in federal elections—is quintessentially a matter reserved, in the first instance, to the states under the Constitution's voter-qualification framework. It is also one for which USPS has neither statutory authority nor relevant expertise. As discussed above, even federal agencies with direct responsibility for immigration or benefits administration maintain records that are ill-suited for determining voting eligibility. It follows *a fortiori* that USPS—whose core mission is mail delivery—cannot reliably determine voter eligibility from individual ballots for nearly 10,000 different election jurisdictions nationwide, raising an unacceptably high risk (if not the certainty) of disenfranchising eligible voters. And indeed, the U.S. Postmaster General himself has confirmed in recent remarks that "We [*i.e.*, USPS] can't compile a list [of eligible voters]. That's not what our job is." Adam Sella, *Postal Service, Already Under Pressure, Now Faces Trump's Mail Ballot Order*, NY Times (Apr. 11, 2026), https://www.nytimes.com/2026/04/11/us/politics/postal-service-budget-mail-ballots.html?unlocked_article_code=1.aVA.vUzG.8AG6gdnTHCer&smid (quoting David Steiner, current Postmaster General).[15]

---

[15] *See also id.* (also quoting statement from former member of the Postal Service Board of Governors, Anton Hajjar, that "it strikes me as an almost impossible task of the Postal Service to do what the president wants it to do within the timeline that it's given").

23

The EO further contemplates that USPS will issue "unique ballot envelope identifiers" and otherwise dictate aspects of ballot design and transmission. 91 Fed. Reg. at 17126, § 3(b)(iv). But the Order offers no meaningful explanation of how such a system would function in practice—what form these identifiers would take, how they would be integrated into existing ballot formats, or how state and localities would be expected to integrate these features into their existing processes (which represent the culmination of decades of review, innovation, and lessons learned)—particularly on the compressed timeline contemplated by the EO. The EO's delegation of these issues to future rulemaking by the Postmaster General only compounds the threat to the fair and orderly conduct of elections posed by these sweeping changes. By leaving essential details to be determined at a later date—while the election calendar continues to advance—the EO all but guarantees widespread confusion, delay, and administrative breakdown. Moreover, given the nature of the tasks assigned to USPS, there is no plausible rulemaking outcome that would both cure the EO's legal defects and avoid substantial disruption to established election systems across the country.

These new obligations would also be imposed on an agency that is already under significant operational strain, diverting USPS from its critical role in delivering ballots on a timely basis. By adding layers of complexity and administrative burden to USPS's operations, the EO significantly increases the likelihood of delays, misrouting, or non-delivery of ballots. Those risks fall most heavily on voters who rely on voting by mail, including military and overseas voters and those with disabilities or limited access to in-person voting.

**D. The EO improperly threatens state and local election officials with federal prosecution for doing their jobs.**

Finally, the EO exacerbates its constitutional and statutory defects by threatening state and local election officials with federal criminal scrutiny for issuing ballots to individuals whom the federal government—relying on its own flawed and extra-statutory lists—deems ineligible. *See id.*

24

at 17126-27, §§ 2(b), 3(c), & 5.  This threat is both legally baseless and practically dangerous, even if it may seem, on its face, to insist only on compliance with the law.  The EO does not—and cannot—create new federal crimes or alter the standards governing criminal liability, which are defined by Congress.  Yet it signals the prospect of federal enforcement untethered to established statutory frameworks, effectively placing election officials at risk based on criteria that have no grounding in duly enacted law.  Meanwhile, this Administration has found zero credible evidence of misconduct by state or local election officials justifying such sweeping threats of prosecution—threats which are untethered to any identified problem, factual predicate, or demonstrated risk.

These threats do not arise in a vacuum.  Election officials across the country have, in recent years, faced increasing scrutiny and, in some instances, the threat—implicit or explicit—of investigation or prosecution tied to their administration of elections.[16]  That reality is especially problematic because the administration of elections routinely requires officials to make time-sensitive determinations based on the best available information.  The EO reinforces this climate of uncertainty, signaling that routine, good-faith execution of state-law duties may expose officials to federal criminal scrutiny.  That prospect will inevitably chill lawful election administration, as officials are forced to weigh their obligations to voters against the risk of personal liability.  The resulting hesitation, over-correction, or withdrawal from lawful duties will disrupt election administration, undermine public confidence in the electoral process, and further risk disenfranchising eligible voters.

## CONCLUSION

For the foregoing reasons, the Court should grant the plaintiffs' motions for summary judgment and injunctive relief and enjoin this unconstitutional and unlawful EO.

---

[16] *See, e.g.*, Cheyanne M. Daniels, *Trump says individuals will soon be prosecuted for 2020 election*, Politico (Jan. 21, 2026), https://perma.cc/5M3H-GKGQ; Jacob Wendler, *Trump DOJ redoubling election scrutiny efforts*, Politico (Apr. 20, 2026), https://perma.cc/RK3M-R9EM.

Respectfully submitted,

/s/ Samantha P. Bateman
SAMANTHA P. BATEMAN*
KYLE R. FREENY*
ROSA L. BAUM*
WASHINGTON LITIGATION GROUP
1717 K Street N.W., Suite 1120
Washington, D.C. 20006
(202) 521-8750
sbateman@washingtonlitigationgroup.org

ANA MUÑOZ

*Counsel for Amici Curiae State and Local Election Officials and Election Experts*

*\* Motions for admission pro hac vice pending*

## APPENDIX: *AMICI CURIAE*

Amici include the Center for Election Innovation and Research ("CEIR"), a nonpartisan nonprofit whose core mission is to work with election officials and build confidence in elections that voters should trust and do trust.  Amici also include the following current or former election officials, listed alphabetically by last name, along with their titles and jurisdictions:

- Sarah Adair, Jefferson County Elections, Elections Technician (Colorado)

- Natalie Adona, Marin County, Registrar of Voters (California)

- Laura Anna, Venango County Elections, Director of Elections (Pennsylvania)

- Seth Bluestein, City of Philadelphia, City Commissioner (Pennsylvania)

- Karen Brinson Bell, North Carolina State Board of Elections, Former Executive Director and Chief Election Official (North Carolina)

- Lisa Brown, Oakland County, Clerk and Register of Deeds (Michigan)

- John Butkovich, Pueblo County, Elections Specialist (Colorado)

- Laura Cantrell, Hot Spring County, Arkansas Board of Election Commissioners, Commissioner (Arkansas)

- Kevin Castillo, Denver Clerk and Recorder, Mail Ballot Administrator (Colorado)

- Katharine Clark, Santa Fe County, County Clerk (New Mexico)

- Domonique Clemons, Genesee County, County Clerk and Register of Deeds (Michigan)

- Becky Close, Eagle County, Clerk and Recorder (Colorado)

- Mark Coakley, Henrico County, Director of Elections (Virginia)

- Ethan Compton, Irwin County Board of Elections and Registrations, Election Supervisor (Georgia)

- Kristin B. Connelly, Contra Costa County, Clerk-Recorder and Registrar of Voters (California)

- Matt Crane, Colorado County Clerks Association, Executive Director; Former Arapahoe County Clerk and Recorder (Colorado)

- Daryl Daugs, Kitsap County Auditor, Chief of Staff (Washington)

- Jilline Dobratz, City of West Bend, City Clerk (Wisconsin)

- Sharon Dubois, Baca County, Clerk and Recorder (Colorado)

- Eileen Giesbrecht, Township of Southfield, Clerk (Michigan)

- Amanda Gonzalez, Jefferson County, Clerk and Recorder (Colorado)

- Monica Gordon, Cook County, County Clerk (Illinois)

- Justin D. Grantham, Fremont County, Clerk and Recorder (Colorado)

- Ingrid Grueter, Pitkin County, Clerk and Recorder (Colorado)

- Hayle Johnson, Jackson County, Clerk and Recorder (Colorado)

- Stephanie Kees, Teller County Government, Clerk and Recorder (Colorado)

- Kevin Kennedy, Wisconsin State Board of Elections, Former Executive Director (Wisconsin)

- Greg Kimsey, Clark County, County Auditor (Washington)

- Carly Koppes, Weld County, Clerk and Recorder (Colorado)

- Tracey Lauritzen, Lake County Government, Clerk and Recorder (Colorado)

- Debra Lee, Clerk, Laramie County, County Clerk (Wyoming)

- Nicholas J. Lima, City of Cranston Canvassing Authority, Registrar / Director of Elections (Rhode Island)

- Shawn Luce, Rio Blanco County, Clerk and Recorder (Colorado)

- Robin Major, Monmouth County Board of Elections, Board of Elections Administrator (New Jersey)

- Sahari McCormick, Gilpin County, Clerk and Recorder (Colorado)

- Kirk McDonough, City of Cranston Board of Canvassers, Chairperson (Rhode Island)

ii

- Catherine McMullen, Clackamas County, County Clerk (Oregon)

- Lori Mitchell, Chaffee County, County Clerk and Recorder (Colorado)

- Cheryl Neilsen, Montmorency County, County Clerk (Michigan)

- Chris Piper, Virginia Department of Elections, Former Commissioner and Chief Election Official (Virginia)

- Jake Quinn, Buncombe County Board of Elections, Member (North Carolina)

- Annette Ramirez, Harris County, Tax-Assessor-Collector and Voter Registrar (Texas)

- Katie Riley, Cayuga County Board of Elections, Deputy Commissioner (New York)

- Justin Roebuck, Ottawa County, County Clerk and Register of Deeds (Michigan)

- Kathy Simillion, Gunnison County, Clerk and Recorder (Colorado)

- Susie Spring, Parmer County, County Clerk (Texas)

- Damon Todd, Ouray County, Clerk and Recorder (Colorado)

- Stacy Towell, Maricopa County, Questionable Signature Technician (Arizona)

- Kenneth Warner, Cayuga County Board of Elections, Election Commissioner (D) (New York)

- Julie Wise, King County Elections, Director (Washington)

- Michael Wyszynski, San Miguel County, Clerk and Recorder (Colorado)

- Josh Zygielbaum, Adams County, Clerk and Recorder (Colorado)

iii