UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| | * | |
| STATE OF CALIFORNIA, et al., | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | |
| | * | |
| DONALD J. TRUMP, in his official capacity | * | |
| as President of the United States, et al., | * | Civil Action No. 1:26-cv-11581-IT |
| | * | |
| Defendants, | * | |
| | * | |
| and | * | |
| | * | |
| STATE OF MISSOURI, et al., | * | |
| | * | |
| Intervenor-Defendants. | * | |

MEMORANDUM & ORDER

June 25, 2026

TALWANI, D.J.

Twenty-three States[1] and the District of Columbia (collectively, "Plaintiff States")

challenge Sections 2, 3, and 5 of Executive Order 14399, Ensuring Citizenship Verification and

Integrity in Federal Elections (the "EO"), 91 Fed. Reg. 17125 (Mar. 31, 2026), as ultra vires and

unconstitutional, arguing that the provisions violate the separation of powers, the Elections and

Electors Clauses, and the Tenth Amendment's anti-commandeering doctrine. Am. Compl.

¶¶ 150–189 [Doc. No. 65]. Plaintiff States assert these claims against the President, and the

various agencies and agency heads listed in the EO. Id.[2]

---

[1] The Plaintiff States are Arizona, California, Colorado, Connecticut, Delaware, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont, Virginia, Washington, Wisconsin, and Josh Shapiro in his official capacity as Governor of Pennsylvania.

[2] Count I, challenging Section 2 of the EO, is brought against President Donald J. Trump; the U.S. Department of Justice and the Acting Attorney General (collectively, "DOJ Defendants");

Defendants, joined by Intervenor States,[3] seek dismissal of Plaintiff States' Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Defs.' Mot. to Dismiss [Doc. No. 154]; Intervenors' Opp'n to Pls.' Mot. for Summ. J. ("Intervenors' Opp'n") 2–7, 13–17 [Doc. No. 153]. Plaintiff States have moved for summary judgment and request that the court declare Sections 2, 3, and 5 of the EO as unconstitutionally void and permanently enjoin Defendant agencies and agency heads from implementing or enforcing those provisions. Pls.' Mot. for Summ. J. [Doc. No. 97].

I.    **Background**

A.    **The Executive Order**

The EO asserts "an unavoidable duty under Article II of the Constitution of the United States to enforce Federal law, which includes preventing violations of Federal criminal law and maintaining public confidence in election outcomes." Exec. Order 14399 § 1. The EO notes that several executive agencies maintain records that "can assist in verifying identity and Federal election voter eligibility" and finds that "additional measures are necessary[]" to "enhance election integrity via the United States Mail[.]" Id.

The EO directs agency heads to take certain actions. Pls.' Statement of Undisputed Material Facts ("Pls.' SUMF") ¶ 4 [Doc. No. 105]; Defs.' Statement of Undisputed Material

_____

the U.S. Department of Commerce and its Secretary (collectively, "Commerce Defendants"); the U.S. Department of Homeland Security and its Secretary; U.S. Citizenship and Immigration Services and its Director; and the Social Security Administration and its Commissioner. Am. Compl. ¶¶ 150–66 [Doc. No. 65]. Count II, challenging Section 3 of the EO, is brought against the President; the Acting Attorney General; and the U.S. Postal Service, Postmaster General, Deputy Postmaster General, U.S. Postal Service Board of Governors Chairwoman, Board of Governors Vice Chairman, and Board of Governor Members. Id. ¶¶ 167–78. Count III, challenging Section 5 of the EO, is brought against the President and DOJ Defendants. Id. ¶¶ 179–189.

[3] The Intervenor States are Alabama, Florida, Indiana, Kansas, Louisiana, Missouri, Montana, Nebraska, Oklahoma, South Carolina, South Dakota, and Texas.

Facts ("Defs.' SUMF") ¶ 4 [Doc. No. 155]. Section 2 of the EO directs the Director of the U.S. States Citizenship and Immigration Services ("USCIS"), a component within the Department of Homeland Security ("DHS"), in coordination with the Commissioner of the Social Security Administration ("SSA"), to compile lists of citizens eligible to vote in a specific state (the "Confirmed Citizen Lists"[4]) "[t]o the extent feasible and consistent with applicable law[.]" Exec. Order 14399 § 2(a). The EO defines the Confirmed Citizen Lists as limited to "individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State[.]" Id.

The EO requires DHS to "establish the infrastructure necessary to compile, maintain, and transmit" the Confirmed Citizen Lists by **June 29, 2026**. Id. § 4(c) (emphasis added). Also by **June 29, 2026**, DHS must designate a point of contact regarding List-related inquiries from individuals and State election officials. Id. The EO requires that DHS update and transmit the Confirmed Citizen List for each State to State election officials at least 60 days before each regularly scheduled Federal election, or upon request regarding a special Federal election. Id. § 2(a). Accordingly, for the November 3, 2026 general election, the EO requires DHS to provide the Confirmed Citizen Lists to State election officials by **September 4, 2026**.

Section 3 of the EO directs the Postmaster General of the U.S. Postal Service ("USPS") to initiate a proposed rulemaking to ensure the integrity of mail voting and requires that a final rule be published by **July 29, 2026**. Id. § 3(a); USPS Notice of Proposed Rulemaking, Ballot Mail for Federal Elections, 91 Fed. Reg. 32915 (June 2, 2026). The EO requires the proposed rule to (1) include requirements regarding election mail design; and (2) specify that USPS, after receiving State-furnished lists of voters approved to vote by mail, shall provide each State with a

---

[4] The EO refers to these federally created lists as "State Citizenship Lists." Exec. Order 14399 § 2(a).

list of individuals who are "enrolled with the USPS" pursuant to a process specified in the rule, and shall not transmit the ballot of any voter unless the individual has been so "enrolled." Exec. Order 14399 § 3(b). The EO requires the proposed rule to specify that States may choose to notify USPS of their intent to use mail ballots no fewer than 90 days prior to a Federal election, and States may submit to USPS, no fewer than 60 days before the election, a list of voters to whom the State intends to provide mail ballots. Id. § 3(b)(ii). Accordingly, for the November 3, 2026 general election, States may notify USPS by **August 5, 2026**, of their intent to use mail ballots, and by **September 4, 2026**, of their mail-ballot voter lists. Id.

In Sections 2 and 5, the EO describes several criminal offenses, both directly and indirectly relating to voter fraud, and requires the Attorney General to prioritize the investigation and prosecution of State and local officials who issue ballots to individuals not eligible to vote. Id. §§ 2(b), 5. The EO also provides that "[s]tates and localities should preserve, for a 5-year period, all records and materials—excluding ballots cast—evidencing voter participation in any Federal election (e.g., ballot envelopes, regardless of carrier)." Id. § 5 (emphases added).

### B.  Federal Election Law

#### 1.  Constitutional Framework

##### a.  The State's Role in Federal Elections

The U.S. Constitution empowers the States to determine voter eligibility in federal elections.

Under the Voter Qualifications Clause, Members of the U.S. House of Representatives must be elected by voters who "have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature." U.S. CONST. art. I, § 2, cl. 1. The Seventeenth Amendment likewise prescribes that voters for U.S. Senators "shall have the qualifications requisite for electors of the most numerous branch of the State legislatures." U.S. CONST. amend.

XVII. Therefore, because the States determine who is eligible to vote for their state legislators, the Constitution indirectly grants the States authority to determine who is eligible to vote for federal legislators.

Article I of the Constitution also empowers the States to prescribe the "Times, Places, and Manner of holding" congressional elections. U.S. CONST. art. I, § 4, cl. 1. "[T]hese comprehensive words embrace authority to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes" among other issues. Smiley v. Holm, 285 U.S. 355, 366 (1932).

The President is elected by vote of the Electoral College. See U.S. CONST. amend. XII. The Electors Clause empowers each State to appoint electors to the Electoral College "in such Manner as the Legislature thereof may direct." U.S. CONST. art. II, § 1, cl. 2. The States require their electors be appointed by popular vote of qualified voters. See Chiafalo v. Washington, 591 U.S. 578, 584 (2020). Accordingly, the States alone determine voter-eligibility requirements, subject only to the outer limits of the Constitution. See, e.g., U.S. CONST. amend. XIX ("The right of citizens of the United States to vote shall not be denied or abridged . . . on account of sex."); U.S. CONST. amend. XXVI ("The right of citizens of the United States, who are eighteen years of age or older, to vote, shall not be denied or abridged . . . on account of age."). For presidential elections, the Electors Clause gives States the primary authority to decide how electors are chosen. U.S. CONST. art. II, § 1, cl. 2.

### b. Congress's Role in Federal Elections

The Elections Clause empowers Congress to "make or alter" State election laws "at any time[.]" U.S. CONST. art. I, § 4, cl. 1. "In practice, the Clause functions as 'a default provision; it invests the States with responsibility for the mechanics of congressional elections, but only so far

as Congress declines to pre-empt state legislative choices.'" Arizona v. Inter Tribal Council of Arizona, Inc., 570 U.S. 1, 9 (2013) (quoting Foster v. Love, 522 U.S. 67, 69 (1997)).

While the Electors Clause does not explicitly reserve supervisory authority to Congress for presidential electors, the Supreme Court has extended "the broad power given to Congress over congressional elections . . . to presidential elections." Voting Rts. Coal. v. Wilson, 60 F.3d 1411, 1414 (9th Cir. 1995) (citing Burroughs v. United States, 290 U.S. 534, 545 (1934)); see Arizona, 570 U.S. at 14–15 ("Because the power the Elections Clause confers is none other than the power to pre-empt, the reasonable assumption is that the statutory text accurately communicates the scope of Congress's preemptive intent . . . . Unlike the States' historic police powers, the States' role in regulating congressional elections . . . has always existed subject to the express qualification that it terminates according to federal law.").

Accordingly, the Elections Clause "grants Congress 'the power to override state regulations' by establishing uniform rules for federal elections, binding on the States." Foster, 522 U.S. at 69 (quoting U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 833 (1995)).

### c. President's Limited Role in Federal Elections

The Constitution does not grant the President any specific powers over elections.[5] Broadly, the Constitution vests the President with "executive Power" and commands him to "take Care that the Laws be faithfully executed." U.S. CONST. art. II, §§ 1, 3. The President "plays no direct role in the process" of appointing electors, "nor does he have authority to control the state officials who do." Trump v. United States, 603 U.S. 593, 627 (2024). As the Supreme

---

[5] Regarding the allocation of election-related authority across the States and Congress, the Framers explained: "[T]here were only three ways in which this power could have been reasonably modified and disposed: that it must either have been lodged wholly in the national legislature, or wholly in the State legislatures, or primarily in the latter and ultimately in the former." THE FEDERALIST NO. 59 (Alexander Hamilton). Notably, the Framers excluded the Executive Branch from any allocation formulation.

Court has observed, "the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." Medellín v. Texas, 552 U.S. 491, 526–27 (2008) (quoting Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 587 (1952)).

      2.      Statutory Landscape

Pursuant to its Elections Clause power, see U.S. CONST. art. I, § 4, cl. 1, Congress has enacted several laws regulating voting and elections. For example, the Voting Rights Act, Pub. L. No. 89-110, 79 Stat. 437 (1965) (codified at 52 U.S.C. §§ 10101), prohibits discriminatory voting or election practices. The Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), Pub. L. No. 99-410, 100 Stat. 924 (1986) (codified at 52 U.S.C. §§ 20301–11) requires States (as well as U.S. territories and the District of Columbia) to permit otherwise-qualified voters residing or stationed overseas to vote in the last place they were domiciled prior to leaving the United States. 52 U.S.C. §§ 20302, 20310. UOCAVA guarantees military and overseas voters the right "to use absentee registration procedures and to vote by absentee ballot in general, special, primary, and runoff elections for Federal office[.]" 52 U.S.C. § 20302(a)(1); see 52 U.S.C. § 20302(a)(8)(A) (requiring States to transmit absentee ballots to UOCAVA voters at least 45 days before an election for federal office to provide voters sufficient time to receive, mark, and return absentee ballots).

The National Voter Registration Act of 1993 (the "NVRA") sets forth certain voter registration requirements with respect to elections for federal office. 52 U.S.C. §§ 20501–20511.[6] Section 5 of the NVRA requires that States offer voter registration opportunities at State

---

[6] Legislation has been introduced in earlier sessions and in the current session of Congress to amend the NVRA to require individuals to provide documentary proof of citizenship when registering to vote, see Safeguard American Voter Eligibility (SAVE) Act, H.R. 8281, 118th Cong. (2024); Safeguard American Voter Eligibility (SAVE) Act, H.R. 22, 119th Cong. (2025), but has not been enacted into law.

motor vehicle agencies. Section 6 of the NVRA requires that States offer voter registration opportunities by mail-in application and limits registration to using a prescribed federal form.

The Help America Vote Act of 2002 ("HAVA"), Pub. L. No. 107-252, 116 Stat. 1666, was passed after the 2000 Presidential election and "aimed 'to alleviate a significant problem voters experience'—eligible voters being turned away at the polls because their names were missing from voter registration lists." United States v. Benson, ___ F.4th ___, 2026 WL 1815425, *3 (6th Cir. June 24, 2026) (quoting Sandusky Cnty. Democratic Party v. Blackwell, 387 F.3d 565, 569 (6th Cir. 2004) (per curiam)). HAVA requires states to maintain an electronic statewide voter registration list.[7] 52 U.S.C. § 21083.

### C.    The Plaintiff States and the Administration of Federal Elections

Plaintiff States and their localities administer elections for federal office. Pls.' SUMF ¶ 6 [Doc. No. 105]; Defs.' SUMF ¶ 6 [Doc. No. 155]. Plaintiff States and their localities are responsible for, inter alia, carrying out voter registration, maintaining and updating voter rolls, issuing ballots to registered voters, tabulating votes, and certifying results in all elections for federal office. Pls.' SUMF ¶ 7 [Doc. No. 105]; Defs.' SUMF ¶ 7 [Doc. No. 155].

---

[7] In 2025, officials in DOJ's Civil Rights Division began sending letters to the Secretaries of various States, requesting access to State's electronic voter registration lists, and the federal government has sued the Secretaries of States who have denied access. The United States' lawsuits have been consistently dismissed and the government's requests held by courts to be facially deficient. See, e.g., Benson, ___ F.4th ___, 2026 WL 1815425; United States v. DeMarinis, 2026 WL 1780586, *5 (D. Md. June 18, 2026); United States v. Wis. Elections Comm'n, __ F. Supp. 3d __ , 2026 WL 1430354 (W.D. Wis. May 21, 2026); United States v. Bellows, ___ F. Supp. 3d ___, 2026 WL 1430481 (D. Me. May 21, 2026); United States v. Fontes, ___ F. Supp. 3d ___, 2026 WL 1177244 (D. Ariz. Apr. 28, 2026); United States v. Amore, ___ F. Supp. 3d ___, 2026 WL 1040637 (D.R.I. Apr. 17, 2026); United States v. Galvin, ___ F. Supp. 3d,___, 2026 WL 972129 (D. Mass. Apr. 9, 2026); United States v. Oregon, ___ F. Supp. 3d ___, 2026 WL 318402 (D. Or. Feb. 5, 2026); United States v. Weber, 816 F. Supp. 3d 1168 (C.D. Cal. 2026).

Plaintiff States are currently in the process of preparing to administer the November 2026 general election, and many are also actively administering or preparing to administer federal primaries. Pls.' SUMF ¶ 8 [Doc. No. 105]; Defs.' SUMF ¶ 8 [Doc. No. 155]. As part of this process, Plaintiff States and their localities conduct programs to remove from their lists of eligible voters those who have died and those who are no longer eligible to vote for various reasons, including a change in residence, or other State law grounds for ineligibility. Pls.' SUMF ¶ 9 [Doc. No. 105]; Defs.' SUMF ¶ 9 [Doc. No. 155].

In accordance with federal law, Plaintiff States do not systematically remove voters from voter rolls during the 90 days prior to a federal election, except as permitted by the NVRA. See 52 U.S.C. § 20507(c)(2)(A); Pls.' SUMF ¶ 10 [Doc. No. 105]; Defs.' SUMF ¶ 10 [Doc. No. 155].[8] For the November 2026 general election, the NVRA 90-day quiet period begins on August 5, 2026. Pls.' SUMF ¶ 10 [Doc. No. 105]; Defs.' SUMF ¶ 10 [Doc. No. 155].

Plaintiff States and their localities require verification of eligibility to register voters, including by attestation, reporting identifying information, or other means, for federal elections. Pls.' SUMF ¶ 11 [Doc. No. 105] (citing the statutory requirements for each Plaintiff state).[9]

---

[8] Plaintiff States' assertion is supported by declarations from state officials. See Lean (CA) Decl. ¶ 14 [Doc. No. 100-1]; Tassinari (MA) Decl. ¶ 29 [Doc. No. 100-2]; Wlaschin (NV) Decl. ¶ 17 [Doc. No. 100-3]; Holmes (WA) Decl. ¶ 27 [Doc. No. 100-4]; Varvel (AZ) Decl. ¶ 13 [Doc. No. 100-5]; Rudy (CO) Decl. ¶ 17 [Doc. No. 100-6]; Rosenberg (CT) Decl. ¶ 16 [Doc. No. 100-7]; Albence (DE) Decl. ¶ 19 [Doc. No. 100-8]; Miller (DC) Decl. ¶ 10 [Doc. No. 100-9]; Berry (MD) Decl. ¶ 39 [Doc. No. 100-11]; Flynn (ME) Decl. ¶ 14 [Doc. No. 100-10]; Brater (MI) Decl. ¶ 16 [Doc. No. 100-12]; Barber (NJ) Decl. ¶ 18 [Doc. No. 100-15]; Vigil (NM) Decl. ¶ 18, [Doc. No. 100-16]; Stavisky (NY) Decl. ¶ 16 [Doc. No. 100-17]; Brunton (NC) Decl. ¶ 9 [Doc. No. 100-18]; Dawson (OR) Decl. ¶ 15 [Doc. No. 100-19]; Marks (PA) Decl. ¶ 14 [Doc. No. 100-20]; Rock (RI) Decl. ¶ 19 [Doc. No. 100-21]; Koski (VA) Decl. ¶ 18 [Doc. No. 100-23]; Hanzas (VT) Decl. ¶ 14 [Doc. No. 100-22]; Michalowski (Cook County, IL) Decl. ¶ 11 [Doc. No. 100-24]; Wise (King County, WA) Decl. ¶ 27 [Doc. No. 100-25]. Defendants' response that they "lack knowledge" as to Plaintiffs' compliance, see Defs.' SUMF ¶ 10 [Doc. No. 155], is not sufficient on summary judgment to rebut Plaintiffs' showing.

[9] Defendants claim that Plaintiffs' assertion that "Plaintiff States and their localities require verification of eligibility (by attestation, reporting identifying information, or other means) to

Plaintiff States also allow individuals to register to vote up to at least 30 days before a federal election, and in some States, individuals may register closer to or on Election Day. Pls.' SUMF ¶ 12 [Doc. No. 105] (citing Lean (CA) Decl. ¶ 12 [Doc. No. 100-1] (registration up to 15 days before election; conditional registration "up to and on Election Day," citing Cal. Elec. Code § 2102(a)); see also Cal. Elec. Code § 2119.5; Cal. Code Regs. 2 § 20020, et seq.); Tassinari (MA) Decl. ¶ 28, [Doc. No. 100-2] (10 days before Election Day, citing Mass. Gen. Laws ch. 51, § 26); Wlaschin (NV) Decl. ¶ 14 [Doc. No. 100-3] (Election Day registration, citing Nev. Rev. Stat. § 293.5847); Holmes (WA) Decl. ¶ 15 [Doc. No. 100-4] (Election Day registration, citing Wash. Rev. Code § 29A.08.140); Varvel (AZ) Decl. ¶ 11 [Doc. No. 100-5] (29 days before Election Day, citing Ariz. Rev. Stat. §§ 16-101(A)(3), 16-134(C)); Rudy (CO) Decl. ¶ 15 [Doc. No. 100-6] (8 days before election to receive a mail ballot, or up to and including Election day in person, citing Colo. Rev. Stat. § 1-2-508); Rosenberg (CT) Decl. ¶ 14 [Doc. No. 100-7] (voters can register by mail up to 18 days before Election Day, in person during early voting, and on Election Day, if they satisfy applicable requirements, citing Conn. Gen. Stat. § 9-23g); Albence (DE) Decl. ¶ 17 [Doc. No. 100-8] (registration up to the third Monday before Election Day, citing Del. Code. Tit. 15 § 1902(c)); Miller (DC) Decl. ¶ 11 [Doc. No. 100-9] (Election Day registration, citing D.C. Code § 1-1001.07(g)); Berry (MD) Decl. ¶ 37 [Doc. No. 100-11] (registration up to 21 days before Election Day, at early voting centers during early voting period, and on Election Day itself, citing Md. Elec. Law § 3-302); Flynn (ME) Decl. ¶ 12 [Doc. No. 100-10] (Election Day Registration, citing Me. Stat. tit. 21, § 121-A); Brater (MI) Decl. ¶ 14

---

register voters for federal elections" does not require Defendants' response on the grounds that "[the assertion] is a legal conclusion[.]" Defs.' SUMF ¶ 10 [Doc. No. 155]. The court finds Defendants' statement to be nonresponsive and finds Plaintiff States' showing that they and their localities require eligibility verification to register voters for federal elections undisputed for purposes of the pending motions.

[Doc. No. 100-12] (registration up to and including Election Day if certain requirements are met, citing Mich. Comp. Laws § 168.497); Linnell (MN) Decl. ¶ 13 [Doc. No. 100-14] (registration up to 20 days before an election, citing Minn. Stat. § 201.061); Barber (NJ) Decl. ¶ 16 [Doc. No. 100-15] (registration up to 21 days before an election, citing N.J. Rev. Stat. § 19:31-6); Vigil (NM) Decl. ¶ 16 [Doc. No. 100-16] (New Mexico allows qualified individuals to register in person on Election Day, citing N.M. Stat. § 1-4-5.7); Stavisky (NY) Decl. ¶ 14 [Doc. No. 100-17] (qualified individuals permitted to register up to ten days before election day, citing N.Y. Elec. Law § 5-210(3)); Brunton (NC) Decl. ¶ 7 [Doc. No. 100-18] (25 days before election and during early voting, citing N.C. Gen. Stat. §§ 163-82.6(d), 163-82.6B); Dawson (OR) Decl. ¶ 11 [Doc. No. 100-19] (21 days before election, citing Or. Rev. Stat. § 247.025); Marks (PA) Decl. ¶ 12 [Doc. No. 100-20] (15 days before election, citing Pa. Cons. Stat. § 3071); Rock (RI) Decl. ¶¶ 15–17 [Doc. No. 100-21] (30 days before Election Day; registration on Election Day to vote for president and vice–president, citing R.I. Gen. Laws § 17-9.1-1); Koski (VA) Decl. ¶ 17 [Doc. No. 100-23] (electronic and mail applications to register up to 11 days before Election day, citing VA. Code 24.2–416; 24.2–416.4); Hanzas (VT) Decl. ¶ 12 [Doc. No. 100-22] (registration up to and including election day, citing Vt. Stat. tit. 17, § 2144a); Michalowski (Cook County, IL) Decl. ¶ 9 [Doc. No. 100-24] (16 days before election and in person during early voting and on Election Day, citing 10 Ill. Comp. Stat. 5/5-50); Wise (King County, WA) Decl. ¶¶ 24, 26 [Doc. No. 100-25] (Election Day registration, citing Wash. Rev. Code § 29A.08.140); Hilby (Sun Prairie, WI) Decl. ¶ 8 [Doc. No. 100-26] (Election Day registration, see Wisc. Stat. § 6.15)).[10]

---

[10] Defendants do not rebut Plaintiffs' assertion that Plaintiff States also allow individuals to register to vote up to at least 30 days before a federal election, and in some States, individuals may register closer to or on Election Day, contending instead that Plaintiffs' assertion "is a legal conclusion" that does not require a response. Defs.' SUMF ¶ 10 [Doc. No. 155]. The court finds Defendants' statement to be nonresponsive and finds the assertion that Plaintiff States and their

In some of the Plaintiff States, 17-year-old citizens who will be 18 years old by the next federal general election are eligible to register to vote in federal primary elections. Pl. SUMF ¶ 14 [Doc. No. 105] (citing Holmes (WA) Decl. ¶ 48 [Doc. No. 100-4] (citing Wash. Rev. Code §§ 29A.04.061, 29A.08.170); Rosenberg (CT) Decl. ¶ 36 [Doc. No. 100-7] (citing Conn. Gen. Stat. § 9-12(b)); Albence (DE) Decl. ¶ 41 [Doc. No. 100-8] (citing 15 Del. Code § 1701(a)); Miller (DC) Decl. ¶ 22 [Doc. No. 100-9] (citing D.C. Code § 1-1001.07(a-2)); Berry (MD) Decl. ¶ 61 [Doc. No. 100-11] (citing Md. Elec. Law § 3-102(a)(2)(i)); Flynn (ME) Decl. ¶ 33 [Doc. No. 100-10] (citing Me. Rev. Stat. tit. 21-A,§ 111-A); Barber (NJ) Decl. ¶ 41 [Doc. No. 100-15] (citing N.J. Stat. §§ 19:31-5, 19:4-1.2); Vigil (NM) Decl. ¶ 37 [Doc. No. 100-16] (citing N.M. Stat. § 1-4-2(B)(3)); Brunton (NC) Decl. ¶ 8 [Doc. No. 100-18] (citing N.C. Gen. Stat. § 163-59); Rock (RI) Decl. ¶ 38 [Doc. No. 100-21] (citing R.I. Gen. Laws § 17-1-3(b)); Koski (VA) Decl. ¶ 34 [Doc. No. 100-23] (citing Va. Code § 24.2-403); Hanzas (VT) Decl. ¶ 33 [Doc. No. 100-22] (citing Vt. Stat. tit. 17, § 2121); Michalowski (Cook County, IL) Decl. ¶ 28 [Doc. No. 100-24] (citing 10 Ill. Comp. Stat. 5/3-6); Wise (King County, WA) Decl. ¶ 44 [Doc. No. 100-25] (citing Wash. Rev. Code § 29A.08.170)); see Minn. Stat. § 201.071 (allowing voter registration, but not voting, for 16-year-olds).[11]

---

localities require eligibility to register voters for federal elections undisputed for purposes of the pending motions.

[11] Defendants do not rebut Plaintiffs' assertion that in some Plaintiff States, 17-year-old citizens who will be 18 years old by the next federal general election are eligible to register to vote in federal primary elections, contending instead that Plaintiffs' statement does not require a response on the grounds that "[it] is a legal conclusion[.]" Defs.' SUMF ¶ 10 [Doc. No. 155]. The court finds Defendants' statement to be nonresponsive and finds the assertion that some Plaintiff States and their localities allow 17-year-old citizens who will be 18 years old by the next federal general election to register to vote in federal primary elections undisputed for purposes of the pending motions.

II.    **Defendants' Motion to Dismiss for Lack of Subject-Matter Jurisdiction**

A.    **Ripeness**

Defendants and Intervenor States contend that judicial review will be appropriate later, after implementation actions have been taken, because Defendant agencies are still considering and deliberating future action. Defs.' Mem. ISO Mot. to Dismiss and Opp'n ("Defs.' Mem.") 9 [Doc. No. 157]; Intervenors' Opp'n 7, 15 [Doc. No. 153]. The court has accepted this argument in part and dismissed without prejudice Plaintiffs States' amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) on prudential ripeness grounds as to their claims regarding the EO and its implementation with regard to elections occurring after November 3, 2026. Mem. & Order [Doc. No. 190]. The court denied dismissal pursuant to Federal Rule of Civil Procedure 12(b)(1) on prudential ripeness grounds with regard to the November 3, 2026 election, and all earlier elections. Id.

B.    **Standing**

Defendants and Intervenor States contest this court's subject matter jurisdiction in this case, arguing that Plaintiff States lack standing to challenge the EO. See Defs.' Mem. 7–12 [Doc. No. 157]; Intervenors' Opp'n 2, 13 [Doc. No. 153]. "Article III confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021). "Such a case or controversy exists only when the plaintiff demonstrates such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends." Gustavsen v. Alcon Labs., Inc., 903 F.3d 1, 6–7 (1st Cir. 2018) (citations omitted). "For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case – in other words, standing." Ramirez, 594 U.S. at 423 (citation omitted). To establish standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or

13

imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." Id. "If the plaintiff does not claim to have suffered an injury . . . there is no case or controversy for the federal court to resolve." Id. (citation and internal quotation marks omitted).

Defendants characterize the EO as an "intra-Executive Branch directive" that "of its own force[] does not change anything at all about elections in any State." Defs.' Mem. 8 [Doc. No. 157]. They argue that the EO merely directs possible future agency action that is insufficiently imminent for an Article III injury. Id. at 9–11. Intervenor States similarly contend that the EO, on its face, does not require any action of Plaintiff States and that any injury claimed by Plaintiff States will be too speculative for this court's review until the EO is implemented. Intervenors' Opp'n 2–7 [Doc. No. 153].

Plaintiff States assert that the EO's directives require them to immediately prepare to comply with the EO and respond to federal implementation of the EO in anticipation of the November 2026 general election. Pls.' Opp'n to Defs.' Mot. to Dismiss and Reply ("Pls.' Reply") 2–9 [Doc. No. 163]. Many Plaintiff States "are actively administering or preparing to administer federal primaries" and all Plaintiff States are presently preparing to administer the November 2026 general election. Pls.' SUMF ¶ 4 [Doc. No. 105]; see, e.g., Tassinari Decl. ¶ 36 [Doc. No. 100-2] (Massachusetts has already "begun preparing training materials, guidance documents and communications to local election officials for the upcoming election cycle and have planned training sessions already scheduled."); Rosenberg Decl. ¶ 26 [Doc. No. 100-7] (Connecticut election officials are busy with endorsements and primary preparations in May and June, conducting primaries in September, processing absentee ballots in late September and October, and conducting the general election in November 2026). Defendants do not dispute these presently ongoing efforts. Defs.' SUMF ¶ 8 [Doc. No. 155].

14

Plaintiff States' statutory obligations—undisputed by Defendants, see Defs.' SUMF ¶ 43 [Doc. No. 155]—require immediate action from Plaintiffs. For example, Connecticut has already had to pull elections staff from critical projects required by statute, e.g., translating election materials, as required by the Voting Rights Act, to analyze and develop a compliance plan for the EO. See Rosenberg Decl. ¶ 12 [Doc. No. 100-7].

Additionally, because state law requires Plaintiff States to provide mail ballots to voters entitled to vote by mail,[12] Plaintiff States must plan to comply with the EO's directives on mail ballots. Nearly half of Plaintiff States have already purchased mail ballot envelopes for the 2026 federal election cycle that will not be in compliance with the requirements the EO has directed USPS to adopt by rulemaking. Pls.' SUMF ¶ 62 [Doc. No. 105]; see also USPS Notice of Proposed Rulemaking, Ballot Mail for Federal Elections, 91 Fed. Reg. 32915 (June 2, 2026) (requiring new envelope and design standards, including Intelligent Mail Barcodes, for election mail). For example, Massachusetts has already spent approximately $3 million on its mail ballot envelopes, see Tassarini Decl. ¶ 81 [Doc. No. 100-2], and both Maine and Rhode Island have already spent over $50,000 on ballot envelopes and return envelopes that lack Intelligent Mail barcodes. Flynn (ME) Decl. ¶¶ 67–68 [Doc. No. 100-10]; Rock (RI) Decl. ¶¶ 72–73 [Doc. No. 100-21]. And Delaware has already purchased envelopes, received approval from USPS on the design, and "does not have funds budgeted" for purchasing new envelopes that would be compliant with the proposed rule. Albence Decl. ¶¶ 75–76 [Doc. No. 100-8].

Defendants and Intervenors dispute that these monetary expenditures qualify as Article III injury, because the EO does not force Plaintiff States to redesign their ballots, but rather

---

[12] See, e.g., Ariz. Rev. Stat. § 16-541; Cal. Elec. Code § 3000.5; Con. Gen. Stat. Ch. 145, § 9; Me. Stat. tit. 21-A, ch. 9, § 753-B; Mass. Gen. Laws ch. 54, §§ 25B(a)(2), 89; Nev. Rev. Stat. § 293.269911; Or. Rev. Stat. § 254.470.

merely directs USPS to issue an NPRM that requires Plaintiff States to redesign their ballots. See Defs.' SUMF ¶ 62 [Doc. No. 155]. Accordingly, they argue that any fiscal injury incurred by Plaintiff States is insufficiently traceable to the EO. See Intervenors' Opp'n 13–14 [Doc. No. 153]. Further, Defendants dispute that the EO threatens Plaintiff States' election officials with criminal enforcement, sufficient to comprise an imminent Article III injury-in-fact. See Defs.' Mem. 11–12 [Doc. No. 157] (citing Susan B. Anthony List v. Driehaus, 573 U.S. 149, 157–58 (2014)).

Defendants and Intervenors are incorrect. Plaintiff States are actively working to conduct primary, special, and general elections. The EO has ordered administrative agencies to take action in the coming months that has already required Plaintiff States to respond given the practical nature of an election cycle. A list of several federal criminal offenses relating to voter fraud appears multiple times in the EO: first as supporting the purpose of the EO, i.e., to reduce voter fraud, see Exec. Order 14399 § 1, and then again in describing an enforcement plan as to both Section 2 specifically, see id. § 2(b), and the EO as a whole, see id. § 5. The EO's prescriptive and proscriptive language, in conjunction with multiple references to criminal penalties, implicitly threatens enforcement of those enumerated laws against election officials who furnish ballots to voters excluded from the Confirmed Citizen Lists or the USPS Lists, and that threat is sufficiently imminent for Article III injury. See N.H. Lottery Comm'n v. Rosen, 986 F.3d 38, 49–51 (1st Cir. 2021) (Courts "do not require a plaintiff to expose [themselves] to liability before bringing suit to challenge the basis for the threat.") (quotation omitted).

Moreover, not only are Plaintiff States experiencing injury now with respect to planning, but it is undisputed that, should the EO's directives go into effect, Plaintiff States will incur compliance costs. Defs.' SUMF ¶ 63 [Doc. No. 155]. An order declaring the EO as unlawful and enjoining its implementation for the November 2026 or earlier elections would redress Plaintiff

States' immediate injuries because they would no longer have to plan to comply or actually comply with the EO prior to those elections, and Plaintiff States' election officials would no longer be threatened with criminal prosecution. Accordingly, Plaintiff States have standing to challenge the EO as unconstitutional. See California v. Trump, 786 F. Supp. 3d 359, 377 (D. Mass. 2025) (states have standing to challenge Executive Order No. 14248, Preserving and Protecting the Integrity of American Elections); Washington v. Trump, 814 F. Supp. 1173, 1198–98 (W.D. Wash. 2026) (same).

Therefore, the court DENIES Defendants' motion, joined by the Intervenor States, to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of standing with regard to the November 3, 2026 (and all earlier) elections.

### III.    Defendants' Motion to Dismiss for Failure to State a Claim

#### A.    Standard of Review

In assessing a complaint under Federal Rule of Civil Procedure 12(b)(6), the court assumes "the truth of all well-pleaded facts" and draws "all reasonable inferences in the plaintiff's favor." Nisselson v. Lernout, 469 F.3d 143, 150 (1st Cir. 2006). To survive dismissal, a complaint must contain sufficient factual material to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . [f]actual allegations must be enough to raise a right to relief above the speculative level[.]" Id. at 555 (citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

### B.        Cause of Action

Defendants argue that Plaintiff States lack a statutory cause of action to challenge the EO and that ultra vires review is unavailable because Plaintiffs fail to plead a specific statutory violation. Defs.' Mem. 23–25 [Doc. No. 157]. Defendants argue that Plaintiffs must wait until the EO is implemented and then sue the implementing agencies under the Administrative Procedure Act ("APA"). Id.; see also Intervenors' Opp'n 16 [Doc. No. 153].

A claim in federal court requires a valid cause of action. See Davis v. Passman, 442 U.S. 228, 236–41 (1979). While a party challenging executive action typically brings suit under the APA, the APA is unavailable to challenge an executive order because "the President is not an agency within the meaning of" the APA, and the issuance of an executive order is not a final agency action. Franklin v. Massachusetts, 505 U.S. 788, 796 (1992).

In the absence of a statute authorizing suit, parties "are entitled to bring a non-statutory cause of action questioning the legality of [an] Executive Order.'" Chamber of Commerce v. Reich, 74 F.3d 1322, 1327 (D.C. Cir. 1996)); see New York v. McMahon, 784 F. Supp. 3d 311, 352 (D. Mass. 2025) (noting that "[a] claim alleging that the President acted in excess of his statutory authority is judicially reviewable even absent an applicable statutory review provision") (quoting Am. Forest Res. Council v. United States, 77 F.4th 787, 796 (D.C. Cir. 2023)); New Hampshire Indonesian Cmty. Support, 765 F. Supp. 3d 102, 112 (D.N.H. 2025) (vacated on other grounds) ("[T]he plaintiffs have a cause of action to seek injunctive relief to redress certain governmental actions that contravene the Constitution or a federal statute.") (citing Youngstown, 343 U.S. at 582). "To act ultra vires a government official is either acting in a way that is impermissible under the Constitution or acting outside of the confines of his statutory authority." New York, 784 F. Supp. 3d 311, 352 (D. Mass. 2025) (quotation omitted). "The nonstatutory review action finds its jurisdictional toehold in the general grant of federal-question jurisdiction

of 28 U.S.C. § 1331." Rhode Island Dep't of Env't Mgmt. v. United States, 304 F.3d 31, 42 (1st Cir. 2002) (citation omitted).

This cause of action is subject to certain limitations, however. Judicial review is available only if the Executive Branch has "taken action entirely 'in excess of its delegated powers and contrary to a specific prohibition' in a statute." Nuclear Regul. Comm'n v. Texas, 605 U.S. 665, 681 (2025) (quoting Ry. Clerks v. Ass'n for Benefit of Non-contract Emps., 380 U.S. 650, 660 (1965)). Further, judicial review is unavailable if an existing "statutory review scheme [1] provides aggrieved persons 'with a meaningful and adequate opportunity for judicial review[;]'" or "[2] forecloses all other forms of judicial review." Id. (quoting Bd. of Governors, FRS v. MCorp Fin., Inc., 502 U.S. 32, 43–44 (1991)).

Here, Plaintiffs have a cause of action, sounding in equity, to seek injunctive and declaratory relief to redress governmental action that allegedly contravenes the Constitution. See Youngstown, 343 U.S. at 585. Defendants admit that no statutory review scheme would provide Plaintiffs with a "meaningful and adequate opportunity for judicial review" at this time. Nuclear Regul. Comm'n, 605 U.S. at 681. Having found Plaintiffs sufficiently injured due to the short timeframe required by the EO's directives prior to the November 3, 2026, and earlier elections, the court will review Plaintiffs' facial challenge to the constitutionality of the EO, sounding in equity, and Defendants' Motion to Dismiss [Doc. No. 154] based on a failure to plead a cause of action is DENIED.

### C.    Dismissal of President Trump

Defendants argue next that President Trump should be dismissed as a defendant because the court lacks jurisdiction to issue injunctive or declaratory relief as to the President in the performance of his official duties. See Defs.' Mem. 30–31 [Doc. No. 157], id. at 46–47 (citing Mississippi v. Johnson, 71 U.S. 475 (1866) and Franklin, 505 U.S. at 827 (Scalia, J.,

19

concurring)). Plaintiff States seek a declaration that the EO is unlawful but do not seek an injunction against the President. Am. Compl. at ECF 44 [Doc. No. 65].

Contrary to Defendants' assertions, Presidential action is not inherently unreviewable. Franklin, 505 U.S. at 828 (Scalia, J., concurring) (citing Youngstown, 343 U.S. 579); Nixon v. Fitzgerald, 457 U.S. 731, 753–54 (1982) ("separation-of-powers doctrine does not bar every exercise of jurisdiction over the President of the United States"). Rather, "the President is subject to judicial process in appropriate circumstances[,]" Clinton v. Jones, 520 U.S. 681, 703 (1997), and the Supreme Court has expressly rejected the notion of "an absolute, unqualified Presidential privilege of immunity from judicial process under all circumstances," id. at 704 (quoting United States v. Nixon, 418 U.S. 683, 706 (1974)).

Defendants primarily rely on Justice Scalia's concurrence in Franklin, in which he stated, "I think we cannot issue a declaratory judgment against the President. It is incompatible with his constitutional position that he be compelled personally to defend his executive actions before a court." Franklin, 505 U.S. at 827 (Scalia, J., concurring). However, six years after Franklin, the Supreme Court expressly stated in Clinton v. City of New York, 524 U.S. 417, 433 n.22 (1998), that a declaratory judgment against the President could redress the plaintiff's injuries. Ultimately, the case law does not support a firm prohibition on a declaratory judgment against the President. See Kingdom v. Trump, No. 25-cv-691-RCL, 2025 WL 1568238, at *16 (D.D.C. June 3, 2025) (declining to dismiss declaratory judgment claim against President); Missouri v. Biden, 662 F. Supp. 3d 626, 682 (W.D. La. 2023) (same); Stone v. Trump, 400 F. Supp. 3d 317, 359 (D. Md. 2019) (same). Therefore, where Plaintiffs seek only declaratory and not injunctive relief as to the President, the court DENIES Defendants' Motion [Doc. No. 154] to dismiss the President from this action.

**D.      Dismissal of Commerce Defendants**

Defendants argue that the Department of Commerce and Commerce Secretary Lutnick should be dismissed as Defendants because the EO includes no express role for the Commerce Defendants, only minimal "coordinat[ion]" regarding implementation. See Defs.' Mem. 30–31 [Doc. No. 157]. Plaintiffs assert only Count I of the Amended Complaint [Doc. No. 65] against the Commerce Defendants, id. ¶¶ 150–66. Plaintiff States argue that both the President and Commerce Defendants "play a critical role in the EO's issuance and implementation[.]" See Pls.' Reply 30 [Doc. No. 163].

The EO features the Commerce Secretary minimally in its directives. The Commerce Secretary is mentioned only in Section 4 of the EO, which requires that "[t]he Secretary of Homeland Security, the Commissioner of SSA, and the Postmaster General shall coordinate with the Secretary of Commerce in effectuating all relevant aspects of the implementation of this order." Exec. Order 14399 § 4(a). But while the specifics of the Commerce Secretary's role are not yet clear, where the court is considering a facial attack against the EO, and the EO explicitly charges the Commerce Secretary with implementation of the EO, the court DENIES Defendants' Motion [Doc. No. 154] to dismiss the Department of Commerce and the Secretary of Commerce.

**IV.     Plaintiffs' Motion for Summary Judgment**

Plaintiffs ask the court to declare Sections 2, 3, and 5 of the EO facially unconstitutional and enjoin all agency heads from implementing the EO's directives. See Pls.' Proposed Order [Doc. No. 97-1].

**A.      Standard of Review**

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material when, under

the governing substantive law, it could affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Baker v. St. Paul Travelers Ins. Co., 670 F.3d 119, 125 (1st Cir. 2012). A dispute is genuine if a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once established, the burden shifts to the non-moving party to set forth facts demonstrating that a genuine dispute of material fact remains. Id. at 322. The non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] upon mere allegations or denials of [the] pleadings." Anderson, 477 U.S. at 256. Rather, the non-moving party must "go beyond the pleadings and by [his or] her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex Corp., 477 U.S. at 324 (quotations omitted). Disputes over facts "that are irrelevant or unnecessary" will not preclude summary judgment. Anderson, 477 U.S. at 248.

Generally, such a motion is brought after the parties have completed discovery. See Celotex Corp., 477 U.S. at 322. Nonetheless, unless a local rule or court order provides otherwise, the movant may file a summary judgment motion before discovery is complete or before it has even commenced. See Fed. R. Civ. P. 56(b) ("[A] party may file a motion for summary judgment at any time until 30 days after the close of all discovery."). However, "the party opposing the motion for summary judgment bears the burden of responding only after the moving party has met its burden of coming forward with proof of the absence of any genuine issues of material fact." Celotex Corp., 477 U.S. at 322 (citation omitted).

When reviewing a motion for summary judgment, the court must take all properly supported evidence in the light most favorable to the non-movant and draw all reasonable

inferences in the non-movant's favor. Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment[.]" Anderson, 477 U.S. at 255.

Here, as set forth above, see supra Section I, there is no genuine dispute of material facts for purposes of the pending motion.

### B.    Saving Language

As a threshold issue, much of Defendants' opposition is based on the EO's qualifying language, directing executive agencies to act "[t]o the extent feasible and consistent with applicable law[.]" Exec. Order 14399 § 2(a). Defendants argue that the EO cannot be facially unlawful, because the EO explicitly requires that its directives comply with the law. Defs.' Mem. 44 [Doc. No. 157]; see also Intervenors' Opp'n 7 [Doc. No. 153].

"The mere possibility that some agency might make a legally suspect decision" and disregard a saving clause's command to follow the law when implementing an executive order "does not justify an injunction against enforcement" of that order. Bldg. and Constr. Trades Dep't, AFL-CIO v. Allbaugh, 295 F.3d 28, 33 (D.C. Cir. 2002). Accordingly, if an executive order containing a saving clause directs a subordinate to achieve a goal that could be achieved in multiple—both legal and illegal—ways, a reviewing court will interpret the order in light of the saving clause to direct only permissible action. Common Cause v. Trump, 506 F. Supp. 3d 39, 49–50, 53 n.8 (D.D.C. 2020); see also Trump v. New York, 592 U.S. 125, 131 (2020).

"If 'consistent with law' precludes a court from examining whether the Executive Order is consistent with law," however, "judicial review is a meaningless exercise, precluding resolution of the critical legal issues." City & Cnty. of San Francisco v. Trump, 897 F.3d 1225,

1240 (9th Cir. 2018). Accordingly, where, as here, the parties' dispute whether certain action required by an order is permissible, review is not precluded by a saving clause.

Moreover, executive orders, "cannot be held to destroy themselves through saving clauses." Common Cause, 506 F. Supp. 3d at 53 n.8 (quoting FTC v. Credit Bureau Ctr., LLC, 937 F.3d 765, 755 (7th Cir. 2019)). If an executive order unambiguously "command[s] . . . action that a saving[ ] clause purports to negate," a reviewing court must interpret the order's operative provision as written, even if that requires disregard of the saving language. Id. Where a plaintiff argues that an executive order is invalid in all possible applications, the saving clause itself cannot preclude review. See Allbaugh, 295 F.3d at 33 (citing Reno v. Flores, 507 U.S. 292, 301 (1993)). If implementation consistent with applicable law is impossible, an executive order's saving clause or otherwise qualifying language "is meaningless." League of United Latin Am. Citizens v. Exec. Off. of President, 780 F. Supp. 3d 135, 176 (D.D.C. 2025). Therefore, the court declines to interpret the EO as nullifying its meaning through saving language and considers whether the President has the authority to issue the EO regardless of the qualifying language. Id.

### C.  Section 2 of the EO

Section 2 directs the USCIS director to compile a Confirmed Citizen List for each State, including individuals who could be eligible to vote in an upcoming election based on citizenship, age, and State residency. Exec. Order 14399 § 2(a). The EO requires USCIS to compile these Lists, "[t]o the extent feasible and consistent with applicable law," from various federal records/databases (including DHS naturalization and citizenship records, SSA records, and the SAVE database) and to send the Lists to State election officials 60 days before a federal election, after which the State will have an opportunity to review and send in suggested

corrections/modifications. Id. Section 2 then identifies several federal criminal offenses[13] and, citing those offenses, directs DOJ to prioritize the investigation and prosecution of federal election officials or administrators "who issue Federal ballots to individuals not eligible to vote in a Federal election[.]" Id. § 2(b).

### 1.    Section 2(a): Establishment of Confirmed Citizen Lists

Plaintiff States argue the President lacks authority to establish Confirmed Citizen Lists. Pls.' Mem. 8–12 [Doc. No. 106]. Consistent with Constitutional principles of State control over elections, all States already maintain registered voter databases, subject to some general structural requirements imposed by Congress. HAVA requires each State to implement a "single, uniform, official, centralized, interactive computerized statewide voter registration list," 52 U.S.C. § 21083(a)(1), and to maintain that list regularly by adding newly eligible voters and removing ineligible voters. Id. §§ 21083(a)(2)(A)(iii), (a)(2)(B). HAVA provides only a minimum set of requirements for categories of information included on voter registration lists. 52 U.S.C. § 21083(a)(1)(A)(ii)–(iii) (requiring that voters' name and registration information be included in the list and that each voter be assigned a unique identifier). Further, state election officials retain discretion under HAVA to determine the appropriate method for creating, storing, and maintaining their State's voter registration list as well as to establish procedures for registering to vote. Id. § 21085 ("The specific choices on the methods of complying with the requirements of this subchapter shall be left to the discretion of the State."); id. § 20503 ("[E]ach State shall establish procedures to register to vote in elections for Federal office[.]").

---

[13] Namely, 18 U.S.C. § 2(a) (Aiding and Abetting Liability); 18 U.S.C. § 241 (Conspiracy Against Rights); 18 U.S.C. § 371 (Conspiracy or Offense to Defraud the United States); 18 U.S.C. § 611(a) (Voting by Aliens); 18 U.S.C. § 1001 (Criminalizing False Statements); 18 U.S.C. 1015 (Criminalizing False Statements re: Citizenship); 52 U.S.C. § 10307 (False Information in Voting); and 52 U.S.C. § 20511 (Criminal Penalties for Election Officials who, inter alia, procure false ballots).

Defendants do not defend the establishment of the Lists directly, arguing that "it is not even clear whether or when these [Confirmed Citizen L]ists will be created—much less in what form, based on what data, or how they might be used." Defs.' Mem. 18 [Doc. No. 157]; but see Defs.' Notice [Doc. No. 188] (notifying the court that, on June 8, 2026, DHS Secretary approved USCIS' plan to build infrastructure necessary to establish the Confirmed Citizen Lists). Intervenor States do defend the Lists, characterizing Section 2 as "organiz[ing] information already within the Executive Branch's possession" and asserting that the compilation of the Confirmed Citizen Lists supports "the President's duty to 'take Care that the Laws be faithfully executed[.]'" Intervenors' Opp'n at 8–9 [Doc. No. 153] (citing U.S. CONST. art. II, § 3).

It is clear that the federal agencies charged with compiling Confirmed Citizen Lists lack the ability to create complete and accurate lists of the U.S. citizens residing in every State. The EO provides that the Confirmed Citizen Lists "shall be derived from Federal citizenship and naturalization records, SSA records, SAVE [Systematic Alien Verification for Entitlements] data,[14] and other relevant Federal databases." Exec. Order 14399, § 2(a); see also id. § 4(c) (the SSA Commissioner must "provide all . . . citizenship and identity data [necessary]" to compile the Confirmed Citizen Lists for the DHS secretary, "consistent with applicable law[.]").[15] But

---

[14] SAVE is a system administered by DHS that is "designed to help federal, state, tribal, and local government agencies confirm citizenship and immigration status prior to granting benefits and licenses, as well as for other lawful purposes." DHS, Privacy Impact Assessment for the Systematic Alien Verification for Entitlements Program, DHS Ref. No. DHS/USCIS/PIA-006(c), at 2 (2020), https://perma.cc/HU2M-NTL8 (2020 PIA). SAVE users "formalize the purpose and use in which they use SAVE through a Memorandum of Agreement (MOA) or Computer Matching Agreement" establishing "the terms and conditions for the user agency's participation in SAVE." Id. at 2–3. One purpose for which States can enter into an agreement to use SAVE is to verify the citizenship of registered voters. Privacy Act of 1974, 5 U.S.C. § 552a; Notice of Modified System of Records, 90 Fed. Reg. 48948, 48952 (Oct. 31, 2025) (2025 SORN). DHS does not dispute that the SAVE system has erroneously flagged citizens as noncitizens. See Pls.' SUMF ¶¶ 15–16 [Doc. No. 105]; Defs.' SUMF ¶¶ 15–16 [Doc. No. 155].

[15] Defendants deny that USCIS has made "any final decisions about what, if any, information will be included in any [Confirmed Citizenship Lists] that may ultimately be created" and, in

where a list of citizens will only be created "[t]o the extent feasible and consistent with applicable law," individual information may only be shared within the limitations of the Privacy Act.[16] More than that, while the EO provides that the Confirmed Citizen Lists "shall be derived from" certain federal records, id. § 2(a), those records do not necessarily track name changes (such as when a woman changes her name at marriage) or residence changes when citizens move from State to State. Accordingly, these Confirmed Citizen Lists will necessarily be incomplete.

Further, while Section 2 labels these Lists as "Citizenship Lists," the EO does not order the creation of a national database comprised exclusively of U.S. citizenship information. Instead, Section 2 directs the compilation of "Lists" for each State limited to "individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State[.]" Id. § 2(a) (emphasis added). However, the EO includes no relevant statutory or constitutional authority for the compilation of "Lists" that include individuals who meet the States' additional and particular criteria for residence. Similarly, the EO points to no authority to limit voting eligibility in primary elections to citizens above the age of 18. Neither Defendants nor Intervenors maintain that any such authority exists. The Constitution provides that only the States determine voter-eligibility requirements, subject, of course, to Constitutional restraints. U.S. CONST. art. I, § 2, cl. 1; art. II, § 1, cl. 2; amend. XVII; amend. XXVI. Both Congress and the President lack any role regarding voter eligibility.

---

response to Plaintiffs' showing that the SAVE system has erroneously flagged citizens as noncitizens, contend that EO § 2(a) "lists 'SAVE data' as a potential source of data[.]" Defs.' SUMF ¶ 15 [Doc. No. 155] (citing Mayhew Decl. ¶¶ 5–10 [Doc. No. 156-1]). As of June 8, 2026, DHS has not confirmed whether or in what capacity SAVE data will be used. See Defs.' Notice 2 [Doc. No. 188].

[16] The Privacy Act strictly limits government agencies from disclosing records about an individual. See 5 U.S.C. § 552a(a)(4) (defining "record"); id. § 552a(b) (limiting disclosure).

Notably, nowhere in HAVA does Congress prescribe who should be included on State voter lists. Further, neither in HAVA nor any other federal statute does Congress authorize the federal government to create their own voting database. Instead, Congress, consistent with the Constitution, has left that authority to the States alone. Accordingly, the creation of the Confirmed Citizen Lists is ultra vires because the President lacks any authority to compile voter lists for each State. See Youngstown, 343 U.S. at 582.

2.      Section 2(b): List Enforcement

After describing the requirements surrounding the compilation and transmission of the Confirmed Citizens Lists, Section 2 then requires that DOJ prioritize the investigation and prosecution of election officials and administrators "who issue Federal ballots to individuals not eligible to vote in a Federal election," including specific criminal offenses, largely relating to voter-fraud. Exec. Order 14399 § 2(b). Plaintiffs argue that Section 2 threatens criminal investigation and prosecution "on a legally baseless theory" to "improperly conscript Plaintiff States and their elections officials to carry out a presidential policy." Pls.' Reply at 16 [Doc. No. 163]. Defendants characterize Section 2(b) as a matter of prosecutorial discretion, exempt from judicial review. Defs.' Reply at 23 [Doc. No. 167]. Intervenor States also dispute that the EO does anything more than direct DOJ to enforce existing federal election laws. Intervenors' Opp'n 11 [Doc. No. 153].

Certainly, the President may direct DOJ to prioritize the investigation and prosecution of certain criminal offenses. See Trump v. United States, 603 U.S. 593, 620 (2024) ("[T]he Executive Branch has 'exclusive authority and absolute discretion' to decide which crimes to investigate and prosecute, including with respect to allegations of election crime.") (citing United States v. Nixon, 418 U.S. 683, 693 (1974)). And, the Constitution empowers the President to "take care that [18 U.S.C. §§ 2(a), 241, 371, 611(a), 1001, 1015; 52 U.S.C. §§ 10307, and 20511

28

are] faithfully executed" and prioritize the enforcement of violators accordingly. U.S. CONST. art. II, § 3. However, criminal offenses are defined by Congress and neither the Take Care nor Guarantee Clause empowers the President to create a new criminal offense. See U.S. CONST. art. I, § 8 ("Congress shall have the power . . . [t]o define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations.").

Congress may explicitly delegate the power to define a criminal offense to the President. See United States v. Grimaud, 220 U.S. 506, 517 (1911) ("[W]hen Congress had legislated and indicated its will, it could give to those who were to act under such general provisions 'power to fill up the details' by the establishment of administrative rules and regulations, the violation of which could be punished by fine or imprisonment fixed by Congress, or by penalties fixed by Congress, or measured by the injury done."). But neither the EO, nor the parties' briefing references a statute that delegates such authority from Congress to the President in this voting-related context. Cf. Touby v. United States, 500 U.S. 160 (1991) (upholding a delegation of power to the Attorney General to bypass (for a limited time) several of the requirements for permanent drug scheduling and expedite the designation of a substance as "controlled").

Defendants argue that no legal significance, criminal or otherwise, attaches to a State's decision to utilize or disregard DHS' Confirmed Citizens List. Defs.' Mem. at 36 [Doc. No. 157]. Defendants describe the Lists as "optional resource[s] that states can use or ignore[.]" Id. (citation omitted). Intervenor States also assert that the "use of the Lists by the States is optional[,]" Intervenors' Opp'n 5 [Doc. No. 153] (emphasis in original), but then point to the law enforcement implications of the EO, see id. at 9 (citing U.S. CONST. art. II, § 3 and arguing that the compilation of the Lists supports "the President's duty to 'take Care that the Laws be faithfully executed[.]'"). Where the President seeks to have the Attorney General and DOJ rely on the Confirmed Citizens Lists to support the President's stated mission to reduce voter fraud,

29

see Exec. Order 14399 § 1 ("Purpose and Policy"), the Lists are being used as an enforcement mechanism that has some type of legal consequence, or at minimum, as a threatened enforcement mechanism that will chill local election officials from complying with legal obligations to ensure that all eligible citizens may vote. Accordingly, to the extent the EO attempts to intimidate local election officials to use the necessarily incomplete Confirmed Citizenship Lists as a resource, lest they face criminal prosecution, such efforts fall outside the Presidents' Article II and otherwise-delegated authority.

### D.    Section 3 of the EO

Plaintiff States argue that Section 3 of the EO, which directs USPS to engage in rulemaking regarding regulating absentee and mail-in ballots, unconstitutionally interferes with "States' and Congress's authority to regulate elections and Congress's power to regulate USPS." Pls.' Mem. 14 [Doc. No. 106]. Defendants argue that the merits are impossible to argue because the ultimate agency action that USPS will take is still unknown. Defs.' Mem. 31–37 (Doc. No. 157]. Intervenor States assert that the President, vested with all the power of the Executive Branch, inherently has the authority to direct USPS. Intervenors' Opp'n 17–20 [Doc. No. 153].

Section 3 of the EO directs USPS to compile its own Lists of individuals eligible to vote by mail and prohibits the transmission of a mail-in ballot completed by anyone not on USPS' Lists. See Exec. Order 14399 § 3(b); see also USPS Notice of Proposed Rulemaking, Ballot Mail for Federal Elections, 91 Fed. Reg. 32915, 32918 (June 2, 2026) (Mail ballots "that do not comply with [standards required by the EO] will not be accepted and will be returned to the authorized ballot mailer."). But the Constitution reserves the power to determine voter eligibility to the States alone. U.S. CONST. art. I, § 2, cl. 1; amend. XII; amend. XVII. Neither the Executive Branch nor Congress may interfere with this power.

30

Additionally, Congress has empowered USPS to "adopt, amend, and repeal such rules and regulations, not inconsistent with this title, as may be necessary in the execution of its functions[.]" 39 U.S.C. § 401(2). However, no law enacted by Congress delegates authority to control mail-in voting to USPS. The voting-related guidance currently issued by USPS is not binding on the States, merely recommended. See USPS Pub. 631, Official Election Mail – Graphic Guidelines and Logos (https://about.usps.com/publications/pub631.pdf) (Feb. 2026); USPS Kit 600, Official Election Mail Guide (https://about.usps.com/kits/kit600.pdf) (Feb. 2026).[17] Accordingly, USPS lacks statutory authorization to promulgate any binding regulations on mail-in voting.

Finally, the EO's directive that USPS require all States to use a specific mail-in ballot is inconsistent with USPS rulemaking procedure. If seeking to make a "change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis," USPS must submit a proposal to the Postal Regulatory Commission ("PRC"), for an advisory opinion. 39 U.S.C. § 3661(b). The PRC then has 90 days to issue its advisory opinion. 39 C.F.R. § 3020.102(a). The EO requires USPS to issue an NPRM by May 30, 2026, and then a final rule by July 29, 2026. This timeframe provides no allowance for Congress' mandated procedure regarding USPS rulemaking. 39 U.S.C. § 3661(b). Therefore, USPS lacks authority to

---

[17] USPS created and published these election mail guidance documents pursuant to a 2021 settlement agreement between USPS and the NAACP, arising out of litigation regarding USPS' announcement and implementation of policy changes to reduce mail pick-up in advance of the 2020 general election. See Stip. of Settlement, Ex. A at 2, NAACP v. USPS, No. 1:20-cv-02295-EGS (D.D.C. Dec. 17, 2021), Dkt. No. 170. The 2021 settlement agreement required USPS, inter alia, to prioritize the timely delivery of election mail for every national election through 2028. Id. The NAACP has filed a motion to enforce that settlement agreement, arguing that the EO directs USPS to violate the settlement agreement. See Pls.' Mot. to Enforce Compliance, NAACP v. USPS, No. 1:20-cv-02295-EGS (D.D.C. June 3, 2021), Dkt. No. 171.

promulgate regulations on voting and the EO's directive that USPS do so constitutes ultra vires executive action.

### E.    Section 5 of the EO

Section 5 requires DOJ and all other executive agencies "with relevant authority" to "take all lawful steps to deter and address noncompliance with Federal law." Exec. Order 14399 § 5. Section 5 also states that "[e]vidence of violations of existing Federal laws by State or local election officials . . . <u>may be</u> referred to [DOJ] for consideration of investigation or charges under," 18 U.S.C. §§ 2(a), 241, 371, 611(a), 1001, 1015, as well as under 52 U.S.C. §§ 10307 and 20511 (the same criminal provisions listed in Sections 1, 2(b), and 3(a) of the EO). <u>Id.</u> (emphasis added). Finally, Section 5 provides that "States and localities <u>should</u> preserve, for a 5-year-period, all records and materials–excluding ballots cast–evidencing participation in any Federal election (e.g., ballot envelopes, regardless of carriers)." <u>Id.</u> (emphasis added).

Plaintiff States argue that Section 5 is unconstitutional because it regulates States' election record retention processes without authority to do so. Pls.' Mem. at 19–20 [Doc. No. 106]. Defendants argue that Section 5 merely sets out the President's view on record retention policies and that the EO does not establish any "legal consequences" for State and local officials who decline to retain all election materials for five years. Defs.' Mem. at 11–12 [Doc. No. 157]. In response, Plaintiff States request the court to "expressly find that [Section 5] does not impose any requirements on Plaintiff States" if the court agrees with Defendants' characterization of Section 5 as strictly precatory. Pls.' Reply at 27 [Doc. No. 163]. Intervenor States make no argument regarding Section 5. Intervenors' Opp'n [Doc. No. 153].

The Civil Rights Act of 1960 establishes record retention rules on election materials. Title III provides that "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of any [federal] election . . . all records and papers which come into his

possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election," and makes the failure to do so punishable by up to one year of imprisonment. 52 U.S.C. § 20701. Title III also provides that "[a]ny record or paper" subject to that preservation requirement "shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying[.]" Id. § 20703.[18]

Congress, pursuant to its Elections Clause power, has set a maximum record retention period of twenty-two months for election materials. U.S. CONST. art. I, § 4, cl. 1.; 52 U.S.C. § 20701. Congress has also expressly provided a role for the Executive Branch, permitting DOJ to investigate and execute the law by obtaining access to those papers pursuant to a specific process. 52 U.S.C. § 20703. Nowhere in Title III of the Civil Rights Act, or any other federal law, does Congress delegate to the President the power to set additional record retention requirements. Accordingly, the EO's 5-year record retention statement must be precatory, because the President lacks any authority to impose such a requirement. Cf. Libertarian Party of Ind. v. Packard, 741 F.2d 981, 988 (7th Cir. 1984) (Where the government lacks the authority to "compel [action], it should not be able to coerce.").

In interpreting the gloss of "should" in other contexts, courts have found that "use of the terms 'should' . . . indicate[s] that the statute is merely precatory." Monahan v. Dorchester Counseling Ctr., Inc., 961 F.2d 987, 994–95 (1st Cir. 1992) (analyzing 42 U.S.C. § 10841, titled the "Restatement of Bill of Rights for Mental Health Patients"). The verb "should" is precatory rather than mandatory because it "neither requires nor prohibits any action on the part of the

---

[18] It is upon this statutory basis that DOJ has recently claimed authority to demand access to States' electronic voter registration lists, a claim routinely dismissed by courts across the country. See supra Note 6.

states or any other party." Id. at 995 (quoting Brooks v. Johnson & Johnson, Inc., 685 F. Supp. 107, 108 (E.D. Pa. 1988)).

Therefore, in light of the President's lack of constitutional or statutory authority to impose an election materials record retention requirement, already expressly limited role in the Civil Rights Act record retention scheme, and a plain-meaning interpretation of the EO's language, Section 5 does not and cannot require the States to retain records of all election materials for five years.

## V.    Conclusion

The court has previously dismissed without prejudice Plaintiffs States' amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) on prudential ripeness grounds with regard to elections occurring after November 3, 2026. Mem. & Order [Doc. No. 190]. For the foregoing reasons, as to the November 3, 2026 election, and all earlier elections, Defendants' Motion to Dismiss [Doc. No. 154] pursuant to Federal Rules of Procedure 12(b)(1) and 12(b)(6) is DENIED and Plaintiffs' Motion for Summary Judgment [Doc. No. 97] pursuant to Rule 56 is GRANTED.

Accordingly, it is hereby ORDERED and DECLARED that Sections 2 and 3 of the EO are legally void as they are ultra vires and unconstitutionally violate the separation of powers, and that Section 5 of the EO is merely precatory.

In addition, other than the President, Defendants and their officers, agents, servants, and employees are hereby ENJOINED from implementing or giving effect to Sections 2 and 3 of the EO with respect to the November 3, 2026 or any earlier federal election in the Plaintiff States as follows:

a.   Defendants United States Department of Justice, Acting Attorney General Todd Blanche, United States Department of Homeland Security, Secretary Markwayne Mullin, United

34

States Citizenship and Immigration Services, Director Joseph B. Edlow, United States Social Security Administration, Commissioner Frank Bisignano, United States Department of Commerce, and Secretary Howard Lutnick, including their officers, agents, servants, and employees, are enjoined from implementing, giving effect to, or enforcing Section 2 of the EO as to Plaintiff States with respect to the November 3, 2026 or any earlier federal election, including taking any steps to create a new federal program to superintend and control Plaintiff States' maintenance of their voter rolls; or initiating any investigation or prosecution of Plaintiff States, their officials, local officials, or agents of such state or local officials involved in the administration of federal elections within Plaintiff States, stemming from the unconstitutional provisions in Section 2 of the EO. This injunction does not bar the federal government from providing assistance with verifying the citizenship or eligibility of any voter if the assistance is provided at the request of any State and within the framework provided by Congress.

b.  Defendants United States Department of Justice, Acting Attorney General Todd Blanche, United States Postal Service, Postmaster General David Steiner, Deputy Postmaster General Doug Tolino, Chair Amber McReynolds, Vice Chair Derek T. Kan, and Members Ronald Stroman and Daniel Tangherlini, including their officers, agents, servants, and employees, are enjoined from implementing, giving effect to, or enforcing Section 3(b)(i)–(v) or (d) of the EO as to elections mail for elections administered by Plaintiff States and ballot envelopes used by Plaintiff States with respect to the November 3, 2026 or any earlier federal election, including refusing to transmit mail-in or absentee ballots from voters registered in Plaintiff States to elections officials in Plaintiff States, regardless of the voters' location; or otherwise initiating or completing rulemaking to promulgate the specific regulations outlined in Section 3(b)(i)–(v) or (d) of the EO as to

35

elections mail for elections administered by Plaintiff States and ballot envelopes used by Plaintiff States for the November 3, 2026 election, or any earlier election. This injunction does not bar the federal government from providing non-binding USPS guidance on ballot mail envelopes or from providing assistance with verifying citizenship or eligibility of any voter if the assistance is provided at the request of any Plaintiff State and within the framework provided by Congress.

c. Defendants United States Department of Justice and Acting Attorney General Todd Blanche, including their officers, agents, servants, and employees, are enjoined from initiating any investigation or prosecution of Plaintiff States, their officials, local officials, or agents of such state or local officials involved in the administration of federal elections within Plaintiff States, with respect to the November 3, 2026 or any earlier federal election, stemming from the unconstitutional provisions in Sections 2 and 3 of the EO.

d. Defendants, other than the President, are hereby ORDERED that they must, in good faith, take such steps as are necessary to prevent explicit or implicit implementation of Sections 2, 3 and 5 of the EO, and to cease and reverse any implementation of those provisions, as to Plaintiff States, with respect to the November 3, 2026 or any earlier federal election.

Further, Defendants, other than the President, are hereby ORDERED to:

(a) Within seven (7) calendar days of entry of this Order, provide written notice of this Order to all Defendants and their employees, and to further notify them that Sections 2 and 3 of the EO are unlawful, null, and void and Section 5 is merely precatory, as to Plaintiff States with respect to the November 3, 2026 or any earlier federal election;

(b) Notify all recipients that they are required to comply with this Order, under penalty of contempt; and

(c) Provide counsel for Plaintiff States with a copy of the notice and/or communications referred to in (a)–(b) on the docket, within seven (7) days of issuance of such notice and/or communications.

Defendants are hereby ORDERED to file a status report with the court within seven (7) days of entry of this Order describing steps taken to ensure compliance with it. The court retains jurisdiction to enforce the injunction and judgment and to award other such relief as may be appropriate.

Plaintiff States are directed to file a proposed Judgment for entry in this matter within seven (7) days of entry of this Order.

IT IS SO ORDERED.

June 25, 2026                              /s/ Indira Talwani
                                           United States District Judge