**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br><br> Defendants. | Case No. 1:26-cv-11581-IT |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO STAY

**TABLE OF CONTENTS**

**INTRODUCTION**............................................................................................................... **1**

**BACKGROUND** ................................................................................................................ **1**

I.     Executive Order 14,399 ........................................................................................... 1

II    Litigation Background ............................................................................................ 5

**ARGUMENT** .................................................................................................................... **6**

I.     Federal Defendants are Likely to Prevail on the Merits of their Appeal ............................ 6

      A.    Plaintiffs lack Article III standing............................................................................. 7

      B.    Plaintiffs' claims are not ripe.................................................................................... 10

      C.    Plaintiffs' claims are likely to fail on the merits......................................................... 15

II.    Federal Defendants Will Suffer Irreperable Harm Absent a Stay. .................................. 17

III.   The Remaining Stay Factors Tip in Favor of Federal Defendants. .................................. 20

**CONCLUSION** ................................................................................................................ **20**

# TABLE OF AUTHORITIES

**CASES**                                                                                                    **PAGE(S)**

*Abbott Labs. v. Gardner*,
   387 U.S. 136 (1967).................................................................................................... 11, 12

*Bldg. & Const. Trades Dep't., AFL-CIO v. Allbaugh*,
   295 F.3d 28 (D.C. Cir. 2002) ................................................................................... 16, 17

*Castro v. Scanlan*,
   86 F.4th 947 (1st Cir. 2023).......................................................................................... 9

*Center for Democracy & Technology v. Biden*,
   No. 21-5062, 2021 WL 11659822 (D.C. Cir. Aug. 9, 2021)........................................ 8

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013)................................................................................................. 7, 8

*Common Cause v. Trump*,
   506 F. Supp. 3d 39 (D.D.C. 2020) ......................................................................... 14, 15

*Ctr. for Democracy & Tech. v. Trump*,
   507 F. Supp. 3d 213 (D.D.C. 2020)........................................................................... 8, 9

*DSCC v. Trump*,
   No. 26-cv-1114, 2026 WL 1487833 (D.D.C. May 28, 2026)...................................... 16

*Equal Rts. Ctr. v. Uber Techs., Inc.*,
   525 F. Supp. 3d 62 (D.D.C. 2021) ................................................................................ 9

*Ernst & Young v. Depositors Econ. Prot. Corp.*,
   45 F.3d 530 (1st Cir. 1995) .......................................................................................... 12

*FDA v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024)................................................................................................. 8, 10

*FDA v. Wages & White Lion Invs., LLC*,
   604 U.S. 542 (2025).................................................................................................... 15

*Los Angeles v. Lyons*,
   461 U.S. 95 (1983)...................................................................................................... 13

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992)...................................................................................................... 7

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990)..................................................................................................... 13

*LULAC v. Exec. Off. of President*,
   808 F. Supp. 3d 29 (D.D.C. 2025) ............................................................................... 14

*Maryland v. King*,
   567 U.S. 1301 (2012)................................................................................................... 20

*McInnis-Miesnor v. Maine Medical Ctr.*,
   319 F.3d 63 (1st Cir. 2003)..................................................................................... 11, 12

*Murthy v. Missouri*,
   603 U.S. 43 (2024)......................................................................................................... 9

*Nat'l Ass'n of Gov't Emps. v. Yellen*,
   120 F.4th 904 (1st Cir. 2024)...................................................................................... 10

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
   538 U.S. 803 (2003)..................................................................................................... 11

*Nat'l Urb. League v. Trump*,
   783 F. Supp. 3d 61 (D.D.C. 2025) ........................................................... 8, 10, 14, 17

*New York v. Trump*,
   485 F. Supp. 3d 422 (S.D.N.Y. 2020)......................................................................... 12

*Off. of Commc'n of United Church of Christ v. FCC*,
   826 F.2d 101, 105 (D.C. Cir. 1987) ............................................................................ 14

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
   523 U.S. 726 (1998)..................................................................................................... 14

*Platte River Whooping Crane Critical Habitat Maint. Tr. v. FERC*,
   962 F.2d 27 (D.C. Cir. 1992)....................................................................................... 10

*Reno v. Cath. Soc. Servs., Inc.*,
   509 U.S. 43 (1993)....................................................................................................... 11

*Seila Law LLC v. CFPB*,
   591 U.S. 197 (2020)..................................................................................................... 20

*Sierra Club v. Costle*,
   657 F.2d 298 (D.C. Cir. 1981)..................................................................................... 16

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009)................................................................................................ 9, 13

*Texas v. United States*,
    523 U.S. 296 (1998)................................................................................................... 11

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021)..................................................................................................... 7

*Trump v. New York*,
    592 U.S. 125 (2020)............................................................................................. *passim*

*USPS v. Gregory*,
    534 U.S. 1 (2001)....................................................................................................... 15

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990)................................................................................................ 8, 10

*Wildlife v. Perciasepe*,
    714 F.3d 1317 (D.C. Cir. 2013)............................................................................... 9, 10

## ADMINISTRATIVE AND EXECUTIVE MATERIALS

*Ensuring a Lawful and Accurate Enumeration and Apportionment Pursuant to
    the Decennial Census*,
    Exec. Order 13,986, 86 Fed. Reg. 7,015 (Jan. 20, 2021), *revoked by*
    Exec. Order 14,148, 90 Fed. Reg. 8,237 (Jan. 20, 2025)........................................... 14

*Ensuring Citizenship Verification and Integrity in Federal Elections*,
    Exec. Order 14,399, 91 Fed. Reg. 17,125 (Mar. 31, 2026) ............................... *passim*

**INTRODUCTION**

The President of the United States signed Executive Order 14,399 ("EO" or "Order" or "E.O.") on March 31, 2026. The EO is an intra-Executive Branch directive from the President to his subordinates, which by itself changes nothing about the administration of any election. Nonetheless, Defendants acknowledge that this Court has granted Plaintiffs' Motion for Summary Judgment, ECF No. 97. *See* Memorandum & Order of June 25, 2026, ECF No. 191 ("M&O") at 34. In particular, this Court has enjoined Defendants "from implementing or giving effect to Sections 2 and 3 of the EO with respect to the November 3, 2026 or any earlier federal election in the Plaintiff States." M&O at 34-37. Defendants respectfully move this Court to stay the injunctive relief because Federal Defendants are correct on the merits concerning the Court's lack of jurisdiction to issue the injunction, because Defendants will be irreparably harmed absent a stay, and because the equities favor the government. Defendants respectfully request a ruling by July 6, 2026, to allow the Government to seek relief, if necessary, from the First Circuit.

**BACKGROUND**

I.      **Executive Order 14,399**

On March 31, 2026, President Trump issued Executive Order 14,399, *Ensuring Citizenship Verification and Integrity in Federal Elections*, 91 Fed. Reg. 17,125 (Mar. 31, 2026). As relevant here, the Order does three different things.

**State Citizenship Lists.** First, the Order directs the "Secretary of Homeland Security . . . in coordination with the Commissioner of [the Social Security Administration (SSA)]" to "the extent feasible and consistent with applicable law" to "compile and transmit" "a list of individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State," *i.e.*, the "State Citizenship List." E.O. § 2(a). "The State Citizenship List shall be derived from Federal citizenship and naturalization records, SSA records, SAVE data, and other relevant Federal databases." *Id.* Additionally, "[t]he Secretary of Homeland Security shall establish procedures to (i) allow individuals to access their individual records as well as to update or correct them in advance of elections; and

- 1 -

(ii) enable States to routinely supplement and provide suggested modifications or amendments to the State Citizenship List transmitted thereto." *Id.*

The Order also directs the Secretary of Homeland Security to "establish the infrastructure necessary to compile, maintain, and transmit the State Citizenship List" "within 90 days of the date" of the Order, *i.e.*, by June 29, 2026. *Id.* § 4(c). The Secretary of Homeland Security and the SSA Commissioner are charged with coordinating to implement the State Citizenship Lists. *See id.* § 4(a). The State Citizenship List "shall be updated and transmitted to State election officials no fewer than 60 days before each regularly scheduled Federal election, or promptly upon request by a State in connection with any special Federal election." *Id.* § 2(a).

The Order does not specify any particular purpose or intended use for the State Citizenship Lists, and (other than their creation by the Department of Homeland Security ("DHS") and transmission to States "[t]o the extent feasible and consistent with applicable law," *id.* § 2(a)) does not require anyone inside or outside of the federal government to do anything with those lists.

On June 8, 2026, the Secretary of Homeland Security signed a memorandum from the Director of United States Citizenship and Immigration Service ("USCIS"). *See* June 8, 2026 DHS Memorandum, ECF No. 188-1 ("June 8 DHS Memo"). The June 8 DHS Memo, among other things, "seeks to establish a technological method to provide state election officials access to citizenship list information under the control of USCIS, [SSA], and the Department of State." June 8 DHS Memo at 1. "In practice, state election officials will be provided access to a portal via Login.gov. Via that portal, States would be able to download separate inputs from USCIS, SSA, and DOS, subject to agency-specific terms of service and disclaimers. The downloaded files would provide citizenship related data elements, such as name, date of birth, and relevant agency identifiers." *Id.* at 2. However, this is merely DHS's technical plan and design; consistent with the Executive Order, each agency must first determine if disclosure of its files through this means is consistent with law. Delivery of the "core digital portal infrastructure needed for state access" was slated for "on or around June 30, 2026." *Id.* at 3. Furthermore, the June 8 DHS Memo averred that

- 2 -

"DHS will continue to work to generate from the information contained in th[e] portal a consolidated list of United States citizens and residents of the applicable State to provide to state election officials no fewer than 60 days before each regularly scheduled Federal election." *Id.* at 3.

**Postal Service Rulemaking.**  Second, the Order directs the United States Postal Service ("USPS" or "the Postal Service") "to initiate a proposed rulemaking" with regards to ballot mail for Federal elections to conform to certain design requirements and to develop procedures for individuals to be enrolled on "State-specific Mail-In and Absentee Participation List[s]." E.O. § 3. Those lists would be distinct from the State Citizenship Lists contemplated by Section 2(a).  The Order directs the Postal Service to begin the proposed rulemaking "within 60 days of" the Order, which was May 30, 2026. *Id.* § 3(b).  The Order further states that "[a]ny final rule" that could result from this rulemaking "shall be issued no later than 120 days from the date" of the Order, which is July 29, 2026. *Id.* § 3(d).  The Order also identifies some proposed provisions for inclusion in the notice of proposed rulemaking, *id.* § 3(b)—though it does not say anything about whether any or all of those provisions should also appear in any final rule.

On June 2, 2026, USPS's proposed rule was published in the Federal Register. *See* Notice of May 29, 2026, ECF No. 169; U.S. Postal Service, *Proposed Rule: Ballot Mail for Federal Elections*, 91 Fed. Reg. 32,915 (June 2, 2026) ("USPS Proposed Rule").  The proposed rule proposes to "amend the *Mailing Standards of the United States Postal Service*, Domestic Mail Manual (DMM), regarding the transmission of mail-in or absentee ballots for federal elections pursuant to [USPS's] rulemaking authority." *Id.* at 32,915.  The proposed rule would "identify new standards for the envelope design and review for outbound and return ballot envelopes," including the use of "the official Election Mail logo, automation compatibility, placement of a uniquely serialized Intelligent Mail barcode (IMb) on each outbound and return ballot envelope, and a mailpiece design review." *Id.* at 32,915-16.  The proposed rule would "improve the visibility of ballots in the mailstream," consistent with USPS's current best practices recommendations, and "facilitate the enforcement of federal law." *Id.*

- 3 -

The proposed rule would also establish a process by which states (including authorized election officials and their mail service providers) would notify USPS of "the individuals to whom they are mailing a mail-in or absentee ballot, along with the unique barcode applied to the outbound and return ballot mail envelope for such individuals such that the name and barcode of the voter will be included on a Mail-In and Absentee Participation List" to which states "may thereafter add to or modify the list of enrollees until the last day that ballots may be mailed out to individuals under state law." *Id.* at 32,916. Under the proposed rule, "states would retain full control over who would (or would not) be able to vote by mail in federal elections within each state, as states would control enrollment with the Postal Service for inclusion on the state's Mail-In and Absentee Participation List." *Id.*; *see also id.* (noting that "[t]he Postal Service would not verify whether individuals should or should not be included on a State's Mail-In and Absentee Participation List").

The proposed rule also sets out mechanisms to ensure compliance with the identified standards. Outbound Federal Ballot Mail, that is mail-in or absentee ballots sent from "an election official of a state or a political subdivision thereof" (or by a mail service provider authorized to send mail-in or absentee ballots on their behalf) to voters, which does not comply with the new standards, would "not be accepted" and will be returned to the authorized election official or authorized designee to address any errors before resubmission. *Id.* at 32,917-18. The proposed rule further sets out that these new standards do not apply for "primary elections or to UOCAVA ballots." *Id.* at 32,916.

The proposed rule is still open for notice-and-comment and comments "must be received on or before July 2, 2026." *Id.* at 32,915. As such, no final rule has been issued. Moreover, the proposed rule noted that USPS "will also take steps necessary for the creation of a new system of records notice ("SORN") in accordance with the Privacy Act.[1] *Id.* at 32,917.

---

[1] Federal Defendants notified this Court that "the Postal Service has provided advance notice" of this SORN on June 18, 2026. *See* Notice of June 18, 2026, ECF No. 189 at 1-2. The SORN will be open for notice-and-comment and will not be effective until the latest of: (1) 30 days after publication in the Federal Register, (2) the publication date of USPS's responses to comments

## II.      Litigation Background

Executive Order 14,399 was issued on March 31, 2026.  91 Fed. Reg. 17,125 (Mar. 31, 2026).  On April 3, 2026, the *California* Plaintiffs[2] filed suit challenging sections 2, 3, and 5 of the Order.  *California* Compl., ECF No. 1.  On April 17, 2026, the *California* Plaintiffs filed their First Amended Complaint.  *California* FAC, ECF. No. 65.

On April 23, 2026, the *California* Plaintiffs filed their motion for summary judgment and supporting papers.  ECF Nos. 97, 100, 103, 104, 105, 106. On May 7, 2026, Federal Defendants filed their motion to dismiss, combined brief, and responsive papers. ECF Nos. 154-157.

On June 18, 2026, this Court issued a Memorandum & Order dismissing without prejudice *California* Plaintiffs' First Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(1) on prudential ripeness grounds "as to their claims regarding the EO and its implementation with regard to elections occurring <u>after November 3, 2026</u>."  Memorandum & Opinion of June 18, 2026, ECF No. 190, at 17 (emphasis in original).  However, this Court denied Federal Defendants' motion to dismiss on prudential ripeness grounds "with regard to the November 3, 2026 election, and all earlier elections." *Id.*

On June 25, 2026, this Court issued its Memorandum & Opinion granting *California* Plaintiffs' motion for summary judgment (ECF No. 97), declared that "Sections 2 and 3 of the EO are legally void as ultra vires and unconstitutionally violate the separation of powers, and that Section 5 is merely precatory."  M&O, ECF No. 191, at 34.  This Court also granted injunctive relief, enjoining Defendants (and their officers, agents, servants, and employees) other than the President from "implementing or giving effect to Sections 2 and 3 of the EO with respect to the November

---

received, or (3) the effective date of the final rule (if a final rule is issued). *Id.* If no final rule is issued, then the system of record will not take effect. *Id.* at 2.

[2] *California* was brought by the States of California, Nevada, Washington, Arizona, Colorado, Connecticut, Delaware, Illinois, Maine, Maryland, Michigan, Minnesota, New Jersey, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont, and Wisconsin, the Commonwealths of Massachusetts and Virgina, the District of Columbia, and Josh Shapiro (in his official capacity as Governor of the Commonwealth of Pennsylvania).  *California* Compl., ECF No. 1 ¶¶ 14-52.

3, 2026 or any earlier federal election in the Plaintiff States." *Id.* at 34-37. In the instant motion, Federal Defendants seek a stay of this Court's injunctive relief pending appeal.

## ARGUMENT

A stay is merited here. Courts consider four factors in assessing a motion for stay pending appeal: (1) the movant's likelihood of prevailing on the merits of the appeal, (2) whether the movant will suffer irreparable harm absent a stay, (3) the harm that other parties will suffer if a stay is granted, and (4) the public interest. *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). When the government is a party, its interests and the public interest "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Federal Defendants are likely to prevail on the merits of their appeal because *California* Plaintiffs lack Article III standing. The equities also tip in favor of Federal Defendants.[3]

### I.    FEDERAL DEFENDANTS ARE LIKELY TO PREVAIL ON THE MERITS OF THEIR APPEAL.

At the time *California* Plaintiffs filed their suit, just three days after President Trump issued the Order, "this case [was] riddled with contingencies and speculation that impede judicial review," *Trump v. New York*, 592 U.S. 125, 131 (2020). That is fatal to the subject-matter jurisdiction of this Court under settled principles of Article III standing and ripeness. On April 17, when Plaintiffs filed their First Amended Complaint, no agency had implemented the Executive Order, and so Plaintiffs faced no actual (or imminent) harm—irreparable or otherwise. For similar reasons, and contrary to this Court's opinion, Plaintiffs could not succeed on the merits of any facial challenge to the Executive Order itself, as agencies should be presumed to interpret it lawfully, rather than unlawfully. *See, e.g.*, M&O at 23-24. And there is no public interest in enjoining ongoing, internal government deliberations. Instead, the Court should "[l]et[] the Executive Branch's decisionmaking process run its course," *Trump v. New York*, 592 U.S. at 134—without prejudice to the possibility of exercising judicial review later, if necessary, over any final agency

---

[3] Mindful of the First Circuit's view that arguments not raised on a stay motion to the district court are waived on appeal, Defendants have set forth a fulsome set of arguments in support of a stay. *See Rhode Island v. Trump*, 155 F.4th 35, 46-46 (1st Cir. 2025).

action that causes Plaintiffs any injury. Since Plaintiffs lack Article III standing, Federal Defendants are likely to prevail on the merits of their appeal of the Court's injunctive relief, thus the Court should issue a stay pending the appeal.

This litigation is premature because Plaintiffs seek relief against agency actions that do not yet exist—and that might never exist in the form that Plaintiffs speculate. They cannot establish standing nor ripeness. Each of these "related doctrines of justiciability" "originat[e] in the case-or-controversy requirement of Article III." *Trump v. New York*, 592 U.S. at 131. Whether viewed through the prism of either standing or ripeness, plaintiffs have failed to establish any present injury that a court could properly remedy. If and when the Executive Branch takes some action to implement the Executive Order, any plaintiff who has suffered a concrete injury (or faces an imminent one) can seek relief at that time. At that time, the parties and the Court will have a better understanding of what (if anything) the government is actually *doing* to carry out the directives in Executive Order 14,399. But Plaintiffs seek nothing more than an advisory opinion about the legality of possible future agency actions—actions that might ultimately bear little resemblance to the speculative assumptions that animate their filings.

### A.    Plaintiffs lack Article III standing.

"[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). Plaintiffs cannot satisfy these basic prerequisites for judicial review.

To support standing, "an injury must be concrete, particularized, and actual or imminent." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending." *Id.* (emphasis omitted) (quoting *Lujan*, 504 U.S. at 564 n.2). To that end, the Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending*

- 7 -

to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient." *Id.* (alteration in original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)); *see also FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) ("[T]he injury must be actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon.").

Executive Order 14,399 is an intra-Executive Branch directive from the President to his subordinates. On its own, it does not change anything at all about elections in any State. It does not require anyone outside the government—and certainly not Plaintiffs—to do (or refrain from doing) anything at all. Generally, these sorts of "intra-governmental mandates" in an Executive Order "do not inflict on Plaintiffs an injury in fact." *Nat'l Urb. League v. Trump*, 783 F. Supp. 3d 61, 77 (D.D.C. 2025); *see also, e.g.*, *Ctr. for Democracy & Tech. v. Trump*, 507 F. Supp. 3d 213, 222 (D.D.C. 2020) (no standing to challenge an Executive Order that "does not apply to private parties," and instead "only sets a course of government processes into motion")*, vacated as moot sub nom. Center for Democracy & Technology v. Biden*, No. 21-5062, 2021 WL 11659822 (D.C. Cir. Aug. 9, 2021). So too here.

Ultimately, Plaintiffs' real concern is not with the Executive Order itself. What they fear are (1) the possible future creation of State Citizenship Lists by DHS (assuming creation of such a list is "feasible" and "consistent with applicable law," E.O. § 2(a)); (2) a possible future final rule that may be issued by the Postal Service; and (3) possible future criminal investigations or prosecutions for violations of existing Federal law. But currently, any injury based on possible future agency actions implementing the Executive Order is far "too speculative for Article III purposes," *Clapper*, 568 U.S. at 409—after all, it is unknown how the relevant agencies will implement it, or on what timeline, or under what parameters, or using what processes. Indeed, the agencies *themselves* are still deliberating regarding the Executive Order's possible future implementation. That genuine and ongoing uncertainty is fatal to any theory of standing that relies on predictions about possible future agency actions. *See, e.g.*, *Nat'l Urb. League*, 783 F. Supp. 3d at 82 (in denying a preliminary-injunction motion challenging an Executive Order, explaining that "uncertainty cuts against Plaintiffs here because they bear the burden of 'mak[ing] a clear showing that

- 8 -

[they] are likely to establish each element of standing'" (alteration in original) (quoting *Murthy v. Missouri*, 603 U.S. 43, 58, 144 (2024))).  This Court recognized as much in dismissing Plaintiffs' claims as to post-November 3, 2026 elections.  *See* Memorandum & Opinion of June 18, ECF No. 190, at 17.

By the same token, the sharp disconnect between Plaintiffs' First Amended Complaint (which challenges the Executive Order) and their possible future injuries (which would stem, if at all, from future implementation actions) also gives rise to an independently fatal causation (or traceability) problem.  In short, "the source of any injury to the plaintiffs is the action that the [government] *might* take in the future to" implement the Executive Order—"not the policy itself 'in the abstract.'" *Trump v. New York*, 592 U.S. at 133-34 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009)).  But Plaintiffs only challenge the Executive Order itself; after all, the future implementation actions that Plaintiffs fear do not even exist, at least as of the date they filed their First Amended Complaint.  But "the relevant state of affairs for the purpose of determining standing to sue in the context of a motion to dismiss are facts known to the plaintiff at the time the complaint is filed, regardless of what may have transpired in the interim." *Equal Rts. Ctr. v. Uber Techs., Inc.*, 525 F. Supp. 3d 62, 76 (D.D.C. 2021) (K.B. Jackson, J.); *see also, e.g.*, *Castro v. Scanlan*, 86 F.4th 947, 959 (1st Cir. 2023) (requiring plaintiff to show an injury "at the time that he filed his complaint" in order to satisfy "the injury-in-fact component of the standing inquiry").

Ultimately, whether considered a problem of injury or causation, "Article III standing requires more than the possibility of potentially adverse regulation." *Defs. of Wildlife v. Perciasepe*, 714 F.3d 1317, 1324-25 (D.C. Cir. 2013).  That is true even where (as here) the contours of that possible future regulation are, in some way, foreshadowed by other legal documents (*i.e.*, the Executive Order), even "using a specific timeline." *Id.*; *see also Ctr. for Democracy & Tech.*, 507 F. Supp. 3d at 222 (no standing to challenge Executive Order 13,295, which directed two federal agencies to "expeditiously propose regulations" preventing online censorship by social-media companies (citation and emphasis omitted)).  In the interim, Plaintiffs' rights are "not impaired by

- 9 -

the initiation of a rulemaking" or other policymaking process—after all, they "will not be precluded from participating in the rulemaking and, if [the government] decides to issue a final rule," they are "not precluded from challenging that rule." *Perciasepe*, 714 F.3d at 1325; *see also Platte River Whooping Crane Critical Habitat Maint. Tr. v. FERC*, 962 F.2d 27, 35 (D.C. Cir. 1992) ("Allegations of injury based on predictions regarding future legal proceedings are, however, 'too speculative to invoke the jurisdiction of an Art[icle] III Court.'" (alteration in original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 157 (1990)); *Nat'l Ass'n of Gov't Emps. v. Yellen*, 120 F.4th 904, 910 (1st Cir. 2024) ("Allegations of *possible* future injury are not sufficient.") (cleaned up).

To be clear, this result does not foreclose the possibility of future judicial review. As agencies eventually implement the Order, "Defendants might, of course, interpret and apply the [Executive Order] in a way that creates a cognizable injury traceable to their conduct." *Nat'l Urb. League*, 783 F. Supp. 3d at 82-83. "[T]hat is when Plaintiffs would have the requisite 'personal stake'" that supports standing. *Id.* at 81 (emphasis omitted) (quoting *All. for Hippocratic Med.*, 602 U.S. at 379).

### B.    Plaintiffs' claims are not ripe.

Plaintiffs' claims independently fail because they are not ripe. This Court has already recognized that Plaintiffs' claims are not ripe as pertains to federal elections on or after November 4, 2026. *See* Memorandum & Opinion of June 18, ECF No. 190, at 17. Yet this Court makes a curious distinction by holding that Plaintiffs' claims are ripe as pertain to federal elections on or before November 3, 2026. *Id.* But this parsing of ripeness is illogical. Either a claim is ripe for immediate adjudication because of some actual or imminent harm that the plaintiff faces, or the claim is unripe for immediate adjudication, because the plaintiff has not suffered actual or imminent harm. Ripeness is not a quantitative measure that is enhanced as a plaintiff gets closer in time to some *potentially* harmful event. Instead, it assesses whether *at the time of adjudication*, a dispute involves a sufficiently concrete, actual, or imminent injury to permit adjudication.

As this Court rightly acknowledges, there are "many uncertainties as to how the agencies will ultimately implement the EO, including the source and accuracy of DHS' [State] Citizen[ship]

Lists, and what final rule, if any, will be adopted by the USPS. The implementation of the EO may well result in the evolving and dynamic process described by Defendants, in which Plaintiffs may participate in a comment period that could result in their concerns being incorporated in agency decision making." *Id.* at 10 (citations omitted).

By holding that Plaintiffs' claims are unripe as to post-November 3, 2026 elections, the Court at least implicitly recognizes that there is significant doubt as to whether Plaintiffs have suffered or would imminently suffer harm. Their claims are unripe, and granting summary judgment for Plaintiffs entangles the Court in adjudicating a mere abstract dispute concerning speculative harm. This Court seems to equate the concept that there is "an ever-narrowing window of time in which review is appropriate and practicable, and where that review may well require timely involvement by the Court of Appeals or Supreme Court prior to the November 3, 2026 election," Memorandum & Order of June 18, 2026, ECF No. 190, at 14, with the determination that Plaintiffs' suit is currently ripe for judicial review. Respectfully, these considerations are not the same. An ever-narrowing window of time for review may support the need for expedited briefing or adjudication by federal courts but cannot transform an unripe challenge to uncertain future harms into one appropriate for judicial review.

"Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967)). The "ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993). "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (cleaned up). "Federal courts cannot—and should not—spend their scarce resources on what amounts to shadow boxing." *McInnis-Miesnor v. Maine*

- 11 -

*Medical Ctr.*, 319 F.3d 63, 72 (1st Cir. 2003) (quoting *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 537 (1st Cir. 1995). Courts typically consider both "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 301 (quoting *Abbott Labs.*, 387 U.S. at 149).

Even if Plaintiffs could show standing, their claims are not ripe. The Supreme Court's decision in *Trump v. New York*—dismissing as unripe another premature challenge to a not-yet-implemented Presidential directive—is all-but-dispositive here (as a matter of standing, ripeness, or both). In that case, President Trump issued a memorandum during the 2020 decennial census that "announced a policy of excluding 'from the apportionment base aliens who are not in a lawful immigration status.'" *Trump v. New York*, 592 U.S. at 129-30 (quoting Presidential Memorandum, *Excluding Illegal Aliens from the Apportionment Base Following the 2020 Census*, 85 Fed. Reg. 44,679, 44,680 (July 21, 2020)). That directive also called for "implementation 'to the maximum extent feasible and consistent with the discretion delegated to the executive branch.'" *Id.* (quoting 85 Fed. Reg. at 44,680).

Similar to this case, a group of plaintiffs sued immediately without waiting for the President's policy to be implemented, arguing that "the exclusion of aliens on the basis of legal status would contravene the requirement . . . that the President state the 'whole number of persons in each State' for purposes of apportionment." *Trump v. New York*, 592 U.S. at 130 (quoting *New York v. Trump*, 485 F. Supp. 3d 422, 477 (S.D.N.Y. 2020)). To show standing, they argued that "the memorandum was chilling aliens and their families from responding to the census, thereby degrading the quality of census data used to allocate federal funds and forcing some plaintiffs to divert resources to combat the chilling effect." *Id.* A three-judge court entered broad injunctive relief in September 2020, just three months before the 2020 election. *See id.*

The Supreme Court vacated the injunction and remanded with instructions to dismiss for lack of jurisdiction, holding that "standing and ripeness inquiries both lead to the conclusion that judicial resolution of this dispute is premature." *Id.* at 134. In doing so, the Court acknowledged that "[t]he President, to be sure, ha[d] made clear his desire to exclude aliens without lawful status

from the apportionment base." *Id.* at 131. Even so, "the President qualified his directive by providing that the Secretary should gather information 'to the extent practicable' and that aliens should be excluded 'to the extent feasible.'" *Id.* (quoting 85 Fed. Reg. at 44,680). As a result, "[a]ny prediction how the Executive Branch might eventually implement this general statement of policy [was] 'no more than conjecture' at th[at] time." *Id.* (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983)). For example, the Supreme Court explained that the President's "policy may not prove feasible to implement in any manner whatsoever, let alone in a manner substantially likely to harm any of the plaintiffs here." *Id.* at 132.

Much like the Presidential Memorandum at issue in *Trump v. New York*, Executive Order 14,399 also specifies that key provisions shall be implemented only "[t]o the extent feasible and consistent with applicable law, including but not limited to the Privacy Act." E.O. § 2(a); *see also id.* § 7(b) (instructing that the Executive Order "shall be implemented consistent with applicable law."). And Section 3 of the Order requires multiple discrete implementation steps, including the (possible) eventual publication of a final rule, the scope of which is not dictated by the Order. *Id.* § 3. In sum, just as in *Trump v. New York*, "[t]he Government's eventual action will reflect both legal and practical constraints, making any prediction about future injury just that—a prediction." 592 U.S. at 133. By the same token, "the source of any injury to the plaintiffs is the action that the Secretary or President *might* take in the future to" implement the Executive order—"not the policy itself 'in the abstract.'" *Id.* at 133-34 (quoting *Summers*, 555 U.S. at 494).

Under these circumstances, "[l]etting the Executive Branch's decisionmaking process run its course" would "bring[] 'more manageable proportions' to the scope of the parties' dispute." *Id.* at 134 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990)). "And in the meantime the plaintiffs suffer no concrete harm from the challenged policy itself, which does not require

them 'to do anything or to refrain from doing anything'" at all. *Trump v. New York*, 592 U.S. at 134 (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998)).[4]

If any agency takes some final action to implement the Executive Order in a way that causes any actual (or imminent) concrete injury to Plaintiffs, they can sue then. But "[a]t present, this case is riddled with contingencies and speculation that impede judicial review." *Trump v. New York*, 592 U.S. at 131. *See also, e.g.*, *Nat'l Urb. League*, 783 F. Supp. 3d at 79 (no jurisdiction to challenge provision of an Executive Order requiring creation of a list, because the "provision does not tell the OMB Director to do anything with the list once he gets it").

In its Memorandum & Order, notwithstanding the EO's clear feasibility and legality constraints, *see, e.g.*, E.O. § 2(a) ("To the extent feasible and consistent with applicable law. . . ."), the Court relied upon *Common Cause v. Trump*, 506 F. Supp. 3d 39 (D.D.C. 2020) in holding that "executive orders, 'cannot be held to destroy themselves through saving clauses.'" M&O at 24 (quoting 506 F. Supp. 3d at 53 n.8)). However, as Defendants have explained, ECF No. 167 at 12, *Common Cause supports* their jurisdictional argument in this case. That decision ultimately held that judicial review was premature in the context of a pre-implementation challenge to the same Presidential Memorandum that the Supreme Court eventually addressed in *Trump v. New York*. In short, "the *Common Cause* court relied on the challenged executive order's saving clause to conclude that judicial review was premature." *League of United Latin Am. Citizens v. Exec. Off. of President*, 808 F. Supp. 3d 29, 67 (D.D.C. 2025) (*LULAC*). To justify that result, the court explained that "[l]ike the Executive Branch," courts also "have a substantial interest in postponing

---

[4] As it turns out, the Supreme Court's decision to order dismissal of *Trump v. New York* on standing and ripeness grounds was vindicated by subsequent events: the Presidential Memorandum at issue there turned out *not* to be "feasible to implement in any manner whatsoever" before the end of President Trump's first term. 592 U.S. at 132. That Presidential Memorandum was eventually revoked by President Biden, apportionment proceeded as usual, and no further litigation was necessary. *See Ensuring a Lawful and Accurate Enumeration and Apportionment Pursuant to the Decennial Census*, Exec. Order 13,986, 86 Fed. Reg. 7,015 (Jan. 20, 2021), *revoked by* Exec. Order 14,148, 90 Fed. Reg. 8,237 (Jan. 20, 2025). Ensuring only ripe claims are litigated increases the possibility that the parties' dispute will narrow or resolve itself without the need for judicial involvement.

- 14 -

review" of a pre-implementation challenge to a non-self executing Presidential directive. *Common Cause*, 506 F. Supp. 3d at 53. And it reasoned that, "[a]lthough we 'are not faced with a serious doubt as to whether the [memorandum] will ever translate into action at all,' we have 'doubts about how the [Secretary and President] may make that translation.'" *Id.* (quoting *Off. of Commc'n of United Church of Christ v. FCC*, 826 F.2d 101, 105 (D.C. Cir. 1987) (citation modified)) (emphasis added). That uncertainty was critical as a matter of ripeness, because "how they do so"—that is, how agencies actually implement the President's policy goals—"will substantially shape the important legal questions that the plaintiffs would have us decide in the abstract." *Id.* So too here— even accepting (as the *Common Cause* court did) that there is no "serious doubt" that at least some portions of the Executive Order will be implemented in some fashion. Ultimately, the approach of the three-judge court in *Common Cause* was vindicated by the Supreme Court in *Trump v. New York*. For this reason, *Common Cause* should not be read to vitiate the Executive Order's directive that implementation is contingent upon feasibility and legality, rendering Plaintiff's present challenge manifestly premature. *Contra* M&O at 24.

In short, since Plaintiffs' claims are not ripe, Federal Defendants are likely to succeed in their appeal and thus merit a stay from this Court pending that appeal.

### C. Plaintiffs' Claims are Likely to Fail on the Merits

Plaintiffs' merits arguments are undermined by the well-settled principle that government agencies are "entitled to a presumption of regularity." *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 577 (2025) (citation omitted); *see USPS v. Gregory*, 534 U.S. 1, 10 (2001) ("[A] presumption of regularity attaches to the actions of government agencies."). The agencies charged with implementation of the Order require time to translate the President's broad policy vision into lawful and specific government actions. In the interim, Plaintiffs do not suffer harm (and cannot suffer imminent harm) from possible future agency action that is presumed to follow all applicable legal constraints—particularly where, as noted above, the President himself explicitly ordered agencies to consider those very legal constraints before acting. *See* E.O. § 2(a) ("To the extent feasible and consistent with applicable law, including but not limited to the Privacy Act of 1974");

- 15 -

§ 4(c) ("consistent with applicable law, the Privacy Act, and all applicable use agreements"); § 5 ("shall take all lawful steps"); § 7(b) ("This order shall be implemented consistent with applicable law.").

Federal Defendants are likely to succeed on the merits because there is no basis to enter summary judgment for the *California* Plaintiffs based on hypothetical legal violations that they think *might* be forthcoming. The Order is not self-executing; it does not itself regulate voter registration or how mail-in or absentee ballots will be transmitted; rather, it directs executive branch officials to take certain actions, subject to the limitations of existing laws. *See DSCC v. Trump,* No. 26-cv-1114, 2026 WL 1487833 at *11 (D.D.C. May 28, 2026). And the Order expressly, and repeatedly, indicates that its directives should be carried out only to the extent "feasible" and "consistent with applicable law." *See* EO §§ 2(a), 4(c), 3(b)(iv), 7(b). Particularly with its multiple explicit caveats about feasibility and legality, that Order standing alone is not *ultra vires* nor does it violate the separation of powers. And whatever may be said about possible future agency actions taken to *implement* the order, none of those are properly before the Court at this time—and might never be, at least in the form that Plaintiffs assume. This Court should not accept Plaintiffs' invitation to opine on the legality of actions that do not yet exist.

The "executive Power shall be vested in a President of the United States of America." U.S. Const. art. II, § 1, cl. 1. Accordingly, "[t]he ordinary duties of officers prescribed by statute come under the general administrative control of the President by virtue of the general grant to him of the executive power, and he may properly supervise and guide their construction of the statutes under which they act in order to secure that unitary and uniform execution of the law which Article II of the Constitution evidently contemplated in vesting general executive power in the President alone." *Sierra Club v. Costle*, 657 F.2d 298, 406 n.524 (D.C. Cir. 1981). "Those officers are duty-bound to give effect to the policies embodied in the President's direction, *to the extent allowed by the law*." *Bldg. & Const. Trades Dep't., AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) (emphasis added).

- 16 -

Executive Order 14,399 fits comfortably within this tradition, as "an exercise of the President's supervisory authority over the Executive Branch." *Id.* at 33. Like the Executive Order at issue in *Allbaugh*—which was likewise limited to implementation "[t]o the extent permitted by law"—Executive Order 14,399 is replete with limiting instructions to agencies (both about feasibility and legality). *See* E.O. §§ 2(a), 4(c), 5, and 7(b). The effect of this language is that "if an executive agency . . . may lawfully implement the Executive Order, then it must do so; if the agency is prohibited, by statute or other law, from implementing the Executive Order, then the Executive Order itself instructs the agency to follow the law." *Allbaugh*, 295 F.3d at 33. In other words, the Order "is not self[-]executing." *Id.* Accordingly, "[t]he mere possibility that some agency might make a legally suspect" act does not justify an injunction against the Order itself. *Id.* Thus, Plaintiffs must either attack some agency's implementation of the Order—*e.g.*, a final rule promulgated by the Postal Service, if and when such a rule is issued—or instead advance a "facial challenge" showing that the Order "is without any valid application." *Id.*

Neither option applies. Plaintiffs cannot yet challenge any implementation of the Executive Order, for the simple reason that none of its provisions have yet been implemented via any final agency action (or anything close). In any event, "Plaintiffs attack the executive order[] and ask for relief in ways confirming that their challenges are facial and not as-applied." *Nat'l Urb. League*, 783 F. Supp. 3d at 88. But Plaintiffs also cannot obtain an injunction against the Order itself, on its face—because it is subject to many lawful interpretations.

Federal Defendants' position is that if Plaintiffs believe that final agency action in implementation of EO 14,399 is both unlawful and injurious to them, Plaintiffs are free to sue (or seek injunctive relief) at that time. An injunction now, however, is both unnecessary and inappropriate. This Court should grant a stay.

## II.    FEDERAL DEFENDANTS WILL SUFFER IRREPARABLE HARM ABSENT A STAY.

Federal Defendants respectfully understand this Court's M&O to enjoin Federal Defendants from taking any steps to implement, give effect, or enforce Sections 2 and 3 of the EO "*with*

*respect to the November 3, 2026 or any earlier federal election in the Plaintiff States.*" M&O at 34 (emphasis added); *see also id.* at 35 ("as to Plaintiff States with respect to the November 3, 2026 . . . "; "as to elections mail for elections administered by Plaintiff States and ballot envelopes used by Plaintiff States with respect to the November 3, 2026 or any earlier federal election"), 36 ("take such steps as are necessary to prevent explicit or implicit implementation of Sections 2, 3 and 5 of the EO, and to cease and reverse any implementation of those provisions, as to Plaintiff States, with respect to the November 3, 2026 or any earlier federal election.").

Federal Defendants do not understand this Court's injunction to enjoin them from (1) continuing work on the portal to provide state election officials with citizenship verification information from the USCIS, SSA, and DOS databases, provided that such efforts apply only to non-Plaintiff States and/or for federal elections on or after November 4, 2026; (2) continuing USPS rulemaking in the USPS Proposed Rule, provided that any final rule applies only to non-Plaintiff States and/or for federal elections on or after November 4, 2026; (3) initiating or continuing investigations or prosecutions to enforce federal law, provided that any such investigations or prosecutions are unrelated to Executive Order 14,399. *See id.* at 34-37. Any contrary interpretation, e.g., requiring DHS to immediately suspend its work on the portal, and requiring USPS to immediately withdraw its proposed rule, would be inconsistent with this Court's previous ruling, dismissing Plaintiffs' suit on prudential ripeness grounds as pertains to future federal elections (after November 3, 2026). *See* Memorandum & Opinion of June 18, 2026, ECF No. 190, at 17.

Nevertheless, even with this important limitation on the Court's injunction, Federal Defendants are irreparably harmed absent a stay. First, as to the DHS portal for citizenship verification, absent a stay, "Plaintiff states will be denied access to voter verification information that will be available to the non-Plaintiff states through the November 3, 2026 election." *See* Mayhew Decl., Exhibit A, ¶ 8. Moreover, absent a stay, "USCIS will not be able to fully implement the E.O. in time for the upcoming elections" and "USCIS will be required to expend additional resources and perform work under potentially tight timelines to fully implement the E.O. at that time." *Id.* ¶ 10.

Second, as to the USPS rulemaking[5], absent a stay, USPS will likely be unable to issue a final rule applicable to the Nov. 3, 2026 elections, even for non-Plaintiff states. *See* Monteith Decl., Exhibit B, ¶ 4. This is because the Postal Service "operates a nationwide network and provides nationwide guidance *with* respect to Election Mail" and operationally is unable to implement a "two-tiered system" where one set of rules applies to Plaintiffs and another to non-Plaintiff states. *Id.* ¶ 5. The same applies to the Postal Service's new portal that would allow election officials "to provide their lists to the Postal Service of voters who are mailed ballots for Federal elections." *Id.* ¶ 7. Absent a stay, the injunction will delay deployment of the portal, even to non-Plaintiff states, for the upcoming general election.

If this Court intended the injunction to require an immediate cessation of DHS's portal for citizenship verification and an immediate recission of USPS proposed rule or suspension of its proposed rulemaking, then the irreparable harm Federal Defendants face is exponentially greater. First, such a broad injunction would massively disrupt DHS's efforts to bring about a functioning portal for citizenship verification in time for the upcoming general election, hampering the efforts of willing (non-Plaintiff State) state or local election officials to utilize federal databases as an optional resource to verify their voter rolls. Second, such a broad injunction would also severely disrupt USPS's efforts to potentially promulgate a final rule that would "improve the visibility of ballots in the mailstream" and "facilitate the enforcement of federal law," USPS Proposed Rule, 91 Fed. Reg. 32,915-16, in time for the upcoming general election. Absent a stay, even if Federal Defendants ultimately prevail in dissolving or limiting this Court's injunction on appeal, valuable and irreplaceable time will have been lost in enjoining preparatory steps. These steps include the technological work to bring the DHS portal online and the rulemaking work to potentially bring about a USPS final rule. These efforts would not be complete in time for deployment as to the

---

[5] The Postal Service received an order related to the proposed rule from a different court today, July 1, 2026. *See NAACP v. USPS*, No. 20-cv-2295 (EGS) (D.D.C.), ECF No. 181. This section and the accompanying declaration address only the harms from this Court's June 25, 2026 order (ECF No. 191).

upcoming general election and would be especially harmful for Defendants because these preparatory steps themselves do not impose any harm on Plaintiffs.

**III.   THE REMAINING STAY FACTORS TIP IN FAVOR OF FEDERAL DEFENDANTS.**

The remaining stay factors of balance of equities and public interest also favor granting a stay. The Court's Order enjoining Federal Defendants from the lawful exercise of their Article II powers necessarily imposes irreparable harm on the Government and the public interest. Ultimately, injunctive relief restrains the President from overseeing the Executive Branch. Such an order harms the public interest, given the Framers' decision to vest all of "[t]he executive Power" in the President and entrust him with the sole constitutional responsibility to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1, cl. 1; *id.* § 3; *Seila Law LLC v. CFPB*, 591 U.S. 197, 203 (2020); *cf. Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (citation omitted)); *LeBlanc v. United States Priv. & C.L. Oversight Bd.*, No. 25-5197, 2025 WL 1840591, at *2 (D.C. Cir. July 1, 2025) ("The public interest is harmed when an injunction wrongfully insulates the President's Executive Branch appointees from his oversight. Such injunctions sever a key constitutional link between the People and their elected President.").

On the other side of the balance, Plaintiffs' interest is slight. At least at this time, they merely seek to prevent hypothesized harm based on speculation about a series of future contingencies that have not yet come to pass and may never come to pass.

**CONCLUSION**

For these reasons, Federal Defendants respectfully request a stay of the Court's injunction pending appeal. Federal Defendants respectfully request a ruling by July 6, 2026, to allow the Government to seek relief, if necessary, from the First Circuit.

- 20 -

Dated: July 1, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division

JOSEPH E. BORSON
Assistant Branch Director
Federal Programs Branch

/s/ Esam K. Al-Shareffi
STEPHEN M. PEZZI
 Chief Litigation Counsel (D.C. Bar. 995500)
ESAM K. AL-SHAREFFI
 Trial Attorney (D.C. Bar 90010174)
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Telephone: (202) 598-7367
E-mail: esam.k.al-shareffi@usdoj.gov

*Counsel for Federal Defendants*

- 21 -