**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*, | |
| *Plaintiffs*, | |
| v. | Case No. 1:26-cv-11581-IT |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | |
| *Defendants.* | |
| and | |
| STATE OF MISSOURI, et al., | |
| *Intervener-Defendants.* | |

**INTERVENER STATES' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO STAY**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION ................................................................................................................... 1

BACKGROUND ..................................................................................................................... 1

    I.   Factual Background ....................................................................................................... 1

    II.  Procedural History ........................................................................................................ 3

LEGAL STANDARD .............................................................................................................. 4

ARGUMENT .......................................................................................................................... 4

    I.   Interveners Are Likely to Prevail on the Merits of Their Appeal. ...................................... 4

        A.   Plaintiffs' claims are premature. ................................................................................. 4

        B.   Plaintiffs have not identified any injury to challenge Section 2(a). ............................... 7

        C.   The injunction against directing USPS to engage in rulemaking is unconstitutional. ..... 9

    II.  Intervener States Will Suffer Irreparable Harm Absent A Stay ........................................ 10

    III.  The Balance of Equities and Public Interest Favor Granting A Stay ................................ 11

CONCLUSION ....................................................................................................................... 12

CERTIFICATE OF SERVICE ................................................................................................. 16

i

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*Abbott Labs. v. Gardner*,
   387 U.S. 136 (1967) ............................................................................................................ 5

*Alaska v. U.S. Dep't of Agric.*,
   17 F.4th 1224 (D.C. Cir. 2021) ......................................................................................... 6

*Allen v. Wright*,
   468 U.S. 737 (1984) ........................................................................................................... 8

*Allen-Bradley Loc. No. 1111, United Elec., Radio & Mach. Workers of Am. v. Wisconsin Emp.
   Rels. Bd.*,
   315 U.S. 740 (1942) ......................................................................................................... 12

*Am. Petroleum Inst. v. EPA*,
   683 F.3d 382 (D.C. Cir. 2012) ...................................................................................... 5, 7

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ................................................................................................... 5, 7, 8

*Common Cause v. Trump*,
   506 F. Supp. 3d 39 (D.D.C. 2020) .......................................................................... 6, 7, 11, 12

*DSCC v. Trump,*
   No. 26-CV-01114 (CJN), 2026 WL 1487833 (D.D.C. May 28, 2026) .................................. 12

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
   561 U.S. 477 (2010) ........................................................................................................... 9

*Gordon-Darby Holdings, Inc. v. Quinn*,
   174 F.4th 255 (1st Cir. 2026) ............................................................................................ 4

*Myers v. United States*,
   272 U.S. 52 (1926) ....................................................................................................... 9, 10

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
   538 U.S. 803 (2003) ........................................................................................................... 5

*Perez v. Mortgage Bankers Ass'n*,
   575 U.S. 92 (2015) ............................................................................................................. 6

*Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*,
   489 F.3d 1279 (D.C. Cir. 2007) ...................................................................................... 11

*Purcell v. Gonzalez,*
    549 U.S. 1 (2006).................................................................................................... 10

*Seila Law LLC v. CFPB,*
    591 U.S. 197 (2020)........................................................................................... 10, 12

*Simon v. E. Ky. Welfare Rts. Org.,*
    426 U.S. 26 (1976).................................................................................................. 8

*SPARTA Ins. Co. v. Pennsylvania Gen. Ins. Co.,*
    621 F. Supp. 3d 169 (D. Mass. 2022) ..................................................................... 8

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998).................................................................................................. 7

Trump v. New York,
    592 U.S. 125 (2020)............................................................................................ 6, 12

*Trump v. Slaughter,*
    No. 25-332, 2026 WL 1855612 (U.S. June 29, 2026) ........................................... 10

*U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd.,*
    540 U.S. 736 (2004)............................................................................................... 10

*United States v. Arthrex, Inc.,*
    594 U.S. 1 (2021).................................................................................................... 9

*Wyo. Outdoor Council v. U.S. Forest Serv.,*
    165 F.3d 43 (D.C. Cir. 1999) .................................................................................. 7

Statutes

18 U.S.C. § 2(a) ....................................................................................................... 2, 5

18 U.S.C. § 241 ........................................................................................................... 2

18 U.S.C. § 371 ........................................................................................................... 2

18 U.S.C. § 611 ........................................................................................................ 2, 9

18 U.S.C. § 1001 ......................................................................................................... 2

18 U.S.C. § 1015 ......................................................................................................... 2

39 U.S.C. § 401 ........................................................................................................... 2

52 U.S.C. § 10307....................................................................................................... 2

52 U.S.C. § 20511.................................................................................................... 2, 9

U.S. Const. art. II, § 1, cl. 1 ........................................................................................................... 9

U.S. Const. art. II, § 3 ..................................................................................................................... 9

**Regulations**

Ballot Mail for Federal Elections,
   91 Fed. Reg. 32,915 (June 2, 2026) ........................................................................................... 3

**INTRODUCTION**

This Court should stay its injunction against Federal Defendants because Intervener States are likely to prevail on the merits, they would be irreparably harmed absent a stay, and the balance of equities and public interest favor the stay. Fundamentally, Plaintiffs' claims are all premature. As this Court correctly stated, "[t]here are clearly many uncertainties as to how the agencies will ultimately implement the EO, including the source and accuracy of DHS' Confirmed Citizen Lists, and what final rule, if any, will be adopted by the USPS." Doc. 190 at 10. For this reason, Plaintiffs' claims are not ripe. Moreover, Intervener States have a concrete interest in ensuring that mail ballots cast by their voters are securely delivered and counted, which would be irreparably undermined if USPS cannot fully implement the EO. Finally, the balance of equities weighs in favor of giving agencies a chance to implement lawfully policies pending appeal—whereas Plaintiffs are not meaningfully harmed by having to wait for finalized policies.

**BACKGROUND**

**I.    Factual Background**

On March 31, 2026, President Trump issued Executive Order No. 14399, *Ensuring Citizenship Verification and Integrity in Federal Elections*. The EO recognized the President's "duty under Article II of the Constitution of the United States to enforce Federal law, which includes preventing violations of Federal criminal law and maintaining public confidence in election outcomes." EO § 1. As relevant to the appeal in this case, the EO furthers these ends in three main ways.

First, Section 2(a) of the EO directs federal agencies to create "State Citizenship Lists" and to transmit the Lists to "State election officials," "[t]o the extent feasible and consistent with applicable law, including but not limited to the Privacy Act of 1974." EO § 2(a). The Citizenship

1

Lists are simply lists of a State's potentially lawful voters—"individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State." *Id.* Under the EO, federal agencies must give States the option "to routinely supplement and provide suggested modifications or amendments to the State Citizenship List" and must allow individuals "to access their individual records as well as to update or correct them in advance of elections." *Id.* As of the date of this filing, it is still unknown which databases federal agencies will use. Doc. 188-1. It is also unknown which States will choose to use the Citizenship Lists, and how States would use the Lists. *Id.*

Second, Section 2(b) of the EO directs the Attorney General to "prioritize the investigation" and "prosecution of State and local officials or any others involved in the administration of Federal elections who issue Federal ballots to individuals not eligible to vote in a Federal election, including under 18 U.S.C. 2(a), 18 U.S.C. 241, 18 U.S.C. 371, 18 U.S.C. 611(a), 18 U.S.C. 1001, 18 U.S.C. 1015, 52 U.S.C. 10307, and 52 U.S.C. 20511." EO § 2(b).

Third, Section 3 of the EO requires the U.S. Postal Service (USPS) to initiate rulemaking under 39 U.S.C. § 401 and other applicable authority to enhance the security mail-in and absentee ballots. Section 3(b)(i) provides that "Official Election Mail" shall bear tracking barcodes, which are already ubiquitous for other kinds of mail. Section 3(b)(ii) provides that States "may choose" to provide the USPS "a list of voters eligible to vote" absentee. Section 3(b)(iii) then provides that the USPS "shall not transmit" absentee ballots from unidentified individuals. Section 3(b)(iv) requires the USPS to create a process by which each State receives "a list of individuals . . . for mail-in or absentee ballots provided by such State, along with unique ballot envelope identifiers."

The EO also provides that the preparation and transmission of these lists "shall comply with the Privacy Act and all applicable use agreements." EO § 3(b)(iv). Section 3(b)(v) then

2

directs the creation of "procedures enabling each State to routinely supplement and provide suggested modifications or amendments to the State's Mail-In and Absentee Participation List in advance of any Federal election, consistent with applicable State law." Finally, Section 3(d) provides, "Any final rule pursuant to this section shall be issued no later than 120 days from the date of this order."

There is no final USPS rule as of the date of this filing. On June 2, 2026, USPS published its notice of proposed rulemaking (NPRM) in response to the EO. Ballot Mail for Federal Elections, 91 Fed. Reg. 32,915 (June 2, 2026). Under this proposal, USPS would not send mail ballots to individuals who are not on lists of eligible voters provided by the States. *Id.* at 32,916. Moreover, "states"—not USPS or any agency of the federal government—"would retain full control over who would (or would not) be able to vote by mail in federal elections within each state, as states would control enrollment with the Postal Service for inclusion on the state's Mail-In and Absentee Participation List." *Id.* "The Postal Service would not change the information provided by the state when compiling the lists" but would rather merely "provide technical assistance to states and localities regarding the secure submission of this data." *Id.*

## II.   Procedural History

The President promulgated Executive Order No. 14399 on March 31, 2026, and Plaintiffs challenged the EO almost immediately, filing their original complaint on April 3, 2026. Doc. 1. Plaintiffs then filed their First Amended Complaint on April 17, 2026. Doc. 64. On April 23, 2026, Plaintiffs filed their motion for summary judgment, declaratory relief, and permanent injunction. Doc. 97.

On June 18, 2026, this Court dismissed without prejudice Plaintiff's First Amended Complaint "as to their claims regarding the EO and its implementation with regard to elections

occurring after <u>November 3, 2026</u>" on ripeness grounds, Doc. 190 at 17, explaining that "[t]here are clearly many uncertainties as to how the agencies will ultimately implement the EO, including the source and accuracy of DHS' Confirmed Citizen Lists, and what final rule, if any, will be adopted by the USPS," *id.* at 10.  This Court denied the motion to dismiss "with regard to the November 3, 2026 election, and all earlier elections." *Id.* at 17.

On June 25, 2026, this Court granted Plaintiff's motion for summary judgment, declaratory relief, and injunction, holding that "Sections 2 and 3 of the EO are legally void as they are ultra vires and unconstitutionally violate the separation of powers." Doc 191, at 34.  This Court further enjoined Federal Defendants from implementing or enforcing Sections 2 and 3(b)(i)–(v) or (d) of the EO as to Plaintiff States with respect to the November 3, 2026 or any earlier federal election. *Id.* at 34–36.

## LEGAL STANDARD

The First Circuit considers four factors when deciding a motion to stay an injunction pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Gordon-Darby Holdings, Inc. v. Quinn*, 174 F.4th 255, 258 (1st Cir. 2026) (citation omitted).

## ARGUMENT

I.  **Interveners Are Likely to Prevail on the Merits of Their Appeal.**

A. **Plaintiffs' claims are premature.**

"Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative

4

policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003) (quoting *Abbott Lab'ys. v. Gardner*, 387 U.S. 136, 148–49 (1967)).  To determine whether a claim satisfies prudential ripeness, courts consider: (1) "the 'fitness of the issues for judicial decision'" and (2) "the extent to which withholding a decision will cause 'hardship to the parties.'"  *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 387 (D.C. Cir. 2012) (quoting *Abbott Lab'ys.*, 387 U.S. at 149).  Assessing whether an issue is "fit[]" for adjudication requires courts to consider whether the issue "is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final."  *Id.* (citation omitted).

As this Court rightly concluded, "[t]here are clearly many uncertainties as to how the agencies will ultimately implement the EO, including the source and accuracy of DHS' Confirmed Citizen Lists, and what final rule, if any, will be adopted by the USPS."  Doc. 190 at 10.  For this reason, Plaintiffs fail to establish the first prong for prudential ripeness because no concrete legal dispute fit for adjudication exists here.  *First*, regarding Section 2(a), Plaintiffs' theories of injury turn on speculation about future events.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409–10, 414 n.5 (2013).  For example, Plaintiffs presume that the Citizenship Lists will be inaccurate because the SAVE database is purportedly incomplete and so "[t]he State Citizenship List will inevitably suffer from the same defects as SAVE."  Doc. 64 ¶¶ 133–36.  But *even* assuming the SAVE database has inaccuracies, Section 2(a) makes clear that the Lists will be based on *other* sources of information, including "Federal citizenship and naturalization records, SSA records, SAVE data, and other relevant Federal databases."  EO § 2(a).  The parties and this Court still do

not know *which* databases federal agencies will use, whether those databases will be inaccurate and whether and how States would use those lists.  Doc. 188-1.

Plaintiffs' extensive speculation about how an eventual regulation will operate dooms their case.  The Supreme Court in *Trump v. New York* rejected judicial review of a presidential directive where it included the exact caveat of feasibility and legality.  *See* 592 U.S. 125, 131–32 (2020) (explaining that where "the President qualified his directive by providing that the Secretary should gather information 'to the extent practicable' and [take action] 'to the extent feasible,'" "[a]ny prediction how the Executive Branch might eventually implement this general statement of policy is 'no more than conjecture' at this time" and the order "may not prove feasible to implement in any manner whatsoever, let alone in a manner substantially likely to harm any of the plaintiffs here"); *see also Common Cause v. Trump*, 506 F. Supp. 3d 39, 47 (D.D.C. 2020) (holding presidential memorandum challenge was unripe where the order included qualifiers that any action taken be only "to the extent feasible" and "to the extent practicable").

*Second*, regarding Section 3(b), while the EO provides a broad outline of what the USPS regulation will include, the administrative process remains ongoing.  It would thus be imprudent (at best) to review an executive order directing rulemaking when it is unknown what the final rule will provide after the notice and comment period.  *See Alaska v. U.S. Dep't of Agric.*, 17 F.4th 1224, 1228–29 (D.C. Cir. 2021) (finding a challenge nonjusticiable because the court "cannot presume that any such future rulemaking" would lead to the specific effects the challenger feared). Indeed, USPS has committed not to implement any of the proposals from Section 3 before completing notice-and-comment rulemaking.  *See* Doc. 156-3 ¶ 5.  That means USPS will be required to accept and weigh ideas submitted in comments.  *Id.*  Agencies must consider changes suggested by commenters.  *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015); *see also*

Doc. 190 at 10 ("The implementation of the EO may well result in the evolving and dynamic process described by Defendants, in which Plaintiffs may participate in a comment period that could result in their concerns being incorporated in agency decision making.").

In allowing ongoing administrative proceedings to be completed, courts "respect the Executive Branch's interest in 'crystallizing its policy before that policy is subjected to judicial review.'" *Common Cause*, 506 F. Supp. 3d at 46 (quoting *Am. Petroleum Inst.*, 683 F.3d at 387). Where, as here, "the possibility that further [administrative] consideration will actually occur before implementation is not theoretical, but real," "[j]udicial intervention at this time would inappropriately interfere with ongoing action within the Executive Branch." *Id.* at 45 (first alteration in original) (quoting *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 50 (D.C. Cir. 1999)).

### B. Plaintiffs have not identified any injury to challenge Section 2(a).

To establish standing, Plaintiffs must prove an "'injury in fact'—a harm suffered by the plaintiff that is 'concrete' and "actual or imminent, not "conjectural" or "hypothetical."'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998) (citation omitted). The threatened injury must be "certainly impending." *Clapper*, 568 U.S. at 409–10, 414 n.5. A "reasonable likelihood" of future harm is insufficient. *Id.*

Applying these principles here, Plaintiffs lack a cognizable injury caused by Section 2(a). Fatal to their standing theories, Plaintiff ignores the reality that any use of the State Citizenship List is *optional*. Indeed, Section 2(a) merely orders the provision of information to States. *See* EO § 2(a) (directing the Secretary of Homeland Security to "take appropriate action to compile and transmit to the chief election official of each State a list of individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and

7

who maintain a residence in the subject State"). There is nothing in Section 2(a) ordering the States to take any sort of action with respect to their voting based on the State Citizenship List.

The allegation that Section 2 "superintend[s] and control[s] States' maintenance of their voter rolls" is illusory and appears nowhere in the EO's text. Doc. 64 ¶ 154; *see also id.* ¶ 155 (speculating that "[u]pon receipt of the State Citizenship List, state elections officials must either rapidly remove voters from the rolls who are omitted from that list and refuse them a ballot … or face risk of criminal prosecution"). Plaintiffs have not claimed any concrete injury stemming from the mere transmission of this list to the States as an optional resource, nor can they.

Because any use of the Citizenship Lists is voluntary, Plaintiffs' alleged harms are extraordinarily speculative. For instance, Plaintiffs allege that Section 2(a) will harm them by "introduc[ing] chaos as the 2026 midterm elections approach, imposing a significant burden on Plaintiff States' electoral systems," *id.* ¶ 139, and that "citizens who access their records on the State Citizenship List and find that they are not listed will likely turn to Plaintiff States with questions about why they are not listed and what," *id.* ¶ 143. Courts routinely reject these kinds of hypothetical standing theories that speculate about how third parties will respond to government action or that involve multiple contingent links between the challenged conduct and the alleged harm. *See Allen v. Wright*, 468 U.S. 737, 757 (1984) (holding that plaintiffs did not have standing where the injury was "highly indirect and 'results from the independent action of some third party not before the court.'" (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41 (1976))); *Clapper*, 568 U.S. at 414 n.5 ("Plaintiffs cannot rely on speculation about the unfettered choices made by independent actors not before the courts." (quotations and citations omitted)); *SPARTA Ins. Co. v. Pa. Gen. Ins. Co.*, 621 F. Supp. 3d 169, 176 (D. Mass. 2022) ("[A]llegations of *possible*

8

future injury are insufficient." (emphasis in original) (quotations and citations omitted)).  It is likely that the First Circuit will as well.

**C.  The injunction against directing USPS to engage in rulemaking is unconstitutional.**

Plaintiffs' challenge to Section 3(b) is likewise unlikely to succeed on the merits because it asks for an impermissible remedy.  In enjoining the President from instructing a federal agency to engage in rulemaking, the Court has given Plaintiffs an impermissible remedy that violates Article II of the Constitution.

The Constitution vests the entirety of the executive power in the President.  U.S. Const. art. II, § 1, cl. 1.  In exercising this power, the President must be able to control and supervise his subordinates to "take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 3; *see Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 483 (2010).  This includes the laws criminalizing provision of a fraudulent ballot and casting ballots by anyone other than eligible voters.  *See* 18 U.S.C. § 611; 52 U.S.C. § 20511.  Indeed, "the activities of executive officers may take legislative and judicial forms, but they are exercises of—indeed, under our constitutional structure they *must be* exercises of—the executive Power, for which the President is ultimately responsible."  *United States v. Arthrex, Inc.*, 594 U.S. 1, 17 (2021) (internal quotation marks and citations omitted).  Thus, the "thousands of officers [who] wield executive power" in the federal government "acquire[] [their] legitimacy and accountability to the public through 'a clear and effective chain of command' down from the President."  *Id.* at 11 (quoting *Free Enter. Fund*, 561 U.S. at 498).

Given those constitutional rules, Congress cannot bar the President from supervising USPS.  The Constitution protects the President's ability to "discharge his own constitutional duty of seeing that the laws be faithfully executed."  *Myers v. United States*, 272 U.S. 52, 135 (1926).

9

Indeed, in *Myers*, the Supreme Court has already held that Congress cannot interfere with the President's ability to supervise the U.S. Postal Service. *See id.* Article II prevents such intrusions—including restrictions on the President's removal of post-office officials. *See id.* Moreover, just this week, the Supreme Court overruled *Humphrey's Executor*, making clear that neither the Legislative nor Judicial Branches can transform quintessentially executive powers into non-executive functions. *See Trump v. Slaughter*, No. 25-332, 2026 WL 1855612, at *15 (U.S. June 29, 2026) ("When an agency 'executes' a congressional mandate against private parties, it exercises executive power—no ifs, ands, or quasis about it."). If Congress cannot prevent the President from *firing* postal officials, it follows naturally that Congress cannot prohibit the President from giving directives to postal officials.

Nor can Plaintiffs insist USPS must be independent from presidential control by analogizing to "financial institutions like the Second Bank and the Federal Reserve," which "can claim a special historical status" because they "have historically enjoyed some insulation from the President." *Seila Law LLC v. CFPB*, 591 U.S. 197, 222 n.8 (2020). Unlike the Federal Reserve, USPS does not share the same historical lineage of independence. For most of the country's history, the Postmaster General was a member of the President's Cabinet. *See U.S. Postal Serv. v. Flamingo Indus. (USA) Ltd.*, 540 U.S. 736, 740 (2004) (providing historical overview).

Article II of the Constitution therefore provides the President with authority to supervise USPS. Neither Congress nor the courts can interfere—including by prohibiting presidential directions to engage in rulemaking. *See Myers*, 272 U.S. at 135.

## II.    Intervener States Will Suffer Irreparable Harm Absent A Stay

Intervener States have a concrete interest in ensuring that mail ballots cast by their voters are securely delivered and counted. *See, e.g.*, *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per

curiam). This interest will be irreparably undermined absent a stay. As Federal Defendants have attested, "USCIS will not be able to fully implement the E.O. in time for the upcoming elections" and "USCIS will be required to expend additional resources and perform work under potentially tight timelines to fully implement the E.O. at that time." Doc 194-1 ¶ 10. USPS will likely be unable to issue a final rule applicable to the November 3, 2026 elections, even for Intervener States, Doc. 194-2 ¶ 4, because USPS "operates a nationwide network and provides nationwide guidance with respect to Election Mail" and operationally is unable to implement a "two-tiered system" where one set of rules applies to some States but not others, *id.* ¶ 5. This also applies to USPS's new portal that would allow election officials "to provide their lists to the Postal Service of voters who are mailed ballots for Federal elections." *Id.* ¶ 7. Intervener States cannot implement these measures themselves, leaving the security of their elections irreparably harmed by the injunction.

## III.    The Balance of Equities and Public Interest Favor Granting A Stay

Plaintiffs cannot show that the balance of equities and the public interests favor maintaining the Court's order pending appeal. On their side of the balance, Plaintiffs can point only to speculative injuries based on non-final agency actions. *See supra* Part I.B. Read charitably, Plaintiffs' strongest equitable claim to harm is their conjectural assertion of an "increase[d] … risk"" of inaccuracy and injury, Doc. 64 ¶ 136, which is insufficient. *See Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1297–98 (D.C. Cir. 2007) ("'increased risk' is" not by "itself [a] concrete, particularized, and actual injury for standing purposes"—harm must be "actual" or "imminent," not merely "increased" (emphasis omitted)).

On the other hand, the federal government has a strong interest in getting a chance to implement executive orders lawfully. *See Common Cause*, 506 F. Supp. 3d at 46. Presidents frequently articulate policy objectives, but they rely on agencies to use their expertise to implement

11

policy ideas lawfully. *See Seila Law*, 591 U.S. at 204. Giving agencies a chance to implement lawfully policies—rather than reflexively barring presidential directives that do not bind the public—reflects the respect due to the executive branch as a coordinate branch of government. *See Common Cause*, 506 F. Supp. 3d at 46.

At the same time, the federal courts also have a strong interest in not being forced to adjudicate rushed, speculative cases like this one. Federal courts exist to resolve concrete legal disputes based on specific factual circumstances. *See Allen-Bradley Loc. No. 1111, United Elec., Radio & Mach. Workers of Am. v. Wis. Emp. Rels. Bd.*, 315 U.S. 740, 746 (1942). But as recognized by this Court and another federal judge, there are still many unknowns about how the EO will be implemented. *See* Doc. 190 at 10 ("There are clearly many uncertainties as to how the agencies will ultimately implement the EO, including the source and accuracy of DHS' Confirmed Citizen Lists, and what final rule, if any, will be adopted by the USPS."); *DSCC v. Trump,* No. 26-cv-01114 (CJN), 2026 WL 1487833, at *6, *10 (D.D.C. May 28, 2026). Entertaining challenges to non-final, evolving policies—like Plaintiffs demand—only pulls federal courts away from the foundational principles that constrain and guide judicial power. *See Trump v. New York*, 592 U.S. at 131–32.

## CONCLUSION

For the foregoing reasons, Intervener States respectfully request that this Court stay its injunction pending appeal.

Date: July 2, 2026

Respectfully submitted,

**STEVE MARSHALL**
ALABAMA ATTORNEY GENERAL

/s/ *A. Barrett Bowdre*
A. Barrett Bowdre*
  *Solicitor General*
STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36104
Telephone: (334) 353-8892
Fax: (334) 353-8400
Barrett.Bowdre@AlabamaAG.gov

**CATHERINE L. HANAWAY**
MISSOURI ATTORNEY GENERAL

/s/ *Louis J. Capozzi III*
Louis J. Capozzi III, DC Bar No. 90018764*
  *Solicitor General*
J. Michael Patton*
  *Deputy Solicitor General*
Benjamin S. Gilberg*
  *Deputy Solicitor General*
Missouri Attorney General's Office
815 Olive Street, Suite 200
St. Louis, MO 63101
Tel. (573) 645-9662
Fax (573) 751-0774
Louis.Capozzi@ago.mo.gov
Michael.Patton@ago.mo.gov
Benjamin.Gilberg@ago.mo.gov

**JAMES UTHMEIER**
FLORIDA ATTORNEY GENERAL

/s/ *David M.S. Dewhirst*
David M.S. Dewhirst*
  *Solicitor General*
Jason J. Muehlhoff*
  *Chief Deputy Solicitor General*
Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
david.dewhirst@myfloridalegal.com
jason.muehlhoff@myfloridalegal.com

**THEODORE E. ROKITA**
INDIANA ATTORNEY GENERAL

/s/ *James A. Barta*
James. A Barta, DC Bar No. 1032613*
  *Solicitor General*
Office of the Indiana Attorney General
302 W. Washington Street
IGC South, Fifth Floor
Indianapolis, IN 46204-2770
Phone: (317) 232-0709
Fax: (317) 232-7979
James.Barta@atg.in.gov

13

**KRIS W. KOBACH**
KANSAS ATTORNEY GENERAL

*/s/ James R. Rodriguez*
James R. Rodriguez*
*Assistant Attorney General*
Kansas Office of the Attorney General
Topeka, Kansas 66612
Phone: (785) 368-8197
jay.rodriguez@ag.ks.gov

**AUSTIN KNUDSEN**
MONTANA ATTORNEY GENERAL

*/s/ Christian B. Corrigan*
Christian B. Corrigan*
 *Solicitor General*
Montana Department of Justice
215 N. Sanders Helena, MT 59601
(406) 444-2707 (o)
Christian.Corrigan@mt.gov

**GENTER DRUMMOND**
OKLAHOMA ATTORNEY GENERAL

*/s/ Garry M. Gaskins, II*
Garry M. Gaskins, II*
 *Solicitor General*
Office of the Attorney General of Oklahoma
313 NE Twenty-First St.
Oklahoma City, OK 73105
(405) 521-3921
garry.gaskins@oag.ok.gov

**ELIZABETH B. MURRILL**
LOUISIANA ATTORNEY GENERAL

*/s/ J. Benjamin Aguiñaga*
J. Benjamin Aguiñaga*
 *Solicitor General*
Louisiana Department of Justice
1885 N. Third St.
Baton Rouge, LA 70802
(225) 506-3746
AguinagaB@ag.louisiana.gov

**MICHAEL T. HILGERS**
NEBRASKA ATTORNEY GENERAL

/s/ *Cody S. Barnett*
Cody S. Barnett*
 *Solicitor General*
Nebraska Department of Justice
1445 K Street, Room 2115
Lincoln, Nebraska 68508
Tel.: (402) 471-2683
Fax: (402) 471-3297
cody.barnett@nebraska.gov

**ALAN WILSON**
SOUTH CAROLINA ATTORNEY GENERAL

*/s/ Joseph D. Spate*
Joseph D. Spate*
 *Deputy Solicitor General*
1000 Assembly Street
Columbia, South Carolina 29201
Tel. (803) 734-3371
Fax (803) 734-3677
josephspate@scag.gov

14

**MARTY J. JACKLEY**
SOUTH DAKOTA ATTORNEY GENERAL

/s/ *Grant Flynn*
Grant Flynn*
  *Assistant Attorney General*
South Dakota Office of the Attorney General
1302 East SD Highway 1889,
Suite 1
Pierre, SD 57501-8501
Telephone: (605) 773-3215
Email: grant.flynn@state.sd.us


/s/ *Ian D. Prior*
Ian D. Prior (Bar No. 655704)
America First Legal Foundation
611 Pennsylvania Ave S.E. No. 231
Washington, D.C. 20003
(410) 205-9681
ian.prior@aflegal.org

**KEN PAXTON**
TEXAS ATTORNEY GENERAL

s/ *David Bryant*
David Bryant*
  *Senior Special Counsel*
Office of the Attorney General of Texas
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2100
david.bryant@oag.texas.gov


* *Admitted pro hac vice*

15

## CERTIFICATE OF SERVICE

I certify that on July 2, 2026, the above was filed electronically through the Court's electronic filing system to be served electronically on counsel for the parties.

/s/ *Louis J. Capozzi III*

16