# United States Court of Appeals
## For the First Circuit

_____

Nos. 26-1774, 26-1779

STATE OF CALIFORNIA; COMMONWEALTH OF MASSACHUSETTS; STATE OF NEVADA; STATE OF WASHINGTON; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WISCONSIN; JOSH SHAPIRO, in the official capacity as Governor of the Commonwealth of Pennsylvania,

Plaintiffs, Appellees,

v.

DONALD J. TRUMP, in the official capacity as President of the United States; UNITED STATES DEPARTMENT OF JUSTICE; TODD BLANCHE, in the official capacity as Acting United States Attorney General; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, in the official capacity as Secretary of the United Stated Department of Homeland Security; UNITED STATES SOCIAL SECURITY ADMINISTRATION; FRANK BISIGNANO, in the official capacity as Commissioner of the United States Social Security Administration; UNITED STATES POSTAL SERVICE; DAVID STEINER, in the official capacity as Postmaster General and Chief Executive Officer of the Postal Service; DOUG TULINO, in the official capacity as Deputy Postmaster General, Chief Operating Officer, and Chief Human Resources Officer of the Postal Service and Member of the Postal Service Board of Governors; AMBER MCREYNOLDS, in the official capacity as Chair of the Postal Service Board of Governors; DEREK T. KAN, in the official capacity as Vice Chairman of the Postal Service Board of Governors; RONALD STROMAN, in the official capacity as a Member of the Postal Service Board of Governors; DANIEL TANGHERLINI, in the official capacity as a Member of the Postal Service Board of Governors,

Defendants, Appellants,

STATE OF ALABAMA; STATE OF MISSOURI; STATE OF FLORIDA; STATE OF INDIANA; STATE OF KANSAS; STATE OF LOUISIANA; STATE OF MONTANA; STATE

OF NEBRASKA; STATE OF OKLAHOMA; STATE OF SOUTH CAROLINA; STATE OF SOUTH DAKOTA; STATE OF TEXAS,

Interested Parties, Appellants.

_____

Before

Gelpí, Rikelman, and Dunlap,
<u>Circuit Judges</u>.

_____

**ORDER OF COURT**
Entered: July 25, 2026

Under the Constitution, state and local officials are responsible for administering federal elections. In the spring of 2026, President Trump issued an executive order with nationwide effects on how state and local officials can administer federal elections, including the upcoming primary and general elections in September and November. In particular, the executive order directed substantial involvement by the United States Postal Service in deciding which ballots sent to and from voters would be delivered. The plaintiffs in this case -- 23 states and the District of Columbia (the "Plaintiff States") -- filed this lawsuit against the President, federal agencies, and agency heads, challenging the executive order as ultra vires and unconstitutional. The district court entered final judgment in favor of the Plaintiff States as to some of their claims and enjoined most of the defendants (but not the President) from implementing certain provisions of the executive order, but only as to federal elections on or before November 3, 2026, and only in the Plaintiff States. The federal defendants and 12 states that intervened in the case in support of the executive order have now filed separate motions seeking a stay of the district court's injunction pending appeal, arguing only that the Plaintiff States lack standing to bring their claims and that those claims are not ripe. We deny their motions.

## I. BACKGROUND

On March 31, 2026, President Trump issued Executive Order 14399: "Ensuring Citizenship Verification and Integrity in Federal Elections" (the "EO"). 91 Fed. Reg. 17125 (Mar. 31, 2026). The EO targets voting by mail. In Section 1, titled "Purpose and Policy," the EO declares that "[t]o enhance election integrity via the United States Mail, additional measures are necessary." <u>Id.</u> at 17125. It then directs federal agencies and officials to take certain actions at specific times in the months leading up to "regularly scheduled Federal election[s]," including the November 3, 2026 election. <u>Id.</u>

This lawsuit focuses on Sections 2, 3, and 5 of the EO. Section 2 is titled "Establishment and Transmission of State Citizenship Lists and Prioritization of Investigations and Prosecutions

Related to Election Fraud." Id. Section 2(a) directs the Department of Homeland Security (DHS), along with other agencies, to compile lists of "individuals confirmed to be United States citizens who will be above the age of 18 at the time of an upcoming Federal election and who maintain a residence in the subject State" ("DHS Citizenship Lists"). Id. Under Section 2(a), federal officials "shall . . . transmit" the DHS Citizenship Lists to state election officials "no fewer than 60 days before each regularly scheduled Federal election," meaning by September 4, 2026, for the November 3, 2026 general election. Id. Also, DHS "shall establish procedures" to permit individuals to "access" and "update" their records and states "to routinely supplement and provide suggested modifications or amendments" to these lists. Id. Section 2(b) orders the Attorney General to "prioritize the investigation and . . . prosecution" of two groups of individuals and entities: (1) "State and local officials or any others involved in" federal election administration who issue ballots to individuals not eligible to vote in federal elections and (2) "individuals and public or private entities engaged in . . . the printing, production, shipment, or distribution of ballots to individuals" not eligible to vote in federal elections. Id. at 17126.

Section 3 of the EO is titled "United States Postal Service Rulemaking on Mail-In and Absentee Ballots," and focuses on the United States Postal Service (USPS). Section 3(b) directs the Postmaster General to "initiate a proposed rulemaking" within 60 days of the EO's issuance to "protect the integrity of the mail" in federal elections. Id. The notice of proposed rulemaking "shall include, at minimum," various requirements for the design of envelopes used by state and local officials to enable voting by mail, including specific markings and unique barcodes for all such envelopes.[1] Id. Section 3(b) then requires that the proposed rule provide that "all outbound ballot mail" sent by states and localities to voters "must be mailed" in such envelopes and that USPS "shall not transmit mail-in or absentee ballots from any individual" voter unless the individual's name appears on a state-specific list. Id. Finally, Section 3(d) directs that "[a]ny final rule" adopted pursuant to Section 3 "shall be issued no later than 120 days from the date of" the EO, meaning by July 29, 2026. Id. at 17127.

Section 5, titled "Enforcement," orders the Attorney General and agency heads to "take all lawful steps to deter and address noncompliance with Federal law" by the two groups targeted by the order: "State or local election officials" and "public or private entities engaged in" ballot printing or distribution. Id. For example, it directs federal officials to "withhold[] Federal funds from noncompliant States and localities where such withholding is authorized by law." Id. It invites referral to the Department of Justice of "[e]vidence of violations" by these two groups for "consideration of investigation or charges." Id. Section 5 also requires states and localities to "preserve, for a 5-year period, all records and materials" related to voter participation in federal elections. Id.

In early April, the Plaintiff States brought this action against the President and the various agencies and agency heads identified in the EO. In their amended complaint, they challenged Sections 2, 3, and 5 of the EO as ultra vires and unconstitutional, in violation of the separation of

---

[1] USPS issued a proposed rule on June 2, 2026. See Ballot Mail for Federal Elections, 91 Fed. Reg. 32915 (proposed June 2, 2026) (to be codified at 39 C.F.R. pt. 111).

powers, the Elections and Electors Clauses, and the Tenth Amendment's anti-commandeering doctrine. See U.S. Const. art. I, § 4, cl. 1; id. art. II, § 1, cl. 2; id. amend. X.

The federal defendants and the intervenor states (collectively, the "Government") moved to dismiss the Plaintiff States' claims for lack of ripeness and Article III standing, as well as on the merits.[2] The district court ultimately granted the motion in part. In an initial ruling, the district court addressed the ripeness challenge and reserved on the other arguments.[3] It dismissed without prejudice the Plaintiff States' claims on prudential ripeness grounds as to federal elections occurring after November 3, 2026. It reasoned that postponing judicial review of the EO "as it relates to distant elections will pose little hardship." By contrast, the court concluded that the Plaintiff States' claims as to the November 2026 elections were ripe for review because the EO created a "direct and immediate dilemma" for the Plaintiff States. (Quoting Stern v. U.S. Dist. Ct. for the Dist. of Mass., 214 F.3d 4, 10 (1st Cir. 2000) (citation modified).)

One week later, the district court granted the Plaintiff States' motion for summary judgment. It concluded, given the undisputed facts in the summary judgment record, that the Plaintiff States had standing to sue based on both current and certainly impending injuries. Among these injuries, the court explained, were planning and compliance costs and the threat of criminal prosecution.

To start, the district court determined that the Plaintiff States are "experiencing injury now" because the EO disrupted their ongoing efforts to administer multiple elections in the coming months. As the court pointed out, it was uncontroverted that, at the time they filed their lawsuit, the Plaintiff States were "actively administering or preparing to administer federal primaries" -- some of which are scheduled for as early as September 2026 -- and "preparing to administer the November 2026 general election." And, by the time they filed their summary judgment motion, certain Plaintiff States "already had to pull elections staff from critical projects required by statute" to "develop a compliance plan for the EO," given that the EO directs multiple changes to the voting-by-mail process. The court also determined that, both for legal and practical reasons, the Plaintiff States could not delay these planning and compliance efforts. For example, in several of the Plaintiff States, statutes require officials to provide mail-in ballots to individuals eligible to vote by mail weeks in advance, and thus they "must plan to comply with the EO's directives on mail ballots" now. These state statutory obligations were "undisputed" by the Government. And as a practical matter, the court relied on record evidence that delays in planning would increase the "financial strain" on state election offices and threaten disenfranchisement of some of the Plaintiff States' citizens.

---

[2] Because the federal defendants and the intervenor states raise largely overlapping arguments in their stay motions, we discuss those arguments together. The intervenor states do press a separate argument as well, which we identify and analyze below.

[3] In addition to the lawsuit by the Plaintiff States giving rise to this appeal, eight nonprofit organizations filed a separate lawsuit also challenging the EO. The district court consolidated the two cases pursuant to Federal Rule of Civil Procedure 42(a) but only for limited purposes. Its initial ruling on prudential ripeness applied to both cases. Its subsequent summary judgment ruling now on appeal to us, however, applied only to the Plaintiff States' claims.

Relatedly, the district court determined that the Plaintiff States faced certainly impending compliance costs from the EO's directives. For example, it noted that "[n]early half of [the] Plaintiff States have already purchased mail ballot envelopes for the 2026 federal election cycle that will not be in compliance with the requirements" listed in the EO, assuring that they will incur monetary costs from any change required by USPS. And the states would have no choice but to purchase new envelopes: The EO directs USPS to propose a rule that it will not "transmit" non-compliant mail-ballot envelopes. See 91 Fed. Reg. at 17125-26. Thus, it was "undisputed" by the Government that, absent an injunction, the Plaintiff States "will incur compliance costs" in the coming weeks or months.

Finally, the district court concluded that the Plaintiff States faced a credible threat of criminal prosecution under the EO. Reading the EO as a whole, the court determined that multiple sections of the EO "implicitly threaten[ed] enforcement" of federal criminal statutes against state and local officials who, for example, furnished ballots to voters who are not included on the DHS Citizenship Lists. And, the court pointed out, the Government conceded that any list it compiled under Section 2(a) would "necessarily be incomplete," based on the limitations of its own records, meaning that some citizens who were eligible to vote in a particular state nevertheless would be missing from the list. Reading the EO based on those undisputed facts, the court reasoned that the threat of criminal enforcement was "sufficiently imminent" as to the 2026 elections to create Article III injury. Thus, the court determined that the Plaintiff States had standing to challenge the EO.

The district court then turned to the merits. It ultimately concluded that the President lacked constitutional authority to order changes to how states and localities administer federal elections. The federal defendants and the intervenor states then filed separate notices of appeal and motions to stay in the district court. The court denied the stay motions.

On July 7, 2026, the district court entered its final judgment.[4] It declared that Sections 2 and 3 are "ultra vires and violate the separation of powers." Then, it enjoined the federal defendants, not including the President, from "implementing, giving effect to, or enforcing" Sections 2 and 3 of the EO "as to [the] Plaintiff States with respect to the November 3, 2026 or any earlier federal election." Notably, the court did not enjoin the federal defendants from taking any actions under Sections 2 and 3 in states other than the Plaintiff States for federal elections on or before November 3, 2026. Nor did it enjoin the federal defendants from taking such actions in any state for federal elections after November 3, 2026. Finally, the court dismissed with prejudice the Plaintiff States' challenge to the recordkeeping portion of Section 5 based on its ruling that this portion of the EO was merely "precatory."

---

[4] Although the district court entered final judgment after the notices of appeal were filed, we have appellate jurisdiction under Federal Rule of Appellate Procedure 4(a)(2) because the district court's order "announce[d] a decision purporting to dispose of all of [the Plaintiff States'] claims." FirsTier Mortg. Co. v. Invs. Mortg. Ins., 498 U.S. 269, 277 (1991); see Fed. R. App. P. 4(a)(2) ("A notice of appeal filed after the court announces a decision or order -- but before the entry of the judgment or order -- is treated as filed on the date of and after the entry.").

That same day, the federal defendants filed this emergency motion to stay the district court's injunction pending appeal. The separate stay motion of the intervenor states followed.

## II. LEGAL STANDARD

"'A stay is an intrusion into the ordinary processes of administration and judicial review' and is not granted as 'a matter of right.'" Washington v. HUD, 171 F.4th 473, 488 (1st Cir. 2026) (quoting Nken v. Holder, 556 U.S. 418, 427 (2009)). In seeking a stay, the Government bears the burden of showing that it is "entitled to this 'extraordinary remedy' under Nken's familiar four-factor test." Id. (quoting Nken, 556 U.S. at 437 (Kennedy, J., concurring)).

Under the Nken test, the Government must (1) make "a strong showing" that it is likely to succeed on the merits of its appeal and also show that (2) it "will be irreparably injured absent a stay"; (3) the issuance of the stay will not "substantially injure the other parties interested in the proceeding"; and (4) the public interest weighs in favor of a stay. Id. (quoting Nken, 556 U.S. at 434). The first two factors are the "most critical." Id. (quoting Nken, 556 U.S. at 434). When assessing the fourth factor, "we consider the interests of the public in general," including American voters, "not just the interests of the parties." Id.

Because "addressing interlocutory motions on a tight timeline is not always optimal for orderly judicial decisionmaking," in this posture we are "especially . . . rel[iant] on the parties to frame the issues for decision." New York v. Trump, 133 F.4th 51, 66 (1st Cir. 2025) (citation modified).

## III. DISCUSSION

Before analyzing the Nken factors, we set out the scope of the issues presented to us in the stay motions. Although the district court held that the EO is unconstitutional, that question is not presently before us because the Government does not defend the legality of the EO in requesting a stay. Instead, it argues only that the Plaintiff States do not have standing to challenge the EO because their claims are premature. And its standing and ripeness arguments focus on a single claim: that the EO was not injuring the Plaintiff States at the time they filed their complaint, and that it would not injure them soon, because the federal defendants were still implementing it.

The Government also does not contest the district court's assessment of the summary judgment record that informed its final ruling.[5] Before the district court, the Government did not dispute the declarations and other factual submissions by the Plaintiff States. And in its request for a stay pending appeal, it contests only the legal implications of those undisputed facts.

Finally, the Government has conceded several points in the district court and in its motion to our court. For example, it concedes that the federal defendants have been moving ahead to implement the directives in the EO, including by "[e]stablishing infrastructure to" "compile, maintain, and transmit [the DHS] Citizenship Lists" and "taking steps to create a [USPS] portal" for collecting information about individuals who are eligible to vote by mail. The Government

---

[5] The intervenor states largely ignore the summary judgment record and cite instead to allegations in the Plaintiff States' complaint in their stay motion.

also has conceded that it seeks to enforce the EO nationwide for the November 2026 election and would do so but for the district court's injunction. And the Government has indicated that it may use the DHS Citizenship Lists to conduct investigations and potential criminal prosecutions of state and local officials. As we will explain, these concessions undermine its arguments that the Plaintiff States lack standing to challenge the EO because their claims are premature.

### A. Likelihood of Success on the Merits

The parties' dispute centers on whether the Plaintiff States have suffered an injury in fact to establish their standing to sue and, relatedly, whether the Plaintiff States' claims are ripe for review. We conclude that the Government has not made a "strong showing" that it is likely to prevail on its standing and ripeness arguments on appeal. Washington, 171 F.4th at 488 (quoting Nken, 556 U.S. at 434).

### 1. Article III Injury

Article III of the Constitution grants federal courts jurisdiction to decide only those legal disputes that qualify as "Cases" or "Controversies." U.S. Const. art. III, § 2, cl. 1. To establish Article III standing, a party must meet a familiar three-part test and show that it has "suffered an injury in fact" that is caused by the "conduct complained of" and that will likely be "redressed by a favorable decision." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992) (citation modified). The asserted injury must be "concrete, particularized, and actual or imminent." TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021). The doctrines of standing and ripeness "originate from the same Article III limitation" and can "boil down to the same question": "whether the harm asserted has matured sufficiently to warrant judicial intervention." Jensen v. R.I. Cannabis Control Comm'n, 160 F.4th 18, 24 (1st Cir. 2025) (citation modified).

The Government focuses on the injury-in-fact requirement and contends that the Plaintiff States' alleged injuries are merely speculative. According to the Government, the Plaintiff States have not suffered any current or impending injuries from the EO itself and are basing their claims on "potential future actions agencies may take to implement it." In particular, the Government emphasizes that Section 2(a) imposes no obligations on the Plaintiff States and USPS has not finalized the details of its new rule.

The district court concluded that the Plaintiff States had suffered three current or certainly impending injuries that were sufficient to satisfy the requirements of Article III. In opposing the Government's stay motion, the Plaintiff States also point to a fourth injury: the EO's intrusion into their sovereign interests in administering state elections consistent with the Constitution and state statutes. To secure a stay, the Government would need to make a strong showing that it is likely to succeed on appeal in demonstrating that none of these injuries are sufficient to confer Article III standing. We conclude that it has not done so with the arguments presented in the stay motions.

First, the district court concluded that the EO imposed a present injury because it required Plaintiff States to begin planning now on how to comply with its directives, given that the September and November elections were just months away. As the Plaintiff States put it, the EO "require[s] [them] to expend time and resources now to prevent . . . chaos, confusion, and

disenfranchisement."  See, e.g., Sierra Club v. U.S. Dep't of Transp., 125 F.4th 1170, 1181 (D.C. Cir. 2025) (holding states had standing to challenge suspended regulation that caused it to "undertake expenditures to mitigate and recover from harms that could have been prevented if that regulation had not been enacted" (citation modified)).  For example, the summary judgment record reflects that the EO has forced Connecticut officials to take "immediate action," including by "coordinat[ing] with other state and local agencies" to develop a plan that would achieve the EO's stated goals "on the designated timeline and with no financial support."  As part of that planning, officials worked to identify and develop the "technical specifications . . . necessary" to share "large volumes of confidential data" comprising state citizenship and voting information with the federal defendants, as contemplated under Sections 2 and 3 of the EO, and consistent with applicable privacy and disclosure laws.  Further, given the truncated timing, including the fast-approaching deadline to prepare and review voter lists described in the EO, Connecticut and multiple other states have had to "plan for and begin" "providing training and guidance to elections officials" to comply with the EO's terms.  And given their limited resources, the states' efforts have necessarily entailed a diversion of staff time and attention from other pressing election-related tasks -- such as preparing public-education materials for voters and rolling out new voting technology -- to coordinate the implementation of the changes articulated in the EO.  All told, between the compressed timelines and anticipated changes to states' election processes, the summary judgment record indicates that the EO has already "produced an incredible strain" on state election officials and their teams.

In its stay motion, the Government does not dispute that the Plaintiff States have begun expending time and "divert[ing] resources" in reaction to the EO.  Rather, it responds only that the EO does not mandate any immediate efforts on their part.  Thus, in the Government's view, the Plaintiff States that have begun preparing for the EO's directives have done so "voluntarily" and based only on possible government conduct, which it maintains cannot support standing under the Supreme Court's decisions in Clapper v. Amnesty International USA, 568 U.S. 398 (2013), and Trump v. New York, 592 U.S. 125 (2020).

The Government's suggestion that the Plaintiff States' injuries here are akin to those held insufficient in Clapper is unpersuasive given the different facts of that case.  Clapper involved a challenge to a new federal statute that, in some circumstances, authorized government surveillance without probable cause of communications by foreign citizens located outside the United States.  See 568 U.S. at 404-05.  The plaintiffs included individual attorneys, who were United States citizens, and advocacy organizations, all of which were located inside the United States.  See id. at 401, 406.  The Supreme Court explained that the statute in question did not target the plaintiffs, so their claims that their communications with foreign citizens would ever be surveilled under its terms, as opposed to other federal statutes, relied entirely on "the decisions of independent actors," id. at 414, and a series of additional "contingencies," id. at 410.  See id. at 410-16.  Thus, the Court concluded that the plaintiffs' various pocketbook costs and changes to their processes in response to the statute's enactment could not support standing because they were "incurred in response to a speculative threat."  Id. at 416 (stating that litigants "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm").

But unlike the relationship between the plaintiffs and the statute they challenged in Clapper, the EO targets the Plaintiff States explicitly and repeatedly. Further, state and local officials are assigned primary responsibility for administering federal elections under the Constitution, and the EO directs various changes to the voting-by-mail process for these elections that will impact how those officials administer elections, regardless of the details of USPS's final rule. See U.S. Const. art. I, § 4, cl. 1; art. II, § 1, cl. 2.

As a result, the Government has failed to convince us that the impact of the EO on the Plaintiff States is "hypothetical" in the sense of the plaintiffs' alleged harms in Clapper. As the district court reasoned, the EO lays out a clear set of rapidly approaching deadlines by which states must coordinate with federal officials and comply with new voting procedures -- all while the states must also ensure that their officials and the public understand the evolving set of rules that would govern the upcoming September and November elections. The Plaintiff States have no practical choice but to respond to the EO now.[6] See Merrill v. Milligan, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring) (emphasizing that "state and local election officials need substantial time to plan for elections" because "[r]unning elections state-wide is extraordinarily complicated and difficult . . . and pose[s] significant logistical challenges").

Given the undisputed summary judgment record, we are also unpersuaded by the Government's contention that New York is "indistinguishable" from this case. New York concerned a presidential memorandum calling for the Secretary of Commerce to produce a report that might, in the future, allow the President to exclude undocumented immigrants from the official population counts that would be used to apportion congressional seats. See 592 U.S. at 129-30. Although the district court had concluded that the plaintiffs had standing based on the memorandum's chilling effect on census responses by immigrants, the plaintiffs conceded that this impact had dissipated by the time the case reached the Supreme Court. See id. at 130-31. The Court then concluded that the dispute was not ripe for review for several reasons: the Secretary of Commerce had already conducted the census using the normal procedures; the government conceded that it would not be possible to exclude all undocumented immigrants from the official population count the Secretary would transmit to the President; and it was not clear that a partial exclusion could have any impact on apportioning congressional seats or federal funding to the states, or that any such changes could be made before a looming deadline. See id. at 132-33. Thus, at the time of the Supreme Court's decision, it was speculative whether the presidential memorandum would have any impact at all on the plaintiffs. See id. at 131.

The Government has failed to explain how New York is controlling given the substantially different and undisputed facts of this case. In New York, there was no claim of present injury whatsoever, whereas the (far more specific) EO here, which is designed to affect elections just weeks away, has already forced the Plaintiff States into action. In New York, the plaintiffs failed to show that any future injury was imminent or would ever occur. By contrast, if the district court's

---

[6] The Government's reliance on FDA v. Alliance for Hippocratic Medicine, 602 U.S. 367, 394 (2024), is even further afield. The Plaintiff States' injuries in fact have nothing to do with "public advocacy." Id. Instead, they are taking actions necessary to administer fast-approaching elections as the Constitution, federal statutes, and state laws require.

injunction is lifted, the Plaintiff States will promptly be forced to divert staff resources and incur costs flowing from the EO in the coming days and weeks. In New York, there was "[n]othing in the record" showing that congressional apportionment would be affected by a "partial implementation of the memorandum," which the parties agreed was the only way it could be implemented at all. Id. at 133. Here, the Government does not dispute, as a factual matter, the EO's current and impending effects on the Plaintiff States, irrespective of how exactly USPS implements it. Thus, the nature, timing, and certainty of the Plaintiff States' injuries are all distinct from those in New York.

The Government next relies on Trump v. American Federation of Government Employees, 145 S. Ct. 2635 (2025), but that case also does not support its stay request. In a two-paragraph order, the Supreme Court stayed a preliminary injunction in a challenge to an executive order directing the Office of Management and Budget to submit plans to the President to reduce the size of the federal government's workforce. See id. at 2635. The Supreme Court's order did not address the plaintiffs' standing to sue or the ripeness of their claims, which were not at issue. To the contrary, the Court stayed the injunction because it determined that the defendants were likely to succeed on the merits of their argument that the executive order was lawful. See id. The Government points to Justice Sotomayor's one-paragraph concurrence, which observed that "[t]he plans themselves are not before this Court, at this stage," and thus the Court had "no occasion to consider whether they can and will be carried out consistent with the constraints of law." Id. (Sotomayor, J., concurring). But, again, that was a discussion of the merits of the plaintiffs' claims, and the Government has failed to explain how that discussion is relevant to the standing and ripeness issues on which its stay motion is based.[7]

---

[7] The Government discusses two other cases, filed outside this Circuit, related to the EO. In one, a private plaintiff moved to enforce USPS's compliance with a settlement agreement arising from a lawsuit related to the 2020 federal election, which had alleged claims under the Administrative Procedure Act. See NAACP v. USPS, No. 20-cv-2295, 2026 WL 1893762 (D.D.C. July 1, 2026). The district court granted the motion and enjoined USPS from implementing its proposed rule pursuant to Section 3 of the EO, reasoning that the proposed rule would violate the parties' settlement agreement. See id. at *4, *7. Subsequently, the U.S. Court of Appeals for the District of Columbia Circuit stayed that order. Order, NAACP v. USPS, No. 26-5257 (D.C. Cir. July 17, 2026). The D.C. Circuit indicated that it reached that decision based on the government's arguments that the plaintiff's claims were not ripe, the EO likely would not violate the settlement agreement, and the government would experience irreparable harm from an order that prohibited USPS from promulgating a final rule. The court did not provide its reasoning for those determinations. See id. In the other case, the district court held in part that the plaintiffs, private organizations representing individual voters and candidates, had not shown that the EO would affect particular voters' ability to vote or particular candidates' ability to win. See DSCC v. Trump, Nos. 26-cv-01114, 26-cv-01132, 26-cv-01151, 2026 WL 1487833, at *6-7, *9 (D.D.C. May 28, 2026). These decisions have limited bearing here given the substantial factual differences in the three cases. For example, only in this case are the plaintiffs the very states and state officials that the EO identifies and targets.

- 10 -

Second, the district court concluded that the Plaintiff States faced certainly impending pocketbook injuries from the EO's direction that USPS control the design of envelopes in all federal voting-by-mail processes. In doing so, it relied on the summary judgment record, which indicated that several states had already ordered mail-ballot envelopes for the 2026 federal election cycle around the time they filed their complaint. Indeed, as of April 2026, Massachusetts alone had already purchased $3 million-worth of envelopes for mail-in ballots. Yet Section 3(b) of the EO directs USPS to propose a rule that "shall include, at minimum," a requirement for all mail-ballot envelopes to "bear[] a unique Intelligent Mail barcode" and logo marking the envelope as "Official Election Mail." 91 Fed. Reg. at 17126. The court determined that redesigning mail-ballot envelopes to conform to the EO's express requirements would unquestionably impose financial costs on the Plaintiff States. As one Rhode Island official explained, because the state had already purchased mail-ballot envelopes, "[c]hanging [the state's] envelope order . . . would cost the state tens of thousands of dollars that was not budgeted." And even beyond ordering new envelopes and devoting staff time to coordinating with USPS about the new envelope design requirements, several states have indicated that they would incur significant other costs as a result of the EO, including to update training materials for local election officials and their staffs.

Again, the Government has failed to demonstrate any error in the district court's analysis, especially because, during the district court proceedings, it did not contest that several states had already purchased mail-ballot envelopes and even conceded "that making design changes to mail-ballot envelopes or adding Intelligent Mail barcodes would add costs to Plaintiff States." The Government nevertheless argues in its stay briefing that these anticipated pocketbook injuries cannot support standing because USPS has not yet issued a final rule implementing Section 3 of the EO.

As the district court determined, the summary judgment record reflects that any change to the kind of envelopes state and local officials must use for voting by mail will necessarily force the Plaintiff States to incur monetary and operational costs. The Government does not put forward any argument that USPS will not issue a final rule or will issue a final rule that provides no new design requirements for the envelopes used by the states in their voting-by-mail processes. Thus, we fail to see how it has made a strong showing that the Plaintiff States will incur no costs as a result of the EO. And the only question before us in assessing Article III standing is whether the Plaintiff States will incur any pocketbook injuries, not the magnitude of those injuries. See Czyzewski v. Jevic Holding Corp., 580 U.S. 451, 464 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'").

In any event, as the Supreme Court held just last year, a litigant at "substantial risk [of] harm" from a government policy need not "wait and see" how exactly it will be implemented to bring suit. See Mahmoud v. Taylor, 606 U.S. 522, 559-60 (2025) (allowing pre-enforcement challenge to county's Board of Education policy of encouraging the use of certain education material without "specific allegations describing how the books are actually being used in classrooms" (citation modified)). With its arguments, the Government has failed to make a strong showing that the Plaintiff States do not face a "substantial risk" of incurring traditional pocketbook

- 11 -

injuries as a result of the EO and thus must "wait and see" the exact logo or barcode that USPS will require for mail-in ballots before filing suit. Id.

Third, the district court concluded that the EO threatens the Plaintiff States and their officials with criminal penalties if they do not comply with its directives and that the "threat is sufficiently imminent for Article III injury." For example, reading Section 2(a) and 2(b) of the EO together, the court determined that the Plaintiff States faced a credible threat of criminal prosecution if they failed to use the DHS Citizenship Lists to verify voter eligibility in upcoming elections, even though the undisputed record demonstrated that those lists would necessarily be underinclusive when transmitted to the states. The court also discussed that Section 2(b)'s definition of individuals who are "eligible to vote in a Federal election" as limited to U.S. citizens who are "18 years of age or older by the date of the upcoming election" conflicted with laws in some states permitting certain 17-year-old residents to vote in federal primary elections. As a result, the court highlighted that officials in those Plaintiff States credibly feared prosecution for delivering ballots to eligible 17-year-old voters in connection with federal primary elections.

For its part, the Government has not explained why the district court's interpretation of the EO's text as threatening the Plaintiff States with criminal prosecution if they violate its directives is incorrect, other than to suggest that the DHS Citizenship Lists do not expressly "require the [Plaintiff] States to do anything." In making this argument, the Government reads each section of the EO in isolation and all but ignores Section 2(b). At the same time, it does not point to any precedent undermining the court's determination that it was required to interpret the EO as a whole, just as it would any statute.[8] Cf. Otero-Burgos v. Inter Am. Univ., 558 F.3d 1, 8 (1st Cir. 2009) ("Instead of culling selected words from a statute's text and inspecting them in an antiseptic laboratory setting, a court engaged in the task of statutory interpretation must examine the statute as a whole . . . ." (citation modified)). And other precedent supports the court's conclusion that the Plaintiff States face an imminent and credible threat of penalties if they do not use USPS-designed envelopes or permit voters who are not on the DHS-provided Citizenship Lists to vote in any federal election. See N.H. Lottery Comm'n v. Rosen, 986 F.3d 38, 50 (1st Cir. 2021) (explaining that "the threatened enforcement of a law may suffice" for standing even without "an actual arrest, prosecution, or other enforcement action" (citation modified)).

Importantly, in challenging the district court's interpretation of the EO, the Government overlooks that the EO expressly targets state and local officials, both overall and in numerous

_____

[8] Our dissenting colleague would grant the stay as to the portions of the district court's judgment concerning Section 2(a) and, in part, 2(b), on the ground that those specific provisions of the EO do not inflict any injury on the Plaintiff States. The district court, however, read Section 2(b) as enforcing Section 2(a), based on both the EO's text and the Government's concessions. And in its stay motion to our court, the Government never argued or explained why it would be likely to succeed in showing that the Plaintiff States could not challenge Section 2(a) and part of 2(b) even if they had standing to challenge the rest of the EO. See American Federation of Government Employees Local 2305 v. U.S. Dep't of Veterans Affs., 177 F.4th 1, 11 n.2 (1st Cir. 2026) (noting that we do not rule on jurisdictional arguments that are not raised when "considering whether to stay an order's operation" (citation modified)).

- 12 -

subsections. See 91 Fed. Reg. at 17125-27 (Sections 2, 3, and 5). The EO also expressly directs "the investigation and, as appropriate, the prosecution of State and local officials" who violate federal law, invites referral to the Attorney General of any such violations by "State or local election officials" or "States or localities, including any instrumentalities thereof," and threatens the withholding of funding. Id. at 17126-27 (Sections 2(b) and 5). The Government does not explain why the district court's reading of the EO is incorrect given these provisions.

The Government's stay arguments on this issue are further undermined by its representations before the district court. In fact, the Government repeatedly indicated below that the DHS Citizenship Lists could be used to "facilitate . . . post-election law-enforcement activity," including prosecuting violations of laws that "explicitly prohibit non-citizens from registering to vote." (Quoting 91 Fed. Reg. at 17125.) And when the district court asked whether the Government would have probable cause to prosecute a state official merely for sending a ballot to someone not on the DHS Citizenship Lists, the Government's counsel equivocated, stating: "I don't know the answer to that question, Your Honor." State and local officials are no exception to the commonsense rule that "[p]eople do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around." Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 68 (1963); see also Dep't of Com. v. New York, 588 U.S. 752, 785 (2019) (explaining that, in their legal rulings, courts "are 'not required to exhibit a naiveté from which ordinary citizens are free'" (quoting United States v. Stanchich, 550 F.2d 1294, 1300 (2d Cir. 1977))). Thus, the Government has not met its burden to show that it is likely to succeed on appeal in demonstrating that none of the injuries to the Plaintiff States credited by the district court were sufficient to establish an Article III controversy.

Finally, the Plaintiff States oppose the Government's request for a stay by arguing that the EO "burdens [their] sovereign interests by interfering with their ability to carry out state laws regarding mail voting and voter eligibility." Although the district court did not address the Plaintiff States' sovereign interests in its standing analysis, it did recognize throughout its ruling that states have a unique and primary role in administering elections, including federal elections. See U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 805 (1995) (observing that the Constitution "express[ly] delegat[es] . . . power to the [s]tates to act with respect to federal elections").

The EO directs unprecedented levels of involvement by federal officials in how states administer elections. In doing so, the EO plainly affects the Plaintiff States' "sovereign power . . . to create and enforce a legal code" for elections. Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez, 458 U.S. 592, 601 (1982). Regardless of the details of how federal officials implement the EO, at its core, the EO contemplates that states will have to coordinate with DHS and USPS to ensure that various lists, whether maintained by the agencies or the states, reflect current mail-voter information (which can change daily up until Election Day), or else risk disenfranchisement for certain voters and penalties for states and their officials. The Supreme Court has held that political candidates have standing to challenge mail-voting rules because of their "interest in a fair process." Bost v. Ill. State Bd. of Elections, 607 U.S. 71, 77 (2026). In Bost, it noted that the "untenable" and "undemocratic" consequences of waiting to hear "election disputes . . . shortly before election day" weighed in favor of adjudication even before the rules'

- 13 -

effects on the plaintiffs had come into full view. <u>See id.</u> at 79-80. We see no reason to treat the Plaintiff States' similar interests, which the EO will impact well <u>before</u> Election Day, any differently. Thus, these considerations further undermine the Government's ability to make a strong showing that it will likely succeed on its standing arguments on appeal.

### 2. Prudential Ripeness

We turn next to the intervenor states' separate prudential ripeness argument. Although the federal defendants address standing and ripeness together, focusing on the injury-in-fact requirement, the intervenor states contend that we should grant a stay because the "prudential ripeness doctrine[]" bars our review of the Plaintiff States' claims about the 2026 primary and general elections. But the intervenor states fail to develop any argument why, if they are wrong on the injury-in-fact analysis, they can nevertheless make a "strong showing" that they will succeed on their prudential ripeness contentions on appeal. <u>Washington</u>, 171 F.4th at 488 (quoting <u>Nken</u>, 556 U.S. at 434).

The "prudential component[s]" of the ripeness doctrine are twofold: (1) "whether resolution of the case turns on 'legal issues not likely to be significantly affected by further factual development'" and (2) "whether the challenged action creates a 'direct and immediate' dilemma for the parties." <u>Algonquin Gas Transmission, LLC</u> v. <u>Weymouth</u>, 919 F.3d 54, 62 (1st Cir. 2019) (first quoting <u>Ernst & Young</u> v. <u>Depositors Econ. Prot. Corp.</u>, 45 F.3d 530, 536 (1st Cir. 1995); and then quoting <u>W.R. Grace & Co.--Conn.</u> v. <u>EPA</u>, 959 F.2d 360, 364 (1st Cir. 1992)). We note that the Supreme Court has left uncertain the doctrine's "continuing vitality." <u>Susan B. Anthony List</u> v. <u>Driehaus</u>, 573 U.S. 149, 167 (2014).

Turning to the contentions in the stay motion, the intervenor states make no argument that the EO does not create a "direct and immediate dilemma for" the Plaintiff States. <u>Algonquin Gas Transmission, LLC</u>, 919 F.3d at 62 (citation modified). Instead, they contend that the Plaintiff States' "theories of injury turn on speculation about future events." They do not clarify, however, how that argument differs, if at all, from their standing argument, which we addressed above. Otherwise, the intervenor states point to factual uncertainties having to do with the precise contents of USPS's final rule. But the Plaintiff States do not challenge the final (or any) rule; instead, they challenge the EO as exceeding the President's authority under the Constitution. The intervenor states fail to identify which of the "legal issues" comprising <u>that</u> decision require further factual development. For example, they fail to explain why the President's power to issue the EO is not a "purely legal question[]." <u>Sidak</u> v. <u>U.S. Int'l Trade Comm'n</u>, 174 F.4th 151, 158 (D.C. Cir. 2026). And any implication that this case lacks "final agency action," which is a prerequisite for judicial review under the Administrative Procedure Act (APA), is not dispositive when the Plaintiff States have not brought an APA action and "rel[y] on an implied constitutional right of action in equity" that has "no finality requirement." <u>Id.</u>

Thus, the intervenor states have not made a strong showing that they are likely to prevail on their prudential ripeness arguments on appeal.

- 14 -

## B. Remaining Stay Factors

Because the federal defendants and the intervenor states have failed to make a strong showing on their likelihood of success on the merits of their appeals, we briefly address the remaining three <u>Nken</u> factors and conclude that they also do not favor a stay.

To start, the irreparable injury arguments offered by the federal defendants and the intervenor states do not persuade us that a stay is warranted. For their part, the federal defendants argue that the injunction will hinder their efforts to comply with the EO's deadlines in time for the upcoming 2026 elections. Relatedly, the intervenor states contend that the injunction will compromise their ability to ensure that their voters' mail-in ballots are securely delivered and counted. But the district court's injunction does not prevent the federal defendants from implementing the EO for the 2026 federal elections in states other than the Plaintiff States, including in the intervenor states. And, of course, the district court's injunction does nothing to prevent the federal defendants from taking steps today to implement the EO for federal elections in all states after November 3, 2026. The federal defendants do maintain that a "two-tiered system" of mail-ballot rules poses "operational confusion" for USPS, but the only statement in the record supporting this claim is entirely conclusory. They do not explain why an online USPS portal cannot be used by some states and not others or why, in a regional post office system, it is impossible to direct changes to how election mail is handled in certain states. See <u>New York</u>, 133 F.4th at 72 (concluding that the defendants' "speculative and conclusory statements" failed to meet their burden of showing irreparable injury); <u>cf.</u> <u>Nken</u>, 556 U.S. at 434-35 ("Simply showing some possibility of irreparable injury fails to satisfy the second factor." (citation modified)). To be sure, the injunction prevents the federal defendants from enforcing the EO in the Plaintiff States' upcoming primary and general federal elections in September and November. But even assuming that restriction will lead to irreparable harm, it does not overcome the federal defendants' failure to meet their burden on the other <u>Nken</u> factors.

Turning to the substantial injury to the other interested parties, neither the federal defendants nor the intervenor states grapple with the numerous "'immediate, predictable' harms" that the Plaintiff States would face absent the injunction. <u>Washington</u>, 171 F.4th at 493 (quoting <u>R.I. State Council of Churches</u> v. <u>Rollins</u>, 158 F.4th 304, 316 (1st Cir. 2025)). As we have detailed above, the record reflects that the Plaintiff States would suffer multiple harms if the EO were enforced, including diversion of staff time to comply with the EO, pocketbook injuries, potential funding cuts and criminal prosecution of their officials, and sovereignty harms.

Finally, neither the federal defendants nor the intervenor states presented any argument on the fourth stay factor, the public interest, thus waiving any argument on that aspect of the <u>Nken</u> analysis. <u>See</u> <u>United States</u> v. <u>Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990). In any event, eligible voters have a "strong interest in exercising the fundamental political right to vote." <u>Purcell</u> v. <u>Gonzalez</u>, 549 U.S. 1, 4 (2006) (citation modified). The undisputed summary judgment record indicates that, were the EO to take effect for the elections taking place in September and November, it would sow confusion and threaten disenfranchisement of many eligible voters. And given that the Government "make[s] <u>no</u> argument that [its] actions were legal on the merits," and "there is generally no public interest in the perpetuation of unlawful [government] action," the public

- 15 -

interest does not favor a stay. <u>Rhode Island</u> v. <u>Trump</u>, 155 F.4th 35, 50 (1st Cir. 2025) (citation modified).

**IV. CONCLUSION**

For all these reasons, we **<u>deny</u>** the motions to stay.[9]

**DUNLAP, <u>Circuit Judge</u>, concurring in part and dissenting in part.** I conclude that the Government and the Intervenor States have shown that Plaintiff States likely lack standing to challenge certain, though not all, aspects of Executive Order 14399 (the "EO"). 91 Fed. Reg. 17125 (Mar. 31, 2026); <u>see</u> <u>TransUnion LLC</u> v. <u>Ramirez</u>, 594 U.S. 413, 423 (2021) (to establish standing, a party must demonstrate injury that is "concrete, particularized, and actual or imminent," that is "likely caused by the defendant," and that "would likely be redressed by judicial relief"); <u>see also</u> <u>Town of Chester</u> v. <u>Laroe Ests., Inc.</u>, 581 U.S. 433, 439 (2017) ("Our standing decisions make clear that 'standing is not dispensed in gross.'") (quoting <u>Davis</u> v. <u>Fed. Election Comm'n</u>, 554 U.S. 724, 734 (2008)). For the following reasons, I would grant in part and deny in part the motions to stay, staying the injunction insofar as it pertains to Section 2(a) and, in part, Section 2(b) of the EO. <u>See</u> <u>Nken</u> v. <u>Holder</u>, 556 U.S. 418, 425-26 (2009) (describing factors for granting a stay).[10]

The Government and Intervenor States are likely to succeed in challenging Plaintiff States' standing insofar as it relates to Plaintiff States' request for an injunction barring implementation of Section 2(a). That provision directs the Secretary of Homeland Security to "compile and transmit" to state election officials a list of United States citizens who will be eighteen years or older at the time of an upcoming federal election and who maintain a residence in the subject State (the "State Citizenship List"). Exec. Order § 2(a). Section 2(a) thus merely orders the provision of information to States; it does not order States, including Plaintiffs, to take any action based on the State Citizenship List. As one court has correctly noted, "nothing in Section 2(a) (or any other

---

[9] There are two pending motions for leave to file amici briefs in relation to the stay motions. We **<u>grant</u>** the motions, and the amici briefs are accepted for filing as of this date.

[10] There is no bar to granting the motions in part as the majority suggests. Although the Government and Intervenor States did not request a partial stay, they addressed the asserted injuries to Plaintiff States from the various provisions of the EO (as they did below) and sought a stay based on the argument that Plaintiff States failed to identify actual or imminent injury from each provision. <u>Cf.</u> <u>Am. Fed'n of Gov't Emps. Loc. 2305</u> v. <u>U.S. Dep't of Veterans Affs.</u>, 177 F.4th 1, 11 n.2 (1st Cir. 2026) (declining to reach an argument not raised in a party's primary brief in this court or below). Disagreement with some arguments raised by the parties does not mandate rejection of the arguments in their entirety; we can grant less than the requested relief. <u>See, e.g.</u>, <u>Nat'l Insts. of Health</u> v. <u>Am. Pub. Health Ass'n</u>, 145 S. Ct. 2658, 2658 (2025) (granting in part and denying in part an application for stay, notwithstanding the government's request for a stay in entirety).

- 16 -

part of the [EO]) purports to require any State to do anything with the State Citizenship List it is provided, let alone to remove otherwise eligible individuals on State voter registration lists." DSCC v. Trump, 26-cv-01114, 2026 WL 1487833, at *6 (D.D.C. June 4, 2026). Provision of a State Citizenship List for informative purposes, allowing (but not requiring) States to use the list as a resource to check their own voter registration rolls, would cause Plaintiff States no injury. Because any injury from the compilation and distribution of State Citizenship Lists is thus speculative and hypothetical, Plaintiff States can show no harm stemming from that provision and lack standing to challenge Section 2(a). See Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013) (noting that "threatened injury must be certainly impending to constitute injury in fact" (quoting Whitmore v. Arkansas, 495 U.S. 149, 158 (1990))); see generally Katz v. Pershing, LLC, 672 F.3d 64, 79 (1st Cir. 2012) (standing absent where harm was "purely theoretical" and "d[id] not rise to the level of a reasonably impending threat").

My colleagues raise enforcement concerns, citing Section 2(b), as the basis for concluding that the Government and the Intervenor States have failed to show a likelihood of success as to their challenge to Plaintiff States' standing regarding Section 2 generally. That provision directs the Attorney General to prioritize investigation and prosecution of State and local officials "who issue Federal ballots to individuals not eligible to vote in a Federal election." Exec. Order § 2(b).[11] "[E]ligible to vote in a Federal election" is in turn defined to include "citizen[s] of the United States, 18 years of age or older by the date of the upcoming election, and otherwise qualified" to vote under state law. Id. I agree that imminent enforcement of a voting-age requirement (not established by federal statute) that conflicts with certain States' laws permitting voting by certain 17-year-olds in primaries suggests that those States would have standing to challenge that aspect of Section 2(b). See Susan B. Anthony List v. Driehaus, 573 U.S. 149, 159 (2014) (explaining that the injury-in-fact component of standing exists where "threatened enforcement" of a law is "sufficiently imminent"). But that does not mean that all Plaintiff States have standing to challenge Section 2(b) insofar as it relates to enforcement of laws banning voting by noncitizens. There is no question under federal law that noncitizens are not allowed to vote, see 18 U.S.C. § 611, and States have no standing to challenge the Executive Branch's discretionary decision to prioritize enforcement of such laws, see generally United States v. Texas, 599 U.S. 670, 678 (2023) ("[T]he Executive Branch possesses authority to decide 'how to prioritize and how aggressively to pursue legal actions against defendants who violate the law.'" (quoting TransUnion LLC, 594 U.S. at 429)). Nor does it mean that the potential use of State Citizenship Lists in enforcement actions gives rise to actual or imminent injury under Section 2(a). There are no immediate deadlines that require States to do anything in relation to the State Citizenship Lists; and the opportunity for

---

[11] It is not clear what is meant by "Federal election." Arguably, it may be limited to general elections. See generally Exec. Order § 2(b) (referencing "the date of the upcoming election"); 2 U.S.C. § 7 (establishing the Tuesday after the first Monday in November in even numbered years "as the day for the election"). Another reading is also possible, however; at least in the context of campaign finance, "election" refers not only to general elections but also primaries for federal offices. See 52 U.S.C. § 30101(1)(A). The government has not urged a narrowed definition in response to the Plaintiff States' arguments regarding the potential scope and application of the EO to primaries, so I will assume that Section 2(b) applies to primary elections.

- 17 -

States to supplement those lists, see Exec. Order § 2(a), means that the prospect of any use of the lists to wrongfully prosecute state or local officials for allowing eligible voters to exercise their right to vote is purely speculative. See Clapper, 568 U.S. at 409.

The contrast between Sections 2(a) and 3 of the EO reinforces this conclusion, while also leading to the conclusion that the Government and Intervenor States failed to establish likelihood of success regarding Plaintiff States' standing as to Section 3. Section 3 requires the Postmaster General to initiate rulemaking that would include provisions (1) requiring States to use specified mail-in ballot envelopes, Exec. Order § 3(b)(i), and (2) precluding the United States Postal Service from transmitting mail-in or absentee ballots that are not included in "State-specific Mail-In and Absentee Participation List[s]" (which are separate and distinct from the State Citizenship Lists to be compiled by the federal government under Section 2), id. § 3(b)(ii)-(v). In turn, the proposed rules promulgated by the Postmaster General provide new standards for ballot envelope design, allow States to submit State-specific Mail-In and Absentee Participation Lists, and would limit the distribution of mail-in ballots to individuals included in such lists. 91 Fed. Reg. 32915, 32915-16. Generally, possible future injury based on proposed rulemaking cannot establish standing. See generally Trump v. New York, 592 U.S. 125, 129-131, 134 (2020) (holding that where President issued a memorandum to the Secretary of Commerce that "announced a policy of excluding 'from the apportionment base aliens who are not in a lawful immigration status'" for the 2020 census, challenges to that memorandum were "premature" because "[a]ny prediction how the Executive Branch might eventually implement th[at] general statement of policy [wa]s 'no more than conjecture' at th[at] time" (quoting Los Angeles v. Lyons, 461 U.S. 95, 108 (1983))). But the proposed changes set forth in the EO have more than speculative future effect. As explained by my colleagues, Plaintiff States are already preparing for the impending November 2026 elections and preceding primaries -- as they must. See generally Merrill v. Milligan, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring). Because many Plaintiff States have already ordered mail-in ballot envelopes that would have to be quickly replaced and would have to promptly provide the federal government with State-specific Mail-In and Absentee Ballot Lists to avoid disruptions in the mail-in balloting process for the November 2026 elections and any prior elections, the uncontested record suggests that Plaintiff States must necessarily take initial steps to comply with these proposed rules as framed by the EO even prior to the promulgation of the anticipated regulations. Thus, although final regulations must normally exist before standing can arise, the specificity of the EO's stated timelines and the inescapable legal requirements and impending deadlines that States currently face in facilitating mail-in and absentee balloting for immediately upcoming elections together establish sufficient concrete injury from the EO in this unusual case. Unlike Section 2(a), therefore, the Government and Intervenor States have failed to show a substantial likelihood of success as to their argument that Plaintiff States will not suffer actual or imminent harm sufficient to establish standing to challenge Section 3.[12] See Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992).

---

[12] Because the Government and Intervenor States mount no substantive defense of Section 3, they have no other basis to demonstrate likelihood of success as to the injunction barring implementation of that provision.

The remaining stay factors -- irreparable harm, harm to interested parties, and the public interest, Nken, 556 U.S. at 434 -- largely flow from the assessment of likelihood of success on the merits.  Where Section 2(a) of the EO does not command Plaintiff States to do anything, they have suffered no certain harm at present, much less irreparable harm.  See DSCC, 2026 WL 1487833, at *13; see generally Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008) (requiring plaintiffs to "demonstrate that irreparable injury is likely in the absence of an injunction").  The Government, however, would be harmed absent a stay of the injunction of Section 2(a) and, in part, Section 2(b) because it would be prevented from taking steps that may provide States with further resources for purposes of the November 2026 election and from enforcing valid federal laws.  See League of Women Voters of U.S. v. Newby, 838 F.3d 1, 9 (D.C. Cir. 2016) (noting that there can be "no do over" once the registration deadlines from an election have passed (quoting League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 247 (4th Cir. 2014))); Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Loc. Lodge 207 v. Raimondo, 18 F.4th 38, 47 (1st Cir. 2021) ("[A]ny time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (quoting Maryland v. King, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)) (alterations in original)).  The contrary is true as to Section 3, as well as Section 2(b) insofar as it affects States permitting certain 17-year-olds to vote in primaries; Plaintiff States would suffer irreparable harm, for instance, if they were unable to timely comply with various mail-in ballot deadlines.  See Merrill, 142 S. Ct. at 880 (Kavanaugh, J., concurring).  This harm outweighs the Government's countervailing interests.  The public interest factor largely reflects the same balancing of harms and does not separately counsel a different result.

With respect, I concur in part and dissent in part.

By the Court:

Anastasia Dubrovsky, Clerk

cc:  Hon. Indira Talwani, Robert Farrell, Clerk, United States District Court for the District of Massachusetts, Ian D. Prior, Alexander Barrett Bowdre, Louis Joseph Capozzi III, Graham Miller, John Michael Patton, Benjamin S. Gilberg, David M.S. Dewhirst, James A. Barta, James R. Rodriguez, Kelsey L. Smith, Christian B. Corrigan, Cody S. Barnett, Garry M. Gaskins II, Joseph David Spate, Grant Michael Flynn, Monroe David Bryant Jr., Donald Campbell Lockhart, Rayford A. Farquhar, Abraham R. George, Laura Myron, David C. Kravitz, Michael Patrick Moore Jr., Jared B. Cohen, Vanessa Arslanian, Jennifer Utrecht, Heidi Parry Stern, Kiel Ireland, Ian Fein, Thomas Patterson, Aaron Daniel Pennekamp, Anne P. Bellows, Kevin Lee Quade, Lisa Catherine Ehrlich, Malcolm Andreas Brudigam, Michael Surren Cohen, Samuel Thomas Harbourt, Robert William Setrakian, Jane Reilley, Nicholas W. Brown, Cristina Sepe, Syreeta Tyrell, Karen J. Hartman-Tellez, Shannon Wells Stevenson, Peter Baumann, William M. Tong, Maura Bridget Murphy, Vanessa L. Kassab, Ian R. Liston, Caroline S. Van Zile, Alex Hemmer, Katherine Thompson, Virginia Anne Williamson, Neil Giovanatti, Erik Grill, Angela Behrens, Allen Barr, Joshua Paul Bohn, Meghan Musso, Jonathan B. Mangel, James Grayson, Bailey Colfax, Barbara D. Underwood, Rabia Muqaddam, Judith N. Vale, Daniel Paul Mosteller, Robert A. Koch, Daniel A. Rayfield, James J. Arguin, Kyla Duffy, Ryan P. Kane, Tillman J. Breckenridge, Lynn Kristine

- 19 -

Lodahl, Michael J. Fischer, Inga S. Bernstein, Richard D. Bernstein, Jonathan Benjamin Miller, Raphael Kalikstein, Carey Dunne, Mónica Pilar Folch, Charanya Krishnaswami, Jason J. Muehlhoff, J. Benjamin Aguiñaga, Stephen Michael Pezzi, Esam Al-Shareffi, Jak Kundl, Robert Bonta, Seth Goldstein, L. Nicole Allan, Aaron D. Ford, Karl D. Smith, Tera M. Heintz, Kristin K. Mayes, Joshua M. Whitaker, Kara M. Karlson, Philip J. Weiser, Kathleen Jennings, Brian L. Schwalb, Eliza Simon, Kwame Raoul, Holly F.B. Berlin, Jane Elinor Notz, Vikas Didwania, Aaron M. Frey, Anthony G. Brown, Dana Nessel, Keith Ellison, Lindsey E. Middlecamp, Jennifer Davenport, Raul Torrez, Letitia James, Colleen K. Faherty, Jeffrey N. Jackson, Laura Howard, Thomas H. Castelli, Charity R. Clark, Jay Jones, Joshua L. Kaul, Charlotte Gibson, Jacob Boyer, Alex Goldstein, Matthew James O'Brien, Stephen S. Cha-Kim, Andrew James Rising, Emily Kirby, Allegra Chapman, Carlos Guevara, Inbar Pe'er, Julia Spiegel, Kevin Trowel, Zack Goldberg, Martha Reiser